UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>IRAQ AND AFGHANISTAN DETAINEES LITIGATION | Misc. No. 06-145 (TFH) |
| This document relates to:<br><br>ALI v. PAPPAS<br>ALI v. RUMSFELD<br>ALI v. KARPINSKI<br>ALI v. SANCHEZ | Civ. No. 05-cv-1377 (TFH)<br>Civ. No. 05-cv-1378 (TFH)<br>Civ. No. 05-cv-1379 (TFH)<br>Civ. No. 05-cv-1380 (TFH) |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS
(continued)

Page

INTRODUCTION ....................................................................................................1

STATEMENT OF THE CASE ..................................................................................3

SUMMARY OF FACTS ...........................................................................................4

ARGUMENT ............................................................................................................7

I.    TORTURE AND CRUELTY ARE UNIVERSALLY PROHIBITED UNDER
      THE CONSTITUTION AND LAW OF NATIONS THAT GOVERNMENT
      OFFICIALS AND MILITARY COMMANDERS HAVE A DUTY TO
      ENFORCE ........................................................................................................8

      A.    The Prohibition Against Torture and Cruel Treatment Is Unequivocal
            Under the Constitution and International Law as the Pronouncements of
            the Executive and Legislative Branches Acknowledge ........................8

      B.    Government Officials and Military Commanders Are Required to Prohibit
            Torture and Cruel Treatment under the Constitution and the Doctrine of
            Command Responsibility ....................................................................13

II.   THE CONSTITUTION PROHIBITS DEFENDANTS FROM SUBJECTING
      PLAINTIFFS TO TORTURE OR CRUEL TREATMENT ...........................16

      A.    Fundamental Constitutional Rights Protect Foreign Nationals Outside the
            United States under the Circumstances Presented Here .....................16

      B.    The United States Exercised Control over Iraq and Afghanistan and the
            U.S. Military Prisons ........................................................................24

      C.    Defendants' Authorities Do Not Refute Application of the Constitution in
            This Case ..........................................................................................30

III.  PLAINTIFFS' DAMAGES REMEDY IS PROPER UNDER BIVENS AND
      DEFENDANTS DO NOT SATISFY THE QUALIFIED IMMUNITY TEST .............35

      A.    Bivens "Special Factors" Do Not Bar a Damages Remedy ................36

            1.    Judicial Action Is Proper .......................................................37

            2.    Congress Has Not Displaced the Bivens Remedy Here ..........43

      B.    This Case Does Not Present A Political Question ..............................47

      C.    Defendants Are Not Entitled to Qualified Immunity .........................53

IV.   THE FEDERAL TORT CLAIMS ACT IS NOT THE EXCLUSIVE REMEDY
      FOR PLAINTIFFS' INTERNATIONAL LAW CLAIMS ............................59

      A.    Westfall Substitution On Its Face Does Not Apply To Plaintiffs' Claims
            For Declaratory Relief Under International Law ................................61

# TABLE OF CONTENTS
(continued)

**Page**

B.     The Westfall Act Does Not Cover Intentional, Egregious Torts In Violation Of The Law Of Nations And The Fourth Geneva Convention............62

C.     The Westfall Act Does Not Apply Because Defendants Were Not Acting Within The Scope Of Employment ...................................................................67

D.     Plaintiffs' Claims Based on the ATS and the Fourth Geneva Convention Fall Within The Westfall Act's Exception For Statutory Actions .....................72

    1.     Plaintiffs' International Law Claims Under the ATS Fall Within the Westfall Act's Statute Exception .....................................................73

    2.     Plaintiffs' Claims Under The Fourth Geneva Convention Fall Within the Westfall Act's Statute Exception...........................................76

V.     PLAINTIFFS' RIGHTS UNDER THE FOURTH GENEVA CONVENTION ARE JUDICIALLY ENFORCEABLE ...................................................................77

A.     The Fourth Geneva Convention is Self-Executing.............................................78

B.     The Fourth Geneva Convention Provides a Private Right of Action .................82

VI.     PLAINTIFFS HAVE STANDING TO SEEK DECLARATORY RELIEF ON ALL CLAIMS..............................................................................................................85

CONCLUSION ......................................................................................................................89

## <u>TABLE OF AUTHORITIES</u>

**Page**

## INTRODUCTION

Plaintiffs are innocent Iraqi and Afghan civilians who were tortured in U.S. military prisons and detention facilities under the exclusive custody and control of the United States in Iraq and Afghanistan. The torture of detainees in U.S. custody was widespread and systemic and occurred over lengthy periods of time. It was widely documented and reported by the military's own investigators, the International Committee of the Red Cross, non-governmental organizations and the national press.

In Defendants' view, even plaintiffs who prove that they were tortured in U.S. military custody and further prove that high-ranking U.S. officials are responsible for that abuse must nonetheless be barred from any judicial remedy in United States courts. If accepted, Defendants' view would leave the Executive with unilateral authority to order or permit the most horrific acts. Defendants' position cannot be sustained, and it is contrary to longstanding judicial precedent as well as pronouncements of the Executive and Congress, which support Plaintiffs' submission that the Constitution and laws apply to the issues presented in this case.

This suit alleges that Defendants bear legal responsibility for that abuse under the Constitution, laws, and treaties of the United States. Defendants issued orders and authorizations that caused the widespread torture and—wholly independent of those orders—failed in their legal duty to stop and prevent the torture and abuse of detainees they knew or had reason to know was being committed by subordinates under their command. The Constitution and laws do not permit U.S. government officials or high-ranking military commanders to formulate policies that violate fundamental rights, implement such policies systematically in territories under U.S. control, abdicate their duty to prevent violations of law, and then be entirely insulated from legal accountability.

Defendants do not and cannot dispute that they have an absolute duty to prohibit and prevent torture.  Nor can they contest that they are required to conform to the military laws and regulations that categorically prohibit such abuse.  Defendants, who must accept all allegations as true for purposes of this motion, nonetheless argue that Plaintiffs cannot pursue any legal action and that all their claims must be dismissed.  Defendants insist that they are completely immune from suit on the grounds that the prohibition against torture of foreign nationals does not violate the Constitution, that liability for damages is an impermissible intrusion into the operation of the military, that the prohibitions against torture and abject cruelty were not sufficiently clear, that their actions were within the scope of their employment, and that Plaintiffs lack standing for declaratory relief.

As shown below, precedent compels the conclusion that the fundamental constitutional rights asserted by Plaintiffs apply under the circumstances presented here.  A damages remedy to enforce the constitutional right against torture does not intrude on military operations because the very conduct that Plaintiffs allege is already prohibited by the military's own laws.  The claims of qualified immunity likewise fail because the conduct at issue here has been unlawful for generations and there is no good faith "margin of error" for Defendants' actions that the courts must protect.  For related reasons, Defendants are precluded from substituting the United States and asserting its sovereign immunity to escape individual liability under the law of nations and the Fourth Geneva Convention where their conduct violates the universal norm against torture.  Finally, even if all the damages claims were barred, Plaintiffs have standing and are entitled to declaratory relief on the constitutional and international law claims.

Defendants may choose to dispute the allegations on which Plaintiffs base their claims or to contest the legal grounds that Plaintiffs seek to enforce. But Defendants cannot obtain dismissal of Plaintiffs' suit at this stage and thereby avoid any adjudication of their liability.

## STATEMENT OF THE CASE

These four consolidated actions were transferred to this Court for pretrial proceedings pursuant to 28 U.S.C. § 1407. On January 5, 2006, Plaintiffs filed a Consolidated Amended Complaint for Declaratory Relief and Damages (hereinafter "Am. Compl."). Five of the Plaintiffs are Iraqi nationals who were detained and tortured in U.S. military custody in Iraq. Four of the Plaintiffs are Afghan nationals who were detained and tortured in U.S. military custody in Afghanistan. All nine Plaintiffs have brought this action against Defendant Rumsfeld in his official and his individual capacity for damages and declaratory relief. The five Iraqi Plaintiffs have also brought actions against Defendants Sanchez, Karpinski and Pappas in their individual capacities.

Plaintiffs collectively assert that the Defendants' actions violated the prohibition against torture and other cruel treatment under the Constitution, the law of nations and the Fourth Geneva Convention.[1] Plaintiffs seek damages under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); the law of nations and the Fourth Geneva Convention pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350; and directly under the Fourth Geneva Convention. Plaintiffs seek declaratory relief on all

---

[1] In this Opposition, the terms "torture and other cruel treatment" and "torture and other abuse" and similar variations refer to acts of unlawful torture and cruel, inhuman or degrading treatment as prohibited under the Constitution and binding international law.

claims.  Defendants filed separate motions to dismiss all claims on March 6, 2006.  Plaintiffs

submit this consolidated brief responding to Defendants' arguments.[2]

## SUMMARY OF FACTS

On a motion to dismiss, allegations in the complaint must be accepted as true and

construed in the light most favorable to plaintiffs.  *Leatherman v. Tarrant County Narcotics*

*Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993); *Ctr. for Law & Educ. v. Dep't of*

*Educ.*, 396 F.3d 1152, 1156 (D.C. Cir. 2005).  Drawing on voluminous documentary evidence,

the Amended Complaint sets forth Plaintiffs' allegations in extensive detail.  It does not, of

course, reflect all of the evidence that would be available at trial.

Plaintiffs are non-combatant innocent civilians who were brutally tortured and abused

while in the custody of the United States military in U.S. military prisons in Iraq and Afghanistan

during 2003 and 2004.  Am. Compl. at ¶¶ 17-25, 173-210.  The Iraqi Plaintiffs were abused at

Abu Ghraib prison and other U.S. military facilities.  *Id.* at ¶¶ 189, 194, 204, 208.  After being

subjected to horrific abuse, each Plaintiff was released without ever being charged or prosecuted

in any way by the United States.  *Id.* at ¶ 169.  Plaintiffs were not engaged in any hostilities

against the United States and pose no threat.  *Id.*

Among the abuses Plaintiffs suffered are mutilation, isolation in wooden boxes after

being stripped and hooded, sexual assault and humiliation with threats of anal rape, mock

execution and death threats, severe beatings, intentional prolonged exposure to extreme

temperatures, prolonged sleep deprivation through beatings, deprivation of adequate food and

water, intimidation with snarling dogs, forced painful stress positions such as hanging from the

ceiling by their arms, and sensory deprivation.  Am. Compl. at ¶¶ 173-210.

---

[2] Plaintiffs are simultaneously filing a separate response to Defendant Pappas's individual
motion to dismiss for lack of personal jurisdiction.

The torture of Plaintiffs is part of a pervasive pattern of abuse and torture in U.S. military prisons in Iraq and Afghanistan that has taken place over a lengthy period of time and has been documented in numerous reports of the United States military, the International Committee of the Red Cross ("ICRC"), major non-governmental organizations and national press. *See* Am. Compl. at ¶¶ 211-26.

Such reports confirm that United States military personnel began engaging in a pattern of abuse in Afghanistan soon after the United States commenced military operations in that country in late 2001. Am. Compl. at ¶ 212. Detainees in U.S. custody were severely beaten, forced into painful and contorted positions for hours or days, and chained to the ceilings of isolation cells for prolonged periods of time. *Id.* at ¶ 214. They were kept naked for prolonged periods, sexually abused and humiliated, terrorized with dogs, and subjected to sleep deprivation, solitary confinement, and sensory deprivation. *Id.* In some cases, detainees died as a result of torture and abuse. *Id.* at ¶¶ 215-16.

These reports likewise confirm that the Plaintiffs' abuse and torture was part of a systemic and widespread pattern of torture and abuse of detainees in U.S. military custody. Torture and abuse occurred at Abu Ghraib and numerous other U.S. detention facilities in Iraq and Afghanistan. Am. Compl. at ¶¶ 212-21. Among other findings, the ICRC found that detainees held in United States custody in multiple U.S. military detention facilities in Iraq were beaten, slapped, punched, kicked, exposed to severe heat and sun for prolonged periods, forced into "stress" positions for lengthy periods, chained to the ceilings naked, stripped naked and in public view with arms raised or with women's underwear over their heads, kept naked in solitary confinement, threatened with death and reprisals against family members, and subjected to mock executions and sensory deprivation. *Id.* at ¶ 220. Military reports also confirm the abuses

committed by U.S. soldiers in Iraq.  *Id.* at ¶ 221.  Military sources and ICRC reports estimated that 70 to 90% of persons detained in Iraq by U.S. military forces had been arrested by mistake. *Id.* at ¶ 11.

Each Defendant had command and control over some or all of the military personnel who tortured and abused Plaintiffs.  Defendant Rumsfeld has, and had at all relevant times, command and control over all members of the U.S. military.  Am. Compl. at ¶ 27.  Defendant Sanchez was, at relevant times, commander of all U.S. military personnel in Iraq.  *Id.* at ¶ 28.  Defendant Karpinski was, at relevant times, commander of all U.S. military personnel in Iraq responsible for the care and control of detainees in U.S. custody.  *Id.* at ¶ 29.  Defendant Pappas was, at relevant times, commander of all U.S. military personnel at Abu Ghraib prison.  *Id.* at ¶ 30.

The complaint details the direct and personal involvement of Defendant Rumsfeld and the other Defendants in setting interrogation policies and practices that authorized abusive techniques and that foreseeably caused this torture and abuse.  Am. Compl. at ¶¶ 49-100.  The complaint further alleges that, wholly apart from their own direct orders and authorizations, Defendants knew or should have known of the abuse and torture of detainees in U.S. military custody in Iraq and Afghanistan.  *Id.* at ¶¶ 101-02, 105-53.  Defendant Rumsfeld was repeatedly notified of the ongoing abuse and torture over a lengthy period of time.  *See id.* at ¶¶ 105-53. Defendants Sanchez, Karpinski, and Pappas were also informed that detainees were being tortured and abused, and were present at Abu Ghraib during periods when soldiers under their command were abusing detainees.  *Id.* at ¶¶ 138-40, 144-47, 152.  Despite knowing or having reason to know of the ongoing and widespread detainee torture and abuse, Defendants failed to take reasonable and required measures to prevent or punish the abuse.  Am. Compl. at ¶¶ 103-04, 154-67.  Instead of taking required action against subordinates involved in detainee torture and

abuse, Defendants continued to assert authority to use harsh measures against detainees and created a climate in which torture and detainee abuse were condoned.  *See id.* at ¶¶ 154-57, 159, 160-61.

The policies and practices of Defendants at issue here continue.  Am. Compl. at ¶ 12. Plaintiffs remain at risk of being re-incarcerated and tortured by the United States military, some have been detained multiple times or actually threatened with re-detention, and all reasonably fear being detained and tortured again.  *Id.* at ¶¶ 48, 176, 180, 184, 188, 192-93, 197-98, 202-03, 207-08, 210.

## **ARGUMENT**

Torture and abject cruelty are absolutely prohibited under the Constitution and law of nations.  Civilian and military commanders have a legal duty, embedded in the Constitution, international law and the military's own laws and regulations not to order or allow torture or abuse and to take the necessary steps when they knew or should have known that their subordinates were engaging in it.  Defendants' actions, as well as their failures to fulfill their duties as commanders and supervisors, violated these core prohibitions and caused Plaintiffs' torture and abuse.

As detailed in Point I below, the Constitution and international law absolutely prohibit authorizing or condoning torture and cruelty under all circumstances.  Point II demonstrates that those prohibitions apply to this case.  Plaintiffs are innocent civilians incarcerated in U.S. military prisons under the exclusive control and authority of the United States in Iraq and Afghanistan, where the United States exercised control and where express provisions immunized U.S. personnel from local law.  Point III shows the *Bivens* damages remedy is proper, that the political question doctrine does not apply, and that qualified immunity cannot immunize Defendants from liability.  This case involves no intrusion into military affairs or second-

guessing of military judgment because Defendants' acts are and long have been universally

prohibited by law and the military's own regulations.  Point IV shows that Plaintiffs are entitled

to both declaratory relief and damages under the law of nations pursuant to the Alien Tort

Statute, and Point V shows that the Fourth Geneva Convention is an independent source of relief.

Point VI demonstrates that Plaintiffs have standing to seek declaratory relief on all claims.

I.      **TORTURE AND CRUELTY ARE UNIVERSALLY PROHIBITED UNDER THE
        CONSTITUTION AND LAW OF NATIONS THAT GOVERNMENT OFFICIALS
        AND MILITARY COMMANDERS HAVE A DUTY TO ENFORCE.**

        The Constitution's prohibitions against torture and cruelty are among the most basic and

categorical limits on the exercise of government power.  The law of nations also absolutely

prohibits torture and inhumane treatment.  Government officials and military commanders have a

duty to enforce those prohibitions under the Constitution and international law, as recognized by

the laws of the United States, the uniform pronouncements of Congress and the Executive, and

the military's own regulations.

        A.      **The Prohibition Against Torture and Cruel Treatment Is Unequivocal Under
                the Constitution and International Law as the Pronouncements of the
                Executive and Legislative Branches Acknowledge.**

        The constitutional and legal prohibitions against torture are not disputed by Defendants

nor could they be.  The prohibition against cruel and unusual treatment predates the Constitution

and reaches back to the English Bill of Rights of 1689.  *See Gregg v. Georgia*, 428 U.S. 153, 169

(1976).  For more than three centuries, Anglo-American jurisprudence has rejected the use of

torture and cruelty as a legitimate means of extracting information, *Ashcraft v. Tennessee*,

322 U.S. 143, 155 (1944), or inflicting punishment, *Gregg*, 428 U.S. at 173.  As the Supreme

Court has explained, while some regimes may "seize persons suspected of crimes against the

state, hold them in secret custody, and wring from them confessions by physical or mental

torture," *Ashcraft*, 322 U.S. at 155, the Constitution establishes a form of government in which

such torture and cruel treatment have no place.  "So long as the Constitution remains the basic

law of our Republic, America will not have that kind of government."  *Id.*

    The prohibition against torture and cruel mistreatment is embodied in the Due Process

Clause of the Fifth Amendment, which bars the government from subjecting individuals to

treatment that "shocks the conscience."  *Rochin v. California*, 342 U.S. 165, 172-73 (1952).  The

most fundamental purpose of the Due Process Clause is to "give protection against torture,

physical or mental" to all those subject to government power.  *Palko v. Connecticut*, 302 U.S.

319, 326 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1979); *see

also Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (plurality); *County of Sacramento v. Lewis*,

523 U.S. 833, 846-847 (1998).

    The Eighth Amendment imposes a fundamental bulwark against "'torture(s)' and other

'barbar(ous)' methods of punishment."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation

omitted); *see also Wilkerson v. Utah*, 99 U.S. 130, 136 (1878) ("punishments of torture . . . and

all others in the same line of unnecessary cruelty, are forbidden by that amendment to the

Constitution").  The Eighth Amendment prohibits punishments that, for example, "involve the

unnecessary and wanton infliction of pain."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981);

*Hudson v. McMillan*, 503 U.S. 1, 9-10 (1992).  Plaintiffs assert that both the Fifth and Eighth

Amendments are applicable here.  The protection against torture and abuse is fundamental to

both.[3]

---

[3] Defendants argue that Plaintiffs have not stated a claim under the Eighth Amendment because
they are not convicted prisoners and because in the domestic context, the Eighth Amendment
applies to convicted prisoners and the Fifth Amendment covers pre-trial detainees and those in
civil confinement.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  Even if only the Fifth
Amendment were applicable, the standard it imposes is at least as rigorous as the Eighth
Amendment for purposes relevant here.  *Brogsdale v. Barry,* 926 F.2d 1184, 1188 n.4 (D.C. Cir.
(footnote continued on next page)

The law of nations is equally absolute that torture is categorically prohibited.  The

torturer, "like the pirate and slave trader before him," is "*hostis humani generis*, an enemy of all

mankind."  *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980).  For decades this

fundamental prohibition has been recognized by U.S. courts as a core *jus cogens* norm

universally prohibited by the law of nations.[4]  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 728

(2004).

Furthermore, Defendants do not and cannot deny that the abuse of these Plaintiffs fails to

comply with the constitutional and international law standard defining torture and inhumane

treatment, or argue that the abuse can be condoned or defended.  Any such effort would be

squarely contrary not only to judicial precedent but also to the consistent pronouncements of the

Executive Branch and Congress, both of which have emphatically stated views that affirm

Plaintiffs' submission that the prohibition against torture applies to U.S. officials ordering,

allowing, or condoning torture at home and abroad.

As the Executive recently stated in a formal submission:

---

1991).  In any event, the facts pled by Plaintiffs make the Eighth Amendment applicable in this case and the claim, therefore, cannot be dismissed in a motion under Rule 12(b)(6).  Plaintiffs have alleged that the detention and abuse was a "form of summary punishment for perceived or alleged wrongdoing and constituted imposition of sentence of Plaintiffs without an adjudication of guilt."  Am. Compl. at ¶ 244.  That is sufficient to invoke the protections of the Eighth Amendment.  *See Ingraham v. Wright*, 430 U.S. 651, 669 n.37 (1977) ("Some punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment.").

[4] *Jus cogens* norms consist of a "handful of heinous actions" including bans on "torture, summary execution, genocide, and slavery."  *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935, 941 (D.C. Cir. 1988); *see also, Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992), *cert denied*, 507 U.S. 1017 (1993); Restatement (Third) of Foreign Relations Law § 702, cmt. n (identifying the prohibition of torture as a *jus cogens* norm).

> The United States is unequivocally opposed to the use and practice of torture. No circumstance whatsoever, including war, the threat of war, internal political instability, public emergency, or an order from a superior officer or public authority, may be invoked as a justification for or defense to committing torture. This is a longstanding commitment of the United States, repeatedly reaffirmed at the highest levels of the U.S. Government. All components of the United States Government are obligated to act in compliance with the law, including all United States constitutional, statutory, and treaty obligations relating to torture and cruel, inhuman or degrading treatment or punishment. The U.S. Government does not permit, tolerate, or condone torture, or other unlawful practices, by its personnel or employees under any circumstances. U.S. laws prohibiting such practices apply both when the employees are operating in the United States and in other parts of the world.

*See* Committee Against Torture, Consideration of Reports Submitted by States Parties Under Article 19 of the Convention: United States of America (May 6, 2005), U.N. Doc. CAT/C/48/Add.3 (2005) at 4, *available at* http://www.state.gov/g/drl/rls/45738.htm (accessed May 16, 2005).[5]

Congress too has condemned the torture and inhumane treatment of detainees in U.S. military custody overseas. In relation to Iraq specifically, Congress expressed its view that such conduct is prohibited by the Constitution, laws, and treaties of the United States:

---

[5] The Executive has consistently expressed this view. In 2004, President Bush reiterated the United States' commitment "to the worldwide elimination of torture." President's Statement on the U.N. International Day in Support of Victims of Torture, Office of the Press Secretary, White House (June 26, 2004), available at http://www.whitehouse.gov/news/releases/2004/06/20040626-19.html. *See also* Committee Against Torture, *Consideration of Reports Submitted by States Parties Under Article 19 of the Convention: United States of America* (Oct. 15, 1999), U.N. Doc. CAT/C/28/Add.5 (2000) at 5, *available at* http://www1.umn.edu/humanrts/cat/cat-reports2000.html (accessed May 16, 2006):

> United States law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on ground of exigent circumstances . . . or on orders from a superior officer or public authority, and the protective mechanism of an independent judiciary are not subject to suspension.

(a) SENSE OF CONGRESS. — It is the sense of Congress that —

* * *

(3) the abuse of persons in United States custody in Iraq
is appropriately condemned and deplored by the American
people;

* * *

(6) the Constitution, laws, and treaties of the United States and the
applicable guidance and regulations of the United States
Government prohibit the torture or cruel, inhuman, or degrading
treatment of foreign prisoners held in custody by the United States.

Reagan National Defense Authorization Act of 2005, Pub. L. No. 108-375, 118 Stat. 1811, 2068-

71 (codified at 10 U.S.C. § 801, stat. note §§ 1091(a)(3), (6)) (the "Reagan Act").[6]  Likewise, the

recent Detainee Treatment Act of 2005 ("DTA") provides:  "No individual in the custody or

under the physical control of the United States Government, regardless of nationality or physical

location, shall be subject to cruel, inhuman, or degrading treatment or punishment."[7]

Military law, regulations, and training also reiterate and implement the universal

prohibition against torture and abuse.  The Uniform Code of Military Justice, 10 U.S.C. § 890 *et*

*seq.,* criminalizes acts that constitute torture and other cruel treatment of detainees, and the

Army's regulations categorically prohibit such treatment.  Army regulations state in absolute

terms that inhumane treatment is "not justified by the stress of combat or with deep

provocation," Dep't of the Army, Army Regulation 190-8, Enemy Prisoners of War, Retained

Personnel, Civilian Internees and Other Detainees § 1-5(a)(4) (1997), and that torture and other

inhumane treatment are "not authorized and will not be condoned by the U.S. Army."  Dep't of

---

[6] The provision is reproduced in its entirety in Appendix A.

[7] National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 1403(a), 119
Stat. 3136, 3148-49 (codified at 42 U.S.C. § 2000dd).  The DTA is reproduced in Appendix B.

the Army, Intelligence Interrogation, Field Manual 34-52, ch. 1 at 1-8 (1992) ("Interrogation

Field Manual").[8]

   **B.    Government Officials and Military Commanders Are Required to Prohibit Torture and Cruel Treatment under the Constitution and the Doctrine of Command Responsibility.**

   Supervisors and military commanders are prohibited from engaging in or ordering torture

or abuse.  They are also duty-bound to prevent and prohibit such conduct by their subordinates.

Under the Constitution, the Fifth Amendment imposes liability on a supervisor when a

subordinate commits torture or other abuse that shocks the conscience if the supervisor (1) was

responsible for supervising the subordinates; (2) knew or had reason to know under the

circumstances that it was highly likely that the constitutional violation would occur; and

(3) failed to instruct the subordinate to prevent the constitutional violation.  *See, e.g.*, *Int'l Action

Center v. United States*, 365 F.3d 20, 25 (D.C. Cir. 2004); *Haynesworth v. Miller*, 820 F.2d

1245, 1261-62 (D.C. Cir. 1987).  Similarly, a supervisor is responsible for an Eighth Amendment

violation if he or she knows of and disregards a substantial risk of harm to a detainee, *Farmer v.

Brennan*, 511 U.S. 825, 838, 842 (1994), or when the supervisor is deliberately indifferent to a

subordinate's unlawful use of force, *Riley v. Olk-Long*, 282 F.3d 592, 595-97 (8th Cir. 2002).

---

[8] The relevant portion of the Army Field Manual is attached as Appendix C.  It provides that "illegal acts," including torture, "are not authorized and will not be condoned." It further states:
   Examples of physical torture include:
   • Electric shock.
   • Infliction of pain through chemicals or bondage (other than legitimate use of restraints to prevent escape).
   • Forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time.
   • Food deprivation.
   • Any form of beating.
   Examples of mental torture include:
   • Mock executions.
   • Abnormal sleep deprivation.
*Id.* at 1-8.

Like the Constitution, international and military law make a commander liable for the acts of subordinates under the doctrine of "command responsibility." When a commander "knew or should have known" that his subordinates "had committed, were committing or planned to commit" acts like torture, the commander has a duty "to prevent the commission" and "to punish the subordinates." *Estate of Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002).

The command responsibility doctrine arose after World War II and was specifically adopted by the Supreme Court in *In re Yamashita,* 327 U.S. 1, 16 (1946). It is an entrenched and central part of military law and training. Commanders have an "affirmative duty to take such measures as [are] within their power and appropriate in the circumstances to protect prisoners of war and the civilian population." *Id.* In *Yamashita*, the Court upheld the conviction and execution of a Japanese general after rejecting his claim that a military commander is liable only for acts that he or she commits directly. The Court held that a commander is liable when he permits or tolerates his subordinates to violate the laws of war. *Id.* at 15-16.

U.S. courts and the U.S. military have incorporated the command responsibility doctrine into U.S. law. *See Garcia*, 289 F.3d at 1288; *Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1996); *Hilao v. Estate of Marcos*, 103 F.3d 767, 777 (9th Cir. 1996).[9] As the Army Field

---

[9] *Garcia* set forth the three "essential elements of liability under the command responsibility doctrine" as "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." *Garcia*, 289 F.3d at 1288. This incorporation of the international law of command responsibility into U.S. domestic law is unremarkable. *See The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.").

Manual 27-10 expressly provides, a commander is "responsible if he has actual knowledge, or *should have knowledge*, through reports received by him or *through other means*, that troops or other persons subject to his control are about to commit or have committed a war crime and *he fails to take the necessary and reasonable steps* to insure compliance with the law of war or to punish violators thereof."  Dep't of the Army, Field Manual 27-10, The Law of Land Warfare, ch. 8, § 2, art. 501 (emphasis added).[10]   *See also* Interrogation Field Manual, ch. 1 at 1-9 ("[t]he commander is responsible for ensuring that the force under his command comply with [the Geneva Conventions].").

## II.    THE CONSTITUTION PROHIBITS DEFENDANTS FROM SUBJECTING PLAINTIFFS TO TORTURE OR CRUEL TREATMENT.

Notwithstanding the fundamental, longstanding and specific prohibitions against committing or allowing torture, and despite the allegations of Defendants' systemic violations, Defendants seek dismissal of this suit under Rule 12(b)(6) on the ground that Plaintiffs can state no conceivable claim, and that no possible judicial remedy can be available under the Constitution.  That position cannot be sustained.  Adopting Defendants' view would negate the most fundamental protections that the Constitution provides.

---

[10] Relevant portions of Army Field Manual 27-10 are attached as Appendix D.  The Manual reflects the worldwide norm to which the United States adheres.  In *Prosecutor v. Delalic*, Case No. IT-96-21-A, Judgment, ¶ 239 (Feb. 20, 2001), the International Criminal Tribunal for Yugoslavia ("ICTY") explained that "the relevant information only needs to have been provided or available to the superior . . . .  It is not required that he actually acquainted himself with the information."  The governing statutes of the ICTY and the International Criminal Tribunal for Rwanda both provide for the same command responsibility standard:  "The fact that [a violation] was committed by a subordinate does not relieve his superior of criminal responsibility if *he knew or had reason to know* that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof."  Statute of the International Criminal Tribunal for the Former Yugoslavia, S.C. Res. 827, U.N. Doc. S/Res/827 (1993), as amended Feb. 2006, art. 7(3); Statute of the International Criminal Tribunal for Rwanda, S.C. Res. 955, U.N. Doc. S/Res/955 (1994), as amended Mar. 2004, art. 6(3) (emphasis added).

Defendants cannot directly argue that the policies and practices of systemic torture and abuse alleged in the complaint are permissible under the Constitution.  They must concede that they are prohibited.  Their central contention is that the Constitution's prohibition cannot be invoked by these Plaintiffs because they are foreign nationals who were tortured outside the United States.  The Supreme Court has never held that the absolute protection against torture can be violated with constitutional impunity by government officials simply because the victim is a foreign national outside the United States.

To the contrary, longstanding Supreme Court case law as understood and affirmed by recent decisions of this District Court and the D.C. Circuit compels application of the constitutional prohibition against torture in this case, where the right asserted is fundamental and where the United States exercised exclusive and complete control over Plaintiffs in military prisons and similar facilities (collectively referred to as prisons hereafter) in territories under the particular authority of the United States where U.S. personnel were subject only to U.S. law.

A.     **Fundamental Constitutional Rights Protect Foreign Nationals Outside the United States under the Circumstances Presented Here.**

In determining the applicability of the Constitution outside our borders, the Supreme Court has historically found that the Constitution's *fundamental* rights are enforceable in territories that the United States controls.  None of the cases cited by Defendants refute that limited but core proposition.

The applicability of fundamental constitutional protections outside the borders of the United States was recently addressed by this District Court.  *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005).  The court concluded that under Supreme Court precedent, as Plaintiffs fully discuss below, a person outside the borders of the United States is protected by "fundamental constitutional rights" when the "territories [are] under the control of the American

538390.1

government" even though "the United States technically is not considered 'sovereign'" and in light of the consideration whether "adhering to constitutional rights outside of the United States would be 'impracticable and anomalous.'" 355 F. Supp. 2d at 463.

Application of the Constitution to areas beyond the borders of the United States derives from a series of Supreme Court decisions at the beginning of the 20th Century known as the *Insular Cases*. *See In re Guantanamo Detainee Cases,* 355 F. Supp. 2d at 454-56 (discussing line of cases). In the *Insular Cases*, the Supreme Court considered whether various constitutional provisions had force in overseas U.S. territories. The Court concluded that outside the United States, the "personal rights" of the territorial inhabitants could not be "unprotected by the provisions of our Constitution and subject to the merely arbitrary control of Congress." *Downes v. Bidwell*, 182 U.S. 244, 283 (1901) (holding that uniform tariffs clause of Article I, which is not a fundamental right, did not apply in Puerto Rico). Rather, in U.S. territories, citizens and non-citizens alike are protected from violations of their fundamental rights by U.S. government actions. "Even if regarded as aliens" in such territories, "they are entitled under the principles of the Constitution to be protected in life, liberty, and property." *Id.*

Thus, in *Territory of Hawaii v. Osaki Mankichi*, 190 U.S. 197, 221 (1903), the Supreme Court found that the "fundamental provisions of the Constitution" are, "by their own force," applicable overseas to U.S. territories. Similarly, in *Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922), the Court emphasized that the Constitution is in force "wherever and whenever the sovereign power of [the U.S.] government is exerted" even while holding that a resident of Puerto Rico was not entitled to the particular protections of a Sixth Amendment right to jury trial. In explaining its holding, the *Balzac* Court underscored the core principle that while a particular constitutional provision may or may not apply in a given situation if it is not deemed

fundamental, "[t]he guaranties of certain *fundamental personal rights* declared in the Constitution, as, for instance, that no person could be deprived of life, liberty, or property without due process of law," apply in territories under U.S. control. *Id.* at 312-13 (emphasis added).

Under the *Insular Cases*, the Supreme Court and other federal courts have consistently affirmed the principle that fundamental constitutional protections apply to *both* citizens and non-citizens overseas. *See, e.g., Mankichi* (non-citizen); *Balzac* (citizen); *Dorr v. United States,* 195 U.S. 138 (1904) (non-citizen). The *Insular Cases* are, therefore, significant for two reasons. First, they rejected an earlier view, *see In re Ross*, 140 U.S. 453, 464 (1891), that none of the provisions of the Constitution ever have application outside the territorial limits of the United States. Second, and critically, the cases apply the same fundamental rights test to claims by both citizens and non-citizens who seek to invoke the protections of the Constitution outside the boundaries of the United States. *See Government of the Canal Zone v. Scott*, 502 F.2d 566, 568 (5th Cir. 1974) ("noncitizens and citizens of the United States resident in such territories [not incorporated into the United States] are treated alike, since it is the territorial nature of the Canal Zone and not the citizenship of the defendant that is dispositive") (citing *Balzac,* 258 U.S. at 309).

In *Reid v. Covert,* 354 U.S. 1 (1957), the Supreme Court further addressed the question of the Constitution's application outside the United States. The plaintiffs, citizens who had been tried and convicted in military courts abroad, asserted a right under the Fifth and Sixth Amendments to a jury trial notwithstanding that such a claim did not constitute a "fundamental right" under prior cases. *See id.* at 5. Summing up the *Insular Cases*, the plurality again

recognized that the *Ross* "approach that the Constitution has no applicability abroad has long since been directly repudiated by numerous cases." *Id.* at 12.[11]

The four-Justice plurality opinion in *Reid* criticized the *Insular Cases* as applying only "fundamental" rights to the Government when it acts "outside the continental United States," *id.* at 8, on the ground that "we can find no warrant in logic or otherwise, for picking and choosing among the remarkable collection of 'Thou shalt nots' which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments." *Id.* at 9. Justice Harlan (concurring) likewise left no doubt of his emphatic rejection of an earlier notion that "the Constitution 'does not apply' overseas," *id.* at 74 (Harlan, J., concurring), as did Justice Frankfurter, *id.* at 53-54 (Frankfurter, J., concurring) ("[t]he Court's opinions in the territorial cases did not lay down a broad principle that the protective provisions of the Constitution do not apply outside the continental limits of the United States"). Thus six Justices categorically rejected any suggestion that the Constitution does not apply outside the United States.

Justice Harlan found that whether any particular constitutional protection should extend overseas depends on the particular facts and circumstances of the case and claim. He embraced a provision-by-provision analysis to determine which constitutional rights apply.

> The proposition [that *Ross* and the *Insular Cases* properly stand for] is, of course, not that the Constitution "does not apply" overseas, but that there are provisions in the Constitution which do not *necessarily* apply in all circumstances in every foreign place.

---

[11] As Defendant Pappas implicitly concedes, the language he cites from *In re Ross (Ross v. McIntyre)*, 140 U.S. 453, 464 (1891), Pappas Mo. at 4, is an historical view that does not state the current law governing application of fundamental protections of the Constitution outside the territory of the United States. Understandably, the other Defendants have not cited *Ross*.

*Id.* at 74 (Harlan, J., concurring) (emphasis original).  Justice Harlan's crucial concurrence then set forth the analysis that should govern.  He explained that the question was ultimately whether application of a provision "would make adherence to a specific guarantee altogether *impracticable and anomalous*."  *Id.* (emphasis added).[12]

Justice Harlan's "impracticable and anomalous" test for application of constitutional rights outside the United States was endorsed most recently by the Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004).  In *Rasul*, the Court held that the habeas corpus statute, 28 U.S.C. § 2241, was available to Guantanamo Bay detainees challenging their detention as illegal. 542 U.S. at 483 n.15.  Of particular significance, in noting that the claims "*unquestionably* describe 'custody in violation of the Constitution or laws or treaties of the United States,'" *id.* (citations omitted) (emphasis added), the *Rasul* majority relied on Justice Kennedy's concurring opinion in *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990), and the cases cited in that opinion.  *See Rasul*, 542 U.S. at 483 n.15 (citing "*United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-278 (1990) (Kennedy, J., concurring), *and cases cited therein*") (emphasis added). [13]

_____

[12] *See also id.* at 75:

> [T]he question is which guarantees of the Constitution should apply in view of the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it.  The question is one of judgment, not of compulsion.  And so I agree with my brother Frankfurter that, in view of Ross and the Insular Cases, we have before us a question analogous, ultimately, to issues of due process; one can say, in fact, that the question of which specific safeguards of the Constitution are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is "due" a defendant in the particular circumstances of a particular case.

[13] The Court stated:

> Petitioners' allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive

(footnote continued on next page)

Justice Kennedy provided the fifth vote for the majority in *Verdugo-Urquidez* but wrote separately to explain that "the Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic." *Verdugo-Urquidez,* 494 U.S. at 277 (Kennedy, J., concurring). He then endorsed the *Insular Cases* and Justice Harlan's analysis in *Reid* applying the "impracticable and anomalous" standard to determine whether constitutional protections applied to the government's action against a foreign national outside the United States. *Id.* at 278 (finding that Fourth Amendment warrant was not required for a search in Mexico because "[t]he conditions and considerations of this case would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous").[14] The critical point is

---

jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-278, 108 L. Ed. 2d 222, 110 S. Ct. 1056 (1990) (Kennedy, J., concurring), and cases cited therein.

*Id.*

[14] Justice Kennedy's opinion states in relevant part:

I take it to be correct, as the plurality opinion in *Reid* v. *Covert* sets forth, that the Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic. *See* 354 U.S. at 6. But this principle is only a first step in resolving this case. The question before us then becomes what constitutional standards apply when the Government acts, in reference to an alien, within its sphere of foreign operations. Justice Harlan made this observation in his opinion concurring in the judgment in *Reid v. Covert*: [quotation omitted]

* * *

The conditions and considerations of this case would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous. Just as the Constitution in the *Insular Cases* did not require Congress to implement all constitutional guarantees in its territories because of their "wholly dissimilar traditions and institutions," the Constitution does not require United States agents to obtain a warrant when searching the foreign home of a nonresident alien.

(footnote continued on next page)

538399 1

that Justice Kennedy's concurrence recognized that whether the Constitution applies to

governmental action against a foreign national outside the United States depends on assessing

whether application of the particular fundamental constitutional right would be "impracticable

and anomalous."[15]

The *Rasul* Court's approval of Justice Kennedy's *Verdugo-Urquidez* concurrence

reaffirms the longstanding fundamental rights principle from the *Insular Cases* and endorses

application of constitutional protections overseas unless they are "impracticable and anomalous"

under the circumstances of the case.[16] *See also Ralpho v. Bell*, 569 F.2d 607, 618 n.69 (D.C. Cir.

---

*Id.* at 277-278.

[15] Justice Rehnquist's additional statements about the Fifth Amendment in *Verdugo-Urquidez,* 494 U.S. at 269 (purporting to reject "the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States"), are plainly dicta since the case raised only Fourth Amendment claims. Moreover, the broad views in the opinion on *both* the Fourth and Fifth Amendments clearly did not command a majority, given that Justice Kennedy's concurrence rejected any categorical approach to determining the applicability of constitutional provisions. *See also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 3.1 (2d. ed.) (noting that because "the three dissenters agreed that the Fourth Amendment applies whenever 'a foreign national is held accountable for purported violations of the U.S. criminal laws,' while two concurring Justices placed great emphasis upon the inapplicability of the Fourth Amendment's warrant clause to the search in the instant case," there is some doubt whether Justice Rehnquist's *Verdugo* opinion would even apply to similar *Fourth* Amendment claims).

[16] The government has argued that *Rasul* held only that there was jurisdiction under 28 U.S.C. § 2241 to hear the detainees' claims, and that the detainees have no substantive rights under the Constitution. Judge Green of this Court rejected that view in *In re Guantanamo Detainee Cases*. *But see Khalid v. Bush*, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005) (concluding that Guantanamo detainees could not rely on constitution in challenging their detention, failing to address *Insular Cases* or *Reid*). Both *Khalid* and *In re Guantanamo Detainee Cases* are currently on appeal to the D.C. Circuit. Regardless of the resolution of those appeals, the constitutional prohibition against torture is among the fundamental rights enforceable by foreign nationals outside of the United States.

1977) (noting that under fundamental rights doctrine, applicability of Constitution abroad is considered "provision-by-provision").[17]

In this case, unlike the Fourth Amendment's warrant requirement or the Sixth Amendment's jury trial requirement, compliance with the Constitution's prohibition against torture and cruel treatment in U.S. prisons in territories under U.S. control is fundamental and is neither impracticable nor anomalous. The prohibition does not depend on any foreign officials or local government apparatus for enforcement, nor on any local custom for interpretation. Compliance with the constitutional prohibitions on torture and cruelty is mandated by the military's own rules and regulations promulgated under the Constitution, treaties, and laws of the United States. Almost by definition, compliance with the prohibition on torture and abuse cannot be impracticable or anomalous.

Notably, the D.C. Circuit has not only endorsed the *Insular Cases'* analytical framework but has expressly noted its applicability to "occupation zones after war." *Harbury v. Deutch,* 233 F.3d 596, 603 (D.C. Cir. 2000) (citations omitted), *vacated on other grounds,* 2002 WL 1905342 (D.C. Cir. Aug. 19, 2002). In *Harbury,* the court of appeals examined the core considerations that govern whether certain constitutional rights apply to foreign nationals. The court explained first that "these cases demonstrate that aliens abroad may be entitled to certain constitutional protections against mistreatment by the U.S. Government . . . [.]" *Id.* at 603. It then noted that "inhabitants of nonstate territories *controlled by the U.S.*—such as

---

[17] In different circumstances, different rights may or may not be considered "fundamental." *See, e.g.*, *Ralpho v. Bell*, 569 F.2d at 618-19 (Fifth Amendment Takings Clause protects non-U.S. citizen residents of Pacific Trust Territories, which are administered by United States but not part of sovereign territory of United States); *Juda v. United States*, 6 Cl. Ct. 441, 457 (1984) (holding that residents of Marshall Islands had fundamental right under Fifth Amendment to seek compensation from United States for losses incurred during atomic bomb testing). The right not to be tortured is a fundamental right under any circumstance.

unincorporated territories or *occupation zones after war*—are entitled to certain 'fundamental rights.'" *Id.* (emphasis added). In *Harbury*, the Court recognized the long line of cases upholding application of certain fundamental constitutional rights on behalf of foreign nationals, including under circumstances where "the United States exercise[d] de facto political control." *Id.* at 604. The court ultimately rejected application of the Constitution on the particular facts in *Harbury*.[18]

### B. The United States Exercised Control over Iraq and Afghanistan and the U.S. Military Prisons.

Plaintiffs were detained and tortured in U.S. military prisons in territories under the control and of the United States where U.S. personnel were not subject to any local law. The allegations in the complaint directly allege exclusive and effective control and are sufficient in themselves to defeat any suggestion that the United States was so disconnected from the facilities or territories in which Plaintiffs were tortured and abused that the absolute prohibition against torture and cruelty is wholly inapplicable. Am. Compl. at ¶¶ 37-39.

Specifically, Plaintiffs allege that, *inter alia*, the torture and other cruel, inhuman or degrading treatment suffered by Plaintiffs occurred in enclaves and facilities under the exclusive and/or effective jurisdiction and control of the United States; that Plaintiffs were detained under the jurisdiction and control of the U.S. military; that access to detainees by any person was and is only with the express or tacit permission of the U.S. military; that the United States and the U.S. military under the command of Defendant Rumsfeld exercised control and authority over Iraq and Afghanistan, including under authority conferred by domestic and international law; and that

---

[18] *Harbury* found that (unlike the present circumstances) the case did not involve a location over which the United States exercised *de facto* control. It also concluded that *Johnson v. Eisentrager*, 339 U.S. 763 (1950), barred application of the Constitution in that case. *Harbury's* reading of *Eisentrager* was clearly mistaken for the reasons discussed *infra*.

the U.S. military continues to exercise control over detainees in U.S. military custody in

Afghanistan and Iraq.  Am. Compl. at ¶¶ 37-38.  Defendants do not seriously question or dispute

the control that Plaintiffs allege.

Further evidence that Plaintiffs would submit will show the pervasive extent of U.S.

control over both the U.S. military prisons and the territories of Iraq and Afghanistan.  For

example, from early in the conflicts in both Iraq and Afghanistan, and continuing to this day,

U.S. military forces in each of those countries are explicitly governed only by U.S. law and enjoy

special protections and immunities from local law.  In Iraq, by formal order of the Coalition

Provisional Authority ("CPA"), U.S. military "[p]ersonnel, property, funds and assets" "shall be

subject to the *exclusive jurisdiction* of [the United States] . . . ." CPA Order No. 17 (Revised),

Status of the CPA, MNFI, Certain Missions and Personnel in Iraq, § 2 (June 27, 2004) (originally

issued June 26, 2003) (emphasis added).[19]  The CPA further provided that U.S. soldiers "shall be

immune from Iraqi legal process" and are "immune from any form of arrest or detention other

than by persons acting on behalf of [the United States.]"  *Id.*[20]  That immunity continues despite

the dissolution of the CPA, and continues to exempt U.S. forces' actions today.  *Id.* § 20; *see

also* CPA Order No. 100, Transition of Laws, Regulations, Orders, and Directives Issued by the

CPA, § 3(8) (June 28, 2004).

Similarly, in Afghanistan, an agreement between Afghanistan and the United States

provides that the United States  "continue[s] to have the freedom of action required to conduct

---

[19] CPA Orders, Regulations, and Public Notices are available at
http://www.iraqcoalition.org/regulations.  Initial citations to CPA documents herein follow the
format: [Document Type] [Number], [Title], [Section] ([Date]).

[20] In exigent circumstances not relevant here, U.S. personnel may be temporarily detained by
other Coalition forces and promptly turned over to the United States.

appropriate military operations . . .” in that country, which includes the authority to hold Afghan citizens in U.S. custody without the consent or oversight of the Afghan government.  Joint Declaration of the United States–Afghanistan Strategic Partnership, May 23, 2005; *see also* Congressional Research Service, “Afghanistan: Post-War Governance, Security, and U.S. Policy,” Mar. 17, 2006, at 22 (noting that “[t]he joint statement did not give [Afghan president] Karzai his requested increased control over facilities used by the U.S. forces, over U.S. operations, or over the disposition of prisoners taken in the course of operations”); Associated Press, Karzai Wants More Control Over Country, May 22, 2005 (statements of Afghan president indicating that detention and other U.S. military operations proceed without consent of Afghan government).  Thus, for example, the United States rejected Afghanistan’s request that it turn over Afghan detainees to the Afghan government.  *Compare id.* (describing May 2005 request) *with* Am. Compl. at ¶ 229 (over 500 detainees in U.S. custody in Afghanistan; number of detainees increased over previous 18 months).

In addition, U.S. control over military prisons and facilities in both Iraq and Afghanistan is unique because there is *no* agreement between the United States and either country recognizing and assigning civil and criminal liability under local and United States law arising from the actions of U.S. military personnel.  That stands in sharp contrast to the situation at every other significant U.S. military base in the world, with the singular exception of Guantanamo Naval Base.  Plaintiffs will show that in other overseas locations, U.S. military forces are subject to Status of Forces Agreements (SOFAs) that determine civil and criminal jurisdiction over acts and omissions by U.S. personnel,[21] and that this differs significantly from the immunity

---

[21] *See* Department of State Washington File: Backgrounder: Status of Forces Agreements, http://canberra.usembassy.gov/hyper/2000/0104/epf210.htm (“In every foreign country where (footnote continued on next page)

arrangements currently in place in Afghanistan and Iraq. In fact, SOFAs typically provide for *concurrent* criminal jurisdiction over U.S. personnel accused of abuse, both requiring the U.S. to prosecute if abuse occurs and allowing the host country to step in if the United States fails to act. See, *e.g.*, NATO Status of Forces Agreement, art. VII, 4 U.S.T. 1792 (entered into force Aug. 23, 1953). A SOFA would usually also provide a process for addressing civil claims arising from such conduct. *See, e.g.*, *id.* art. VIII.[22] But there are no SOFAs governing the U.S. military in Iraq or Afghanistan.[23] In this case, absent a remedy under U.S. law, the immunity arrangements coupled with the lack of any SOFAs ensure that no legal regime would apply in either region.

In Iraq, moreover, the United States exercised plenary governmental authority through the Coalition Provisional Authority from May 8, 2003, shortly after the President's formal announcement that the regime of Saddam Hussein had ended, until June 28, 2004, when the CPA transferred sovereignty to the Iraq Interim Government.[24] That includes the entire period during

---

substantial numbers of American troops are stationed for any appreciable length of time the United States will have a Status of Forces Agreement with the host country.").

[22] *See* Department of State Washington File: Backgrounder: Status of Forces Agreements, http://canberra.usembassy.gov/hyper/2000/0104/epf210.htm (explaining that "[t]he starting proposition is that the host country exercises complete authority over all of its territory and over anyone who is in that territory, subject to any agreements that make exceptions to that authority").

[23] *See* Ashraf Fahim, The Perils of Colonial Justice in Iraq, *Asia Times Online*, July 6, 2005 (quoting Cherif Bassiouni, former U.N. Independent Expert on the Situation of Human Rights in Afghanistan, stating that government has "refused to have a SOFA not only with Iraq but with Afghanistan"); *see also* UN Doc. E/CN.4/2005/122, at 8 (report of same expert noting that United States military "appear[s] to be unregulated by a [SOFA]" in Afghanistan).

[24] *See* Texts of Letters on Iraq Sovereignty as Read by Scott McClellan, *available at* http://www.whitehouse.gov/news /releases/2004/06/20040628-10.html (Bremer letter stating that "the Coalition Provisional Authority will cease to exist on June 28, at which point the occupation will end, and the Iraqi Interim Government will assume and exercise full sovereign authority on (footnote continued on next page)

which Plaintiffs were detained and tortured.  The CPA was formally established by the United

States and Britain to "exercise powers of government" in Iraq, CPA Reg. No. 1, The Coalition

Provisional Authority, § 1(1) (May 16, 2003), and was recognized as the governing authority in

Iraq by the United Nations Security Council, Security Council Resolution 1483, U.N. Doc.

S/Res/1483 (May 22, 2003).

Although the United States and United Kingdom were officially regarded as "occupying

powers under unified command," *id.,* the United States retained complete authority over the CPA

and, hence, over the government of Iraq.  The CPA's rules provided that all authority "shall be

exercised by the CPA Administrator."  CPA Reg. No. 1 § 1(2).  That Administrator, L. Paul

Bremer, was appointed by and reported directly to Defendant Rumsfeld, and not to any foreign

or international official or entity.[25]

The CPA exercised plenary authority and was "vested with all executive, legislative and

judicial authority necessary to achieve its objectives."  CPA Reg. No. 1 § 1(2).  CPA

---

behalf of the Iraqi people"); *see also* Coalition Provisional Authority Historical
Accomplishments, at 2 (June 28, 2004 document stating that CPA "governed Iraq since April
2003").

[25] U.S. Gen. Accounting Office, Rebuilding Iraq: Fiscal Year 2003 Contract Award Procedures
and Management Challenges, No. GAO-04-605, at 7 (2004) (stating that Bremer "reports to the
President through the Secretary of Defense"); James Dao & Eric Schmitt, President Picks a
Special Envoy to Rebuild Iraq, *New York Times*, May 7, 2003 (stating that Bremer "will report
directly to Secretary of Defense Donald H. Rumsfeld"); Hansard H.L., 12 Feb 2004: Column
WA178 ("[t]he decision to appoint Ambassador Bremer was one for the US Administration");
Hansard H.C. 9 Mar 2005 : Column 1893W (UK representative has "independent presence with
no formal role within the CPA's hierarchy and with no formal legal decision making power")
(Comment of Mr. Rammell).

Administrator Bremer issued scores of edicts while the CPA was in power.[26]  These provided for

major structural reforms, including the dissolution of the Iraqi military; de-Baathification; and

the overhaul of the criminal justice system.[27]  They created new government agencies and

regulated large and small aspects of life.[28]

Defendant Pappas suggests that the Iraqi Governing Council functioned as the

government of Iraq during much of that time.  Pappas Mo. at 11.  However, as Defendant Pappas

acknowledges, the Governing Council was appointed by and subject to the CPA Administrator,

who remained the supreme governmental authority in Iraq.  *See* Iraqi Governing Council,

*available at* http://www.iraqcoalition.org/government/governing_council.html.  In fact, the CPA

continued to issue regulations, orders and memoranda at a rapid pace after the Governing

Council convened.

---

[26] The CPA promulgated 13 regulations, 100 orders, 17 memoranda, and 12 public notices while in existence.

[27] *See, e.g.,* CPA Order No. 2, Dissolution of Entities (Aug. 23, 2003) (dissolving entire military); CPA Order No. 1, De-Baathification of Iraqi Society (May 16, 2003); CPA Order No. 4, Management of Property and Assets of the Iraqi Baath Party (May 25, 2003) (rescinded June 28, 2004); CPA Order No. 5, Establishment of the Iraqi De-Baathification Council (May 25, 2003) (rescinded Nov. 4, 2003); CPA Memo. No. 3 (Revised), Criminal Procedures (June 27, 2004); CPA Pub. Notice, Regarding the Creation of a Central Criminal Court of Iraq and Adjustments to the Criminal Procedure Code (June 18, 2003); CPA Order No. 31, Modifications of Penal Code and Criminal Proceedings Law (Sept. 10, 2003).

[28]  *See, e.g.,* CPA Order No. 33, Ministry of Municipalities and Public Works (Sept. 8, 2003); CPA Order No. 44, Establishment of the Ministry of the Environment (Nov. 14, 2003); CPA Order No. 50, Creation of Ministry of Displacement and Migration (Jan. 11, 2004); CPA Order No. 49, Tax Strategy of 2004 (Feb. 20, 2004); CPA Order No. 96, The Electoral Law (June 15, 2004); CPA Pub. Notice, Regarding the Prohibition Under Iraqi Law of Vehicles With Tinted Windows (June 27, 2003).  The CPA's laws and rules continued in effect even after the dissolution of the CPA.  CPA Order No. 100 ("laws, regulations, orders, memoranda, instructions and directives of the CPA remain in force unless and until rescinded or amended by legislation duly enacted and having the force of law").

C.    **Defendants' Authorities Do Not Refute Application of the Constitution in This Case.**

Rather than grappling with the fundamental constitutional rights doctrine, the *Insular Cases* and the consequences of United States control, Defendants cite a handful of cases and broad dicta from various inapposite contexts to argue that the U.S. Constitution never protects noncitizens outside the United States. None of these cases undercuts the settled principle that *fundamental* rights of noncitizens abroad are protected in places where the United States exercises the exclusive control alleged here. Some of the cases cited by Defendants involve non-fundamental rights that pale in comparison to an individual human being's right not to be tortured.[29] Other cases cited by the Defendants contain only brief statements in dicta that cannot be applied to the circumstances of the instant case.[30] Defendants' remaining citations are to dicta from cases that neither address nor undercut the long line of authority discussed above and do not concern the categorical constitutional prohibitions at issue here. *See* Rumsfeld Mo. at 20 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936); *Zadvydas v.*

---

[29] *See Jifry v. Federal Aviation Administration*, 370 F.3d 1174 (D.C. Cir. 2004) (challenging FAA regulations that resulted in revocation of airman certificates); *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1363 (4th Cir. 1987) (holding that foreign organization did not have constitutional right to extension of deadline for claims in products liability class action). *See People's 32 County Sovereignty Committee v. Dep't of State*, 292 F.3d 797 (D.C. Cir. 2002) (foreign entities, not individuals, sought statutory review of U.S. Secretary of State's designation of the entities as "foreign terrorist organizations" under 8 U.S.C. § 1189); *Mojahedin Organization of Iran v. U.S. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) (same).

[30] *See Pauling v. McElroy*, 278 F.2d 252 (D.C. Cir. 1960) (holding that citizen and noncitizen plaintiffs who sought injunction against nuclear weapons testing by U.S. government had no standing because they did not allege a specific injury to themselves, and adding in dicta in a footnote, without explanation, that "non-resident aliens here plainly cannot appeal to the Constitution or laws of the United States").

*Davis*, 533 U.S. 678, 693 (2001)).[31] Defendants cannot cite to any authority holding that systemic torture of foreign nationals in locations and territories controlled by the United States is beyond constitutional constraints. No court has ever issued the holding that Defendants seek.

Defendants place heavy reliance on *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) (Leon, J.), which held that detainees at Guantanamo do not have Fifth Amendment rights to challenge their detention through habeas corpus. Unlike *In re Guantanamo Detainee Cases*, *Khalid* did not consider the long line of *Insular Cases* establishing that the Constitution protects the fundamental constitutional rights of individuals in areas under the de facto control of the United States, and held categorically that non-citizens outside the sovereign territory of the United States never have any constitutional rights. *Khalid* 355 F. Supp. 2d at 321. As already explained, the categorical rejection of constitutional rights is simply not correct under the Supreme Court's case law. Moreover, *Khalid* placed heavy reliance on the purported similarities between the petitioners in *Khalid* and the petitioners in *Johnson v. Eisentrager,* 339 U.S. 763 (1950), a case that Plaintiffs address below. In any event, whatever rule may ultimately apply with regard to judicial scrutiny over detention of those alleged to be enemy combatants, this case involves the categorical prohibition against torture, a norm that is absolute and long-established.

Defendants Karpinski, Sanchez, and Pappas argue that *Johnson v. Eisentrager* stands for the principle that the Constitution does not prohibit them from torturing Plaintiffs abroad. But *Eisentrager* establishes no such thing. In that case, the Supreme Court dismissed the habeas corpus petitions of German enemy prisoners of war, holding that a military prisoner was not

---

[31] In fact, *Zadvydas* supports Plaintiffs' submission that torture is categorically prohibited by the Constitution. In *Zadvydas*, Justice Scalia assumed in dissent that even an alien at our borders who cannot assert any claim to procedural due process is nonetheless protected against torture. 533 U.S. at 704 (Scalia, J., dissenting) ("I am sure [aliens at the border] cannot be tortured . . . .").

"constitutionally entitled to the writ" when "he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States."  339 U.S. at 777.

First, as the Supreme Court expressly recognized in *Rasul*, "*all six* of [these] facts [were] critical to its disposition . . . ."  *Rasul,* 542 U.S. at 476 (emphasis added).  In *Eisentrager,* the petitioners were actively hostile and were formally charged with and convicted of engaging in unlawful military activity against the United States.  *Eisentrager*, 339 U.S. at 778 ("These prisoners were actual enemies, active in the hostile service of an enemy power.  There is no fiction about their enmity."). They had a military commission trial and subsequent review on appeal.  *See id.* at 766.  In this case, the Plaintiffs are in entirely different circumstances and raise different claims.  Plaintiffs are not seeking a writ of habeas corpus and they do not ask the Court to determine whether they were properly detained by the United States military.  They are innocent civilians, are not hostile to the United States, were never charged as such, and have had no forum in which to assert their substantive claims.  *Cf. Arar v. Ashcroft*, 414 F. Supp. 2d 250, 275 (E.D.N.Y. 2006) (distinguishing *Eisentrager* in part on the ground that petitioners in *Eisentrager* had some process of law).

Defendants Karpinski and Pappas nevertheless seize on dicta in *Eisentrager* stating that "[t]he alien . . . has been accorded a generous and ascending scale of rights as he increases his identity with our society," and that in some cases "the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the judiciary authority to act." *Eisentrager* 339 U.S. at 771.  This dicta does not address the *Insular Cases* and does not even

suggest any departure from the fundamental rights doctrine established in those cases.  The

language simply describes the history of habeas cases brought by aliens in the United States, and

explains why *those* cases did not establish the constitutional rights that the *Eisentrager* petitioner

sought to invoke with regard to his trial in China.  *Id.*  As Justice Scalia noted in *Zadvydas*, the

alien cases plainly do not stand for the proposition that a claim of torture is barred.  *See* note 31,

*supra.*

Similarly, Defendant Sanchez seeks to garner support from language in *Eisentrager*

questioning the view that "the Fifth Amendment confers rights upon all persons, whatever their

nationality, wherever they are located and whatever their offenses . . . ."  *Eisentrager,* 339 U.S.

at 783.  Plaintiffs, of course, make no such claim.  In any event, the *Eisentrager* Court's

discussion was directed at the specific issue presented there and at the lower court's reliance on

the Fifth Amendment's application to "any person" as the basis for applying the amendment's

full protections worldwide.[32]  The Supreme Court rejected that view and specifically pointed out

that under the lower court's analysis *all* the protections of the First, Second, Fourth, and Sixth

Amendments would be equally applicable worldwide.  *Id.*

The *Eisentrager* Court's statement that "[s]uch extraterritorial application of organic law

would have been so significant an innovation in the practice of governments that, if intended or

apprehended, it could scarcely have failed to excite contemporary comment," *id.* at 784

(emphasis added), is again a reference to the particular lower court analysis the Court was

---

[32]  The quotation's full context makes that clear.  "The Court of Appeals has cited no authority
whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their
nationality, wherever they are located and whatever their offenses, except to quote extensively
from a dissenting opinion in *In re Yamashita*.  The holding of the Court in that case is, of course,
to the contrary."  *Id.* (citation omitted).

rejecting, which would have required conferring rights "on all the world" under the Fifth

Amendment and its "companion civil-rights Amendments . . . ."  *Id.; see Harbury*, 233 F.3d at

604 (citing same passage in *Eisentrager*).    *That* result, the Court found, would have been too

"significant an innovation."  Notably, the *Eisentrager* Court then cites to *Downes v. Bidwell*,

182 U.S. 244 (1901), as contrasting authority—one of the *Insular Cases* on which Plaintiffs rely

for the much narrower application of *fundamental* constitutional rights under the specific

circumstances presented here.  *See Eisentrager,* 339 U.S. at 784-85.[33]

  Finally, Defendant Pappas relies extensively (and Defendants Sanchez and Karpinski in

passing) on dicta in Justice Rehnquist's opinion in *Verdugo-Urquidez* concerning the

inapplicability of the Fifth Amendment, 494 U.S. at 269.  That view did not command a majority

when written.  As fully explained above, Justice Kennedy, whose fifth vote was essential to the

judgment of the Court in *Verdugo-Urquidez*, clearly rejected any categorical approach to

---

[33] If the *Eisentrager* Court had been considering the actual issue presented here, namely abuse of detainees in overseas military custody, relevant historical precedent would have been available. For example, in England, the Court of King's Bench applied the common law to hold English officials liable for torts less severe than torture committed against aliens overseas.  *Fabrigas v. Mostyn*, 20 Howell's State Trials 81 (K.B. 1775) (sustaining action by "native" from military colony of Minorca against military governor for false imprisonment and banishment without trial).  In rejecting the governor's sweeping assertions of executive power, Lord Mansfield cautioned that "to lay down in an English court of justice such monstrous propositions as that a governor . . . can do what he pleases and to maintain here that every governor in every place can act absolutely; that he may spoil, plunder, affect [individuals'] bodies and their liberty, and is accountable to nobody – is a doctrine not be maintained; for if he is not accountable in this court, he is accountable nowhere."  Id. at 231; *see also, e.g., id*. at 167 (argument of counsel) (citing case where "alien infidel" permitted to sue representatives of the former governor of Patna for money due under employment contract); *Cooke v. Maxwell*, 171 Eng. Rep. 614 (K.B. 1817) (successful damages action by American subject against governor of Sierra Leone for illegal arrest and destruction of property); William Winthrop, *Military Law and Precedents* 885-86 (2d ed. 1920) (citing cases in which military or naval commanders were held liable in damages to civilians for personal injury).

determining the applicability of constitutional provisions.  *See* note 15, *supra*.  In any case, the

dicta does not survive *Rasul.*

In short, the Supreme Court has never held that the absolute prohibition against torture

embodied in the Fifth and Eighth Amendments can be disregarded with impunity by government

officials who inflict abuse on foreign nationals outside the United States.  Indeed, a long line of

Supreme Court cases compels application of the constitutional prohibition against torture on

behalf of these Plaintiffs, and doing so cannot be impracticable or anomalous especially because

compliance with that constitutional mandate is also compelled by military law and regulations.

## III.    PLAINTIFFS' DAMAGES REMEDY IS PROPER UNDER *BIVENS* AND DEFENDANTS DO NOT SATISFY THE QUALIFIED IMMUNITY TEST.

*Bivens* provides an "ordinary remedy for an invasion of personal interests in liberty."

403 U.S. 388, 395 (1971).  In inferring a remedy directly from the Constitution, the Supreme

Court emphasized that "[t]he very essence of civil liberty certainly consists in the right of every

individual to claim the protection of the laws, whenever he receives an injury."  *Id.* at 397

(quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)).  This is the core role that the Judicial

Branch has played throughout history: assuring that the Executive Branch acts within the

constitutional limits of its power over individuals.

Nonetheless, Defendants argue that Plaintiffs' constitutional damages claims under

*Bivens* must be dismissed because "special factors" preclude the Court from recognizing a

*Bivens* remedy.  Some Defendants also argue in varying degrees that this litigation raises a non-

justiciable political question.  All Defendants assert that even if Plaintiffs are protected by the

constitutional prohibition against torture, the Defendants are entitled to qualified immunity.  As

demonstrated below, neither "special factors" nor the political question doctrine counsels against

enforcement of the fundamental constitutional rights at issue here, and the doctrine of qualified

immunity cannot save the Defendants from liability, given the clear and absolute prohibition against the conduct at issue in this case.

### A.    *Bivens* "Special Factors" Do Not Bar a Damages Remedy.

Despite the longstanding availability of *Bivens* remedies as a check on government officials' abuses, the Defendants here rely on the Court's caution in *Bivens* that in some cases, there might be "special factors counseling hesitation" in providing such a remedy, such as where Congress has plainly indicated a contrary intent or provided an alternative comprehensive remedial scheme. *Bivens*, 403 U.S. at 396-97; *see also Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (*Bivens* claim may be defeated "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective") (emphasis in original).

There are no such special factors in this case. Providing an effective remedy for the violation of Plaintiffs' constitutional rights would be wholly consonant with longstanding military laws and regulations and would not entangle the Court in any inappropriate inquiry. There has been no explicit congressional declaration (and Defendants cite none) that individuals who suffered gross acts of torture and abuse at the hands of U.S. officials are barred from recovering damages. Neither has Congress enacted a comprehensive remedial scheme for redress of the harms alleged here. In fact, Congress has expressed affirmative views that support Plaintiffs' claims.

### 1.    Judicial Action Is Proper.

Contrary to Defendants' assertions, Plaintiffs' claims do not require the Court to review any battlefield decisions, to interfere with day-to-day military decision making, or to adjudicate the propriety of any foreign policy choices properly within the discretion of the political branches. Plaintiffs seek only the enforcement of the non-discretionary requirements of the

Constitution in accord with the laws and regulations that have constrained the conduct of U.S.

military detention operations for decades, and that manifestly prohibit the kinds of torture and

abuse alleged here.

First and foremost, it is essential to recognize what this suit is not.  This suit has nothing

to do with judicial oversight over any "military decisions undertaken in a field of battle"

(Karpinski Mo. at 21).  Plaintiffs are civilians who were detained in prisons and detention

facilities away from the exigencies of combat and under the complete control of military police.

Am. Compl. at ¶¶ 16-25.  Their mistreatment occurred at a time when they posed no threat to the

United States, were fully subdued, and were incarcerated.  Am. Compl. at ¶¶ 10, 16-25, 169,

211-226.

Defendants mischaracterize Plaintiffs' suit by describing it as a challenge to "conditions"

of detention in military prisons overseas (*e.g.*, Rumsfeld Mo. at 1), thereby implying that

adjudication of this case would require judicial oversight of day-to-day military decision making.

Even a casual reading of the complaint shows that this case does not involve "conditions" of

confinement and does not require inquiry into "the security requirements that may be imposed at

detention facilities," or the "appropriate assignment of military resources to the task" (Rumsfeld

Mo. at 15).  The only issue here is torture and abuse that are universally prohibited.

Defendants' arguments that the process of litigation itself will interfere with military

affairs, or chill effective decision making by individual military officers, Karpinski Mo. at 21-23;

Rumsfeld Mo. at 15-16, also fail as matter of fact and law.  Throughout our history, the Supreme

Court has adjudicated damages claims in cases where U.S. national security interests were at

issue, even those involving war or exigent circumstances.  For example, the Court awarded

damages to foreign citizens for the wrongful actions of U.S. military authorities, even though it

required review of actions by U.S. naval forces engaged in a military blockade during the Spanish-American War. *The Paquete Habana*, 175 U.S. 677, 714 (1900) (ordering that the proceeds from the sale of vessels wrongfully seized as prize of war be "restored to the claimant . . . with damages and costs"). Similarly, in *Little v. Barreme*, 6 U.S. 170 (1804) (Marshall, C.J.), the Court held a U.S. Navy captain liable in damages to a Danish ship owner for the illegal seizure of his vessel during the war against France. The Court held that the President's orders authorizing the seizure did not protect the captain from liability for civil damages where the President's instructions went beyond his statutory authority. *Id.* at 178-79.

In *Mitchell v. Forsyth*, 472 U.S. 511, 513 (1985), the Court entertained a *Bivens* suit arising out of actions taken by the United States Attorney General for the stated purpose of "gathering of intelligence in the interest of national security" concerning an alleged plot to "blow up heating tunnels linking federal office buildings in Washington, D.C." and to kidnap the National Security Adviser. The Court rejected the Attorney General's arguments that national security concerns justified dismissal of the damages suit. *Id.* at 523-24. *See also, e.g., Saucier v. Katz*, 533 U.S. 194, 197-99 (2001) (allowing *Bivens* claim against a military police officer for excessive force to protect the Vice President) (cited by Defendants, *see, e.g.*, Rumsfeld Mo. at 18); *Scheuer v. Rhodes*, 416 U.S. 232 (1974) (*overruled on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)) (permitting damages suit against various state officers and members of the state National Guard for actions taken to quell civil disorder). Indeed, at common law, courts (including the Supreme Court) allowed an array of damages actions against military officials for intentional torts, even during times of war.[34]

_____

[34] *See, e.g., Beckwith v. Bean*, 98 U.S. 266, 274 (1878) (reviewing damages award against officer of the Union army for assault and battery and false imprisonment of plaintiff during Civil War); (footnote continued on next page)

Most recently, in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court again held that review of claims of the deprivation of fundamental individual rights were well within the appropriate sphere of the federal judiciary. The Court rejected the government's arguments that litigation "half a world away" against military officers "engaged in the serious work of waging battle" would be "unnecessarily and dangerously distracted by litigation." *Id.* at 531-32 (plurality). The Court also rejected the government's contention that "discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war," explaining that "proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." *Id.* at 533. Thus, in *Hamdi*, the Supreme Court dispelled the notion that a case like this one would interfere with military operations.

*Hamdi* rejected the government's arguments even though it presented a far greater risk of intrusion into military operations than this case does. *Hamdi* sought immediate habeas corpus relief for a detained combatant, which necessarily must be litigated with urgency. Damages claims present a far more manageable process, which—as this suit demonstrates—can be tailored to address the needs of the parties. Any possible burdens can easily be addressed through normal

---

*Mitchell v. Harmony*, 54 U.S. 115, 135-37 (1851) (affirming damages award against Army officer for wrongful seizure of a U.S. merchant's goods while in Mexico during the Mexican War, finding that the seizure was not justified by military necessity); *McCall v. McDowell*, 15 F. Cas. 1235, 1247 (C.C.D. Cal. 1867) (No. 8673) (awarding damages against an Army brigadier general for false imprisonment of plaintiff who had exulted over the assassination of President Lincoln); *Cochran v. Tucker*, 43 Tenn. 186, *3 (Tenn. 1866) (affirming damages award against Confederate soldiers for wrongful arrest and imprisonment of former Union soldier during the Civil War); *Smith v. Shaw*, 12 Johns. 257 (N.Y. 1815) (affirming damages award against the commanding officer of an Army station for assault and battery and false imprisonment of plaintiff who was charged with being a spy); *McConnell v. Hampton*, 12 Johns. 234 (N.Y. 1815) (remanding for a new determination of the amount of damages in an action for assault and false imprisonment against a military commander for arresting the plaintiff on treason charges).

procedures for managing litigation.  In many cases, the passage of time may alleviate any

potential interference with urgent military tasks or battlefield duties.  In this case, for example, it

appears that three of the four Defendants do not currently have duties in Iraq.  In any case, if

problems are presented, courts may consider the duties of military defendants and are obliged to

take into account a litigant's military service when setting case schedules and controlling the

pace of litigation.[35]

Moreover, in invoking fears that a damages action would "chill" military action,

Defendants ignore that torture and abuse are already categorically prohibited by the military's

own rules and regulations.  The Army Field Manual on Intelligence Interrogation proscribes

abusive practices and warns of the criminal prosecutions that can follow.  Dep't of the Army,

Intelligence Interrogation, Field Manual 34-52, ch. 1 at 1-8 (1992).  The Defendants therefore

cannot credibly argue that a civil damages remedy will engender unwarranted caution since they

are already under a duty not to engage in torture.  Defendants have no basis for claiming a "safe

harbor" for torture or abuse that is prohibited by existing law.

In any case, the doctrine of qualified immunity already serves to address the objections

that Defendants raise.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982); *Butz v. Economou*,

---

[35] *See* Servicemembers Civil Relief Act, 50 App. U.S.C. § 522(b)(2)(2003) (authorizing stay of
proceedings if current military duty prevents appearance); *see also* 50 App. U.S.C. § 521(d)
(providing, in civil cases in which a military litigant fails to appear, for "stay of proceedings for a
minimum of 90 days under this subsection upon application of counsel, or on the court's own
motion").  The federal courts have routinely ordered stays in civil cases involving military
litigants.  *See, e.g., White v. Black*, 190 F.3d 366, 368-69 (5th Cir. 1999) (affirming district
court's stay, pursuant to former Soldiers' and Sailors' Civil Relief Act, now the Servicemembers
Civil Relief Act, of constitutional damages action because defendant was on active Air Force
duty).

438 U.S. 478, 508 (1978).[36]  As the Supreme Court stated emphatically in response to the

national security claim in *Mitchell v. Forsyth*: "We do not believe that the security of the

Republic will be threatened if [public officials] [are] given incentives to abide by clearly

established law."  472 U.S. at 524.[37]

Defendants finally point to cases declining to recognize damages remedies in suits

brought by U.S. military personnel.  From those cases, Defendants argue that if American

soldiers are barred from seeking damages against their commanders, then Plaintiffs' claims

should be barred as well.  Rumsfeld Mo. at 16; Karpinski Mo. at 19-20; Pappas Mo. at 17-18;

Sanchez Mo. at 13-15.  This argument misses the point.  The cases Defendants cite, *Chappell v.

Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley,* 483 U.S. 669 (1987), declined to

recognize a *Bivens* remedy for suits *by soldiers* incident to their military service because such

suits would interfere with "the unique disciplinary structure of the military establishment" and

"the peculiar and special relationship of the soldier to his superiors."  *Chappell*, 462 U.S. at 304

(punctuation and citation omitted); *see also Bois v. Marsh*, 801 F.2d 462, 471 (D.C. Cir. 1986)

(reasoning adopted in *Chappell* and related cases "turned on the need to preserve discipline

within our Nation's Armed Forces").  None of the cases stands for the sweeping proposition

---

[36] For example, in *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006), Judge Urbina disregarded the defendants' lengthy arguments that special factors precluded suit altogether, adjudicating the case (erroneously, in Plaintiffs' view) on qualified immunity grounds instead.

[37] *See also El Maghraby v. Ashcroft*, No. 04-01809 (JG) (SMG) (E.D.N.Y. Sept. 27, 2005), slip op. at 29-30 (rejecting defendants' claim that "special factors" militated against provision of a *Bivens* remedy, and reasoning that "our nation's unique and complex law enforcement and security challenges in the wake of the September 11, 2001 attacks do not warrant the elimination of remedies for the constitutional violations alleged here") (citing *Hamdi v. Rumsfeld*, 542 U.S. at 532 (plurality)).

advanced by Defendants that suits against the military *by civilians or others outside the military* are barred.

Indeed, even service members may bring damages actions against military officials where the injuries complained of were not "incident to service." *See, e.g., United States v. Brown*, 348 U.S. 110, 112 (1954) (veteran could recover damages for negligence of military doctors that occurred *after* his discharge from military service because "[t]he injury for which suit was brought was not incurred while respondent was on active duty or subject to military discipline"); *Brooks v. United States*, 337 U.S. 49, 51-52 (1949) (allowing servicemen to bring damages claims for injuries caused by Army personnel while they were off duty); *see also Johnson v. United States*, 810 F. Supp. 7, 10 (D.D.C. 1993) ("Where a [service member] plaintiff has been engaged in an activity of a civilian nature, the [incident to service] bar has not been applied."). As the Supreme Court explained in *United States v. Muniz*, 374 U.S. 150 (1963), where it declined to extend the incident-to-service doctrine to suits by federal civilian *prisoners*, the reason for barring damages was grounded in the "'peculiar and special relationship of the soldier to his superiors, [and] the effects of the maintenance of such suits on discipline." *Id.* at 162. *See also Cummings v. Dep't of the Navy*, 279 F.3d 1051, 1056 (D.C. Cir. 2002) (same).

When civilians bring suit against the military, the concerns expressed in *Chappell* and *Stanley* are inapplicable. Accordingly, the courts have permitted a variety of constitutional damage actions against military personnel for injuries to civilians. *See, e.g.*, *Saucier*, 533 U.S. 194 (*Bivens* action against military police officer for excessive force during demonstration at army base); *Bissonette v. Haig*, 800 F.2d 812 (8th Cir. 1986) (en banc) (*Bivens* action challenging deployment of the Army during the occupation of Wounded Knee); *Trueman v. Lekberg*, No. CIV.A. 97-1018, 1998 WL 181816 (E.D. Pa. April 16, 1998) (*Bivens* suit against a

Navy captain for false arrest and false imprisonment at a Naval Air Station); *Vu v. Meese*, 755 F.

Supp. 1375 (E.D. La. 1991) (*Bivens* claim against members of the U.S. Coast Guard for unlawful

search and seizure of plaintiff's vessel); *Butler v. United States*, 365 F. Supp. 1035 (D. Hawaii

1973) (*Bivens* suit against military personnel arising out of actions taken to detain plaintiffs at an

Air Force Base during a visit by the President).

### 2.    Congress Has Not Displaced the *Bivens* Remedy Here.

Defendants finally argue that Congress has expressed its intent to preclude a *Bivens*

remedy under the circumstances here.  *See* Rumsfeld Mo. at 11-14; Pappas Mo. at 20-22;

Sanchez Mo. at 16-17; Karpinski Mo. at 26-27 (citing cases such as *Schweiker v. Chilicky*, 487

U.S. 412, 428 (1988) (declining to imply additional remedy beyond those set forth in extensive

Social Security disability statutes and regulations)).  But Defendants cannot point to any clear

congressional statement to this effect, much less to any "comprehensive" statutory scheme

suggesting that Congress even considered the issue.  *See Spagnola v. Mathis*, 859 F.2d 223, 227

(D.C. Cir. 1988) (en banc) (per curiam) (describing the *Chilicky* standard as weighing against a

*Bivens* remedy only where "the comprehensiveness of a statutory scheme cannot be gainsaid"

such that "it appears that 'congressional inaction [in providing for damages remedies] has not

been inadvertent'") (alteration in original)*; see also Bush v. Lucas*, 462 U.S. 367, 385, 388

(1983).

Instead, Defendants rely on scattered language from legislative debates or statutes that in

fact *support* Plaintiffs' claims.  For example, Defendants cite some selectively chosen (and

misquoted) legislative history of the Detainee Treatment Act of 2005.  *See* National Defense

Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, §§ 1402-1406, 119 Stat. 3136,

3148-49 (the "DTA").  First, the *text* of the DTA negates any suggestion that Congress intended

to bar damages remedies for torture and cruel treatment as a general matter.  In establishing

uniform standards for interrogation, the DTA specifically provides that "[n]othing in this section shall be construed to affect the rights under the United States Constitution of any person in the custody or under the physical jurisdiction of the United States."  DTA § 1402(c).  In another section the DTA clearly contemplates that those responsible for torture and similar offenses may be amenable to suit because it establishes a limited affirmative defense "[i]n any *civil action* or criminal prosecution" and further provides that "[n]othing in this section shall be construed to limit or extinguish any defense or protection otherwise available to any person or entity from *suit, civil* or criminal *liability, or damages*."  *Id.* § 1404(a) (emphasis added); *see also id.* § 1404(b) (providing for government payment of fees in "civil action[s]" and other cases).  The DTA cannot be read as evidencing a congressional intent to bar any remedy that Plaintiffs possess when it expressly recognizes the existence of damages actions and assumes they can and will be brought.

Second, even if recourse to statements on the Senate floor were warranted in the face of the statute's express language, Defendants misleadingly cite only selective portions and misquote the language on which they rely.  Defendants quote Senator McCain, the principal author, as purportedly saying that the bill "does not create a private right of action."  *See* Rumsfeld Mo. at 12-13; Pappas Mo. at 21.  In fact, Senator McCain said that the detainee treatment provisions "do not create a *new* private right of action," thus suggesting that *other* causes of action already exist. 151 Cong. Rec. S14269 (daily ed. Dec. 21, 2005) (emphasis added).  Indeed, in the next sentence, Senator McCain continued: "At the same time, these provisions do not eliminate or diminish any private right of action otherwise available.  It is our intent not to disable that in any way."  *Id.*; *see also id.* (statement of Senator Levin) (daily ed. Dec. 21, 2005) ("I do not believe that the [DTA] was intended either to create such a private right of action, or to eliminate or

undercut any private right of action such as a claim under the Alien Tort Statute—that is otherwise available to an alien detainee.").[38]

Defendants next invoke the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, §§ 1091-94, 118 Stat. 1811, 2068-71 (the "Reagan Act"). *See* Rumsfeld Mo. at 12-14; Karpinski Mo. at 7-8; Pappas Mo. at 21-22; Sanchez Mo. at 16 n.16. But that enactment—passed in response to evidence of widespread torture and abuse of Iraqis in U.S. custody at Abu Ghraib, and reiterating the prohibition on "cruel, inhuman or degrading treatment" by any U.S. civilian or military official—affirmatively supports Plaintiffs' submission that the constitutional prohibition against torture applies in this case. As part of the Reagan Act, Congress set forth its view with regard to Iraq that "the Constitution, laws, and treaties of the United States . . . prohibit the torture or cruel, inhuman, or degrading treatment of foreign prisoners held in custody by the United States." Reagan Act § 1091(a)(6). *See supra* note 6 and accompanying text. Other provisions of the Act reaffirm the United States' policy that the Armed Forces should and must take responsibility for both preventing torture and, in turn, for punishing perpetrators of abuse. *See, e.g.,* Reagan Act, § 1091(a)(5) (stating that "the Department of Defense and appropriate military authorities must continue to undertake corrective action, as appropriate, to address chain-of-command deficiencies and the systemic deficiencies identified in the [abuses inflicted upon detainees at Abu Ghraib]"). But the Reagan

---

[38]   Defendant Sanchez argues that other DTA provisions governing habeas corpus actions over detention claims at Guantanamo should be read as barring damages claims for torture in Iraq and Afghanistan. Sanchez Mo. at 16 n.19. The unrelated DTA jurisdictional provisions cannot be contorted that way since they do not deal with abuse at all and, in any case, have no effect on torture suits but rather intend to channel certain Guantanamo *detention* challenges to the D.C. Circuit.

Act makes no mention of remedies for victims of those subject to torture and abuse and cannot plausibly be read to bar damages or to provide an alternative comprehensive remedial scheme.[39]

Defendant Karpinski also suggests that the system of military justice, including court martial proceedings, amounts to a comprehensive "remedial" scheme indicating Congress's intent not to provide a damages remedy.[40]  *See* Karpinski Mo. at 24-25.  By its nature, however, a criminal prosecution is obviously not a *remedial* mechanism.  Moreover, it is commonplace for criminal penalties to coexist simultaneously with civil remedies, and Congress's provision of the former does not demonstrate that it made a considered decision to reject the possibility of a civil damages remedy.  Indeed, as noted, the existence of this scheme belies any claim by Defendants that a damages remedy for conduct already criminalized will interfere with their duties.

Finally, Defendant Sanchez inexplicably suggests that the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350, stat. note 2(a)—providing a cause of action for torture

---

[39] Defendants rely on *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), for the proposition that with the Reagan Act, "Congress entrusted punishment of those accused of unlawful treatment of detainees to the military judicial system," and not the courts.  Rumsfeld Mo. at 12.  However, *Khalid* merely recognized a "[c]onspicuous . . . absence in the Reagan Act" to "any reference by Congress to federal court review" of claims against "United States personnel engage[d] in impermissible treatment of a detainee."  355 F. Supp. 2d at 329.  The "conspicuous absence" of a cause of action under the Reagan Act does not preclude federal courts from reviewing *Bivens* damages claims under the Constitution.  Moreover, as noted, the Reagan Act contains an expression of congressional views that supports Plaintiffs' claim.  *See* Reagan Act §1091.

[40] Defendants understandably have not suggested that the Foreign Claims Act ("FCA"), 10 U.S.C. § 2734, or Military Claims Act ("MCA"), 10 U.S.C. § 2733, could constitute a remedial scheme evidencing congressional intent to preclude other remedies because doing so would be contrary to relevant regulations, and the courts have uniformly held that the statutes do not provide an exclusive remedy.  *See* 32 C.F.R. § 842.65(p) (providing that an FCA claim is not payable if subject to litigation); *see also, e.g., Paalan v. United States*, 51 Fed. Cl. 738, 750 (Fed. Cl. 2002) (stating that courts "universally have held that the MCA is not an exclusive remedy" and collecting cases), *aff'd*, 120 Fed. Appx. 817 (Fed. Cir. 2005).

*under the color of foreign law*—manifests a refusal by Congress to authorize an action by a foreign citizen to remedy torture by U.S. government officials. *See* Sanchez Mo. at 16-17. But as the text and legislative history show, the TVPA was addressing a different evil, namely torture under the authority of *foreign* government officials and the lack of redress in many foreign nations.[41]

### B.    This Case Does Not Present A Political Question.

Defendants Sanchez and Karpinski argue that the case should be dismissed as non-justiciable on the ground that it raises a political question. That submission must be rejected. Nothing Plaintiffs seek in this case causes the courts to intrude on questions constitutionally committed to the political branches or to move beyond areas of judicial expertise. Neither do Plaintiffs' claims trigger prudential considerations against adjudicating Plaintiffs' rights. Defendant Rumsfeld relies on some of the same authorities to argue that "special factors" should bar a *Bivens* remedy, but significantly, he does not argue that a case raising the prohibition against torture, which Congress and the President have unambiguously condemned, is non-justiciable.

The D.C. Circuit has adopted Justice Powell's formulation that the political question test, first articulated in *Baker v. Carr*, 369 U.S. 186 (1962), involves three basic inquiries: "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" *Antolok v. United States*, 873 F.2d 369, 381 (D.C. Cir. 1989) (quoting

---

[41] Congress recognized that non-citizens had existing remedies for torts in violation of the law of nations and enacted the TVPA not to supplant those remedies, but to "establish an unambiguous basis" for relief for torture by *foreign* officials, particularly for U.S. citizens. H. Rep. No. 101-55, 101st Cong., 1st Sess., pt. 1 at 3 (1989).

*Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Powell, J., concurring)). None of these inquiries result in a finding of non-justiciability here.

First, this case—seeking to enforce fundamental laws protecting individual rights to be free from torture and cruel treatment—goes to the core function of the independent judiciary. The judicial power is, of course, vested in the judiciary by Article III of the Constitution, and it is well-established that "[w]hat are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Sterling v. Constantin*, 287 U.S. 378, 401 (1932). The Supreme Court has consistently upheld that principle, including during times of active hostilities and in the current war on terror. *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Rasul v. Bush*, 542 U.S. 466 (2004); *The Paquete Habana*, 175 U.S. 677 (1900); *Little v. Barreme*, 6 U.S. 170 (1804).

Indeed, the cases cited by Defendants confirm that the courts maintain an important role in reviewing actions of the military even in times of war. In *Hamdi*, the Supreme Court stated: "While we . . . recognize that the scope of [military] discretion necessarily is wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here." 542 U.S. at 535 (plurality) (cited in Rumsfeld Mo. at 5; Pappas Mo. at 15; Sanchez Mo. at 14 n.16).[42] Similarly, in *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), *vacated on other grounds,* 471 U.S. 1113 (1985), the D.C. Circuit rejected the government's argument that the plaintiffs presented a political question when "[p]laintiffs' claim,

_____

[42] *See also Rostker v. Goldberg*, 453 U.S. 57, 67, 70 (1981) (cited in Karpinski Mo. at 18) (while the political branches are entrusted with responsibility for military affairs, "[n]one of this is to say that [the political branches are] free to disregard the Constitution when [they] act[] in the area of military affairs"; "[judicial] deference *does not mean abdication*") (emphasis added).

properly understood, [was] narrowly focused on the lawfulness of the United States defendants'

occupation and use of the plaintiffs' cattle ranch" in Honduras, rather than broad questions of the

propriety of United States military involvement in that country.[43]  *Id*. at 1512.  *See also*

*Population Institute v. McPherson*, 797 F.2d 1062, 1070 (D.C. Cir. 1986) ("more than an impact

on foreign relations is required before a political case becomes a political question").[44]

      Contrary to Defendants' arguments, this case has nothing to do with policy decisions to

go to war in Afghanistan and Iraq, to deploy military force abroad, or even the military's power

to detain civilians as part of the war effort.  *Cf. Crockett v. Reagan*, 720 F.2d 1355, 1356-57

(D.C. Cir. 1983) (per curiam) (congressional challenge to legality of the United States' presence

in El Salvador raised a political question); *El-Shifa Pharm. v. United States*, 402 F. Supp. 2d 267,

274-76 (D.D.C. 2005) (suit for damages arising from President's decision to bomb a

pharmaceutical plant in Sudan raised political questions).  In this case, the challenged conduct is

torture, which the political branches themselves have repeatedly stated as a matter of law and

policy is contrary to the interests of the United States.  Far from finding torture "inextricably

intertwined" with U.S. foreign policy, the political branches have consistently condemned it.

---

[43] Although the court in *Schneider v. Kissinger*, 412 F.3d 190, 196 (D.C. Cir. 2005), declined to consider *Ramirez de Arellano*, the D.C. Circuit has continued to cite and rely upon *Ramirez de Arellano* after its vacatur, in other cases addressing the political question doctrine.  *See, e.g.*, *Bancoult v. McNamara*, 2006 WL 1042356, at *6, *7 (D.C. Cir. April 21, 2006); *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 909 (D.C. Cir. 1996); *Nixon v. United States*, 938 F.2d 239, 251, 258 (D.C. Cir. 1991); *Antolok v. United States*, 873 F.2d 369, 381 (D.C. Cir. 1989); *Comm. Of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 934, 935 (D.C. Cir. 1988).

[44] *See also Stehney v. Perry*, 101 F.3d 925, 932 (3rd Cir. 1996) (holding that "whether [the National Security Agency] complied with its own regulations or violated [plaintiff's] constitutional rights presents a justiciable claim"); *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992) (citing numerous Supreme Court decisions permitting challenges to governmental operations, and ruling that the shooting down of a civilian aircraft by a U.S. warship was justiciable, despite occurring in the midst of an undeclared "tanker war" between Iran and Iraq).

Defendants cannot argue, and Defendant Rumsfeld does not suggest, that U.S. foreign policy can or does authorize the torture and abuse at issue here or that enforcing the prohibition in any way intrudes on the realm of foreign policy.

Defendants' reliance on cases such as *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 1768 (April 17, 2006) (No. 05-743), and *Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004), *aff'd*, No. 05-5049, --- F.3d ---, 2006 WL 1042356 (D.C. Cir. April 21, 2006), (Sanchez Mo. at 6-8; Karpinski Mo. at 37-41) is thus entirely misplaced.  The actions challenged in *Sanchez-Espinoza*, *Schneider* and *Bancoult* involved the Executive Branch's strategic determinations regarding the dynamics of world politics and the means for effectuating the foreign political change deemed necessary to safeguard American interests.  *See Sanchez-Espinoza*, 770 F.2d at 205-06 (challenging President's decision to provide financial support for the overthrow of the Nicaraguan government); *Schneider*, 412 F.3d at 197 (asking court "to define the standard for the government's use of covert operations in conjunction with political turmoil in [Chile]").  For example, in *Bancoult*, the plaintiffs sought to challenge policies related to a decision by Congress and President 30 years earlier to enter into an agreement with Great Britain during the Cold War to depopulate British-governed islands for the purpose of constructing a U.S. naval base.  In considering this joint decision by both political branches, *Bancoult* found that such a decision was "inextricably intertwined" with foreign policy and further noted that the case would raise different issues if it asserted "constitutionally-protected liberties."  *Bancoult*, 2006 WL 1042356, at *7.  The inquiries in all three cases were "classically within the province of the political branches, not the courts."  *Schneider*, 412 F.3d at 195.  In sharp contrast, in this case the Executive and Congress have condemned, not endorsed, the

torture and abuse of foreign nationals in U.S. custody, and Plaintiffs' suit to enforce legal claims is entirely consistent with those views.

Resolution of the question presented here—whether Defendants are legally responsible for Plaintiffs' unlawful torture and abuse—does not require the Court to review or analyze issues outside core areas of judicial expertise. Plaintiffs are decidedly *not* asking the Court to develop judicial standards for regulating the military (*see* Karpinski Mo. at 40; Sanchez Mo. at 8), but rather to address Defendants' failure to abide by U.S. constitutional and international legal obligations that are already incorporated in pre-existing military rules and regulations. In this respect, this case is the opposite of *Gilligan v. Morgan*, 413 U.S. 1 (1973), on which Defendant Sanchez relies, where plaintiffs asked "the District Court [to] establish standards for the training, kind of weapons and scope and kind of orders to control the actions of the National Guard" in the wake of the Kent State student shootings and "exercise a continuing judicial surveillance over the Guard to assure compliance." *Id.* at 6. Notably, when the same incident was litigated in a *damages* action, the Supreme Court had no trouble distinguishing *Gilligan*. *See Scheuer v. Rhodes*, 416 U.S. 232, 249 (1974) ("[In *Gilligan*] we specifically noted that we neither held nor implied that . . . there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief.") (quoting *Gilligan*, 413 U.S. at 11-12).[45]

---

[45] In any event, specific legal questions relating to claims of torture are regularly addressed by the domestic courts and are plainly within their competency. *See, e.g., Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (addressing acts constituting "torture" within the meaning of the Convention Against Torture and the Torture Victim Protection Act of 1991); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 294-95 (D.C. Cir. 2002) (same). *See also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1251 (11th Cir. 2005) (addressing definition of "torture" in the Convention Against Torture and the Alien Tort Statute).

Finally, no prudential considerations militate against reaching the merits of Plaintiffs'
claims. As the D.C. Circuit has stated with regard to the last *Goldwater/Baker* inquiry, "the key
consideration is that, at the end of the day, there will only be one pronouncement on this
question." *Population Institute*, 797 F.2d at 1070 (1986). Defendant Sanchez cites *Sanchez-
Espinoza v. Reagan*, 568 F. Supp. 596 (D.D.C. 1983), but that case is not to the contrary. As
noted above, *Sanchez-Espinoza* concerned claims brought by members of Congress and others
alleging that the President had initiated an unauthorized war. The court there concluded that
judicial involvement was inappropriate because, among other things, it would have "provide[d]
yet a third view on U.S. activities." *Id.* at 600.

*Arar v. Ashcroft*, 415 F. Supp. 2d 250 (E.D.N.Y. 2006), is also inapposite. That case
involved numerous claims, including a challenge to the Executive's policy of "rendition" of a
suspect to a foreign country for interrogation and torture. The district court found that Arar's
claim involved "complex relationships with foreign governments." *Id.* at 281. Here, by contrast,
the Plaintiffs were in the sole and exclusive custody of the United States, and foreign
governments had no access to, control over, or connection with the events at issue. Notably, the
*Arar* court had no difficulty finding that Arar's abuse in U.S. custody while at JFK airport
presented a *Bivens* claim despite the government's position that he was a member of a terrorist
organization who posed a threat to the security of the United States. *Id.* at 283-84, 286.

In this case, to the extent Congress has spoken, it has expressly supported the position
Plaintiffs advance—that the Constitution prohibits the torture and abuse of foreign nationals
detained in U.S. custody abroad. The Reagan Act expresses the "sense of Congress" that "the
Constitution, laws, and treaties of the United States . . . prohibit the torture or cruel, inhuman, or

degrading treatment of foreign prisoners." Reagan Act § 1091.[46]  Far from risking "multifarious

pronouncements," Plaintiffs are seeking to enforce the prohibition on torture and cruel treatment

that is already uniformly condemned by the laws passed by Congress, and the regulations

embraced by the military.  Judicial resolution would reinforce the undisputed, single view that

the U.S. Constitution categorically prohibits the torture of detainees in U.S. military custody.

### C.    Defendants Are Not Entitled to Qualified Immunity.

Defendants further argue that they are entitled to qualified immunity from Plaintiffs'

constitutional claims for damages, on the ground that when Plaintiffs suffered their injuries, it

was not clear that a noncitizen outside the United States could bring an action for redress for

torture.  Defendants' argument—in essence, that they could not reasonably have known their

conduct was unlawful—does not survive even passing scrutiny.

Under the Supreme Court's two-step qualified immunity test, the Court is required first to

determine whether Plaintiffs have asserted a cognizable constitutional right.  As the D.C. Circuit

recently stated, "First, there is a 'threshold question: Taken in the light most favorable to the

party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

right?'" *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) (citations omitted).  If that

question is answered affirmatively, the Court goes on to determine whether the right was clearly

established at the time of Defendants' acts.  *Groh v. Ramirez*, 540 U.S. 551, 563 (2004);

---

[46] A sense-of-Congress provision is a direct expression of congressional intent and is relevant to
the courts' interpretation of existing law.  *See Accardi v. Pennsylvania R. Co.*, 383 U.S. 225,
228-29 (1966) (finding that sense-of-Congress provision showed "continuing purpose of
Congress" already established in another law); *State Highway Comm'n of Missouri v. Volpe*,
479 F.2d 1099, 1116 (8th Cir. 1973) (determining that sense-of-Congress provision "can be
useful in resolving ambiguities in statutory construction" and interpreting existing law).

*Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). *See also Barham*, 434 F.3d at 572.[47]

In making the qualified immunity determination, the Court asks whether the Defendants' actions were objectively reasonable at the time they were executed. *Wilson*, 526 U.S. at 614. The constitutional right should be framed with an appropriate level of specificity, but the question is not whether the precise action at issue has previously been held to be unlawful. *Id.* at 614-15; *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001). Rather, the relevant question is whether "in the light of pre-existing law the unlawfulness [was] apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Butera*, 235 F.3d at 646.

In this case, it was readily apparent from the pre-existing law that Defendants' actions were unlawful. It has long been the settled law under the Constitution that the torture of any detainee is forbidden. *See* Point I.A., *supra*. It is equally well-settled that Defendants have a legal duty to stop and prevent torture if they knew or had reason to know that it was happening. *See* Point I.B., *supra*. These legal mandates, which are also reflected in U.S. Army manuals and regulations, put the Defendants on notice that committing or allowing the torture of Plaintiffs was unlawful.

Despite the clarity of their obligations, Defendants argue that they are entitled to qualified immunity by contending that it was not clear at the time Plaintiffs were tortured that a non-citizen outside the United States could bring an action for redress of such torture. Rumsfeld Mo.

---

[47] As the Supreme Court explained, the two-step analysis serves the purpose of developing jurisprudence on constitutional rights. If courts were permitted to bypass the first inquiry into the existence of the constitutional right and skip to the second-stage inquiry, no constitutional principle could ever become sufficiently clearly established. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *see also Wilson*, 526 U.S. at 609.

at 20; Sanchez Mo. at 24; Karpinski Mo. at 31; Pappas Mo. at 27.  Defendants' contention is *not* that there is any doubt about the illegality of their conduct; rather, it is that these particular victims of their policies were not clearly entitled to seek relief in U.S. courts.  That argument turns the law of qualified immunity on its head.

Qualified immunity was never meant to excuse knowing violations of the law based on a post hoc argument that the victim's legal remedies were not certain.  Defendants cite no case adopting such a skewed view of the immunity doctrine, and Plaintiffs know of none.  The purpose of qualified immunity is to protect an officer who could not reasonably have known that his conduct was unlawful and makes a "mere mistake" as to the lawfulness of his conduct. *Butz v. Economou,* 438 U.S. 478, 507 (1978); *see also Saucier*, 533 U.S. at 202 (qualified immunity test is "whether it would be clear to a reasonable officer that his *conduct was unlawful* in the situation he confronted") (emphasis added); *Hope*, 536 U.S. at 741 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances").

In this case, the Constitution, as well as Army regulations and the military's own criminal law, make clear that the torture and brutal abuse of custodial detainees by U.S. authorities is prohibited in *all* circumstances.  Defendants therefore cannot legitimately argue that it was not clear "to a reasonable officer that his conduct was unlawful."  *Cf. Hope*, 536 U.S. at 741-42, 743-44 (state regulations forbidding use of hitching post for prisoners put prison officials on notice that practice was unconstitutional); *Groh*, 540 at 564 & n.7 (police department guidelines put defendant officer on notice that search warrant was unlawful); *Barham*, 434 F.3d at 576 (police

manual embodying constitutional principles relevant to defeating qualified immunity even though "[s]tanding alone" an internal procedure "might not" be sufficient).[48]

In the face of these authorities, Defendants' reliance on recent case law is at best misplaced. In *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006)—a decision that is not binding on this Court—the district court concluded that certain Guantanamo detainees' constitutional rights regarding torture were not clearly established at the time of their detention, and therefore dismissed the detainees' claims on qualified immunity grounds. *Id.* at 43-44. But Judge Urbina did not recognize (and the plaintiffs there did not argue) that the proper qualified immunity question is whether the prohibition against torture was clearly established, not whether the particular detainees in that case had a clear right to enforce that prohibition in U.S. courts.

The district court's *Rasul v. Rumsfeld* opinion also mistakenly relied on *Eisentrager* and *Verdugo-Urquidez*, without ever considering the long line of Supreme Court precedent establishing that *fundamental* rights are protected in areas controlled by the United States under the *Insular Cases* and the authorities endorsed by the Supreme Court in *Rasul v. Bush*. A single mistaken district court decision cannot unsettle decades of Supreme Court precedent that fundamental rights apply outside the territory of the United States under the circumstances presented here. *See* Point II *supra*.

---

[48] *See generally Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902-04 (6th Cir. 2004) (explaining that "[o]ther sources [besides case law] can also demonstrate the existence of a clearly established constitutional right," and relying in part on training received by police officers to conclude that defendants had violated the clearly established right against excessive force); *Beier v. City of Lewiston*, 354 F.3d 1058, 1069-70 (9th Cir. 2004) (relying in part on state statute and police training to conclude that defendant police officers had acted in violation of clearly established law); *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002) (noting that "[p]rison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established," and relying on regulations authorizing use of pepper spray only in specified circumstances to conclude that defendants' use violated clearly established law).

Defendants also cite *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. Rasul v. Bush*, 542 U.S. 466 (2004), in which the D.C. Circuit held that the district court did not have habeas jurisdiction to review claims of unlawful detention by detainees at Guantanamo. But *Al Odah*, which was reversed by the Supreme Court, does not support Defendants' argument for three reasons. First, as explained above, it focuses on the Plaintiffs' right to habeas, not on the lawfulness of Defendants' conduct. Second, many of Defendant Rumsfeld's unlawful acts occurred *before* the D.C. Circuit decided *Al Odah*. He authorized detainee abuse in violation of U.S. and international law as early as November 2002 and continued in his unlawful activities throughout early 2003, before the *Al Odah* decision. Am. Compl. ¶¶ 49, 51-67. Under the case law prevailing at all times relevant to Defendant Rumsfeld's actions, the Constitution forbade and continues to forbid U.S. officials from violating such fundamental prohibitions as those against torture and cruelty, in U.S. military prisons in territories subject to U.S. control. Third, the *Al Odah* case involved categorically different legal claims and facts. *Al Odah* concerned claims about wrongful detention and collateral issues such as detainees' lack of access to family members and counsel.[49] Unlike the instant case, *Al Odah* did not concern a categorical prohibition. The law against torture is absolute and does not vary depending on particular facts and circumstances, and does not require enforcement mechanisms that might be deemed "impractical and anomalous." *See* Point II *supra*.

Defendants are then left to argue that since the Supreme Court reversed *Al Odah* in *Rasul v. Bush*, 542 U.S. 466 (2004), the district courts have disagreed about whether noncitizens

---

[49] *See* 321 F.3d at 1136-37 (noting petitioners sought "declaratory judgment and an injunction ordering that they be informed of any charges against them and requiring that they be permitted to consult with counsel and meet with their families," "a writ of habeas corpus, release from unlawful custody, . . . an end to interrogations, and other relief," and "legally sufficient process to establish the legality of [ ] detention").

have certain constitutional rights outside the United States, and that this disagreement shows that

the rights at issue here still are not clearly established.  Sanchez Mo. at 24-25; Karpinski Mo. at

31 n.25 (citing *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) (Green,

J.); *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) (Leon, J.)).  While Judges Green and

Leon did disagree about the applicability of constitutional rights regarding challenges to

unlawful detention at Guantanamo, they did not grapple with or have occasion to consider the

fundamental constitutional prohibition against torture.  *Guantanamo Detainee Cases*, 355 F.

Supp. 2d at 445, 464 (holding that detainees have Fifth Amendment right to habeas review of

military procedures for designation as "enemy combatant"); *Khalid*, 355 F. Supp. 2d at 323

(concluding that petitioners may not challenge lawfulness of detention at Guantanamo through

habeas corpus).  In particular, *Khalid* did not consider the line of cases establishing that the

Constitution protects the *fundamental* constitutional rights of individuals in the circumstances

presented here, holding categorically that noncitizens outside sovereign U.S. territory have no

constitutional rights.  *Id.* at 321-23.  The disagreement between these two rulings is not enough

to show a lack of clarity where Supreme Court precedent has consistently protected fundamental

rights.

## IV.     THE FEDERAL TORT CLAIMS ACT IS NOT THE EXCLUSIVE REMEDY FOR PLAINTIFFS' INTERNATIONAL LAW CLAIMS.

In response to Plaintiffs' claims for relief under the law of nations and the Geneva

Convention (IV) Relative to the Protection of Civilian Persons in Time of War (1949),

75 U.N.T.S. 287 ("Fourth Geneva Convention"), Defendants do not dispute that they had a duty

as commanders not to authorize torture and other cruel and inhuman treatment and also a duty to

prevent and to punish any such acts by their subordinates.  Nor do Defendants dispute that the

prohibition against torture is a *jus cogens* norm—that is, a right under international law that

"enjoy[s] the highest status [ . . . ] and prevail[s] over both customary international law and treaties." *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988). Defendants could not dispute these matters for they are universally accepted. *See supra* Point I.

Defendants instead maintain that they are immune from liability and are entitled to have the U.S. government substituted as a defendant. Defendants Rumsfeld, Sanchez and Pappas move to dismiss Counts Three, Four and Five on the ground that the conduct pled by Plaintiffs falls within the scope of Defendants' federal employment for purposes of the Federal Employees Liability Reform and Tort Compensation Act of 1998, Pub. L. No. 100-694, 102 Stat. 4563 (codified in relevant part at 28 U.S.C. §§ 2671, 2674, 2679) (the "Westfall Act"). Under the Westfall Act, the sole remedy for certain torts committed by federal officials within the scope of their employment is against the U.S. government under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ("FTCA").[50] Defendants contend that they are immune from the international law claims as a result of this provision. Defendants Rumsfeld and Pappas further contend that under the FTCA, claims for torts "arising in a foreign country" are not permitted, 28 U.S.C. § 2680(k), and therefore Plaintiffs' international law claims should be dismissed under the sovereign immunity doctrine. Rumsfeld Mo. at 27-31; Pappas Mo. at 34. Defendants'

---

[50] The Westfall Act provides for two exceptions to its exclusive remedy provision. The U.S. government cannot be substituted for an individual government employee defendant in an action "which is brought for a violation of the Constitution of the United States," or "which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2). The former exception for constitutional violations includes Plaintiffs' *Bivens* claims, which therefore are not subject to the exclusive remedy of the FTCA. The latter exception for violations of statutes is discussed below in more detail.

contentions are wrong for four reasons.[51]  First, Defendants' arguments about the Westfall Act

go only to Plaintiffs' claims for damages under international law, and not to Plaintiffs' claims for

declaratory relief under international law; the plain text of the Westfall Act applies only to

damages claims and not to equitable remedies.  Second, the Westfall Act's exclusive remedy

provision covers "negligent or wrongful" acts only.  Congress never intended this provision to

include intentional, egregious torts in violation of *jus cogens* norms such as the prohibition

against torture and other cruel, inhuman or degrading treatment.  Third, Defendants' acts and

omissions fall outside the scope of their employment and therefore the United States cannot

substitute for Defendants under the Westfall Act.  At a minimum, dismissal at this stage would

be improper because the parties disagree on what constitutes Defendants' scope of employment.

Plaintiffs are entitled at least to discovery on this issue.  Fourth, even if the Westfall Act applies,

Plaintiffs' international law claims based on the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"),

---

[51] Defendant Sanchez, alone among the Defendants, asserts that Plaintiffs have failed to state a
claim under the law of nations.  Sanchez Mo. at 35.  Relying on the Convention Against Torture
and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Dec. 10,
1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, UN Doc. A/RES/39708 (1984),
entered into force June 26, 1987, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (1984), as modified, 24
I.L.M. 535 ("CAT"), and the Torture Victims Protection Act, 28 U.S.C. § 1350 stat. note 2(a)
("TVPA"), he argues that Plaintiffs are precluded from asserting claims of torture under the
Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").  This argument fails because nothing in either the
CAT or TVPA forecloses such claims.  Indeed, the legislative history shows that the TVPA was
enacted to supplement, not supplant, the causes of action recognized by the ATS.  *See, e.g.*, S.
Rep. No. 102-249 at 5 ("while the Alien Tort Claims Act provides a remedy to aliens only, the
TVPA would extend civil liability also to U.S. citizens who may have been tortured abroad.");
*see also Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir.1995) ("The scope of the Alien Tort Act
remains undiminished by enactment of the Torture Victim Act"); *Doe v. Islamic Salvation Front*,
993 F. Supp. 3, 7-9 (D.D.C. 1998) (recognizing simultaneous claims under ATS and TVPA).  In
*Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004), the Supreme Court cited the prohibition
against torture as an example of an international norm that was sufficiently universal and definite
to support claims under the ATS.

and the Fourth Geneva Convention fall within the Westfall Act's express exception for statutory

violations.

      A.     **Westfall Substitution On Its Face Does Not Apply To Plaintiffs' Claims For Declaratory Relief Under International Law.**

      Plaintiffs seek not only damages, but also declaratory relief for the violations of their

rights under the law of nations and the Fourth Geneva Convention.[52]  Declaratory relief is

available for a tort in violation of the law of nations or treaties of the United States under the

ATS.  28 U.S.C. § 1350; *Sanchez-Espinoza v. Reagan*, 770 F. 2d 202, 207 (D.C. Cir. 1984); *Tel-*

*Oren v. Libyan Arab Republic*, 726 F.2d 774, 784-85 (D.C. Cir. 1984) (Edwards, J., concurring);

*see also Jota v. Texaco, Inc.*, 157 F.3d 153, 161-62 (2d Cir. 1998); *In re Estate of Ferdinand*

*Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994); *Presbyterian Church of the Sudan v. Talisman*

*Energy, Inc.*, 244 F. Supp. 2d 289, 353 (S.D.N.Y. 2003); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1334

(N.D. Cal. 2004); *Adra v. Clift*, 195 F. Supp. 857, 865 (D. Md. 1961).  Equitable relief is also

available for violation of the Fourth Geneva Convention.  *Cf. Asakura v. City of Seattle*, 265 U.S.

332, 339-41 (1924) (plaintiff entitled to injunctive relief under treaty which court found

"operates of itself" and would therefore "be applied and given authoritative effect by the

courts"); *Jordan v. Tashiro*, 278 U.S. 123 (1928) (granting mandamus petition to enforce same

treaty).

      To the extent Defendants argue that the FTCA is the exclusive remedy for Plaintiffs'

claims for declaratory relief under international law, their argument fails under the plain terms of

the Westfall Act.  The Westfall Act states that the remedy provided by the FTCA will be

---

[52] Defendants Sanchez, Karpinski and Pappas erroneously assume that Plaintiffs seek declaratory relief only against Defendant Rumsfeld.  As set forth in the Prayer for Relief in the Consolidated Amended Complaint and in the original separate complaints filed against Defendants Sanchez, Karpinski and Pappas, Plaintiffs do seek declaratory relief against all four Defendants.

exclusive of "[a]ny other civil action or proceeding *for money damages . . . .*" 28 U.S.C. 2679(b)(1) (emphasis added).  Thus, the Westfall Act does not cover Plaintiffs' claims for declaratory relief.  None of the Defendants dispute this, nor can they.  "[S]ubstitution [of the United States as defendant under the Westfall Act] is appropriate insofar as [a] plaintiff's claim seeks damages, it is inappropriate insofar as plaintiff's claim seeks injunctive or declaratory relief."  *Vanover v. Hantman*, 77 F. Supp. 2d 91, 97 (D.D.C. 1999).

### B.    The Westfall Act Does Not Cover Intentional, Egregious Torts In Violation Of The Law Of Nations And The Fourth Geneva Convention.

With regard to Plaintiffs' claims for damages under the law of nations and the Fourth Geneva Convention, the Westfall Act's exclusive remedy provision also does not apply.  As set forth below, the Westfall Act does not cover intentional, egregious torts in violation of *jus cogens* norms, recognized under the law of nations and the Fourth Geneva Convention.

The Westfall Act provides that the U.S. government shall be substituted for an individual defendant in a "civil action or proceeding for money damages"

> for injury or loss of property, or personal injury or death arising or resulting from the *negligent or wrongful* act or omission of any employee of the Government while acting within the scope of his office or employment . . . .

8 U.S.C. § 2679(b)(1) (emphasis added).  Thus, for the Westfall Act's exclusive remedy provision to apply, two factors, among others, must be met:  (1) that the claim is for a "negligent or wrongful act or omission"; and (2) that such act or omission occurred within the scope of the federal employee's office or employment.

The text of the Westfall Act is ambiguous as to the meaning of "negligent or wrongful act or omission."  28 U.S.C. § 2679(b)(1).  In particular, it is unclear what Congress meant by use of the word "wrongful."  In construing the ambiguous phrase, the Court should look at the words in context, and with an eye to Congress's intent.  *See Dolan v. U.S. Postal Services*, 126 S. Ct.

1252, 1257 (2006); *Dalehite v. United States*, 346 U.S. 15 (1953). The general structure and legislative history of the Westfall Act demonstrate that an intentional, egregious tort in violation of a *jus cogens* norm—such as a commander's condoning or authorizing torture—falls outside the description "negligent or wrongful," which Congress intended to indicate ordinary torts such as those under state law.

      The legislative history of the Westfall Act clarifies that Congress never intended to make intentional, egregious violations of international law—such as torture—subject to the Westfall Act's exclusive remedy provision. Congress passed the Westfall Act in order to override the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), which held an individual federal employee personally liable for a state-law tort. Congress disagreed with the Court's analysis and passed the Westfall Act in order to subject garden-variety state-law torts to the FTCA as an exclusive remedy. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 425 (1995). The House Report on the Westfall Act clearly stated that "[i]f an employee is accused of egregious misconduct rather than mere negligence or poor judgment, then the United States may not be substituted as a defendant." H.R. Rep. No. 100-700 at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5946 (noting that claims subject to Westfall Act would include "suits for clerical negligence" and recommending that Congress pass the statute to announce "standards governing . . . state-law tort action[s]"); 134 Cong. Rec. H4718 (June 27, 1988) (statement of Rep. Frank) ("we are not talking about intentional acts of harming people"). In light of this legislative history, the statutory term "negligent or wrongful" should not be construed to extend to intentional, egregious torts in violation of a *jus cogens* norm of international law.

      In addition to the legislative history that demonstrates Congress's clear intent not to immunize intentional, egregious violations of international law, this result is also compelled by

the long-settled principle that statutes should be construed to be consistent with international law. *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *see also F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 166 (2004); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963). Since Nuremberg, international law has required states to hold perpetrators accountable for human rights violations—*see* Robert H. Jackson, Final Report to the President on the Nuremberg Trials, Oct. 7, 1946, U.S. Dep't St. Bull. Vol. XV, nos. 366-391, Oct. 27, 1946, at 771, 774—not only through criminal punishment, but also through redress to victims. [53] If this Court were to construe the Westfall Act to preclude suit against the Defendants in this case, the statute would be at odds with this fundamental principle of the law of nations. The U.S. law of statutory construction does not permit such an interpretation.

---

[53] *See* Universal Declaration on Human Rights, G.A. Res. 217 A (III), U.N. GAOR, 3d. Sess., U.N. Doc. A/810 (1948), art. 8 ("Everyone has the right to an effective remedy by the competent national tribunals for acts violating . . . fundamental rights . . . ."); International Covenant on Civil and Political Rights, Dec. 19, 1966, 6 I.L.M. 368, 999 U.N.T.S. 171 ("ICCPR"), art. 2(3) (requiring states "to develop the possibilities of judicial remedy," and "to ensure that the competent authorities shall enforce such remedies when granted") and art. 9(5) ("Anyone who has been the victim of an unlawful arrest or detention shall have an enforceable right to compensation."); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 ("CAT"), art. 14(1) ("Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation . . . ."). The United States has ratified both the ICCPR and CAT and is also bound by the Universal Declaration of Human Rights, which is a statement of customary international law. International law requires governments to open their legal systems to claims by victims and survivors of human rights abuses. *See* Right to Restitution, Compensation and Rehabilitation for Victims of Grave Violations of Human Rights and Fundamental Freedoms, Final Report of the Special Rapporteur, M. Cherif Bassiouni, U.N. ESCOR, 56th Sess., at XX 2(b), 2(c), 3(d), U.N. Doc. E.CN.4/2000/62. *See generally* U.N. Commission on Human Rights, Basic Principles and Guidelines on Right to a Remedy (rev. Oct. 24, 2003), U.N. Doc. E/CN.4/2004/57 (2004).

Federal courts repeatedly have declined to extend immunity to individuals in the analogous context of ATS cases in which foreign defendants assert the "act of state doctrine" as a defense to tort liability.[54]   In those cases, foreign official defendants have sought dismissal of cases alleging acts such as torture or other cruel, inhuman or degrading treatment on the basis that these acts were governmental acts and thus immune from suit under the act of state doctrine. U.S. courts have uniformly rejected defendants' characterization of such acts as legitimate "public acts" that are shielded from review by courts by act of state immunity.   Courts have squarely held that such egregious violations of international law can never be considered "public acts" for purpose of the doctrine.   *See, e.g., Filartiga v. Pena-Irala*, 630 F.2d 876, 889-890 (2d Cir. 1980); *Kadic v. Karadzic*, 74 F.3d 377 (2d Cir. 1996); *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994); *Xuncax v. Gramajo*, 886 F. Supp. 162, 175-76 (D. Mass. 1995); *Cabri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996).   Thus, foreign government officials may not assert that acts of torture and inhumane treatment were performed on behalf of the sovereign and therefore should be immunized.[55]   Defendants here similarly should not be immunized from liability for their conduct.

---

[54] The act of state doctrine precludes judicial inquiry into the validity of the "public" or "official" acts of a recognized foreign sovereign power.  *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 428 (1964).

[55] Like the courts, Congress has provided expressly that foreign government officials can be held personally liable for acts of torture, even when they purport to be carrying out their official duties.  In the TVPA, 28 U.S.C. § 1350 stat. note 2(a), Congress authorized suits against government officials for acts of torture perpetrated "under color of foreign law."  Civil suits can be filed under the TVPA even if the foreign government official is still in office.  Similarly, a 1996 amendment to Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, adds a category of non-immune conduct to the limited range of acts committed by nation states designated by the United States as "state sponsors of terrorism."  Specifically, the amendment permits actions in U.S. courts by a U.S. citizen that allege "personal injury or death [ . . . ] caused by an act of torture, extra-judicial killing."  28 U.S.C. § 1605(a)(7).  Significantly, no immunity applies to
(footnote continued on next page)

The fundamental point is that an intentional, egregious tort in violation of a *jus cogens* prohibition is not one that a sovereign can approve, as the prohibition is recognized under the U.S. Constitution and federal statute.  *See In re Agent Orange Product Liability Litig.*, 373 F. Supp. 2d 7, 83-84 (E.D.N.Y. 2005) ("[B]y definition, the law of any particular state is either identical to the *jus cogens* norms of international law, or it is invalid.").  Because substitution of the United States for the individually named Defendants would result in sovereign immunity for conduct that a sovereign cannot engage in, this Court cannot sanction the substitution.

In an analogous context, the Supreme Court has held that when a state officer violates the Constitution, Eleventh Amendment immunity does not attach because the individual officer is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Ex Parte Young*, 209 U.S. 1234, 159-60 (1908). Similarly, when a federal officer acts outside his or her lawfully delegated authority, by intentionally violating a *jus cogens* norm, the conduct falls outside lawfully delegated authority. *Cf. Nasuti v. Scannell*, 906 F.2d 802, 807 n.10 (1st Cir. 1990) ("If an employee is accused of egregious misconduct, rather than mere negligence or poor judgment, then the United States may not be substituted as the defendant, and the individual employee remains liable.") (citing H.R. Rep. No. 100-700 at 5, *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949).

Defendants' acts fall entirely outside the scope of the Westfall Act because they are egregious intentional torts in violation of the law of nations and the Fourth Geneva Convention. Defendants therefore may be held personally accountable for these violations.

---

such conduct when it is "engaged in by an official, employee or agent . . . while acting within the scope of his or her office, employment or agency." *Id.* § 1605(a)(5).

### C.    The Westfall Act Does Not Apply Because Defendants Were Not Acting Within The Scope Of Employment.

As set forth above, Congress has made clear that it did not intend to include violations of *jus cogens* norms in the scope of the Westfall Act's reference to "negligent or wrongful" acts and omissions.  The Westfall Act also does not apply for the separate reason that an intentional, egregious tort in violation of a *jus cogens* norm of international law does not fall within the "scope of employment"—a second requirement for Westfall Act substitution.

Defendants argue that their conduct falls within the scope of employment, and thus within the Westfall Act's exclusive remedy provision, on two grounds.  First, Defendants argue that the D.C. law of respondeat superior should apply, and that under that law, their conduct falls within the "scope of employment."  Second, each Defendant submits a certification by the Department of Justice, stating that at the time of the conduct alleged in the complaint, he or she was acting within the scope of employment.  Neither of these grounds supports dismissal of Plaintiffs' claims for damages under the law of nations and the Fourth Geneva Convention.

Ordinarily, in determining the scope of employment for purposes of the Westfall Act, a court should apply the law of respondeat superior in the state where the alleged act or omission occurred.  *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994).[56]  In this case, because the acts or omissions occurred both in the United States (at the Pentagon, in Virginia, where Defendant Rumsfeld developed and implemented the policies, practices and procedures at issue) and in Iraq and Afghanistan, the Court should apply "general principles of tort law

---

[56] Defendants Sanchez and Karpinski claim that under *Tarpeh-Doe*, this Court should apply the law of respondeat superior in D.C.  Sanchez Mo. at 29; Karpinski Mo. at 12.  *Tarpeh-Doe* does not compel that result; it applied D.C. law because the plaintiffs claimed that defendant State Department officials in Washington, D.C., were negligent in their supervision of a U.S. government physician in Liberia and, significantly, the parties stipulated to the choice of law.  The instant case does not have a nexus to D.C. and the parties have not stipulated to the application of D.C. law.

common to the majority of the United States jurisdictions." *Kashin v. Kent*, 333 F. Supp. 2d 926,

930 (S.D. Cal. 2004) (quoting 32 C.F.R. § 536.28(b)).  Those general principles of respondeat

superior are reflected in the Restatement (Second) of Agency, which provides that an employee's

act is within the scope of employment when (1) it is of the kind he is employed to perform; (2) it

occurs substantially within time and space limits authorized by the employer; (3) it is actuated, at

least in part, by a purpose to serve the master; and (4) if force is intentionally used by the

employee against another, the use of force is not unexpectable by the employer.  *See, e.g.,*

*Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987) (citing

Restatement (Second) of Agency (1957)).  An employee's conduct is not within the scope of

employment if it is different in kind from that authorized, if it is too far beyond the authorized

time or space limits, or does not have the purpose of serving the employer.  *Id.*

Under the Restatement standards, Defendants' conduct was not within the scope of

employment.  Under the first prong of the Restatement test, an employee's conduct is deemed to

be within the scope of employment if it was "of the same general nature as that authorized" or

"incidental to the conduct authorized."  *Schneider v. Kissinger*, 310 F. Supp 251, 265

(D.D.C. 2004) (quoting Restatement (Second) of Agency (1957) § 229); *see also Rasul v.*

*Rumsfeld*, 414 F. Supp. 2d 26, 32.  The key inquiry is whether the employer (*i.e.*, the United

States) could have foreseen that the employee (*i.e.*, Defendants) would engage in such conduct

(here, policies and practices authorizing or knowingly tolerating torture).  *See Haddon v. United*

*States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (employee's acts are foreseeable to employer if they

are "a 'direct outgrowth' of the performance of an employee's instructions or job assignment")

(quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984) and *Penn Central*

*Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979)).[57]   The point of the foreseeability inquiry

is whether it is fair to hold the employer liable for the employee's acts.  *Haddon*, 68 F.3d at 1424

("Foreseeable in this context does not carry the same meaning as it does in negligence cases;

rather, it requires the court to determine whether it is fair to charge employers with responsibility

for the intentional torts of their employees.") (internal quotation marks and citation omitted).

In this case, fairness would be ill-served by immunizing Defendants and shifting their

liability to the United States.  Defendants' conduct cannot be deemed to be within the scope of

employment because it is not foreseeable that the Secretary of Defense of the United States or

high-ranking U.S. military commanders would authorize and tolerate torture and other cruel,

inhuman or degrading treatment of detainees.[58]   To the contrary, such conduct by commanders is

expressly forbidden under U.S. law and military regulations, including those that reflect

international law.  *See*, *e.g.*, Dep't of the Army, Intelligence Interrogation, Field Manual 34-52,

ch. 1 at 1-8 (1992); Point I, *supra*.  When a federal officer commits an intentional, egregious tort

in violation of a *jus cogens* norm, he or she cannot be deemed to act within the scope of

---

[57] Even if the other factors are met, foreseeability is still required.  *Haddon*, 68 F.3d at 1424; *Weinberg v. Johnson*, 518 A.2d 985, 992 (D.C. 1986).

[58] Defendants Sanchez, Karpinski and Pappas all argue that because Defendant Rumsfeld issued policies and implemented practices, they are not liable for their conduct in following his lead. This defense has been rejected since the Nuremberg tribunals, and military commanders cannot excuse conduct condoning or permitting torture on the ground that they were following orders. *See*, *e.g.*, Nuremberg Rules, in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, 82 U.N.T.S. 279, *entered into force* Aug. 8, 1945; Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, U.N. Doc. S/25704 at 36, annex (1993) and S/25704/Add.1 (1993), adopted by Security Council on 25 May 1993, U.N. Doc. S/RES/827 (1993), art. 7(4); International Criminal Tribunal for Rwanda, Rules of Procedure and Evidence, U.N. Doc. ITR/3/REV.1 (1995), *entered into force* 29 June 1995, art. 6(4); Rome Statute of the International Criminal Court, 2187 U.N.T.S. 3, *entered into force* July 1, 2002, art. 33.

employment.  Indeed, the military itself has stated that torture falls outside the scope of

employment.[59]

The district court cases cited by the Defendants fail to acknowledge the basic principle

that a government official—like the government itself—cannot act outside the prohibition

against torture.  In *Rasul v. Rumsfeld*, 414 F. Supp. 2d at 34, the district court relied on the D.C.

law of respondeat superior to reach the mistaken conclusion that "torture is a foreseeable

consequence of the military's detention of suspected enemy combatants."  The decision also

rejected the plaintiffs' argument that the defendants' conduct fell outside the scope of

employment because it was contrary to the official position of the United States.  *Id.* at 32 n.5.

This ruling, however, erroneously transplants the D.C. law of respondeat superior to a context in

which it was never meant to apply.[60]  *Rasul v. Rumsfeld* in fact relied upon two extreme D.C.

---

[59] In response to an administrative claim filed by an individual allegedly tortured by the U.S. military in Iraq, an Army attorney wrote that the "[Military Claims Act] requires that the alleged Government tortfeasors be acting within the scope of their authority when they cause injury to a claimant" and that the conduct alleged—torture and mistreatment of a detainee—"appears to be clearly outside the scope of duty required of a military member to arrest and detain someone." Record of claims under Foreign Claims Act and Military Claims Act, Document #DOD045906-DOD045923, *available at* http://www.aclu.org/projects/foiasearch/pdf/DOD045906.pdf; *see also* Record of claims under Foreign Claims Act and Military Claims Act, Document #DOD045924-DOD045944, *available at* http://www.aclu.org/projects/foiasearch/pdf/DOD045924.pdf. Similarly, the U.S. Department of State has reported to the U.N. Committee Against Torture that torture does not fall within the scope of employment of members of the military.  *See* U.S. Department of State, Initial Report of the United States of America to the U.N. Committee Against Torture at 6 (1999) (noting that the United States acknowledges that the prohibition on torture applies to the U.S. military); *id.* at 109 ("a commanding officer who orders such punishment would be acting outside the scope of his or her position and would be individually liable for the intentional infliction of bodily or emotional harm").

[60] The other cases cited by the Defendants are distinguishable from the instant case.  In *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004), the district court rejected the broader argument that "a violation of international law always falls outside the scope of a federal official's employment," in a case involving U.S. foreign policy decisions and support for a coup in a foreign country.  Similarly, in *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 4 (D.D.C. 2004), *aff'd*, No. 05-5049, --- F.3d ---, 2006 WL 1042356 (D.C. Cir. Apr. 21, 2006), the court (footnote continued on next page)

cases which, the court acknowledged, held a "panoptic" view of the scope of the respondeat superior doctrine. *Rasul v. Rumsfeld*, 414 F. Supp. 2d at 33-34 (citing *Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) (Laundromat employee shot customer in dispute over missing shirts); *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (deliveryman raped and stabbed customer in dispute over payment and inspection of goods). As the D.C. Circuit itself noted in *Lyon*, such a result "was perhaps at the outer bounds of respondeat superior," but was a proper question for the jury. *Lyon*, 533 F.2d at 651. Since *Lyon*, however, the expansive "trend has apparently reached its limit . . . and in more recent cases [the D.C. Court of Appeals] expressly declined to expand the scope of employer liability." *Haddon*, 68 F.3d at 1425. Regardless of the applicability of the "outer bounds" of the D.C. law of respondeat superior in ordinary employer liability cases, such a holding would be incorrect in this case. As set forth above, the extreme D.C. cases are not controlling, and the Court should apply the general principles of respondeat superior. In any event, D.C. law is itself based on fairness and the general Restatement test, which both lead to the conclusion that Defendants' acts in this case were not foreseeable and therefore were not within the scope of their employment.

At the very least, dismissal on this ground would be improper and Plaintiffs are entitled to discovery on the scope of employment. As demonstrated by *Lyon* and *Weinberg*, the scope of a defendant's employment is an issue of fact that generally cannot be determined at the motion to dismiss stage. *Weinberg*, 518 A.2d at 988-89 (question of scope of employment properly submitted to jury); *Lyon*, 533 F.2d at 651 (same). *See also Brown v. Argenbright Sec.*, 782 A.2d

---

confronted the forced displacement of a population for purposes of building a U.S. military base. Neither case considered whether the Westfall Act's exclusive remedy provision can apply to violations of the *jus cogens* prohibition against torture.

752, 757 (D.C. 2001).  The Attorney General's certifications are not afforded any particular

evidentiary weight, *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995), and they

merely state in conclusory terms, without reasons, that Defendants' conduct was within the scope

of employment.  To survive a motion to dismiss, Plaintiffs need only allege facts that, if true,

would establish that the defendant acted outside the scope of his employment.  *Stokes v. Cross*,

327 F.3d 1210, 1215 (D.C. Cir. 2003).  Plaintiffs have done so.  *See* Am. Compl. at ¶ 46; *see*

*also id.* at ¶¶ 6-9, 32-36, 49-54, 57, 59, 65.  Because there is, at a minimum, a material dispute as

to whether Defendants were acting within the scope of their employment, this Court cannot

dismiss these claims at this stage.  *Stokes*, 327 F.3d at 1214 (citing *Kimbro v. Velten*, 30 F.3d

1501, 1508 (D.C. Cir. 1994)).

### D.  Plaintiffs' Claims Based on the ATS and the Fourth Geneva Convention Fall Within The Westfall Act's Exception For Statutory Actions.

The Westfall Act specifically states that substitution does not apply to an action "brought

for a violation of a statute of the United States under which such action against an individual is

otherwise authorized."  28 U.S.C. § 2679(b)(2)(B).  Plaintiffs' claims for torture and other cruel,

inhuman or degrading treatment, brought under the ATS and the Fourth Geneva Convention,

come within this statute exception for two separate reasons.  First, they are brought under the

ATS, 28 U.S.C. § 1350, which grants the federal courts original jurisdiction over "any civil

action by an alien for a tort only, committed in violation of the law of nations *or* a treaty of the

United States" (emphasis added).[61]  In 1988, when the Westfall statutory exception was enacted,

Congress understood the ATS to be a statute that authorized a substantive cause of action for

violations of the law of nations and treaties of the United States.  Second, in addition to bringing

---

[61] Thus, the ATS consists of two "prongs" of jurisdiction—one for violations of the law of nations, and the other for violations of a treaty.

their Fourth Geneva Convention claims through the jurisdictional mechanism of the ATS,

Plaintiffs bring a claim directly under the Fourth Geneva Convention, with federal question

jurisdiction under 28 U.S.C. § 1331 (as well as 28 U.S.C. §§ 2201-02).  The Fourth Geneva

Convention has the same status as a domestic statute because it is the "law of the land" under the

Constitution and, as explained in greater detail in Point V, *infra*, the specific provisions relied

upon are self-executing and provide a direct and private right of action over which federal courts

have jurisdiction.

1.       **Plaintiffs' International Law Claims Under the ATS Fall Within the Westfall Act's Statute Exception.**

Plaintiffs bring two sets of claims under the ATS: for violations of the law of nations

prohibitions against torture and cruel, inhuman and degrading treatment (Counts Three and Four)

and for violations of the "treaty" prong of the ATS (Count Five, violation of the Fourth Geneva

Convention).  Each jurisdictional prong of the ATS authorizes Plaintiffs to proceed against

Defendants individually.  At the time Congress passed the Westfall Act in 1988, both the

prevailing case law and contemporaneous congressional understanding of the ATS made clear

that the ATS was both a jurisdictional statute and a substantive cause of action for non-citizens

who brought actions for violations of fundamental rights. The Supreme Court subsequently held

in 2004 that the ATS only provides jurisdiction and not a substantive cause of action, *Sosa*,

542 U.S. at 712-714, but that was not the law at the time Congress passed the Westfall Act in

1988.  In construing the Westfall Act, the Court should look to this context and congressional

intent.  *Cf. Dolan v. U.S. Postal Services*, --- U.S. ---, 126 S. Ct. 1252, 1257 (2006) (construing

FTCA in light of context and congressional intent); *Dalehite v. United States*, 346 U.S. 15 (1953)

(same).

Because Congress intended to preserve all existing statutory remedies when it passed the

Westfall Act, 28 U.S.C. § 2679(b)(2)(B), its contemporaneous understanding of the ATS is

relevant to the proper construction of that section.[62]  At the time of the Westfall Act's passage in

1988, the prevailing case law provided that the ATS granted both jurisdiction and a substantive

cause of action for aliens bringing actions for violations of certain international laws.  *See, e.g.,*

*In re Estate of Marcos,* 25 F. 3d 1467, 1475 (9th Cir. 1994); *Filartiga v. Pena-Irala,* 630 F.2d

876, 885-87 (2d Cir. 1980); *Forti v. Suarez-Mason,* 672 F. Supp. 1531, 1540 (N.D. Cal. 1987).[63]

Although the D.C. Circuit had expressed a minority view, alone among the circuits, that the ATS

was only a jurisdictional statute, *Tel-Oren v. Libya,* 726 F.2d 774, 801 (D.C. Cir. 1984) (Bork, J.,

concurring); *id.* at 827 (Robb, J., concurring), Congress accepted the prevailing view.  This

congressional understanding is reflected most clearly in the legislative history of the Torture

Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 stat. note 2(a), which was considered by

Congress contemporaneously with the Westfall Act. The House Judiciary Committee's 1989

---

[62] In interpreting a statute (here, the Westfall Act) that refers to other statutes (such as the reference to "statute" in 28 U.S.C. § 2679(b)(2)(B)), the court must presume that Congress was aware of existing case law.  *Cf. Capital Traction Co. v. Hof,* 174 U.S. 1, 36 (1899) ("By a familiar canon of interpretation, heretofore applied by this court whenever congress . . . has borrowed from the statutes of a state provisions which had received . . . a known and settled construction before [the] enactment by congress, that construction must be deemed to have been adopted by congress together with the text which it expounded, and the provisions must be construed as they were understood at the time in the state"); *see also Molzof v. United States,* 502 U.S. 301, 307 (1992).

[63] The Executive Branch also historically adopted the view that the ATS provided a substantive cause of action.  *See* 1 Op. Att'y Gen. 57, 59 (1795) (opining that ATS provided civil remedy to British citizens injured in Africa by citizens of France and United States); 26 Op. Att'y Gen. 250, 252-53 (1907) (opining that statutory predecessor to ATS "provide[s] a forum and right of action" for torts committed in violation of law of nations); Memorandum for the United States as Amicus Curiae, *Filartiga v. Pena-Irala, reprinted at* 19 I.L.M. 585, 601-06 (1980) (stating that because torture is a "tort . . . in violation of the law of nations," it gives rise to a judicially cognizable remedy under ATS).

report on the TVPA made clear that Congress considered the ATS to provide a substantive cause of action:

> The TVPA would establish an unambiguous and modern basis for a *cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act)*, which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations." Section 1350 has other important uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing.

H.R. Rep. No. 101-55, 101st Cong., 1st Sess., pt. 1 at 3 (1989) (emphasis added); *see also* H.R. Rep. No. 367, 102d Cong., 1st Sess., pt. 1 (1991) (same). The Senate Report echoed that "[t]he TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the title 28 . . . ." S. Rep. No. 249, 102d Cong., 1st Sess. (1991).

Thus, at the time Congress considered both the TVPA and the Westfall Act, it understood that the ATS provided a substantive cause of action for violations of the law of nations or treaties of the United States. Section 2679(b)(2)(B) therefore should be read to include Plaintiffs' claims brought pursuant to the ATS. Those claims would have been recognized, prior to *Sosa* and at the time of the passage of the Westfall Act, to be violations of "a statute of the United States under which such action against an individual is otherwise authorized," 28 U.S.C. § 2679(b)(2)(B), and therefore fall within the statutory exception to the exclusive remedy provision.

### 2. Plaintiffs' Claims Under The Fourth Geneva Convention Fall Within the Westfall Act's Statute Exception.

Plaintiffs' direct cause of action under the Fourth Geneva Convention also comes within the Westfall Act's exception for statutory violations. Although Congress did not specify precisely which causes of action it intended to preserve through the statutory exception, the exception should be construed to include the Fourth Geneva Convention, because courts have

538399.1

defined the word "statute" broadly to encompass "[a]ny enactment, to which a state gives the force of law, whether it has gone through the usual stages of legislative proceedings or been adopted in other modes of expressing the will of the state." *Stevens v. Griffith*, 111 U.S. 48, 50 (1884); *American Fed'n of Labor v. Watson*, 327 U. S. 582, 592-93 (1946). *See also* Black's Law Dictionary 1410 (6th ed. 1990) (defining "statute" to include any "formal written enactment of a legislative body," and stating that the term is used "to designate the legislatively created laws in contradistinction to court decided or unwritten laws"). The Fourth Geneva Convention is the "law of the land" under the Supremacy Clause, U.S. Const. art. VI, cl. 2. It has been ratified by Congress, and is self-executing and gives rise to a private right of action. *See* Point V, *infra*. The Fourth Convention is equivalent in every way to any other Act of Congress and should therefore fall within the Westfall Act's statute exception. U.S. Const. art. VI, cl. 2 (recognizing the equal status under the Constitution of laws of the United States and treaties); *Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation.").

Defendants cite *United States v. Smith*, 499 U.S. 160 (1991), for the proposition that construing the statutory exception to the Westfall Act's exclusive remedy provision to include a claim under the Fourth Geneva Convention would be an impermissible "third exception." Rumsfeld Mo. at 27; Sanchez Mo. at 34; Karpinski Mo. at 11; Pappas Mo. at 34. But *Smith* is inapposite. It concerned the Gonzalez Act, 10 U.S.C. § 1089, which exempted federal government physicians from tort claims; the Supreme Court rejected plaintiffs' argument that the Gonzalez Act could fall within the statute exception of the Westfall Act, for the simple reason that the Gonzalez Act was an exemption from liability and did not create any cause of action.

*Smith*'s holding says nothing about whether the Fourth Geneva Convention—which does provide a cause of action—can fall within the statute exception to the Westfall Act.[64]

## V. PLAINTIFFS' RIGHTS UNDER THE FOURTH GENEVA CONVENTION ARE JUDICIALLY ENFORCEABLE.

Once the United States signed and ratified the Fourth Geneva Convention, it became the "law of the land" under the Supremacy Clause. U.S. Const. art. VI, cl. 2. The Constitution expressly gives courts jurisdiction to resolve disputes arising under such treaties, just like any other act of Congress. U.S. Const. art III, cl. 2. The Fourth Geneva Convention, independently and apart from jurisdiction through the treaty prong of the ATS, gives Plaintiffs a cause of action.[65] First, the relevant provisions of the Fourth Geneva Convention are self-executing such that rights under the treaty are applicable to individuals without any further action by Congress.

---

[64] Defendants Rumsfeld and Pappas similarly cite the Ninth Circuit's decision in *Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) (en banc), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), to argue that the ATS does not fall within the Westfall Act's statute exception. Rumsfeld Mo. at 29; Pappas Mo. at 36. *Alvarez-Machain* is not binding, and this Court should reject the Ninth Circuit's decision. The Ninth Circuit adopted the district court's decision without extensive analysis and failed to consider any of the legislative history. Moreover, the court erroneously treated the ATS as though it were identical to the Gonzalez Act. 331 F.3d at 631-32. Unlike the Gonzalez Act, whose purpose was to limit liability, the ATS recognized and provided jurisdiction for claims under the existing law of nations. *Sosa*, 124 S. Ct. at 2756. The Ninth Circuit failed to note this key distinction between the Gonzalez Act and the ATS.

[65] Plaintiffs are nationals of Iraq and Afghanistan—both countries that are signatories to the Geneva Conventions—who were detained during armed conflict and/or occupation of those countries. Plaintiffs were and are non-combatant civilians who pose no threat to the United States, were not engaged in hostilities against the United States, and were not prosecuted for criminal violations. *See* Am. Compl. at ¶ 169. Accordingly, they are protected persons entitled to the rights established by Article 3 common to all four Geneva Conventions, and Articles 27, 31, 32, 118 and 119 of the Fourth Geneva Convention. Plaintiffs' claims arise under these provisions. Defendants have not argued that plaintiffs were prisoners of war. Should that argument be made, plaintiffs reserve the right to brief the applicability of the relevant provisions of the Third Geneva Convention.

538399.1

Second, the Fourth Geneva Convention contemplates a right of action for individuals to enforce those self-executing provisions in court.

### A.     The Fourth Geneva Convention is Self-Executing.

A treaty, such as the Fourth Geneva Convention, that has been duly ratified has the status of domestic law even if Congress has not enacted legislation to implement that treaty.  *Foster v. Neilson,* 27 U.S. 253, 314 (1829); *see also United States v. Percheman*, 32 U.S. 51, 89 (1833). Courts use the term "self-executing" to describe treaty provisions that can be judicially enforced without any implementing legislation.  *See, e.g., Whitney v. Robertson*, 124 U.S. 190, 194 (1888).  The Supreme Court has a long history of finding treaty provisions self-executing when the treaty provisions at issue confer individual rights:  although treaties are agreements between sovereign nations, the Supreme Court has recognized for well over a century that they may directly provide rights to individuals.  *Head Money Cases [Edye v. Robertson]*, 112 U.S. 580, 598-99 (1884).

To determine whether a treaty is self-executing, a court uses traditional tools of statutory interpretation, looking to "the intent of the signatory parties as manifested by the language of the instrument, and, if the language is uncertain, . . . to the circumstances surrounding its execution." *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976).  Defendants essentially concede that the relevant provisions of the Fourth Geneva Convention are self-executing; indeed they must, because the treaty text, ratification history, and authoritative commentaries overwhelmingly support this finding.

Six provisions of the Fourth Geneva Convention are relevant here.[66]  None of the six require implementing legislation or other political action before the specified rights and obligations can take effect.  *See Lidas v. United States*, 238 F.3d 1076, 1080 (9th Cir. 2001).  Thus, the language of all six meets the test that it be specific, mandatory and binding—*i.e.*, that the language creates rules governing rights, as opposed to stating aspirational goals that are left to states to legislate.  *Head Money Cases*, 112 U.S. at 598 (central inquiry is whether treaty provisions "prescribe a rule by which the rights of a private citizen or subject may be determined"); *see also United States v. Lindh*, 212 F. Supp. 2d 541, 554 & n.20 (treaty that "neither invite[d] nor require[d] congressional action" was self-executing).  The applicable provisions of the Fourth Geneva Convention are (with emphasis added):

- Article 3 (common to all the Geneva Conventions), which sets forth the baseline requirements for prisoner treatment (whether prisoners are lawful combatants, civilians or otherwise) and requires that signatory parties "*shall be bound to apply*" its provisions, that protected persons "*shall in all circumstances* be treated humanely, and that specified acts of torture and inhumane treatment "*are and shall remain prohibited.*"

- Article 27 ("[Protected persons] *shall at all times be humanely treated*, and *shall be protected* especially against all acts of violence or threats thereof and against insults . . . .)"

- Article 31 ("*No physical or moral coercion shall be exercised* against protected persons, in particular to obtain information from them or from third parties.")

- Article 32 ("The High Contracting Parties specifically agree that each of them *is prohibited from taking any measure* of such a character as to cause the physical suffering . . . of protected persons in their hands.  This prohibition applies not only to murder, torture . . . but also to any other measures of brutality whether applied by civilian or military agents.")

---

[66] Because "[s]ome provisions of an international agreement may be self-executing and others non-self-executing," Restatement (Third) Foreign Relations Law of the United States § 111 cmt. H (1987), courts evaluate "the nature of the particular obligation imposed by the part of the agreement under consideration." *Jogi v. Voges*, 425 F.3d 367, 377 (7th Cir. 2005).

- Article 118 ("Imprisonment in premises without daylight, and, in general, all forms of cruelty without exception *are forbidden*.")

- Article 119 ("*In no case shall* disciplinary penalties be inhuman, brutal or dangerous for the health of internees.")[67]

Because the intent of the parties "is clear from the treaty's language," no further inquiry is necessary. *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (1985); *Jogi v. Voges*, 425 F.3d 377 (7th Cir. 2005).

   If there were any doubt about the intent of the United States to be bound by force of these Convention provisions themselves, the ratification history would make it clear that they are self-executing. The United States did not, as it has in other instances, make a reservation at the time of ratification that the Geneva Conventions required implementing legislation. *Cf. Sosa*, 542 U.S. at 735 (International Covenant on Civil and Political Rights "did not itself create obligations enforceable in the federal courts" because the United States expressly stated at ratification that treaty provisions were not self-executing). To the contrary, the Senate Committee on Foreign Relations's Ratification Report stated "it appears that very little in the way of new legislative enactments will be required to give effect to the provisions contained in the four conventions." S. Comm. on Foreign Relations, Geneva Conventions for the Protection of War Victims, S. Exec. Rep. No. 84-9 (1955), *reprinted in* 84 Cong. Rec. S9958, 9971 (1955). The Executive Branch concurred. *Geneva Conventions for the Protection of War Victims: Hearing on Executives D, E, F and G Before the Senate Comm. on Foreign Relations*, 84th Cong. 59 (1955)

---

[67]On the other hand, when the Geneva Conventions establish goals for, and vest discretion in, states party, rather than prescribe rules, they also say so. *See, e.g.,* Fourth Geneva Convention, Art. 14 (providing that parties "*may* establish in their own territory and, *if the need arises*, in occupied areas, hospitals and safety zones . . . .") (emphasis added).

(letter from J. Lee Rankin, Assistant Attorney General).[68]  Only provisions relating to four issues were ultimately found to require any implementing legislation; none of the provisions relevant here are among them.

Important explanatory materials provide further indication that the 1949 Geneva Conventions are self-executing.  According to the International Committee of the Red Cross's authoritative Commentary to the Fourth Geneva Convention, "[i]n the development of international law the [Fourth] Geneva Convention [of 1949] occupies a prominent place, since . . . it is the first time that a set of international regulations has been devoted not to State interests, but solely to the protection of the individual."  It is beyond dispute that the purpose of the Geneva Conventions is "first and foremost to protect individuals, and not to serve state interests."  Commentary on the Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War (Geneva: Int'l Comm. of the Red Cross) ("ICRC Commentary") art. 8, at 2.[69]  Thus, the applicable Fourth Geneva Convention provisions are self-executing.

_____

[68] The self-executing nature of the Conventions is also evident from the fact that military regulations have been promulgated directly pursuant to the Geneva Conventions.  *See* Army Regulations 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees § 1.1(a) (Oct. 1, 1997).  No other statute is cited as a basis for the regulation's authority.

[69] Contrary to Defendant Pappas's claim, Pappas Mo. at 40, the fact that the Geneva Conventions include mechanisms for international dispute resolution does not preclude domestic enforcement by individuals.  From the earliest cases, the Supreme Court enforced treaty rights in private suits notwithstanding the existence of significant state-to-state resolution mechanisms.  For example, the Treaty of Amity, Commerce, and Navigation, U.S. – Great Britain, Nov. 19, 1794 ("Jay Treaty"), which provided a number of enforcement and dispute resolution measures, supplied the rule of decision in numerous early Supreme Court cases.  *See*, *e.g.*, *Shanks v. Dupont*, 28 U.S. 242 (1830); *Hughes v. Edwards*, 22 U.S. 489 (1824); *Fairfax's Devisees v. Hunter's Lessee*, 11 U.S. 603 (1812).  Because treaties "are signed by countries with differing legal systems that provide different kinds of remedies," it is not surprising that treaties such as the Geneva Conventions do not spell out particular private enforcement mechanisms.  *Jogi*, 425 F.3d at 384-(footnote continued on next page)

**B.     The Fourth Geneva Convention Provides a Private Right of Action.**

In addition to being self-executing, and therefore judicially enforceable, the Fourth

Geneva Convention provides a private right of action.  Although no federal court has addressed

this precise question, the Seventh Circuit's analysis of another treaty, the Vienna Convention on

Consular Relations, is instructive.  The court applied traditional methods of statutory

construction to find that where (1) a provision of a treaty is self-executing, and (2) the

provision's language manifests the intent of the drafters to make a part of it privately

enforceable, there is an implied private right of action.  *Jogi,* 425 F.3d at 384.  Applying that test

here, it is clear that Plaintiffs have an enforceable cause of action.[70]

In *Jogi*, the Seventh Circuit found that language that plainly established a right or duty

showed the drafters' intent to create an enforceable right of action.  *Id*. at 380 (citing treaty

provision that "authorities '*shall* inform the person concerned without delay *of his rights.*")

(emphasis in original) (citations omitted); *see also Cannon v. University of Chicago*, 441 U.S.

677, 690-93 (1979) (implying private right of action where text of statute contained "an

unmistakable focus on the benefited class").  Here, the relevant provisions of the Fourth Geneva

Convention confer specific and mandatory individual rights on Plaintiffs as "protected

---

85.

[70] The Court has jurisdiction over Plaintiffs' stand-alone Geneva Convention claim under
28 U.S.C. § 1331.  In addition, Plaintiffs have a right of action for declaratory relief under 28
U.S.C. §§ 2201 and 2002.  Additionally, like the plaintiff in *Jogi*, Plaintiffs' damages claims for
the Geneva Convention violation are akin to those in common law tort cases, *Jogi*, 425 F.3d at
384-85, and should be permitted to proceed.

persons."[71]  The applicable provisions use the imperative term "shall," which is precisely the type of "'rights-creating' language" that courts have found to imply a cause of action.  *See Alexander v. Sandoval,* 532 U.S. 275, 288-89 (2001) (affirming that a statutory provision decreeing that "[n]o person . . . shall . . . be subjected to discrimination" implied a private right of action) (citation omitted).

Contrary to Defendants' contention, *see* Rumsfeld Mo. at 31-32, Sanchez Mo. at 36, Pappas Mo. at 40, Karpinski Mo. at 45, the D.C. Circuit's decision in *Hamdan v. Rumsfeld* is not dispositive.  As a threshold matter, *Hamdan* is pending before the Supreme Court, and Plaintiffs reserve all arguments ostensibly foreclosed by the D.C. Circuit.

In any event, *Hamdan* is distinguishable.  In *Hamdan*, the Court of Appeals considered the applicability of provisions of the *Third* Geneva Convention (on prisoners of war) to an individual deemed to be an unlawful enemy combatant and found they could not be enforced through federal habeas proceedings.  *Hamdan v. Rumsfeld,* 415 F.3d 33 (D.C. Cir. 2005), *cert. granted*, 126 S. Ct. 622 (2005).  *Hamdan* did not address whether the specific provisions of the *Fourth* Geneva Convention at issue here imply a private right of action.[72]  The two Geneva Conventions are distinguishable in key respects.  *Hamdan* was based in part on a footnote in *Johnson v. Eisentrager,* 339 U.S. 763 (1950), which found that the 1929 predecessor to the *Third* Geneva Convention was not enforceable by habeas petitioners and so the Third Geneva

---

[71] Article 4 of the Fourth Geneva Convention defines protected persons as those "who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals."

[72] Analysis of treaties' enforceability requires examination of specific and individual provisions. Restatement (Third) Foreign Relations Law of the United States § 111 cmt. h (1987).

Convention could not be enforced through habeas either.[73]  Unlike the Third Geneva

Convention, the Fourth Geneva Convention has no precursor analogous to the 1929

Convention—the Fourth Convention is unique because it provides rights specifically to

individuals.  *See* ICRC Commentary, art. 8, at 3.  *Hamdan* therefore does not foreclose Plaintiffs'

arguments concerning the Fourth Geneva Convention.[74]

 The purpose of the Fourth Geneva Convention would be seriously undermined if

individuals such as Plaintiffs, upon whom the rights are conferred, were unable to enforce their

rights in court in the event of a breach.  It is exactly this sort of result that the Supremacy Clause

was enacted to prevent.  Defendants' argument for dismissal of Plaintiffs' Geneva Convention

claims must be rejected.

## VI. PLAINTIFFS HAVE STANDING TO SEEK DECLARATORY RELIEF ON ALL CLAIMS.

 Plaintiffs seek declaratory relief on all their constitutional and international law claims

against all Defendants.  Defendant Rumsfeld's only response is that Plaintiffs lack standing to

seek such relief.  The remaining Defendants wrongly assume that they have been sued only for

damages.[75]  As set forth below, Plaintiffs have plainly alleged facts sufficient to confer standing

for declaratory relief, and such relief is proper against all Defendants.

---

[73] Moreover, as the Seventh Circuit explained in a decision issued after *Hamdan*, civil remedies
may be available for violations of treaty rights even when remedies sought through habeas are
not.  *See Jogi,* 425 F.3d at 385; *see also Standt v. City of New York,* 153 F. Supp. 2d 417
(S.D.N.Y. 2001) (violation of Vienna Conventions was subject to 42 U.S.C. § 1983 remedy).

[74] Defendant Sanchez mistakenly claims that *Hamdan* held that the Fourth Geneva Convention
does not provide a private right of action.  *See* Sanchez Mo. at 36.  *Hamdan* does not mention the
Fourth Geneva Convention.

[75] Defendants Sanchez, Karpinski, and Pappas are mistaken in their belief that Plaintiffs do not
seek declaratory relief against them.  Like the original complaints against all four Defendants,
the Consolidated Amended Complaint seeks declaratory relief against all four Defendants.  *See*
(footnote continued on next page)

Defendant Rumsfeld argues that "Plaintiffs fail to allege any facts suggesting that they face a real and imminent threat of being detained again." *See* Rumsfeld Mo. at 37; *see also id.* at 34 (citing *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1272 (D.C. Cir. 1994)). He argues in the alternative that Plaintiffs' allegations are "nothing more than mere speculation," or that the allegations of future injury are based on subjective feelings, ungrounded in fact. These arguments ignore what is actually in the complaint.

Plaintiffs have pled numerous facts establishing an immediate threat of further injury, including repeated detention and actual and direct threats of re-detention and additional mistreatment by Defendants' military subordinates. Among Plaintiffs' allegations are the following:

- Each of the Plaintiffs alleges that he fears and is at risk of detention and continued injury at the hands of the U.S. military. Am. Compl. at ¶ 172.

- Plaintiffs Ahmad, Siddiqi, Shirullah, and Abdul Rahman all were arrested by U.S. military personnel based on false accusations by individuals in Afghanistan with ongoing ties to U.S. forces and with animosity toward them, and they remain at risk of future re-arrest on the same basis. Am. Compl. at ¶¶ 176, 180, 184, 188.

- A U.S. soldier directly threatened Plaintiff Arkan M. Ali with re-arrest and warned him that he would never see his family again if he were to report or discuss abuses he suffered and witnessed in U.S. military custody. Am. Compl. at ¶ 192. Other Iraqi detainees have been threatened by U.S.

---

Am. Compl. at 82-83 (Prayer for Relief) ¶¶ (a) and (c). To the extent that Count VI creates any ambiguity, Defendants will not be prejudiced by the granting of declaratory relief. *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("The usual rule is that where legal rights have been invaded and a cause of action is available, a federal court may use any available remedy to make good the wrong done."); Fed. R. Civ. P. 54(c) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings").

military personnel in similar fashion, in attempts to keep them silent about torture and mistreatment.  Am. Compl. at ¶ 233-34.

- Plaintiffs Sabar and Khalid both were actually re-detained by U.S. military personnel after their lengthy periods in U.S. military custody, simply because they inquired about their confiscated property and a colleague who remained in custody, and even though they had done nothing wrong. Am. Compl. at ¶¶ 197.

- Plaintiffs Arkan M. Ali, Sabar, Khalid, and Ali H. fear redetention and abuse because the U.S. military continues to arrest large numbers of Iraqis. Am. Compl. at ¶¶ 193, 198, 207.

- Plaintiff Ahmed fears redetention because he was re-arrested and detained for an extended period after his first period in U.S. custody, even though he had done nothing wrong in the few days between his first release and second arrest.  Am. Compl. at ¶¶ 208, 210.

- The U.S. military continues to exercise control over detainees in U.S. military custody in Afghanistan and Iraq.  Am. Compl. at ¶ 38.

- Defendants' policies, practices and procedures that caused the torture and cruel, inhuman or degrading treatment of Plaintiffs continue in effect to date,[76] and the U.S. military has continued to detain large numbers of Iraqi and Afghan civilians under those policies, practices and procedures.  Am. Compl. at ¶¶ 48, 227-34.

- Defendant Rumsfeld continues in his failure to punish U.S. military personnel who torture and mistreat detainees, and in his neglect of reports of serious abuse of detainees.  Am. Compl. at ¶¶ 161-62.

These facts are sufficient to confer standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the

defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general

---

[76] Defendants' argument that that Congress has enacted a policy reiterating the prohibitions on torture and mistreatment of detainees, Rumsfeld Mo. at 12 (citing the DTA, 119 Stat. at 3474-75), misses the point.  First, Plaintiffs allege that U.S. military personnel continue to torture and mistreat detainees in Iraq and Afghanistan, Am. Compl. at ¶¶ 227-234.  Second, Plaintiffs allege that they were tortured notwithstanding the many provisions of law that outlawed these practices well before DTA's enactment, *see* Point I *supra*.  Defendants do not assert that any policies have actually changed as a result of the DTA, and Plaintiffs allege that Defendants' illegal policies and practices remain in place.  Am. Compl. at ¶¶ 227-234.

allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 133 (D.D.C. 2004) (citing *Lujan*).

Defendants' reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), misses the point and ignores the Court's reasoning in *Lyons*. In *Lyons*, the plaintiff sought declaratory and injunctive relief that use of a chokehold by the police under certain circumstances violated the Constitution. The Court held that the plaintiff lacked standing because only his own future *illegal* conduct might subject him to the challenged practice and because the police department had already changed the policy governing use of the chokehold. *Id.* at 102-05 (citing *O'Shea v. Littleton*, 414 U.S. 488 (1974); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Golden v. Zwickler*, 394 U.S. 103 (1969)). The instant case is different because Plaintiffs were detained and abused without engaging in any wrongdoing, Am. Compl. at ¶¶ 1, 10, 16, 169, 176, 180, 184, 188. Thus, Plaintiffs may be subjected to the same policies and practices in the future, through no fault of their own. *Lyons* therefore does not apply. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1265-66 (11th Cir. 2003); *Armstrong v. Davis*, 275 F.3d 849, 860-66 (9th Cir. 2001); *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990); *Maneely v. City of Newburgh*, 208 F.R.D. 69, 73 (S.D.N.Y. 2002).

Furthermore, *Lyons* is distinguishable on the separate ground that the Supreme Court emphasized that the challenged chokehold practice had been suspended, 461 U.S. at 100, and that that the claim of future injury was based upon "relatively few instances of [past] violations" that lacked "any showing of a deliberate policy on behalf of the named defendants." *Id.* at 104 (citing *Rizzo*, 423 U.S. at 372). As *Lyons* notes, and as the courts of appeals have uniformly held, plaintiffs have standing for declaratory relief against *ongoing* policies. *See Lyons*, 461 U.S.

at 105-06 & n.7 (noting plaintiff would have had standing if he had alleged that he would encounter officers again and that individual officers' complained-of actions were pursuant to order, authorization or policy); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 807-08 (D.C. Cir. 1987) (under *Lyons*, "past official conduct, *not taken pursuant to an official policy*, provides no basis for standing to seek prospective injunctive relief") (emphasis added). *See also 31 Foster Children*, 29 F.3d at 1266; *Armstrong v. Davis*, 275 F.3d at 861; *DeShawn E. v. Safir*, 156 F.3d 340, 344-45 (2d Cir. 1998); *LaDuke v. Nelson*, 762 F.2d 1318, 1324-25 (9th Cir. 1985); *Franklin v. City of Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984).

In contrast to *Lyons*, the instant case involves ongoing policies. Plaintiffs allege that widespread and systemic torture as well as deliberate and ongoing policies of these Defendants remain in place. For example, Plaintiffs allege that large numbers of detainees were subjected to torture and other cruel, inhuman or degrading treatment, regardless of their innocence or any wrongdoing, Am. Compl. at ¶¶ 211-226, that many civilians continue to be detained in U.S. military custody in Iraq and Afghanistan, Am. Compl. at ¶¶ 228-29, and that detainees have continued to be tortured and mistreated in U.S. military custody since the time Plaintiffs were released from detention. Am. Compl. at ¶¶ 231-32. Plaintiffs also allege that they were injured as a result of the widespread policies, practices, and patterns developed and implemented by Defendants, Am. Compl. at ¶¶ 168-210, and that those policies, practices, and patterns remain in force. Am. Compl. at ¶¶ 227. Thus, *Lyons* is distinguishable on this second ground, and Plaintiffs have made sufficient allegations to establish standing.

## **CONCLUSION**

For the reasons and upon the authorities cited above, Defendants' motions to dismiss should be denied.

**Respectfully submitted,**


*/s/ Lucas Guttentag*

_____

LUCAS GUTTENTAG
CECILLIA D. WANG
JENNIFER C. CHANG
MÓNICA M. RAMÍREZ
American Civil Liberties Union Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612
(510) 625-2010


STEVEN R. SHAPIRO
OMAR C. JADWAT
AMRIT SINGH
STEVEN WATT
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 549-2500


*/s/ Arthur B. Spitzer*

_____

ARTHUR B. SPITZER
D.C. Bar No. 235960
American Civil Liberties Union
   of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800


*/s/ Michael Posner*

_____

MICHAEL POSNER*
DEBORAH PEARLSTEIN*
HINA SHAMSI*
PRITI PATEL*
Human Rights First
333 Seventh Avenue, 13th Floor
New York, NY 10001-5004
(212) 845 5200


*/s/ Bill Lann Lee*

_____

BILL LANN LEE
CHIMÈNE I. KEITNER
NIREJ S. SEKHON
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
(415) 956-1000


JOHN D. HUTSON*
RADM, JAGC, USN (ret.)
Of Counsel, Human Rights First
2 White Street
Concord, NH 03301
(603) 228-1074

538390.1

JAMES P. CULLEN*
BG, JAGC, USA (ret.)
Of Counsel, Human Rights First
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1565

PAUL HOFFMAN
Schonbrun DeSimone Seplow Harris &
    Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

DAVID RUDOVSKY
Kairys, Rudovsky, Epstein & Messing LLP
924 Cherry St., Suite 500
Philadelphia PA 19107
(215) 925-4400

ERWIN CHEMERINSKY
Duke University School of Law
Science Drive & Towerview Rd.
Durham, NC  27707
(919) 613-7173

\* Representing Plaintiffs against Defendant Rumsfeld only

May 19, 2006