# FM 34-52
# INTELLIGENCE INTERROGATION

HEADQUARTERS, DEPARTMENT OF THE ARMY

DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.

FIELD MANUAL 34-52

*FM 34-52
Headquarters
Department of the Army
Washington, DC, 28 September 1992

# INTELLIGENCE INTERROGATION

## Table of Contents

Page

PREFACE ... iv

CHAPTER 1 - MILITARY INTELLIGENCE MISSIONS AND ... 1-1
　　INTELLIGENCE PREPARATION OF THE BATTLEFIELD
　　Warfighting Doctrine ... 1-1
　　The Intelligence Cycle ... 1-1
　　Intelligence Disciplines ... 1-2
　　Intelligence and Electronic Warfare Operations ... 1-3
　　Mission, Enemy, Troops, Terrain, and Time Available Factors ... 1-5
　　Definition of Interrogation ... 1-6
　　Definition of Prisoner of War and Enemy Prisoner of War ... 1-9
　　Pertinent Articles of Geneva Conventions ... 1-10
　　Types of Sources ... 1-10
　　Personal Qualities ... 1-12
　　Special Areas of Knowledge ... 1-14
　　Interrogator Capabilities and Limitations ... 1-15
　　Conflicts ... 1-16
　　Interrogation Missions ... 1-17
　　Drug and Law Enforcement Agency Operations ... 1-17

CHAPTER 2 - COMPOSITION AND STRUCTURE ... 2-1
　　Tactical Operations Center ... 2-1
　　Interrogation Below Division ... 2-2
　　Division Interrogation Assets ... 2-3
　　Corps Interrogation Assets and Organization ... 2-6
　　Echelons Above Corps Interrogation Assets and Organization ... 2-7
　　Enemy Prisoner of War and Interrogation Facilities ... 2-9

DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.

*This publication supersedes FM 34-52, 8 May 1987.

|  | Page |
|---|---|
| Corps Facilities | 2-10 |
| Echelons Above Corps Facilities | 2-12 |
| Medical Company Interrogations | 2-12 |
| Interrogation at Brigade and Below | 2-12 |
| Special Forces | 2-14 |
| Amphibious Operations | 2-14 |
| Airborne Operations | 2-15 |
| Interrogator Supported Operations | 2-18 |
| Theater Interrogation Facility | 2-22 |
| Support Relationships | 2-24 |

CHAPTER 3 - THE INTERROGATION PROCESS ........................... 3-1
    Collection Priority ........................................... 3-1
    Screening .................................................... 3-2
    Planning and Preparation ..................................... 3-7
    Approach Phase .............................................. 3-10
    Questioning Phase ........................................... 3-20
    Termination Phase ........................................... 3-26
    Reporting Information ....................................... 3-28
    Interrogation with an Interpreter ........................... 3-29
    Strategic Interrogations and Debriefings .................... 3-31

CHAPTER 4 - PROCESSING AND EXPLOITING CAPTURED ENEMY ............ 4-1
    DOCUMENTS
    Document Categories ......................................... 4-2
    Document Handling ........................................... 4-4
    Document Exploitation ....................................... 4-7
    Translating ................................................. 4-9
    Evacuation Procedures ....................................... 4-12

APPENDIX A - UNIFORM CODE OF MILITARY JUSTICE EXTRACT ........... A-1

APPENDIX B - QUESTIONING GUIDES ................................. B-1

APPENDIX C - S2 TACTICAL QUESTIONING GUIDE AND BATTLEFIELD EXPLOITATION ... C-1
    OF CAPTURED ENEMY DOCUMENTS AND EQUIPMENT

APPENDIX D - PROTECTED PERSONS RIGHTS VERSUS SECURITY NEEDS .... D-1

APPENDIX E - REPORTS ........................................... E-1

APPENDIX F - COMMAND LANGUAGE PROGRAM .......................... F-1

APPENDIX G - INDIVIDUAL AND COLLECTIVE TRAINING ................ G-1

|  | Page |
|---|---|
| GLOSSARY | Glossary-1 |
| REFERENCES | References-1 |
| INDEX | Index -1 |

### ENEMY

The enemy, and our knowledge of the enemy, can influence interrogator assignments and the complexity of the exploitation process. One factor which affects interrogation operations is the type of opposing enemy force. The techniques and procedures used to collect from insurgents in a LIC may differ from those used to collect from regular enemy forces in a MIC to HIC.

For example, an EPW from a regular forces unit may have undergone political indoctrination, but his commitment to his unit may not be as strong as that of the insurgent who is passionately committed to an ideal. Thus, interrogators may have more difficulty persuading the insurgent to talk.

Another factor affecting interrogation operations is our current intelligence holdings on the enemy force and the interrogator's understanding of the threat. Our intelligence holdings on the composition of a newly formed insurgent organization usually will not be as complete as holdings on the composition of a regular enemy force. Thus, the focus of interrogation efforts in the early stages of a LIC may be on enemy force composition; whereas, the focus in a MIC or HIC may be on enemy force missions or intentions.

Cultural aspects also affect interrogation missions. The employment of some basic interrogation techniques will differ based on the ethnic and cultural background of the enemy, and our failure to understand and adapt to this could hamper the collection effort.

### TROOPS

The number, experience level, and language proficiency of interrogators affect the tactical employment of interrogation elements. Due to the limited number of interrogators at any echelon, interrogation element commanders have to pick from available interrogators. They must manage personnel to ensure the most experienced are used to the best advantage (for example, to exploit complex enemy documents) and select EPWs most likely to answer SIR.

Interrogation element commanders often have to contend with a mismatch between language-qualified personnel assigned to the unit and languages needed to perform the mission. They overcome the mismatch by acquiring local national (LN) interpreter support through the Assistant Chief of Staff, G1 (Personnel). They can also augment their interrogators by requesting other available linguists within the supported command to serve as interpreters.

Another troop-related factor which affects interrogation operations is the training of all soldiers on EPW handling and evacuation. EPW treatment during the early stages of capture is critical to the success of subsequent interrogations. The availability of military police (MP) support at brigade and above can enhance interrogation activities. Interrogation operations are more effective in a controlled environment where EPWs are adequately guarded.

### TERRAIN

Terrain and weather are relevant to interrogator operations and affect site deployments, communications, and mobility. MP must ensure proper shelter and security for the EPW facility if it is collocated or immediately adjacent to the EPW collecting point or internment facility.

### TIME AVAILABLE

Information collected through interrogation operations is valuable only if it is reported in a timely manner. Exploitation procedures may need to be adjusted to make the most use of time available. At the tactical level, interrogations will be brief, PIR driven, and reported in concise formats such as size, activity, location, unit, time, equipment (SALUTE).

At the operational and strategic levels, time will generally allow for a more expanded interrogation effort and flexible reporting format, such as the intelligence information report (IIR).

The challenge is for interrogators to be proficient linguists and skilled members of a highly organized collection activity. This ensures the acquisition of the maximum amount of pertinent information regardless of time available.

Like other intelligence assets, interrogators must serve the commander. Interrogation operations are of no value unless they contribute to the accomplishment of the supported commander's mission. To understand the interrogator's role in mission accomplishment, one must understand the interrogation process.

## DEFINITION OF INTERROGATION

Interrogation is the process of questioning a source to obtain the maximum amount of usable information.

The goal of any interrogation is to obtain reliable information in a lawful manner, in a minimum amount of

time, and to satisfy intelligence requirements of any echelon of command. Sources may be—

- Civilian internees.
- Insurgents.
- EPWs.
- Defectors.
- Refugees.
- Displaced persons.
- Agents or suspected agents.
- Other non-US personnel.

A good interrogation produces needed information which is timely, complete, clear, and accurate. An interrogation involves the interaction of two personalities— the source and interrogator. Each contact between these two may differ because of individual characteristics and capabilities of the participants. Furthermore, the circumstances of each contact and physical environment vary.

Other forms of intelligence interrogations include interviews, debriefings, and elicitations. There are certain principles which generally apply to all types of interrogations; namely, the objective, the prohibition against use of force, and security.

## OBJECTIVE

Each interrogation must be conducted for a definite purpose. The interrogator must keep this purpose firmly in mind as he proceeds to obtain usable information to satisfy the assigned requirement, and thus contribute to the success of the unit's mission.

The objective may be specific—Establish the exact location of an ammunition storage facility. Or it may be general—Seek to obtain OB information about a specific echelon of the enemy forces.

In either case, the interrogator must use the objective as a basis for planning and conducting the interrogation. He should attempt to prevent the source from becoming aware of the true objective of the interrogation. The interrogator should not concentrate on the objective to the extent he overlooks or fails to recognize and exploit other valuable information extracted from the source.

For example, during an interrogation, the interrogator learns of the presence of a heretofore unknown, highly destructive weapon. Although this information may not be in line with his specific objective, the interrogator must develop this important lead to obtain all possible information concerning this weapon. It becomes obvious an interrogation objective can be changed as necessary or desired.

## PROHIBITION AGAINST USE OF FORCE

The Intelligence Staff Officer (J2, G2, or S2) has responsibility for all command intelligence functions. He assists the commander by—

- Supervising the collection, evaluation, and interpretation of all intelligence information.
- Disseminating intelligence to appropriate higher, lower, and adjacent units.
- Assuming primary responsibility to ensure that all command intelligence functions are conducted in accordance with international, US, and other applicable law and policy. Specifically, the J2, G2, or S2 is responsible to ensure the GWS, GPW, and GC are not violated by intelligence personnel.

One of the significant means used by the intelligence staff is the interrogation of the following:

- EPWs.
- Captured insurgents.
- Civilian internees.
- Other captured, detained, or retained persons.
- Foreign deserters or other persons of intelligence interest.

These persons are protected by the Geneva Conventions for the Protection of War Victims of August 12, 1949, as they relate to captured wounded and sick enemy personnel (GWS), retained enemy medical personnel and chaplains (GWS), enemy prisoners of war (GPW), and civilian internees (GC). Captured insurgents and other detained personnel whose status is not clear, such as suspected terrorists, are entitled to PW protection until their precise status has been determined by competent authority.

In conducting intelligence interrogations, the J2, G2, or S2 has primary staff responsibility to ensure these activities are performed in accordance with the GWS, GPW, and GC, as well as US policies, regarding the treatment and handling of the above-mentioned persons.

FM 34-52

The GWS, GPW, GC, and US policy expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation.

Such illegal acts are not authorized and will not be condoned by the US Army. Acts in violation of these prohibitions are criminal acts punishable under the UCMJ. If there is doubt as to the legality of a proposed form of interrogation not specifically authorized in this manual, the advice of the command judge advocate should be sought before using the method in question.

Experience indicates that the use of prohibited techniques is not necessary to gain the cooperation of interrogation sources. Use of torture and other illegal methods is a poor technique that yields unreliable results, may damage subsequent collection efforts, and can induce the source to say what he thinks the interrogator wants to hear.

Revelation of use of torture by US personnel will bring discredit upon the US and its armed forces while undermining domestic and international support for the war effort. It also may place US and allied personnel in enemy hands at a greater risk of abuse by their captors. Conversely, knowing the enemy has abused US and allied PWs does not justify using methods of interrogation specifically prohibited by the GWS, GPW, or GC, and US policy.

Limitations on the use of methods identified herein as expressly prohibited should not be confused with psychological ploys, verbal trickery, or other nonviolent or noncoercive ruses used by the interrogator in the successful interrogation of hesitant or uncooperative sources.

The psychological techniques and principles in this manual should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, physical or mental torture, or any other form of mental coercion to include drugs that may induce lasting and permanent mental alteration and damage.

Physical or mental torture and coercion revolve around eliminating the source's free will, and are expressly prohibited by GWS, Article 13; GPW, Articles 13 and 17; and GC, Articles 31 and 32. Torture is defined as the infliction of intense pain to body or mind to extract a confession or information, or for sadistic pleasure.

Examples of physical torture include—
- Electric shock.
- Infliction of pain through chemicals or bondage (other than legitimate use of restraints to prevent escape).
- Forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time.
- Food deprivation.
- Any form of beating.

Examples of mental torture include—
- Mock executions.
- Abnormal sleep deprivation.
- Chemically induced psychosis.

Coercion is defined as actions designed to unlawfully induce another to compel an act against one's will. Examples of coercion include—
- Threatening or implying physical or mental torture to the subject, his family, or others to whom he owes loyalty.
- Intentionally denying medical assistance or care in exchange for the information sought or other cooperation.
- Threatening or implying that other rights guaranteed by the GWS, GPW, or GC will not be provided unless cooperation is forthcoming.

Specific acts committed by US Army personnel may subject them to prosecution under one or more of the following punitive articles of the UCMJ:
- Article 78 - Accessory after the fact.
- Article 80 - Attempts (to commit one of the following offenses).
- Article 81 - Conspiracy (to commit one of the following offenses).
- Article 93 - Cruelty and maltreatment.
- Article 118 - Murder.
- Article 119 - Manslaughter.
- Article 124 - Maiming.


FM 34-52

- Article 127 - Extortion.
- Article 128 - Assault (consummated by battery; with a dangerous weapon; or intentionally inflicting grievous bodily harm).
- Article 134 - Homicide, negligent:

    -- Misprision of a serious offense (taking some positive act to conceal a serious crime committed by another).

    -- Soliciting another to commit an offense.

    -- Threat, communicating.

See Appendix A for the text of these offenses.

While using legitimate interrogation techniques, certain applications of approaches and techniques may approach the line between lawful actions and unlawful actions. It may often be difficult to determine where lawful actions end and unlawful actions begin. In attempting to determine if a contemplated approach or technique would be considered unlawful, consider these two tests:

- Given all the surrounding facts and circumstances, would a reasonable person in the place of the person being interrogated believe that his rights, as guaranteed under both international and US law, are being violated or withheld, or will be violated or withheld if he fails to cooperate.
- If your contemplated actions were perpetrated by the enemy against US PWs, you would believe such actions violate international or US law.

If you answer yes to either of these tests, do not engage in the contemplated action. If a doubt still remains as to the legality of a proposed action, seek a legal opinion from your servicing judge advocate.

The approaches, psychological techniques, and other principles presented in this manual must be read in light of the requirements of international and US law as discussed above.

Authority for conducting interrogations of personnel detained by military forces rests primarily upon the traditional concept that the commander may use all available resources and lawful means to accomplish his mission and to protect and secure his unit.

It is the stated policy of the US Army that military operations will be conducted in accordance with the law of war obligations of the US. The GWS, GPW, and GC establish specific standards for humane care and treatment of enemy personnel captured, retained, or detained by US military forces and its allies. Suspected or alleged violations of these standards will be reported, investigated and, if appropriate, referred to competent authority for trial or other disposition. Violations of the GWS, GPW, or GC committed by US personnel normally constitute violations of the UCMJ.

The commander is responsible for ensuring that the forces under his command comply with the GWS, GPW, and GC. Should violations occur in the conduct of warfare, the commander bears primary responsibility for investigating and prosecuting violations.

### SECURITY

The interrogator, by virtue of his position, possesses a great deal of classified information. He is aware his job is to obtain information, not impart it to the source. He safeguards military information as well as the source of that information.

This becomes very clear when one considers that among those persons with whom the interrogator has contact, there are those attempting to collect information for the enemy. The interrogator is alert to detect any attempt made by the source to elicit information.

### DEFINITION OF PRISONER OF WAR AND ENEMY PRISONER OF WAR

A PW is a US or allied person detained by an enemy power. An EPW is a person detained by US or allied powers. The first issue interrogators must deal with is who must be afforded PW treatment. Figure 1-3 paraphrases Article 4 of the GPW. In addition, the following personnel shall be treated as PWs: Persons belonging, or having belonged, to the armed forces of the occupied country, if—

- The occupying power considers it necessary by reason of such allegiance to intern them; in particular, if—
- Such persons have made an unsuccessful attempt to rejoin the armed forces to which they belong and which are engaged in combat; or