UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>IRAQ AND AFGHANISTAN DETAINEES LITIGATION | Misc. No. 06-145 (TFH) |
| This document relates to:<br><br>ALI, *et al.* v. PAPPAS<br>ALI, *et al.* v. RUMSFELD<br>ALI, *et al.* v. KARPINSKI<br>ALI, *et al.* v. SANCHEZ | No. 05-cv-1377 (TFH)<br>No. 05-cv-1378 (TFH)<br>No. 05-cv-1379 (TFH)<br>No. 05-cv-1380 (TFH) |

**BRIEF *AMICI CURIAE* OF CONCERNED RETIRED MILITARY OFFICERS AND MILITARY LAW AND HISTORY SCHOLARS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

[see inside cover for list of *amici*]

Sidney S. Rosdeitcher – D.C. Bar No. 094532
*Counsel of Record*
Douglas M. Pravda
Carmen K. Cheung
Judd S. Henry
Colin C. McNary*
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
*Counsel for* Amici Curiae *Concerned Retired Military Officers and Military Law and History Scholars*

* *Not yet admitted; under supervision of counsel of record*

*AMICI CURIAE*

Brigadier General (Ret.) David M. Brahms

Commander (Ret.) David Glazier

Professor Elizabeth L. Hillman

Professor Jonathan Lurie

Professor Diane Mazur

Brigadier General (Ret.) Richard M. O'Meara

Lieutenant Colonel (Ret.) Gary D. Solis

## Table of Contents

**Page**

Table of Authorities ............................................................................................ ii

Interest of *Amici* .............................................................................................. 1

Introduction and Summary of Argument ............................................................ 3

Argument .......................................................................................................... 5

I.    Judicial Enforcement of Prohibitions on Torture and Inhumane Treatment Will Not Intrude Into Matters Reserved to Executive or Military Discretion and Properly Buttresses Fundamental Principles of Military Discipline and Responsibility .................................................................... 5

    A.    Humane Treatment of Persons Detained in Armed Conflict Has Been a Cornerstone of United States Military Doctrine Since the Nation's Founding .............................................................................. 6

    B.    The Uniform Code of Military Justice and the Military's own Regulations Forbid the Mistreatment of Detainees ......................... 12

    C.    Congress and the Executive Recognized the Competence of the Federal Courts to Enforce Humanitarian Standards for the Treatment of Detainees ...................................................................... 18

II.    Defendants Are Not Entitled to Immunity Under the Westfall Act ................... 23

    A.    Defendants' Command Responsibilities Require That They Be Accountable For the Conduct Alleged Here .......................................... 25

    B.    The Conduct Alleged Is Not Within Defendants' Scope of Employment ........................................................................................ 30

        1.    Application of *Respondeat Superior* Doctrine and Cases Would Be Wholly Inappropriate in Light of the Command Responsibilities Defendants Are Alleged To Have Violated ..................................................................................... 31

        2.    Even Under *Respondeat Superior* Doctrine, Defendants' Conduct Was Not Within the Scope of Their Employment ......... 33

Conclusion ...................................................................................................... 36

## TABLE OF AUTHORITIES

### CASES

*Bancoult* v. *McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004), __F.3d _, 2006 WL 1042356 (D.C. Cir. Apr. 21, 2006)..................................................................23, 31

*Bivens* v. *Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)......................................................................................................................4

*Estate of Ford* v. *Garcia*, 289 F.3d 1283 (11th Cir. 2002)..........................................25, 26

*Gutierrez de Martinez* v. *Lamango*, 515 U.S. 417 (1995)....................................................23

*Haddon* v. *United States*, 68 F.3d 1420 (D.C. Cir. 1995)....................................................23

*Hilao* v. *Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996)....................................................26

*Kimbro* v. *Velten*, 30 F.3d 1501 (D.C. Cir. 1994)................................................................31

*Lyon* v. *Carey*, 533 F.2d 649 (D.C. Cir. 1976)...................................................................32

*Rasul* v. *Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006)....................................24, 31, 34

*In re Sealed Case*, 131 F.3d 208 (D.C. Cir. 1997)...............................................................31

*Sanchez-Espinoza* v. *Reagan*, 770 F.2d 202 (D.C. Cir. 1985)...........................................23

*Schneider* v. *Kissinger*, 310 F.Supp.2d 251 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005).........................................................22, 31

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004).................................................................21

*United States* v. *Finch*, 22 C.M.R. 698 (U.S.N. Bd. Rev. Oct. 24, 1956).........................12

*Weinberg* v. *Johnson*, 518 A.2d 985 (D.C. 1986)..............................................................32

*Xuncax* v. *Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)....................................................27

*In re Yamashita*, 327 U.S. 1 (1946).....................................................................................26

### STATUTES

18 U.S.C. § 2340.................................................................................................................20

18 U.S.C. § 2340(1)...........................................................................................20

18 U.S.C. § 2340(2)...........................................................................................21

18 U.S.C. § 2340A.............................................................................................20

28 U.S.C. § 2679(b)(1)......................................................................................23

Detainee Treatment Act, 42 U.S.C. § 2000dd(a)............................................22

Uniform Code of Military Justice, 10 U.S.C. § 801, *et seq.*...........................12
    10 U.S.C. §893............................................................................................12
    10 U.S.C. §918............................................................................................12
    10 U.S.C. §919............................................................................................12
    10 U.S.C. §920............................................................................................12
    10 U.S.C. §924............................................................................................12
    10 U.S.C. §927............................................................................................12
    10 U.S.C. §928............................................................................................12
    10 U.S.C. §934............................................................................................12

War Crimes Act, 18 U.S.C. § 2441 ...................................................................21

## LEGISLATIVE HISTORY

101 Cong. Rec. 9,958-73 (1955) ...................................................................8, 19

136 Cong. Rec. S17,486-92 (1990) ....................................................................19

151 Cong. Rec. S14,269 (2005).........................................................................22

H.R. Rep. No. 104-698 (1996) ..........................................................................21

S. Exec. Rep. No. 101-30 (1990)........................................................................19

S. Rep. No. 103-107 (1993)...............................................................................21

## BOOKS, ARTICLES AND TREATISES

27 Am. Jur. 2d, *Employment Relationship* (2004).............................................32

Symposium, *The Sixth Annual American Red Cross-Washington College of Law
    Conference on International Humanitarian Law: A Workshop on
    Customary International Law and the 1977 Protocols Additional to the
    1949 Geneva Conventions*, 2 Am. U. J. Int'l L. & Poly 415 (1987) ....................27

Maj. Jeffrey F. Addicott and William A. Hudson, Jr., *The Twenty-Fifth Anniversary of My Lai: A Time to Inculcate the Lessons*, 139 Mil. L. Rev. 153 (1993)..........................................................................................11, 29

Brig. Gen. J.V. Dillon, *The Genesis of the 1949 Convention Relative to the Treatment of Prisoners of War*, 5 Miami L.Q. 40 (1950)........................................8

Patrick Finnegan, *The Study of Law as a Foundation of Leadership and Command: The History of Law Instruction at the United States Military Academy at West Point*, 181 Mil. L. Rev. 112, (2004)......................................7, 10

David Hackett Fischer, *Washington's Crossing* (2004).........................................7

Maj. James F. Gebhardt, *The Road to Abu Ghraib: U.S. Army Detainee Doctrine and Experience*, Military Review, Jan.-Feb. 2005 ...............................................11

L.C. Green, *Command Responsibility in International Humanitarian Law*, 5 Transnat'l L. & Contemp. Probs. 319 (1995)...........................................................25

Paul Lewis, *The Somalia Mission: Prisoners; U.N., Urged by U.S., Refuses to Exchange Somalis*, The N.Y. Times, Oct. 8, 1993 .................................................12

Cmdr. Roger D. Scott, *Kimmel, Short, McVay: Cases Studies in Executive Authority, Law and the Individual Rights of Military Commanders*, 156 Mil. L. Rev. 52 (1998) ...........................................................................................29

Yuval Shany & Keren R. Michaeli, *The Case Against Ariel Sharon: Revisiting the Doctrine of Command Responsibility*, 34 N.Y.U. J. Int'l L. & Pol. 797 (2002) ............................................................................................................30

William H. Taft, IV, *The Law of Armed Conflict After 9/11*, 28 Yale J. Int'l L. 319 (2003)...............................................................................................................10

Kenneth Watkin, *Controlling the Use of Armed Force*, 98 Am. J. Int'l L. 1, 22 (Jan. 2004) .............................................................................................................33

## OTHER AUTHORITIES

Annex to the Fourth Hague Convention Respecting the Laws and Customs of War on Land, art. 1, Oct. 18, 1907, 36 Stat. 2277, 2295, 1 Bevans 631 ..............27

Department of Defense Directive 5525.7 (Jan. 22, 1985) ..................................18

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 .........................................................................................................8

Geneva Convention for the Amelioration of the Condition of Wounded, Sick and
Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T.
3217, 75 U.N.T.S. 85 ................................................................................8

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12,
1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ...........................................*passim*

Geneva Convention Relative to the Protection of Civilian Persons in Time of
War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.....................*passim*

Francis Lieber, *Instructions for the Government of Armies of the United States
in the Field*, United States War Department General Orders No. 100
(April 24, 1863) ...................................................................................7

Memorandum from William J. Haynes II, Gen. Counsel, Dep't of Defense, to
Donald Rumsfeld, Secretary of Defense (Nov. 27, 2002) (approved by
Secretary Rumsfeld on December 2, 2002)...........................................17

Memorandum from Alberto J. Mora to Inspector General, United States
Department of the Navy (July 27, 2004) .........................................16, 17

Memorandum from Major General Jack L. Rives, Deputy Judge Advocate
General of the U.S. Air Force, to SAF/GC (Feb. 5, 2003) ....................16

Memorandum from Major General Jack L. Rives, Deputy Judge Advocate
General of the U.S. Air Force, to SAF/GC (Feb. 6, 2003) ...............15, 16

Memorandum from Major General Thomas J. Romig, U.S. Army, Judge
Advocate General, to General Counsel of the Air Force (Mar. 3, 2003) ..............16

Memorandum from Brigadier General Kevin M. Sandkuhler, U.S. Marine Corps,
Staff Judge Advocate to CMC, to General Counsel of the Air Force (Feb.
27, 2003).............................................................................................15

*Prosecutor v. Delalic,* Case No. IT-96-21-T, Judgment (Nov. 16, 1998).........................29

Protocol Additional to the Geneva Conventions of August 12, 1949, and
Relating to the Protection of Victims of International Armed Conflicts,
Art. 75 at ¶ 2, June 8, 1977, 1125 U.N. 3 ......................................*passim*

Rome Statute of the International Criminal Court, art. 28, *opened for signature*
July 17, 1998, 2187 U.N.T.S. 3 ..........................................................27

Statute of the International Tribunal for the Prosecution of Persons Responsible
for Serious Violations of International Humanitarian Law Committed in

the Territory of the Former Yugoslavia since 1991, art. 7, May 25, 1993,
U.N. Doc. S/25704...................................................................................................27

Statute of the International Criminal Tribunal for the Prosecution of Persons
    Responsible for Genocide and other Serious Violations of International
    Humanitarian Law Committed in the Territory of Rwanda and Rwandan
    Citizens Responsible for Genocide and other Such Violations Committed
    in the Territory of Neighboring States Between January 1, 1994 and
    December 31, 1994, art. 6, Nov. 8, 1994, 33 I.L.M. 1598 ...................................28

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, *opened for signature* Dec. 10, 1984,
    G.A. Res. 39146, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc.
    A/39/51 (1984)..........................................................................................18, 19, 20

U.S. Military Assistance Command for Vietnam, Annex A of Directive
    No. 381-46 (Dec. 27, 1967) ..................................................................................11

U.S. Reservations, Declarations and Understandings to the United Nations
    Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, § I.(1)...........................................................................19

U.S. Dep't of Army, Army Regulation 600-20, *Army Command Policy*,
    (Feb. 2006)..............................................................................................................28

U.S. Dep't of Army, Field Manual 22-100, *Military Leadership*,
    (Aug. 1999).................................................................................................28, 29, 30

U.S. Dep't of Army, Field Manual (FM) 27-10, *The Laws of Land Warfare*
    (July 1956) .......................................................................................................10, 13

U.S. Dep't of the Army, Field Manual 34-52, *Intelligence Interrogation*
    (May 1987) ......................................................................................................13, 14

U.S. Dep't of Army, Field Manual 101-5, *Staff Organization and Operations*,
    (May 1997) .............................................................................................................28

## Interest of *Amici*

*Amici curiae* are former military officers or scholars who teach and write extensively in the field of military law and military history. Many of these *amici* have served on active duty in the military, either in the operational field or as military lawyers. *Amici* thus have an interest in the maintenance of the long and honorable tradition of the United States military of humane treatment of detainees captured in armed conflict and strict enforcement of military, domestic and international law requiring such treatment.

Brigadier General (Ret.) David M. Brahms served in the United States Marine Corps from 1963 through 1988, with a tour of duty in Vietnam. During the 1970s, he was the principal legal advisor for POW matters at Headquarters Marine Corps. As the Staff Judge Advocate to the Commandant of the Marine Corps from 1985 through 1988, General Brahms was the senior uniformed lawyer for the Marine Corps. General Brahms is a member of the Board of Directors of the Judge Advocates Association.[1]

Commander (Ret.) David Glazier served twenty-one years as a United States Navy surface warfare officer, culminating with command of the U.S.S. George Philip, a guided missile frigate. He is a research fellow and lecturer at the University of Virginia School of Law's Center for National Security Law, where he teaches courses on the Law of War and American Military Justice. Beginning in July, he will be Associate Professor of Law at Loyola Law School Los Angeles. He has published a number of articles on military law and military commissions.

---

[1]   References to each *amici*'s institutional or organizational affiliations are for identification purposes only.

Elizabeth L. Hillman is a former Air Force Captain with seven years of active service. She is Associate Professor of Law at Rutgers Law School-Camden (and will become a full professor on July 1). At Rutgers, she teaches courses in military law, constitutional law, and legal history. Prior to joining Rutgers, she taught military history at the United States Air Force Academy. She also serves on the National Institute of Military Justice Board of Directors. She has authored numerous articles on U.S. military justice and published a book last year, *Defending America: Military Culture and the Cold War Court-Martial*.

Jonathan Lurie is a Professor of History and Adjunct Professor of Law at Rutgers University, where he teaches legal history and military legal history. He was awarded a Fulbright Lectureship in Sweden, where he taught courses on military justice, including a course on War, National Security, and the Rule of Law. He is the author of a two-volume history of the United States Court of Appeals for the Armed Forces and several other books on military justice.

Diane Mazur served as a United States Air Force officer from 1979 to 1983, achieving the rank of Captain. She is the University of Florida Research Foundation Professor of Law at the University of Florida College of Law, where she teaches courses in Civil-Military Relations, Professional Responsibility, Constitutional Law, and Evidence. She is a member of the National Institute of Military Justice Board of Advisors. She has written numerous articles on military law, including a chapter titled "Military Law" in the forthcoming book, *Law and Popular Culture*.

Brigadier General (Ret.) Richard M. O'Meara retired from the United States Army after thirty-five years of active and reserve service. He is a combat veteran

2

who served as an enlisted soldier, an infantry officer and a judge advocate. He currently teaches international relations, American foreign policy and other security related courses at Rutgers and Monmouth Universities in New Jersey.

Lieutenant Colonel (Ret.) Gary D. Solis retired from the United States Marine Corps after twenty-six years on active duty and serving two combat tours in Vietnam. He was a Judge Advocate for eighteen years, during which time he was a judge in numerous courts martial. He directs instruction in the law of war at the United States Military Academy at West Point, where he teaches Law of War for Commanders and Advanced Law of War. He has a doctorate in the law of war from the London School of Economics and Political Science. In addition to numerous articles, papers, and book chapters, he has written two books on law in combat: *Marines and Military Law in Vietnam* and *Son Thang: An American War Crime.*

## Introduction and Summary of Argument

Plaintiffs allege that they were subjected to torture and cruel, inhuman and degrading treatment during their detention in U.S. military custody in Iraq and Afghanistan. Plaintiffs seek damages and declaratory and injunctive relief, claiming that Defendants – Secretary of Defense Donald Rumsfeld, Major General Ricardo Sanchez, Brigadier General Janis Karpinski and Colonel Thomas Pappas – authorized or encouraged such conduct or failed to prevent it when they knew or should have known it was occurring. Each of the Defendants has moved to dismiss the Consolidated Amended Complaint for failure to state a claim.

*Amici* submit this brief to address two issues raised by the Defendants' motions: *First*, whether the matters alleged in the amended complaint – Defendants'

3

alleged authorization or failure to prevent acts of torture and other inhuman or degrading

treatment of detainees by persons subject to their command – would inappropriately

require the Court to intrude into matters of national security and military decision-making

that are within the discretion of the Executive branch and the military leadership[2]; and

*second*, whether Defendants are immunized from suit by the Westfall Act because their

alleged conduct was within Defendants' "scope of employment."

Amici submit that the answer to both questions is "no." In this brief, *amici*

show why any other answer would conflict with military tradition, law and regulation,

and would be subversive of fundamental principles of military discipline and command

responsibility. Adherence to domestic and international standards for the humane

treatment of persons within military custody is not a matter of discretion.

Defendants were not only obligated to adhere strictly to these standards

themselves, but as persons in positions of command, were obligated to educate and train

military personnel subject to their command to understand and adhere to them, and to

prevent and punish deviation from those standards of which they knew or should have

known. Adherence to these standards is buttressed by their enforcement in civilian

courts. And Congress and the Executive recognized that these standards are appropriate

for judicial enforcement, enacting laws which make violations of such humanitarian

standards enshrined in the Geneva Conventions and the Convention Against Torture

subject to federal criminal prosecution.

---

[2]   These issues are raised by Defendants under the political question doctrine or as
"special factors" as articulated in *Bivens* v. *Six Unknown Named Agents of the Fed.
Bureau of Narcotics*, 403 U.S. 388 (1971), or both.

For similar reasons, no matter how the term "scope of employment" may be understood in other contexts, it cannot reasonably be stretched to immunize the conduct alleged here, involving the treatment of detainees in military custody. Accountability, not immunity, for the conduct of military personnel within Defendants' command is fundamental to military law, discipline and the law of war. This principle has special force when it comes to enforcement of those standards of the law of war governing the humane treatment of persons detained in armed conflict, for deviations from those standards threaten the safety and well-being of our own military personnel who fall into enemy hands; expose military personnel to severe sanctions under military, domestic and international law; undermine military discipline; and damage the reputation of our Nation and the military. It was the essence of Defendants' scope of employment to educate and train those within their command responsibility to adhere to those standards and to do everything within their power to prevent and punish deviations from them. If they not only failed to do so, but authorized or encouraged such deviations, their conduct would be the antithesis of the scope of their employment and immunity would be inconsistent with the well-established principle of command responsibility.

## Argument

### I.

### JUDICIAL ENFORCEMENT OF PROHIBITIONS ON TORTURE AND INHUMANE TREATMENT WILL NOT INTRUDE INTO MATTERS RESERVED TO EXECUTIVE OR MILITARY DISCRETION AND PROPERLY BUTTRESSES FUNDAMENTAL PRINCIPLES OF MILITARY DISCIPLINE AND RESPONSIBILITY

Defendants portray the subject of this lawsuit as involving matters of national security and military and war-making powers that are within Executive and

5

military discretion and outside judicial competence.  This misconceives the nature of this lawsuit.

This suit involves claims that the Secretary of Defense and high-ranking military officers authorized or encouraged conduct amounting to torture and cruel, inhuman and degrading treatment, and failed to prevent such conduct of which they knew or should have known.  These allegations entail no matters involving Executive or military discretion.  They allege conduct that has long been unequivocally forbidden as a matter of military law and tradition and domestic and international law.  Enforcement of these prohibitions by federal courts buttresses principles of military discipline and command responsibility.  The propriety of such judicial enforcement of these prohibitions is recognized by the enactment of the War Crimes Act and the federal anti-torture statute, which make the conduct alleged federal criminal offenses to be prosecuted in federal courts.

**A.    Humane Treatment of Persons Detained in Armed Conflict Has Been a Cornerstone of United States Military Doctrine Since the Nation's Founding**

Throughout its history, the United States military has maintained a tradition of treating captured combatants with humanity, and condemned the use of violence or abusive treatment in extracting information from prisoners.  After crossing the Delaware River and winning the Battle of Trenton on Christmas Day, 1776, George Washington ordered his troops to give refuge to hundreds of surrendering Hessian soldiers.  While European military tradition allowed field commanders to decide whether to put captured enemy soldiers "to the sword" or to keep them captive ("give quarter"), Washington instructed his lieutenants to treat captured British soldiers "with humanity,"

and to "[l]et them have no reason to complain of our copying the brutal example of the British army." David Hackett Fischer, *Washington's Crossing*, 377-79 (2004).

The requirement that all prisoners of war be treated with humanity and dignity was formally codified during the Civil War, when President Abraham Lincoln signed General Orders No. 100 in 1863, also known as the Lieber Code. Francis Lieber, *Instructions for the Government of Armies of the United States in the Field*, United States War Department General Orders No. 100 (April 24, 1863). The Lieber Code, provided for "instructions for the government of armies of the United States in the field," and declared that military law must "be strictly guided by the principles of justice, honor and humanity – virtues adorning a soldier even more than other men, for the reason that he possesses the power of his arms against the unarmed." *Id.* at § I, art. 4. The Lieber Code defined minimum standards for treating prisoners of war and explicitly forbade the "intentional infliction of any suffering, or disgrace, by cruel imprisonment, want of food, by mutilation, death, or any other barbarity" upon a prisoner of war. *Id.* at § III, art. 56. Moreover, the Code specified that while prisoners of war may be confined "such as may be deemed necessary on account of safety," they "are to be subjected to no other intentional suffering or indignity" and "treated with humanity." *Id.* at art. 75-76. The use of violence in extracting information from captured enemy forces was also forbidden. *Id.* at § I, art.16 ("Military necessity does not admit of cruelty – that is, the infliction of suffering for the sake of suffering or for revenge, nor of maiming or wounding except in fight, nor of torture to extort confessions.") While the law and ethics of warfare had been taught at the United States Military Academy well before the Civil War, the Lieber Code was integrated as part of military training upon its codification. Patrick Finnegan, *The*

*Study of Law as a Foundation of Leadership and Command: The History of Law Instruction at the United States Military Academy at West Point*, 181 Mil. L. Rev. 112, 114 (2004). Notably, the Lieber Code was promulgated during the Civil War as guidance for treatment of an enemy that was considered to be engaged in an unlawful rebellion against the United States.

The Lieber Code has served as "the basis of every convention and revision" of international law concerning the treatment of prisoners of war, including the subsequent Hague Conventions of 1899 and 1907, the first multilateral codification of the modern law of war. Brig. Gen. J.V. Dillon, *The Genesis of the 1949 Convention Relative to the Treatment of Prisoners of War*, 5 Miami L.Q. 40, 42 (1950). The brutality of the First World War prompted the United States and more than forty other nations to enter into the 1929 Geneva Convention Relative to the Treatment of Prisoners of War. At the end of the Second World War, the laws of war were revisited, resulting in the adoption in 1949 of the four Geneva Conventions.[3]

The four Geneva Conventions of 1949 provide comprehensive standards for the treatment of persons detained in armed conflicts. In particular, the Third Geneva Convention (Geneva Convention Relative to the Treatment of Prisoners of War, August

---

[3] *See* Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (collectively, the "1949 Geneva Conventions"). All four conventions were ratified by the United States in 1955. *See* 101 Cong. Rec. 9,958-73 (1955).

12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("GPW" or the "Third Convention"))

addresses the treatment of prisoners of war and the Fourth Geneva Convention (Geneva

Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949,

6 U.S.T. 3516, 75 U.N.T.S. 287 ("GC" or the "Fourth Convention")) deals with the

treatment of civilians. Moreover, Common Article 3 – so denominated because it is

common to all four Geneva Conventions – addresses the treatment of persons detained in

armed conflicts that do not involve conflicts between nation states, such as civil wars.[4]

Common Article 3 provides a minimum standard, applicable under all the Conventions,

which prohibits "violence to life and person . . . mutilation, cruel treatment and torture;

. . . [and] outrages upon personal dignity, in particular, humiliating and degrading

treatment" against all detainees, regardless of their status. *See, e.g.*, GPW, Art. 3; GC,

Art. 3. Moreover, Article 17 of the GPW provides that "[p]risoners of war who refuse to

answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous

treatment of any kind."

　　　　The Fourth Convention makes clear that torture or inhuman and degrading

treatment is prohibited. Article 27 of the Fourth Convention provides that protected

persons "shall at all times be humanely treated, and shall be protected especially against

all acts of violence or threats thereof or against insults . . . ." Article 31 specifically

---

[4]　This case does not raise the issues present in cases involving Guantánamo detainees,
as to whether the protections of Geneva, including common Article 3, apply to al
Qaeda or the Taliban. Plaintiffs here are alleged to be non-combatant civilian
nationals of Iraq and Afghanistan abused while in U.S. military custody in Iraq and
Afghanistan and subsequently released without ever having been charged. As such
they are protected persons under the Fourth Geneva Convention and Common Article
3. Consolidated Amended Complaint ("Compl.") ¶ 169. Defendants' motions do not
claim otherwise.

prohibits "physical or moral coercion . . . against protected persons, in particular to obtain information . . . ." Article 32 prohibits "any measure" that causes "physical suffering" and "applies not only to murder, torture . . . but also to any other measures of brutality whether applied by civilian or military agents" and Article 118 states that "all forms of cruelty without exception are forbidden."

Article 75 of Protocol I to the Geneva Conventions prohibits torture, "violence to the life, health, or physical or mental well-being," and "outrages upon personal dignity, in particular humiliating and degrading treatment" of any detainees. Protocol Additional to the Geneva Conventions of August 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, Art. 75 at ¶ 2, June 8, 1977, 1125 U.N. 3, ("Protocol I"). The United States has not adopted Protocol I, but it "regard[s] the provisions of Article 75 as an articulation of safeguards to which all persons in the hands of an enemy are entitled." William H. Taft, IV, *The Law of Armed Conflict After 9/11*, 28 Yale J. Int'l L. 319, 322 (2003).[5] The United States military has long trained its officers concerning their obligation to observe the laws of war and, since the adoption of the Hague and Geneva conventions, their obligation to observe the standards set forth in those conventions. *See* Finnegan, 181 Mil. L. Rev. 112; *see generally* U.S. Dep't of the Army, Field Manual (FM) 27-10, *The Laws of Land Warfare* (July 1956) ("FM 27-10").

The military sought to maintain this commitment to treat detainees in armed conflicts with humanity in contemporary campaigns, even if detainees did not technically qualify for treatment as "prisoners of war" under the Third Convention.

---

[5]   Mr. Taft was Legal Adviser to the Department of State from 2001 to 2005.

During the Vietnam War, the United States extended prisoner of war protections as articulated in the Geneva Conventions to all captured combatants – including captured Viet-Cong, who did not follow the laws of war. *See* United States Military Assistance Command for Vietnam, Annex A of Directive No. 381-46 (Dec. 27, 1967), *reprinted in* Charles I. Bevans, ed., *Contemporary Practice of the United States Relating to International Law*, 62 Am. J. Int'l L. 754, 766-67 (1968). In the wake of revelations of serious human rights abuses committed by members of the U.S. Armed Forces during the war in Vietnam, the military undertook high-level investigations which found, *inter alia*, that troops and command had been inadequately trained in the law and principles of the Geneva Conventions. *See* Maj. Jeffrey F. Addicott and William A. Hudson, Jr., *The Twenty-Fifth Anniversary of My Lai: A Time to Inculcate the Lessons*, 139 Mil. L. Rev. 153, 162-64 (1993). Following the Vietnam War, the United States Army amended its doctrine concerning the treatment of enemy prisoners of war in order to emphasize the primacy of the Geneva Conventions and humanitarian law, adopting the "implementation of the Geneva Conventions" as the main objective of enemy prisoner of war operations in place of the "acquisition of maximum intelligence information." *See* Maj. James F. Gebhardt, *The Road to Abu Ghraib: U.S. Army Detainee Doctrine and Experience*, Military Review, Jan.-Feb. 2005, at 44, 50 (comparing United States Department of the Army Field Manual 19-40, *Enemy Prisoners of War and Civilian Detainees*, ¶ 1-2a (Dec. 1967) with United States Department of the Army Field Manual 19-40, *Enemy Prisoners of War, Civilian Detainees, and Detained Persons*, ¶ 1-3a (1967)).

The U.S. military reinforced its tradition of treating all detainees with humanity again in 1993, when the United States was engaged in armed conflict in

Somalia. There, although the United States maintained that captured Somali fighters would not normally be considered prisoners of war, it nonetheless sought to ensure that any captured fighters be accorded the treatment owed to a prisoner of war under the Geneva Conventions. *See* Paul Lewis, *The Somalia Mission: Prisoners; U.N., Urged by U.S., Refuses to Exchange Somalis*, The N.Y. Times, Oct. 8, 1993, at A16.

**B.      The Uniform Code of Military Justice and the Military's own Regulations Forbid the Mistreatment of Detainees**

The law governing the conduct of individuals in the military is set forth in the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 801, *et seq.*, and the Field Manuals issued by the Armed Forces. It is clear from both the UCMJ and the Field Manuals that military law has consistently prohibited the mistreatment of individuals in military custody.

The UCMJ specifically prohibits a member of the Armed Forces from committing acts of "cruelty toward, or oppression or maltreatment of any person subject to his orders." 10 U.S.C. § 893; *see e.g. United States* v. *Finch*, 22 C.M.R. 698, 700-1 (U.S.N. Bd. Rev. Oct. 24, 1956) (affirming conviction of prison guard for violating § 893 by maltreating prisoners). Murder, manslaughter, rape, maiming and assault – as well as attempts to murder, rape, maim and assault – are all punishable under the UCMJ. 10 U.S.C. §§ 918, 919, 920, 924, 928. Extorting or threatening a detainee for information is also prohibited, pursuant to 10 U.S.C. §§ 927 and 934, respectively.

FM 27-10 contains the Army's interpretation of the law of war, incorporating reference to international conventions – including the 1949 Geneva

Conventions – and rules of the customary law of war.[6]  Importantly, FM 27-10 incorporates Common Article 3 of the Geneva Conventions.  *See* FM 27-10, Art. 11; *see also id.* at Arts. 246, 248, 271, 446.  FM 27-10 also mandates that prisoners of war must "at all times be humanely treated . . . [and] protected, particularly against acts of violence or intimidation and against insults and public curiosity."  *See* FM 27-10, Art. 89 (incorporating GPW, art. 13).  FM 27-10 also prohibits the use of "physical or moral coercion" in obtaining information from prisoners of war or captured civilians.  *Id.* at Arts. 93, 270 (incorporating, respectively, GPW, art. 17 and GC, Art. 31).

The United States Department of the Army Field Manual 34-52, *Intelligence Interrogation* (May 1987) ("FM 34-52"), sets forth acceptable interrogation techniques and prohibited conduct.  The prohibitions against the use of torture and cruel, inhuman and degrading treatment during interrogations are clear.  FM 34-52 recognizes that all principles and techniques of interrogations outlined in the manual are to be used only "within the constraints" established by the UCMJ and the Geneva Conventions.  FM 34-52, *preface* at iv.  The manual makes clear that the Geneva Conventions and United States policy "expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation."  *Id.* at 1-8; *see also id.* at 1-12 ("threats in and of themselves constitute a form of coercion").[7]

---

[6]  *See* Appendix A-128 – A-131, listing the Articles of the Geneva Conventions and the 1907 Hague Conventions incorporated into FM 27-10.

[7]  In outlining the types of treatment that are considered physical and mental torture, the manual lists, *inter alia*, techniques such as:

- Infliction of pain through chemicals or bondage;

As discussed in greater detail in Point II, *infra*, Defendants also have command responsibility, which makes them liable for acts of subordinates if they knew, or should have known, of conduct that violates these standards, and failed to take measures within their power to prevent such conduct, or failed to investigate and punish violations of which they are or should be aware. Accordingly, the United States Army recognizes that the Geneva Conventions impose an "affirmative duty upon commanders to insure their subordinates are not mistreating protected persons or their property. The command and the government will ultimately be held responsible for any mistreatment." FM 34-52, D-1. These prohibitions apply regardless of whether the individual detained is a prisoner of war, captured insurgent, or civilian internee. *Id.* at 1-7. Army personnel are warned that "improper" or "unlawful" interrogation techniques could not only harm critical intelligence gathering efforts, but also "send U.S. soldiers to prison." *Id.* at C-4.

Given the Armed Forces' long tradition of treating detainees with humanity and legal obligation to avoid using torture and cruel, inhuman or degrading treatment in intelligence gathering, the Offices of the Judge Advocate General for the Navy, Army and Air Force in 2003 all expressed concern over the authorization of aggressive counter-resistance techniques for use in interrogating detainees. In a

---

- Forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time;

- Any form of beating;

- Mock executions; and

- Abnormal sleep deprivation.

*Id.* at 1-8; *see also id.* at D-1 – 2.

memorandum to the General Counsel of the Air Force, Brigadier General Kevin M.

Sandkuhler, U.S. Marine Corps, Staff Judge Advocate to CMC, argued that authorizing

use of aggressive interrogation techniques would "adversely impact the following:

> a.  Treatment of U.S. Servicemembers by Captors and
>     compliance with International Law.
>
> b.  Criminal *and Civil Liability* of DOD Military and
>     Civilian Personnel in Domestic, Foreign, and
>     International Forums.
>
> c.  U.S. and International Public Support and Respect of
>     U.S. Armed Forces.
>
> d.  Pride, Discipline, and Self-Respect within the U.S.
>     Armed Forces.
>
> e.  Human Intelligence Exploitation and Surrender of
>     Foreign Enemy Forces, and Cooperation and Support of
>     Friendly Nations."

Memorandum from Brigadier General Kevin M. Sandkuhler, U.S. Marine Corps, Staff

Judge Advocate to CMC, to General Counsel of the Air Force (Feb. 27, 2003) *reprinted*

*in* 151 Cong. Rec. S8794 (emphasis added).  General Sandkuhler further observed, in his

comments on a draft Working Group Report on Detainee Interrogations being prepared

for defendant Secretary of Defense, that the U.S. military's culture and self-image is

maintained through observing "high benchmarks of compliance with the principles and

spirit of the law of war and humane treatment of all persons in U.S. Armed Forces

custody." *Id.*  Similarly, in his comments on the same draft Working Group Report,

Major General Jack L. Rives, Deputy Judge Advocate General of the United States. Air

Force, suggested that the report contain the following discussion:

> U.S. Armed Forces are continuously trained to take the
> legal and moral 'high-road' in the conduct of our military
> operations regardless of how others may operate.  While

> the detainees' status as unlawful belligerents may not
> entitle them to protections of the Geneva Conventions, that
> is a legal distinction that may be lost on the members of the
> armed forces. *Approving exceptional interrogation
> techniques may be seen as giving official approval and
> legal sanction to the application of interrogation
> techniques that U.S. Armed Forces have heretofore been
> trained are unlawful.*

Memorandum from Major General Jack L. Rives, Deputy Judge Advocate General of the

U.S. Air Force, to SAF/GC (Feb. 6, 2003) *reprinted in* 151 Cong. Rec. S8794-95

(emphasis added). In another memorandum, General Rives argues that

> the use of the more extreme interrogation techniques
> simply is not how the U.S. armed forces have operated in
> recent history . . . . Our forces are trained in this legal and
> moral mindset beginning the day they enter active duty. It
> should be noted that law of armed conflict and code of
> conduct training have been mandated by Congress and
> emphasized since the Vietnam conflict when our POWs
> were subjected to torture by their captors.

Memorandum from Major General Jack L. Rives, Deputy Judge Advocate General of the

U.S. Air Force, to SAF/GC (Feb. 5, 2003), *reprinted in* 151 Cong. Rec. S8796.[8]

In July 2004, Alberto Mora, then General Counsel to the Navy, submitted

a memorandum to Vice Admiral Albert Church, who led the Pentagon's investigation

into alleged abuses at the U.S. detention facility at Guantánamo Bay, Cuba, setting forth

his criticisms of policies authorizing coercive interrogation techniques. *See*

Memorandum from Alberto J. Mora to Inspector General, United States Department of

---

[8]    Likewise, in his memorandum to the General Counsel of the Air Force, Major
General Thomas J. Romig, U.S. Army, Judge Advocate General, noted that some of
the "aggressive counter-resistance interrogation techniques" being considered by the
Department of Defense failed to "comport with Army doctrine as set forth in Field
Manual (FM) 34-52 Intelligence Interrogation." Memorandum from Major General
Thomas J. Romig, U.S. Army, Judge Advocate General, to General Counsel of the
Air Force (Mar. 3, 2003), *reprinted in* 151 Cong. Rec. S8794.

the Navy (July 27, 2004) ("Mora Memorandum), available at

http://www.newyorker.com/images/pdfs/moramemo.pdf, last visited May 18, 2006.   He

argued that the interrogation techniques authorized by the Secretary of Defense in his

December 2, 2002 memorandum[9] were improper.

> [These techniques] should not have been authorized
> because some (but not all) of them, whether applied singly
> or in combination, could produce effects reaching the level
> of torture . . . . Furthermore, even if the techniques as
> applied did not reach the level of torture, they almost
> certainly would constitute 'cruel, inhuman, or degrading
> treatment, another class of unlawful treatment.

Mora Memorandum at 6.

* * *

In sum, federal court adjudication of charges that Defendants authorized

or encouraged mistreatment of detainees, or failed to prevent such conduct of which they

knew or should have known, involves no intrusion into Executive or military discretion

on matters of military of national security decision-making.  Such conduct is

unequivocally forbidden by military doctrine, military law and regulations which

incorporate federal statutory requirements, the standards of the Geneva Conventions, and

related laws of armed conflict.  Defendants were not only forbidden from authorizing

such conduct, but were under legal obligations to educate and train military personnel to

adhere to the standards of treatment set forth in the Geneva Conventions, to warn them of

---

[9]  Memorandum from William J. Haynes II, Gen. Counsel, Dep't of Defense, to Donald
Rumsfeld, Secretary of Defense (Nov. 27, 2002) (approved by Secretary Rumsfeld on
December 2, 2002), available at
http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.12.02.pdf,  last visited
May 18, 2002.

the consequences of deviations from those standards, and to prevent such conduct of which they knew or should have known.  Enforcement of those standards by the federal courts in no way interferes with matters committed to Executive or military discretion, but rather buttresses military discipline and command responsibility and is consistent with the principles laid down by the military establishment for more than 200 years. Moreover, the Department of Defense has recognized that violations of law by military personnel can be prosecuted not only through courts martial but also by the civilian courts. *See* Department of Defense Directive 5525.7 (Jan. 22, 1985), *attached as Appendix 3 to Manual for Courts-Martial, United States (2002 ed)*.  And, as we discuss below, Congress and the Executive have long recognized that enforcement of these standards by the civilian federal courts is appropriate and, indeed, essential to the operation of the U.S. military.

**C.    Congress and the Executive Recognized the Competence of the Federal Courts to Enforce Humanitarian Standards for the Treatment of Detainees**

Congress and the Executive have clearly communicated their understanding that federal courts are competent to enforce domestic and international standards prohibiting torture and inhuman and degrading treatment – in short, that the enforcement of these laws presents the opposite of a political question.

*First*, the President entered into international treaties which prohibit torture and cruel, inhuman and degrading treatment, including the Geneva Conventions and the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, G.A. Res. 39146, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. A/39/51 (1984) ("CAT").  In 1955, the Senate

ratified the 1949 Geneva Conventions (101 Cong. Rec. 9,958-73 (1955)), and in 1990,

the Senate ratified the Convention Against Torture[10] (136 Cong. Rec. S17,486-92

(1990)).

The Convention Against Torture prohibits "any act by which severe pain

or suffering, whether physical or mental, is intentionally inflicted on a person . . . when

such pain or suffering is inflicted by or at the instigation of or with the consent or

acquiescence of a public official or other person acting in an official capacity." CAT, art.

1. Such torture cannot be justified by any circumstances: "No exceptional circumstances

whatsoever, whether a state of war or a threat of war, internal political instability or any

other public emergency, may be invoked as a justification of torture." CAT, art. 2(2).

Notably, in ratifying CAT, the Senate noted that the prohibition against torture was "a

standard for the protection of all persons, in time of peace as well as war." S. Exec. Rep.

No. 101-30, at 11 (1990). Moreover, the United States was required under CAT to

"ensure in its legal system that the victim of an act of torture obtains redress and has an

enforceable right to fair and adequate compensation . . . ." CAT, art. 14(1). The

Convention Against Torture also required the United States to "ensure that all acts of

---

[10]   More precisely the Senate advises and consents to ratification and ratification takes
effect when the President deposits it as required by the treaty. In the case of CAT, the
President did not deposit the treaty until 1994. In ratifying the CAT, the United
States expressed the reservation that cruel, inhuman and degrading treatment was
limited to conduct that violated the Fifth, Eighth, and Fourteenth Amendments to the
Constitution. *See* United States Reservations, Declarations and Understandings to the
United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, § I.(1), available at
http://www.unhchr.ch/html/menu2/6/cat/treaties/convention-reserv.htm., last visited
May 18, 2006. In most cases that is likely to be the same conduct forbidden by the
Convention.

torture are offences under its criminal law." CAT, art. 4(1).  Likewise, the 1949 Geneva

Conventions also required contracting parties to "enact any legislation necessary to

provide effective penal sanctions for persons committing, or ordering to be committed"

grave breaches of the Conventions.  *See* GPW, art. 129; GC, art. 146.

       *Second*, Congress has made torture and cruel, inhuman and degrading

treatment subject to criminal prosecution in federal courts by enacting legislation

criminalizing violations of these international standards.

       In 1994, Congress enacted legislation implementing CAT.  *See* 18 U.S.C.

§§ 2340, 2340A.  Section 2340A makes it a felony for any U.S. national or any person

present in the United States to commit or attempt to commit torture outside the United

States.  18 U.S.C. § 2340A.  Section 2340 defines torture as "an act committed by a

person acting under the color of law specifically intended to inflict severe physical or

mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon

another person within his custody or physical control."  18 U.S.C. § 2340(1).  Severe

mental pain or suffering, in turn, is defined as the mental harm caused by or resulting

from:

        (A) the intentional infliction or threatened infliction of
        severe physical pain or suffering;

        (B) the administration or application, or threatened
        administration or application, of mind-altering substances
        or other procedures calculated to disrupt profoundly the
        senses or the personality;

        (C) the threat of imminent death; or

        (D) the threat that another person will imminently be
        subjected to death, severe physical pain or suffering, or the
        administration or application of mind-altering substances or

other procedures calculated to disrupt profoundly the senses or personality.

*Id.* at 2340(2).[11]

In 1996, Congress enacted the War Crimes Act, 18 U.S.C. § 2441, thus reaffirming its intent that torture and cruel, inhuman and degrading treatment be a federal crime, punishable in the civilian courts. The War Crimes Act makes it a felony for any member of the Armed Forces of the United States or any U.S. national to violate Common Article 3 of the Geneva Conventions of 1949 which expressly forbids torture and other degrading treatment or to commit any "grave breaches" of the 1949 Geneva Conventions. Under the Geneva Conventions, "torture or inhuman treatment" constitutes grave breaches. *See* GPW, art. 130 (defining "grave breaches" under the Convention); GC, art. 147 (same). In enacting the War Crimes Act, Congress observed that torture and attempted torture were already crimes punishable under federal law by 18 U.S.C. § 2340A. *See* H.R. Rep. No. 104-698, at 4 (1996). In enacting Sections 2340A and 2441 of title 18 of the United States Code, Congress clearly intended for the civilian courts to enforce these criminal prohibitions against torture and cruel and inhuman treatment.

*Third*, Congress recently enacted the Detainee Treatment Act, which provides, in relevant part, that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location,

---

[11]  The legislation did not separately create any private right of action for torture committed outside the United States. *See* S. Rep. No. 103-107, at 59 (1993). Nonetheless, this does not mean that there is no private right of action for torture committed in foreign countries. In its discussion concerning the type of claims that could be brought under the Alien Tort Claims Act, the Supreme Court indicated that the prohibition against torture is a recognized norm of international law. *See Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 728 (2004).

shall be subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C. §

2000dd(a). The law defines such treatment to mean the "cruel, unusual, and inhumane

treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to

the Constitution." *Id.* at 2000dd(d). While that statute does not provide for any private

right of action, its legislative history indicates that Congress did not intend to exclude

otherwise available private causes of action.

> Thus, Senator Levin stated:

> > It has never been my understanding that the McCain
> > amendment [to the Detainee Treatment Act] would, by
> > itself, create a private right of action. I do not believe that
> > the amendment was intended either to create such a private
> > right of action, or to eliminate or undercut any private right
> > of action such as a claim under the Alien Tort Statute that is
> > otherwise available to an alien detainee.

151 Cong. Rec. S14,269 (2005). Similarly, Senator McCain observed that "these

provisions do not eliminate or diminish any private right of action otherwise available."

*Id.* Senator Warner recognized that while the Detainee Treatment Act did not provide for

a private right of action, civil actions may be brought under "other statutes." *Id.* As a

result, it is clear that Congress understood that civilian courts would hear civil and

criminal cases involving torture and cruel, inhuman and degrading treatment – including

such conduct by U.S. soldiers – and that Congress did not anticipate that having civilian

courts hear these cases would in any way subvert military authority. There is thus no

basis for concluding that federal courts are not competent to enforce the humanitarian

standards adopted by law, treaty and military regulation.

> Defendants rely on cases like *Schneider* v. *Kissinger*, where the court

concluded that it would be inappropriate for the courts to address the alleged impropriety

of the Executive branch's assisting a coup d'état in Chile. 310 F.Supp.2d 251, 270

(D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005). But there, the

court reasoned that as part of its power to set national policy in the matters of foreign

affairs, the Executive could properly exercise discretion to engage in such conduct. *Id.* at

260-61. Other cases cited by Defendants, such as *Sanchez-Espinoza* v. *Reagan*, 770 F.2d

202 (D.C. Cir. 1985) and *Bancoult* v. *McNamara*, 370 F. Supp. 2d 1, 8 (D.D.C. 2004),

*aff'd*,__F.3d__, 2006 W.L. 1042356 (D.C. Cir. Apr. 21, 2006) (Sanchez Mo. at 6-8;

Karpinski Mo. at 37-41; Pappas Mo. at 17), similarly involved the Executive's discretion

in the conduct of foreign affairs. Here, neither the civilian Executive nor the uniformed

military leadership has discretion to authorize or order conduct that has long been

prohibited in domestic, international and military law, and in military regulation and

tradition.

## II.

## DEFENDANTS ARE NOT ENTITLED TO IMMUNITY UNDER THE WESTFALL ACT

The Government maintains that Defendants' alleged conduct falls within

their "scope of employment," as that term is used in the Westfall Act, and is therefore

immunized.[12] *Amici* submit that treating the conduct alleged here as within the

Defendants' "scope of employment" and granting them immunity is wholly

---

[12]  Under the Westfall Act, if the Attorney General properly certifies that defendants'
conduct was within their scope of employment, the United States is substituted as a
defendant and the individual defendants are immunized. 28 U.S.C. § 2679(b)(1),
(d)(1). The Attorney General's certification, however, is not conclusive and is
subject to judicial review. *See Gutierrez de Martinez* v. *Lamango*, 515 U.S. 417, 434-
35 (1995); *Haddon* v. *United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995).

inappropriate. It ignores the unique responsibilities imposed on defendant Secretary of

Defense and the other Defendants – high-ranking military officers – for the alleged

conduct of subordinates within their command consisting of torture and inhuman and

degrading treatment of detainees in their custody, and Defendants' duty to prevent such

conduct of which they knew or should have known, or to investigate and punish

violations of which they are or should be aware. These special responsibilities in the

military context – known as command responsibility – are recognized by civilian and

military law and the law of war and are fundamental to the maintenance of military

discipline. The claim that Defendants not only failed to prevent such conduct by their

subordinates but authorized or encouraged it is so flatly inconsistent with the

responsibilities and duties of their official positions that it cannot reasonably be deemed

to come within the scope of their employment. Moreover, immunizing their conduct is

fundamentally inconsistent with the accountability that is the hallmark of Defendants'

command responsibilities.

      We are aware that courts have treated the term "scope of employment"

under the Westfall Act as synonymous with its use under the doctrine of *respondeat*

*superior*, and that a recent decision in this court, following that reasoning, concluded that

conduct similar to that alleged here was within the scope of employment of defendant

Secretary of Defense and other military officers and was therefore immunized under the

Westfall Act. *See Rasul* v. *Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006). As we show

below, however, except for *Rasul*, none of the other cases considering "scope of

employment" under the Westfall Act had occasion to consider the application of that term

in the special context of the command responsibilities of the defendants involved here, and *Rasul* simply overlooked the significance of those responsibilities.

We, therefore, first explain the nature of Defendants' command responsibilities and then show that (1) application of *respondeat superior* cases and doctrine would be inappropriate in light of the command responsibilities Defendants are alleged to have violated, and (2) even under *respondeat superior* doctrine, Defendants' conduct could not fall within the scope of their employment because, given their command responsibilities, their alleged conduct was not incidental to their employment and was certainly not foreseeable.

## A.    Defendants' Command Responsibilities Require That They Be Accountable For the Conduct Alleged Here

Under U.S. military doctrine, military law and the law of war as it has been enforced in U.S. courts, persons in positions of command are held legally responsible for the unlawful conduct of their subordinates, if they either directed it or knew or should have known of it and failed to take measures within their power to prevent it, or failed to investigate and punish violations of which they are or should be aware.[13]  The doctrine of command responsibility has been recognized in international law at least since a proclamation of Charles VII of France in 1439,[14] and has since become accepted as part of the law of war and of U.S. military regulations.

---

[13]  *See, e.g., Estate of Ford* v. *Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002); Protocol I, *supra*, art. 86(2).

[14]  *See* L.C. Green, *Command Responsibility in International Humanitarian Law*, 5 Transnat'l L. & Contemp. Probs. 319, 320-21 (1995).

This doctrine of command responsibility was recognized by the United States Supreme Court in *In re Yamashita*, 327 U.S. 1 (1946), in which the Court held that General Yamashita, the commander of Japanese forces in the Philippines, could be held liable for atrocities committed by his troops against non-combatants and American prisoners of war.  Yamashita argued that he had not violated the law of war because he was not charged with either committing atrocities or directing the commission of atrocities by his troops.  *Id.* at 14.  The Supreme Court disagreed, finding that Yamashita should be held personally liable for failing to take measures to prevent the atrocities and concluding that "the law of war imposes on an army commander a duty to take such appropriate measures as are within his power to control the troops under his command for the prevention of the specified acts which are violations of the law of war. . . ."  *Id.* at 14-15.  As the Court observed:

> [The law of war's] purpose to protect civilian populations and prisoners of war from brutality would largely be defeated if the commander of an invading army could with impunity neglect to take reasonable measures for their protection.  Hence the law of war presupposes that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates.

*Id.* at 15.  U.S. Courts have repeatedly relied on *Yamashita* to hold military and civilian commanders liable for war crimes and grievous human rights abuses perpetrated by their subordinates.  *See, e.g., Estate of Ford* v. *Garcia*, 289 F.3d 1283, 1289, 1296 (11th Cir. 2002); *Hilao* v. *Estate of Marcos*, 103 F.3d 767, 776-78 (9th Cir. 1996) (estate of Ferdinand Marcos liable for human rights violations committed by Philippine Army);

*Xuncax* v. *Gramajo*, 886 F. Supp. 162, 171-73 (D. Mass. 1995) (former Guatemalan

Minister of Defense liable for crimes perpetrated by Guatemalan army).

The doctrine of command responsibility has also become part of

customary international law. For instance, the Annex to the Fourth Hague Convention of

1907, which addressed the laws and customs of land warfare, provided that an armed

force must be "commanded by a person responsible for his subordinates" in order to be

accorded the rights of lawful belligerents. Annex to the Fourth Hague Convention

Respecting the Laws and Customs of War on Land, art. 1, Oct. 18, 1907, 36 Stat. 2277,

2295, 1 Bevans 631. Protocol I of the Geneva Conventions of 1949, adopted in 1977,

specifies that:

> The fact that a breach of the Conventions or of this
> Protocol was committed by a subordinate does not absolve
> his superiors from penal or disciplinary responsibility, as
> the case may be, if they knew, or had information which
> should have enabled them to conclude in the circumstances
> at the time, that he was committing or was going to commit
> such a breach and if they did not take all feasible measures
> within their power to prevent or repress the breach.

Protocol I, *supra*, art. 86(2).[15] In addition, the doctrine of command responsibility has

been adopted by the International Criminal Court and by the International Tribunals for

the former Yugoslavia and for Rwanda.[16]

---

[15] Though the United States has not ratified Protocol I, it is recognized that Article 86 reflects customary international law. *See* Symposium, *The Sixth Annual American Red Cross-Washington College of Law Conference on International Humanitarian Law: A Workshop on Customary International Law and the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 Am. U. J. Int'l L. & Poly. 415, 428 (1987).

[16] *See* Rome Statute of the International Criminal Court, art. 28, *opened for signature* July 17, 1998, 2187 U.N.T.S. 3; Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International

Perhaps most importantly, longstanding doctrines of the U.S. military, as embodied in army regulations and field manuals, impose responsibility on those who exercise command for the conduct of those subject to that command. A soldier who exercises command authority in the United States military "[is] responsible for everything [his or her] command does or fails to do." U.S. Dep't of Army, Army Regulation 600-20, *Army Command Policy*, §2-1b (Feb. 2006). As part of this responsibility, a commander assumes "the legal and ethical obligation . . . for the actions, accomplishments, or failures of a unit" as well as responsibility for "the health, welfare, morale, and discipline of personnel as well as the equipment of his command." U.S. Dep't of Army, Field Manual 101-5, *Staff Organization and Operations*, 1-1 (May 1997) ("FM 101-5"). Thus, the Army lionizes Dwight Eisenhower as a role model for commanders because "[h]is character allowed for nothing less than acceptance of *total personal responsibility*." U.S. Dep't of Army, Field Manual 22-100, *Military Leadership*, §2-84 (Aug. 1999) ("FM 22-100") (emphasis added). As a matter of official military policy, the "ultimate authority, responsibility, and accountability" for the acts of subordinates "rest wholly with the commander." FM 101-5, 1-2.

The doctrine of command responsibility is fundamental to military discipline and effectiveness. Combat success depends on discipline: the willingness of

---

Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, art. 7, May 25, 1993, U.N. Doc. S/25704; Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and other Such Violations Committed in the Territory of Neighboring States Between January 1, 1994 and December 31, 1994, art. 6, Nov. 8, 1994, 33 I.L.M. 1598.

soldiers to obey orders instantly in stressful and morally ambiguous circumstances. This discipline is not created and maintained through coercion, but through trust and respect. *See* FM 22-100, §3-6 ("The highest form of discipline is the willing obedience of subordinates who trust their leaders. . .") Holding commanders wholly responsible for the fate of their commands conveys to subordinates that they can implicitly trust the judgment of their superiors. Subordinates know that they will never receive an order for which their commander will not be held accountable. Moreover, the doctrine of command responsibility forces commanders to exhibit the type of commitment and dedication to their commands that breeds respect. *See* FM 22-100, §§ 3-22 – 3-23; *See* Cmdr. Roger D. Scott, *Kimmel, Short, McVay: Cases Studies in Executive Authority, Law and the Individual Rights of Military Commanders*, 156 Mil. L. Rev. 52, 170 (1998) ("command responsibility is the bedrock upon which all military discipline rests") (quoting Sen. Malcolm Wallop (R-WY)); *Prosecutor* v. *Delalic*, Case No. IT-96-21-T, Judgement, ¶ 647 (Nov. 16, 1998) ("The doctrine of command responsibility is . . . a species of vicarious responsibility through which military discipline is regulated and ensured.").

In addition to instilling respect for the orders issued by commanding officers, the doctrine of command responsibility creates a powerful incentive for a commander to thoroughly train and monitor his subordinates. This incentive is especially important in the context of the laws of war, where officers and non-commissioned officers are best positioned, and bear the primary responsibility, for ensuring that soldiers obey the laws of war. *See* Protocol I , Art. 87(1); Addicott & Hudson, *supra, The Twenty-Fifth Anniversary of My-Lai: A Time to Inculcate the Lessons*, 139 Mil. L. Rev. at

168-69 and Yuval Shany & Keren R. Michaeli, *The Case Against Ariel Sharon: Revisiting the Doctrine of Command Responsibility*, 34 N.Y.U. J. Int'l L. & Pol. 797, 834 (2002).

The doctrine of command responsibility is integral to the military's view that effective leadership is based on the character of the commander. According to the military, "[c]ommand is a sacred trust." FM 22-100, §1-61.

> The legal and moral responsibilities of commanders exceed those of any other leader of similar position or authority. Nowhere else does a boss have to answer for how subordinates live and what they do after work. Our society and the institution look to commanders to make sure the missions succeed, that people receive proper training and care, that values survive.

*Id.* And before a military commander is considered fit to exercise this sacred trust, he or she must internalize, accept and *embody* certain core values, including loyalty, duty, respect, and integrity. *See Id.* at §§1-1 – 1-4, 2-4 – 2-39. Pursuant to these values, a leader "take[s] full responsibility for [his] actions and those of [his] subordinates." *Id.* at §2-14.

It is against this background of command responsibility that the Court must evaluate the question of whether the conduct by the defendants that is alleged in the Complaint is within their scope of employment. We submit that it would be inconsistent with Defendants' duties under the doctrine of command responsibility for them to be immunized from responsibility for their alleged conduct.

**B.      The Conduct Alleged Is Not Within Defendants' Scope of Employment**

This Court should not disturb this long-standing law, doctrine and tradition of command responsibility by immunizing Defendants from responsibility for

the consequences of acts that are alleged to violate U.S. and international law. Defendant

Secretary of Defense, as the civilian official at the apex of the military hierarchy, and the

other defendants, as officers with command responsibilities for the military personnel

who are alleged to have directly inflicted abusive treatment on Plaintiffs in their custody,

were obligated not only to refrain from authorizing or encouraging such conduct but also

to prevent it, to the extent they knew or had reason to know that it was taking place. As

we discuss below, the application of *respondeat superior* doctrine to determine whether

Defendants' alleged conduct here is within the scope of their employment would be

inappropriate in light of their command responsibilities. And even if *respondeat superior*

doctrine were applied, Defendants' alleged conduct was neither incidental to their

employment nor foreseeable.

    1.    **Application of *Respondeat Superior* Doctrine and Cases Would Be Wholly Inappropriate in Light of the Command Responsibilities Defendants Are Alleged To Have Violated**

        Dictum in this Circuit indicates, and cases in other circuits have held, that

*respondeat superior* doctrine can be looked to in order to determine whether a federal

employee was acting within the scope of employment for purposes of the Westfall Act.

*See In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997); *Kimbro* v. *Velten*, 30 F.3d

1501, 1508-09 (D.C. Cir. 1994). Other courts in this district have also looked to

*respondeat superior* doctrine to determine scope of employment under the Westfall Act.

*See Rasul*, 414 F. Supp. 2d at 33-36, *Bancoult* v. *McNamara*, 370 F. Supp. 2d 1, 8

(D.D.C. 2004), *aff'd on other grounds*,__F.3d__, 2006 W.L. 1042356 (D.C. Cir. Apr. 21,

2006); *Schneider* v. *Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004), *aff'd on other

grounds*, 412 F.3d 190 (D.C. Cir. 2005). The latter cases have taken an expansive view

of the meaning of scope of employment, based on two other extremely broad *respondeat superior* rulings finding within the scope of their employment a mattress delivery person's rape of a customer following an argument over the inspection and payment for the mattress and a laundromat employee's decision to shoot a customer during an argument over clothes which the employee had a duty to remove from a laundry machine if left unattended. *See Lyon* v. *Carey*, 533 F.2d 649, 651 (D.C. Cir. 1976); *Weinberg* v. *Johnson*, 518 A.2d 985, 988 (D.C. 1986).[17]

As an initial matter it would seem illogical to blindly apply cases involving issues of *respondeat superior* to determine the "scope of employment" for purposes of Westfall immunity. The purpose of *respondeat superior* is to determine whether it is fair to impose liability on an employer who is better able to satisfy a judgment than its employee. 27 Am. Jur. 2d, *Employment Relationship*, § 374 (2004) ("The policy objectives underlying the imposition of respondeat superior liability are . . . to give greater assurance of compensation for the victim."). But *respondeat superior* does not thereby immunize the employee from liability; the employee remains liable for the conduct, but liability is extended to the employer as well.

Conferring immunity raises quite different questions of policy, such as the societal benefits of conferring immunity weighed against the benefits of insisting on accountability, which should inform the meaning to be given to "scope of employment"

---

[17] We do not address the question of whether the District of Columbia law of *respondeat superior* would govern *if respondeat superior* doctrine were to be applied in determining scope of employment in this case. As noted, we do not believe *respondeat superior* doctrine *should* apply, but, as we show, even if it did, under District of Columbia *respondeat superior* law as applied to the facts alleged here, Defendants' conduct would not be within the scope of employment.

under the Westfall Act.  In determining "scope of employment" in that context, such

considerations may dictate a narrower definition.  But whether *respondeat superior* cases

may be an appropriate guide in other contexts for determining Westfall Act immunity, it

is plainly inappropriate in the context here.  It was central to Defendants' job function to

educate and train military personnel within their command to rigorously comply with

humanitarian standards forbidding torture and inhumane treatment and to do all within

their power to prevent deviations from those standards, if they knew or should have

known they were occurring.  Instead, it is alleged, Defendants not only failed to exercise

these responsibilities, but authorized or encouraged such misconduct.  Accordingly,

conferring immunity here based on the assertion that the conduct alleged was within

Defendants' "scope of employment" runs counter to the very essence of their job

function, which was to take responsibility for their subordinates' conduct.[18]

2.    **Even Under *Respondeat Superior* Doctrine, Defendants' Conduct Was Not Within the Scope of Their Employment**

In any event, even applying the standards defining "scope of employment"

for purposes of *respondeat superior*, the conduct with which Defendants are charged

does not fall within the scope of their employment.  The acts and omissions with which

Defendants are charged do not meet two of the factors that are required to establish scope

_____

[18]  Defendant Sanchez alleges his conduct was within the scope of his employment
because he was merely following orders from Defendant Rumsfeld.  Defendants
Karpinski and Pappas also maintain they were following orders from their superiors.
But as established at least since the Nuremberg War Crimes trials, these Defendants
were not permitted to follow plainly unlawful orders.  *See* Kenneth Watkin,
*Controlling the Use of Armed Force*, 98 Am. J. Int'l L. 1, 22 (Jan. 2004) ("The
doctrine of superior orders and the obligation to disobey manifestly illegal orders are
. . . fundamental tenets of the law regulating armed conflict."); *see also* Plaintiffs'
Consolidated Opposition to Defendants' Motion to Dismiss, 69, fn. 58.

of employment under the *respondeat superior* doctrine:  that the conduct at issue is "of

the kind [the employee] is employed to perform" and that "if force is intentionally used

by the servant against another, the use of force is not unexpectable by the master."  *Rasul*,

414 F. Supp. at 32 (quoting Restatement (Second) of Agency § 228 (1957)).

The Complaint alleges that Defendants authorized, encouraged or failed to

prevent conduct that violates numerous domestic and international laws, as well as

military regulations, prohibiting the use of torture and cruel and inhuman treatment.  The

*Rasul* court, considering charges similar to those involved here, nevertheless concluded

that this was "the kind" of conduct defendants were "employed to perform,"  414 F.

Supp. 2d at 33-34, and that given the post-9/11 environment, such conduct was

foreseeable:

> [T]he heightened climate of anxiety, due to the stresses of
> war and pressures after September 11 to uncover
> information leading to the capture of terrorists, would
> naturally lead to a greater desire to procure information
> and, therefore, more aggressive techniques for
> interrogations.  Indeed, according to the plaintiffs, this
> increased motivation culminated in defendant Rumsfeld's .
> . . approving more aggressive interrogation techniques. . . .
> Although these aggressive techniques may be sanctionable
> within the military command, . . . the fact that abuse would
> occur is foreseeable.

*Id.* at 36.

But this misconceives the nature of Defendants' special responsibilities.  It

was neither incidental to Defendants' job functions nor foreseeable or expected that the

Secretary of Defense, who exercises the Executive's authority as Commander-in-Chief,

nor high-ranking officers with command responsibilities, would engage in such conduct

or submit to pressures to procure information by authorizing or failing to prevent what

the *Rasul* court euphemistically referred to as "aggressive interrogation techniques." It was precisely Defendants' job function to make unequivocally clear to those within their command the flat legal prohibitions against the use of such "aggressive" techniques under military regulations and the law of war – and the severe consequences to themselves, the military and the Nation of violations of those prohibitions – so that military personnel conducting interrogations would *not* give in to the "stresses and pressures of war" and employ aggressive techniques that violated these prohibitions. It could not, and should not, be expected or foreseen that Defendants would authorize or encourage such conduct or create such confusion about the proper standards that those conducting the interrogations or directly responsible for the conditions of custody would not know what was or was not forbidden. And it certainly was not expected that these Defendants would give in to the pressures they were obligated to train others to resist. Hence, Defendants' alleged conduct was neither incidental to their employment nor foreseeable and therefore, not within the scope of their employment

**Conclusion**

For the reasons set forth above, the Court should reject the Government's

claims that it would be an inappropriate intrusion into Executive or military discretion for

this court to adjudicate the allegations of the Amended Complaint or that Defendants'

conduct is immune by virtue of the Westfall Act.

Respectfully submitted,

Sidney S. Rosdeitcher – D.C. Bar No. 094532
    *Counsel of Record*
Douglas M. Pravda
Carmen K. Cheung
Judd S. Henry
Colin C. McNary*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

\* *Not yet admitted; under supervision of counsel of record*

36