# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | ) ) ) | Misc. No. 06-145 |
| This document relates to: | ) ) ) | |
| ALI v. PAPPAS | ) | Case No. 05-1377-TFH |
| ALI v. RUMSFELD | ) | Case No. 05-1378-TFH |
| ALI v. KARPINSKI | ) | Case No. 05-1379-TFH |
| ALI v. SANCHEZ | ) | Case No. 05-1380-TFH |

## REPLY BRIEF IN FURTHER SUPPORT OF LIEUTENANT GENERAL RICARDO SANCHEZ'S MOTION TO DISMISS AMENDED COMPLAINT

Stephen L. Braga
(D.C. Bar No. 366727)
Ryan E. Bull
(D.C. Bar No. 481743)
Joshua A. Klein
(D.C. Bar No. 489078)
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 639-7700

July 21, 2006

*Counsel for Lieutenant General Ricardo S. Sanchez*

# TABLE OF CONTENTS

I.      Plaintiffs' Challenge to Military Interrogation Policies in the Theater of War
        Inextricably Involves Nonjusticiable Political Questions ................................................... 1

II.     Plaintiffs Fail to Rebut LTG Sanchez's Challenges to the Sufficiency
        of the Purported Constitutional Claims ............................................................................ 7

        A.      Special Factors Preclude Extension of the *Bivens* Remedy to Foreign
                Nationals Detained Abroad by the U.S. Military During War. ............................ 7

        B.      Foreign Nationals May Not Assert Rights Under the U.S. Constitution
                As Grounds for Monetary Relief ........................................................................ 13

        C.      LTG Sanchez Is Entitled to Qualified Immunity ................................................. 17

III.    The International Law and Treaty Claims Against LTG Sanchez in Counts
        III, IV, and V Must Be Dismissed Under the Westfall Act and for Failure to
        State a Claim ..................................................................................................................... 20

IV.     There Is No Claim for Declaratory Relief Against LTG Sanchez ................................... 23

Conclusion .................................................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Adler v. Pataki*,
    204 F. Supp. 2d 384 (N.D.N.Y. 2002) ........................................................................24

*Antolok v. United States*,
    873 F.2d 369 (D.C. Cir. 1989) ...................................................................................1

*Arar v. Ashcroft*,
    414 F. Supp. 2d 250 (E.D.N.Y. 2006) .......................................................................9

*Baker v. Carr*,
    369 U.S. 186 (1962).................................................................................................1, 2

*Balzac v. People of Porto Rico*,
    258 U.S. 298 (1922)..................................................................................................14

*Bancoult v. McNamara*,
    370 F. Supp. 2d 1 (D.D.C. 2004) ..............................................................................24

*\*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ...........................................................................2, 4, 6

*Brooks v. United States*,
    337 U.S. 49 (1949)......................................................................................................9

*Bush v. Lucas*,
    462 U.S. 367 (1983)...................................................................................................11

*Carlson v. Green*,
    446 U.S. 14 (1980).....................................................................................................11

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).....................................................................................................24

*Correctional Services Corp. v. Malesko*,
    534 U.S. 61 (2001)..................................................................................................8, 11

*Dorr v. United States*,
    195 U.S. 138 (1904)..................................................................................................14

*Downes v. Bidwell*,
    182 U.S. 244 (1901)..................................................................................................14

*El Shifa Pharmaceutical Industries Co. v. United States*,
   378 F.3d 1346 (Fed. Cir. 2004) ........................................................................25

*Elmaghraby v. Ashcroft*,
   No. 04cv1409, 2005 WL 2375202 (E.D.N.Y. Sept 27, 2005) ........................23

*Gonzalez-Vera v. Kissinger*,
   No. 02-02240 (D.D.C. Sep. 17, 2004) ............................................................24

*\*Gonzalez-Vera v. Kissinger*,
   449 F.3d 1260 (D.C. Cir. 2006) ........................................................................5

*Government of the  Canal Zone v. Scott*,
   502 F.2d 566 (5th Cir. 1974) ..........................................................................14

*Hamdan v. Rumsfeld*,
   126 S.Ct. 2749 (2006) .....................................................................................16

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ...................................................................................10, 16

*Harbury v. Deutch*,
   233 F.3d 596 (D.C. Cir. 2000) ........................................................................15

*Howard University. v. Best*,
   484 A.2d 958 (D.C. 1984) ...............................................................................22

*In re Guantanamo Detainee Cases*,
   355 F. Supp. 2d 443 (D.D.C. 2005) .................................................................14

*\*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ...................................................................................15, 16

*Johnson v. United States*,
   810 F. Supp. 7 (D.D.C. 1993) ............................................................................9

*Jones v. United States*,
   137 U.S. 202 (1890) .........................................................................................17

*Kaukab v. Harris*,
   No. 02 C 0371, 2003 WL 21823752 (N.D.Ill. Aug. 6, 2003) ........................24

*Little v. Barreme*,
   6 U.S. 170 (1804) .............................................................................................10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................24

*Lyon v. Carey*,
    533 F.2d 649 (D.C. Cir. 1976) ...............................................................22

*Marbury v. Madison*,
    5 U.S. 137 (1803) ...................................................................................24

*Mitchell v. Forsyth*,
    472 U.S 511 (1985) ..........................................................................10, 19

*Moseley v. Second New St. Paul Baptist Church*,
    534 A.2d 346 (D.C. 1987) ......................................................................21

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ...................................................................7

*Ramirez de Arellano v. Weinberger*,
    745 F.2d 1500 (D.C. Cir. 1984) ...............................................................6

*Rasul v. Bush*,
    542 U.S. 466 (2004) ..........................................................................16, 17

*Rasul v. Rumsfeld*,
    414 F. Supp. 2d 26 (D.D.C. 2006) .........................................................23

*Reid v. Covert*,
    354 U.S. 1 (1957) ..............................................................................14, 15

*Ross v. McIntyre*
    140 U.S. 453 (1891) ...............................................................................16

*\*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) ................................................9, 11, 12, 24

*Saucier v. Katz*
    533 U.S. 194 (2001) ..........................................................................10, 18

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ...........................................................................6, 10

*Schneider v. Kissinger*,
    310 F. Supp. 2d 251 (D.D.C. 2004) .......................................................20

iv

*Schneider v. Kissinger,
    412 F.3d 190 (D.C. Cir. 2005) ...............................................................2, 4, 5

Simpson v. Socialist People's Libyan Arab Jamahiriya,
    326 F.3d 230 (D.C. Cir. 2003) .........................................................................6

Spagnola v. Mathis,
    859 F.2d 223 (D.C. Cir. 1988) .......................................................................11

Stencel Aero Engineering Corp. v. United States,
    431 U.S. 666 (1977).........................................................................................10

Tel-Oren v. Libyan Arab Republic,
    726 F.2d 774 (D.C. Cir. 1984) .......................................................................12

Territory of Hawaii v. Osaki Mankichi,
    190 U.S. 197 (1903) .........................................................................................14

The Paquete Habana,
    175 U.S. 677 (1900) .........................................................................................10

United States v. Brown,
    348 U.S. 110 (1954) ...........................................................................................9

United States v. Shearer,
    473 U.S. 52 (1985).........................................................................................9-10

United States v. Smith,
    499 U.S. 160 (1991).........................................................................................20

United States v. Stanley,
    483 U.S. 669 (1987)..................................................................................9, 11, 12

United States v. Tiede,
    86 F.R.D. 227 (U.S. Ct. Berlin 1979) ...........................................................15

*United States v. Verdugo-Urquidez,
    494 U.S. 259 (1990)...........................................................................10, 14, 15, 16

Vermilya-Brown Co. v. Connell,
    335 U.S. 377 (1948).........................................................................................17

Vieth v. Jubelirer
    541 U.S. 267 (2004) ....................................................................................24-25

*Weinberg v. Johnson*,
  518 A.2d 985 (D.C. 1986) ..........................................................................21, 22

*Wilson v. Layne*,
  526 U.S. 603 (1999).........................................................................................19

## STATUTES

Ronald Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No.
  108-375, 118 Stat. 1811 (2005) ..........................................................................12

10 U.S.C. § 2734..............................................................................................................13

Torture Victims Protection Act of 1991, 28 U.S.C. § 1350 note § 2(a) .......................12

Alien Tort Statute , 28 U.S.C. § 1350.............................................................................23

28 U.S.C. § 2679.......................................................................................................20, 23

Detainee Treatment Act of 2005, 10 U.S.C. § 801, stat. note § 1404(f) .......................13

## MISCELLANEOUS

Moore's Federal Practice (3d ed. Supp. 2006) ..............................................................2

Restatement (Second) of Agency (1958)..................................................................21, 22

United States Department of State, Second Periodic Report of the United States of
  America to the U.N. Committee on Torture, June 29, 2005, at 79 (*available at*
  http://www.state.gov/documents/organization/62175.pdf).................................13

Plaintiffs request judicial scrutiny of extraordinarily delicate issues of military and foreign policy. Their request is not based on any congressional determination that private plaintiffs should be able to require such a proceeding. None of the claims against General Sanchez are specifically authorized by statute. Indeed, many are specifically precluded. Hearing Plaintiffs' case would require ignoring statutory limits on nonconstitutional cases, and extending an implied cause of action for constitutional issues to circumstances far beyond what the Supreme Court has ever countenanced. The prisons Plaintiffs ask the Court to scrutinize are, unlike Guantanamo, within the battlefield. In fact, all of the acts, omissions, and injuries alleged with respect to LTG Sanchez occurred in the theater of war, during wartime, at a prison subject to repeated enemy attacks. Plaintiffs ask for a revolution in constitutional and military affairs— one which would allow foreign plaintiffs to run to court to harass military officials and distract them from the business of prosecuting wars authorized by the President and Congress. Such a revolution simply cannot proceed without clear statutory authorization.

I.    **Plaintiffs' Challenge to Military Interrogation Policies in the Theater of War Inextricably Involves Nonjusticiable Political Questions**

General Sanchez's opening brief laid out in detail the reasons why the Political Questions doctrine requires dismissing this case. *See* Mem. in Supp. of Lieutenant General Ricardo Sanchez's Mot. to Dismiss ("Motion") at 5-10; *see also* Karpinski Mot. to Dismiss, at 34-44. As discussed there, Plaintiffs' suit raises all of the classic characteristics of political questions. Plaintiffs' efforts to show the contrary are both logically and legally flawed. When the case is analyzed under the controlling test of *Baker v. Carr*, 369 U.S. 186 (1962), the nonjusticiable nature is apparent.[1] Plaintiffs' suit runs afoul of multiple *Baker* factors: It concerns a question

---

[1]    Perhaps in order to downplay the independent significance of some of the six *Baker v. Carr* factors, Plaintiffs almost entirely ignore that case, instead choosing to proceed under the three-pronged inquiry given in *Antolok v. United States,* 873 F.2d 369, 381 (D.C. Cir. 1989). See Opp'n at 47-52. This is a mistake. As the D.C. Circuit

textually committed to the Executive and Legislative branches (Motion at 5-6); lacks judicially manageable standards (*id.* at 6-7); implicates political, rather than judicial, policy decisions (*id.* at 7-8); expresses severe lack of respect for coordinate branches (*id.* at 8-9); and risks multifarious pronouncements on foreign policy issues requiring the Nation to speak with one voice (*id.* at 9). Any one of these factors would be sufficient to require dismissal. *See Bancoult v. McNamara,* 445 F.3d 427, 432 (D.C. Cir. 2006); *Schneider v. Kissinger,* 412 F.3d 190, 194 (D.C. Cir. 2005). In combination, they are surely fatal. Plaintiffs' arguments to the contrary are contradicted by their own Complaint, and by binding precedent.

1. Plaintiffs attempt to avoid this result by pretending that the legal questions in this case are firmly settled and do not implicate any policy dispute. In their Consolidated Opposition to the Motions to Dismiss ("Opp'n"), Plaintiffs claim to be complaining only of torture, *see* Opp'n. at 49 ("In this case, the challenged conduct is torture"), which has long been forbidden in U.S. policy and law. But the Complaint is not nearly as limited as Plaintiffs now pretend. The Complaint is *not* limited to allegations of torture *per-se*. Rather, Plaintiffs complain as well of "cruel, inhuman, or degrading treatment." *E.g.,* Am. Compl. ¶¶ 4, 5, 190, 195, 200, 205, 209, 220. And in this latter category, the Plaintiffs seek redress for a variety of actions quite distinct from "torture," as that term is commonly (and legally) understood. Plaintiffs Ali and Sabar, for instance, seek redress not only for alleged acts of torture, but also for the alleged desecration of religious items. Am. Compl. ¶ 190(m) & ¶ 195(j). Plaintiff Ahmed seeks compensation not just for alleged torture, but also for the humiliation of having "toy animals" taped to his head and being subjected to racial epithets. Am. Compl. ¶ 209(a). Plaintiff Ali H. complains of the manner by which he was released from custody. Am. Compl. ¶ 205(f). LTG Sanchez points out

---

recently reiterated, *Baker*'s six-factor test provides "the authoritative taxonomy" of the political questions doctrine. *Bancoult v. McNamara,* 445 F.3d 427, 432 (D.C. Cir. 2006). *See also* 15 Moore's Federal Practice § 101.113 (3d ed. Supp. 2006) (noting Supreme Court's "continuing approval" of the *Baker v. Carr* test).

these portions of the Complaint not to make light of the actions alleged.  Such actions may indeed be reprehensible.  But they are not torture, and their inclusion in Plaintiffs' Complaint forecloses any assertion that the case is limited to such a narrow legal theory.  Having filed a Complaint seeking redress for a broad swathe of allegations, Plaintiffs cannot temporarily disavow them when attempting to evade the Political Questions doctrine.

2.      Even the portions of the Complaint that *do* concern allegations of torture focus, in large part, on a relatively unsettled part of the law—the "command responsibility doctrine." Opp'n at 14.  Plaintiffs seek to hold LTG Sanchez responsible for allegedly taking inadequate steps to prevent or punish human rights violations committed by his subordinates  (*e.g.*, Am. Compl. ¶¶ 250-51, 254-55).  But this aspect of the suit shows that Plaintiffs are asking the Court to do precisely what they disclaim—"develop judicial standards for regulating the military." Opp'n at 51.  While it is clear as a general matter that U.S. commanders have a duty to seek to prevent and punish torture—a point which LTG Sanchez wholeheartedly supports—the precise *content* of the commander's oversight duty is very much an unsettled policy issue.  Plaintiffs and Amici, who cite numerous authorities as evidence that a commander *has* a duty to take steps to prevent torture—do not and cannot point to similarly clear authority on what a commander must do to *fulfill* that duty.  How much attention must a top commander pay to fulfilling this command responsibility, as opposed to his other responsibilities?  How much of the duty is delegable and how much oversight must he retain for himself?  How much of the duty is fulfilled by *post-hoc* punishment, and how much anticipatory training is required?  *These* are the kinds of questions that would govern much of Plaintiffs' proposed case against LTG Sanchez.  And these questions require not the simple application of well-worn legal rules, but rather a host of initial policy determinations—decisions that are unfit for judicial decision and risk conflict with coordinate

branches.  *See* Motion at 5-10.  At bottom, Plaintiffs' case asks for judicial interference in questions of the military's internal command structure and warfighting priorities.  The pretense that the Court could resolve the issue of LTG Sanchez's alleged liability without delving into the realm of foreign and military *policy* is a fantasy that would have especially deleterious effects on national security and separation of powers.

3.    Finally, and most importantly, Plaintiffs' approach has been specifically rejected by the D.C. Circuit in no fewer than three recent cases concerning human rights claims by foreign plaintiffs seeking redress for wrongs U.S. officials allegedly committed overseas.  In each case, the plaintiffs alleged that a certain implementation of U.S. policy violated specific, precise human rights norms—including, in two cases, the norm against torture; and in all three, the prohibition on cruel, inhuman, and degrading treatment.  The plaintiffs claimed that those implementations were separable from and not necessary to any political policy choice, much as Plaintiffs do here.  *See, e.g.*, Opp'n at 49.  Nonetheless, the Court of Appeals held each suit nonjusticiable.

First, in *Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005), the D.C. Circuit held nonjusticiable a lawsuit seeking to hold former National Security Adviser Henry Kissinger responsible for human rights violations arising out of U.S. support for the 1970 coup that removed Chilean President Salvatore Allende.  The claims—including claims of "torture" and "cruel, inhuman, or degrading treatment," *id.* at 192—were dismissed as political questions.

Next, in *Bancoult v. McNamara,* the D.C. Circuit explicitly rejected the "claim that the manner in which [a] policy decision was implemented is distinct from the policy itself, and is thus reviewable."  445 F.3d at 436.  The plaintiffs in *Bancoult* sought damages for the U.S. military's forced relocation of indigenous people to make way for a proposed military base—

4

relocation alleged to have violated, *inter alia*, the international norm against "cruel, inhuman, and degrading treatment." *Id.* at 431. The plaintiffs claimed to be challenging only the manner in which the United States had built the base, rather than the policy goal of constructing the base. The Court, however, found that questions of tactics and of strategy merged in such a case— because tactical decisions on which measures to use in promoting a policy goal necessarily depend on a prior strategic assessment of the importance of the goal. *See id.* at 436 ("The political branches must 'determine whether drastic measures should be taken in matters of foreign policy and national security,' and the President 'must determine what degree of force a crisis demands.'") (quoting *Schneider,* 412 F.3d at 197, and *The Prize Cases,* 67 U.S. 635, 670 (1863)). The Court dismissed the case, holding that the "specific tactical measures allegedly taken to depopulate the Chagos Archipelago and construct the Diego Garcia base" were "inextricably intertwined with the underlying strategy of establishing a regional military presence," just as, in the *Schneider* case, "the alleged 'neutralization' of General Schneider" was "intertwined" with "the policy of undermining Allende's government." *Id.* at 436.

Most recently, in *Gonzalez-Vera v. Kissinger,* 449 F.3d 1260 (D.C. Cir. 2006), the Court of Appeals reiterated and reemphasized its reasoning from *Bancoult.* As in *Schneider,* the plaintiffs in *Gonzalez-Vera* sought damages for human rights violations relating to the 1970 Chilean coup and its aftermath. They alleged numerous human rights violations—including "specific 'acts of torture,'" *id.* at 1263—and sued under the Alien Tort Statute and customary international law, *id.* at 1261. The plaintiffs again tried to separate the acts complained of from any underlying foreign policy decision, arguing that since the acts of torture complained of occurred "after the" coup, those acts "could not have been committed in furtherance of any policy decision" on the coup. *Id.* at 1263 (internal quotations omitted). They claimed that the

political questions doctrine was no bar to adjudication of "claims based on a narrow class of international norms, such as . . . claims of torture and extrajudicial killing." *Id.* (internal quotations omitted)  And they claimed to be challenging only discrete actions and implementations, rather than any particular policy. *Id.* at 1264.

The D.C. Circuit, once again, rejected each line of reasoning.  "[T]he difference between actions taken to place Pinochet in power and actions taken to keep him in power does not a viable distinction make: Both types of actions, if they occurred, were 'inextricably intertwined with the underlying' foreign policy decisions." *Id.* at 1264 (quoting *Bancoult,* 445 F.3d at 436). Likewise, the Court rejected the plaintiffs' purported "distinction between challenging an 'action' and challenging a 'policy'":  "As we explained in *Bancoult,* the dichotomy is false; actions taken in furtherance of foreign relations themselves may 'constitute[] foreign policy decisions.'" *Id.* (quoting *Bancoult,* 445 F.3d at 437).  Just like in *Schneider,* the Court dismissed the claims of "torture" along with all other claims.

When the Court of Appeals speaks three times on a subject in little over a year, this Court must presume that it meant what it said.  *Schneider, Bancoult,* and *Gonzales-Vera*—recent, binding precedents—directly control the case at hand.  They make clear that there is no exception from the political questions doctrine for cases alleging torture, and that the decision of *how* to go to war in Iraq cannot be neatly separated from the decision *whether* to go to war.  In the realm of national security and overseas warfighting, "[t]actical and logistical details" are "as much a matter of executive discretion as are strategic decisions." *Bancoult,* 445 F. 3d at 437 n.5. Plaintiffs' case must be dismissed as nonjusticiable.[2]

---

[2]  Notably, as precedent for their proposed extension of judicial power into the realm of foreign and military affairs, Plaintiffs cite to (i) suits *by U.S. citizens,* or (ii) suits *against foreign regimes.  See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 234 n.2 (1974) (noting that Plaintiffs were citizens of New York and Pennsylvania) (cited at Opp'n 51); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514-15 (D.C. Cir. 1984) (permitting a suit brought by "United

## II.    Plaintiffs Fail to Rebut LTG Sanchez's Challenges to the Sufficiency of the Purported Constitutional Claims

The deplorable misconduct of some military personnel at Abu Ghraib prison does not justify wholesale disregard of the legal principles that limit judicial extension of the *Bivens* remedy in the military arena.  Nor does that misconduct require the extension of rights under the Constitution to foreign nationals affected by U.S. military operations abroad.  Alternative means to redress and deter such misconduct already exist.  And even if such a claim could be judicially created, LTG Sanchez would be entitled to qualified immunity.

### A.    Special Factors Preclude Extension of the *Bivens* Remedy to Foreign Nationals Detained Abroad by the U.S. Military During War.

1.    Even Plaintiffs accept the principle that this Court should not "interfere with day-to-day military decision-making . . . properly within the discretion of political branches."  Opp'n at 36.  Instead, as in their political questions argument, they contend that their claims steer clear of such dangers because "the only issue here is torture and abuse that are universally prohibited." *Id.* at 37.  Plaintiffs are wrong for at least five reasons.

*First*, Plaintiffs represent that a *Bivens* remedy is permissible because detention operations in Iraq were removed from "the exigencies of combat."  *Id.* at 37.  But the report of Gen. James Schlesinger, cited repeatedly in the Amended Complaint, confirms that Abu Ghraib prison was "under continual attack" between July 2003 and May 2004.  *See* Final Report of the Independent Panel to Review DOD Detention Operations, August 2004 ("Schlesinger Report"), at 11; *see also id.* at 60 (describing Abu Ghraib prison as "smack in the middle of a combat environment").  In July 2003 alone, Abu Ghraib prison was subject to mortar attacks 25 times.

States litigants") (cited at Opp'n 48-49); *Simpson v. Socialist People's Libyan Arab Jamahiriya,* 326 F.3d 230, 234 (D.C. Cir. 2003) (foreign government as defendant) (cited at Opp'n 51 n.45); *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82 (D.C. Cir. 2002) (foreign government as defendant) (cited at Opp'n 51 n.45).  They do *not* cite precedent for a suit by foreigners against U.S. officials, for actions taken by the military overseas, in time of war.  Presumably, this lacuna reflects the radical and unprecedented nature of Plaintiffs' claims.

*Id*. A mortar attack in August 2003 killed five detainees and wounded 67. *Id*. A similar attack in April 2004 killed 22 detainees. Five U.S. soldiers died as a result of mortar attacks on the prison. *Id*. The "exigencies of combat" thus plainly and repeatedly affected both Abu Ghraib and the detention and interrogation policies challenged in this case.

*Second*, "even a casual reading of the complaint" shows that Plaintiffs call into question military decisions and policies. *Compare* Opp'n at 37. Plaintiffs allege that LTG Sanchez's "actions, orders, authorizations, approvals and omissions caused the torture and abuse of Plaintiffs" in the Iraqi war zone. Am. Compl. ¶¶ 238, 245, 246. Judicial resolution of these allegations will affect, indeed must affect, the war zone policies of military commanders. *Cf. Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70-71 (2001) (purpose of *Bivens* is deterrence). For example, Plaintiffs allege that LTG Sanchez employed "non-doctrinal command structures" by vesting command responsibility for Abu Ghraib in a military intelligence officer, and that these allegedly improper structures caused abuse at Abu Ghraib. *See* Am. Compl. ¶¶ 90-92. But which type of Army unit should bear responsibility for detention facilities is a military question requiring the judgment of military commanders. Likewise, Plaintiffs allege that emphasis on the collection of actionable intelligence from detainees to assist in counter-insurgency operations "led to the torture of detainees." Am. Compl. ¶ 100. But whether and how to stress the collection of human intelligence during counter-insurgency operations are issues that call for military judgment, and the application of military—not legal—doctrine. *See, e.g.,* FMI 3-07.22 Counterinsurgency Operations (October 2004).[3] Plaintiffs cannot avoid the interconnections between their complaint and military policy simply by disclaiming them.

_____

[3]  Plaintiffs also challenge the manner in which theater-specific policies were communicated to soldiers at Abu Ghraib prison: "As a result of the proliferation of interrogation memoranda issued by General Sanchez, military interrogators in Iraq became increasingly confused about the legal limits of their conduct toward detainees. This confusion . . . caused the torture and cruel, inhuman or degrading treatment of detainees." Am. Compl. ¶ 85.

*Third*, Plaintiffs also cannot limit the sweeping rationale of *Chappell*, *Stanley* and their controlling progeny to suits "*by soldiers*." Opp'n at 41 (emphasis in original). As the D.C. Circuit held in *Sanchez-Espinoza v. Reagan*, "considerations of institutional competence preclude judicial creation of damage remedies" even for non-military plaintiffs that challenge the conduct of the U.S. military abroad, and even when the misconduct alleged is torture and abuse. 770 F.2d 202, 208-209 (D.C. Cir. 1985) ("Just as the special needs of the armed forces require the courts to leave to Congress the creation of damage remedies against military officers for allegedly unconstitutional treatment of soldiers, so also the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad."); *see also Arar v. Ashcroft*, 414 F. Supp. 2d 250, 281-83 (E.D.N.Y. 2006) (declining to extend *Bivens* to Syrian national detained at U.S. border for national security and foreign policy reasons).

Similarly, the fact that military officials and non-soldiers alike are statutorily entitled to seek monetary relief *against the United States* when the injuries complained of did not arise out of military service does not advance Plaintiffs' arguments for non-statutory relief against individual defendants. *Cf.* Opp'n at 42 (citing *United States v. Brown*, 348 U.S. 110, 112 (1954); *Brooks v. United States*, 337 U.S. 49, 51-52 (1949); *Johnson v. United States*, 810 F. Supp. 7, 10 (D.D.C. 1993) (all interpreting the Foreign Tort Claims Act ("FTCA")). The FTCA suits are relevant only insofar as they direct cases like this one to be brought pursuant to the FTCA and subject to the limitations that Congress established in the Act.[4] And, at any rate, even suits by non-soldiers against the United States are barred if they might require "the civilian court to

---

Whether and how to communicate theater-specific policies on issues such as interrogation are military judgments that should be left to the military, and not judicial second-guessing.

[4] Of course, the common law cases cited by Plaintiffs at note 34 are now superseded by the FTCA. *See* Opp'n at 38-39, n. 34. None of these cases involved a judicially-created cause of action founded on the Constitution.

second-guess military decision" or "impair essential military discipline."  *United States v. Shearer*, 473 U.S. 52, 57 (1985).  *See also Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977).

*Fourth*, Plaintiffs point to no precedent authorizing the judiciary to create a private right of action over matters so intimately involved in the process of waging war.  Plaintiffs' reliance on cases such as the *The Paquete Habana* and *Little v. Barreme* is unavailing.  Liability in both cases was founded on maritime prize law rather than the Constitution, and amounted to the return of property (or the value of property) that had been seized by naval commanders as prize.  *See The Paquete Habana*, 175 U.S. 677, 714 (1900); *Little v. Barreme*, 6 U.S. 170, 178-79 (1804); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 267-68 (1990).  Plaintiffs' other authority is similarly inapposite.  *Mitchell v. Forsyth* was a case about immunity, not about the *Bivens* cause of action.  As a result, the Court never undertook special factors analysis.  472 U.S. 511, 513, 523-24 (1985); *see also Saucier v. Katz*, 533 U.S. 194, 197-99 (2001).  Likewise, *Scheuer v. Rhodes*, was based on a *statutory* cause of action that adds nothing to Plaintiffs' case.  And the suggestion that *Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004), "dispelled the notion that a case like this one would interfere with military operations" is also far off the mark.  Opp'n. at 39.  The Court in *Hamdi* never considered the function of judicial authority in a war zone.[5]

*Fifth*, Plaintiffs' proposed extension of the *Bivens* remedy is no more palatable because "laws and regulations" prohibit the kinds of torture and abuse alleged here.  *Id*. at 36-37; *see also* Brief *Amici Curiae* of Concerned Retired Military Officers and Military Law and History Scholars in Supp. of Pls' Consolidated Opp'n to Defs' Mot. to Dismiss.  The military prohibited

---

[5]  Moreover, nothing in this suit to date has transpired which has required the active participation of the parties themselves.  It is therefore difficult to discern where in this case Plaintiffs find any "demonstrat[ion]" that the scheduling needs of an overseas military commander in a time of war can be "manageabl[y]" accommodated with any litigation schedule.  *Compare* Opp'n at 39.

discrimination on the basis of race at the time of *Chappell*, and forbade the provision of LSD to soldiers without consent in *Stanley*. Likewise, as Plaintiffs and Amici concede, the military prohibited torture and abuse at the time of *Sanchez-Espinoza*. Nonetheless, special factors precluded the extension of a *Bivens* remedy in each case, because non-statutory damage suits would interfere with military decisionmaking and undercut the Nation's foreign and national security policies.

2.     Plaintiffs concede that Congress has (i) addressed the issue of torture on at least three occasions in the last 15 years, but never authorized a private right of action by foreign aliens against military officers, and (ii) created a statutory framework through which foreign aliens can seek redress for injuries allegedly caused by the U.S. military abroad. Plaintiffs' argument that the judiciary should nonetheless extend the *Bivens* remedy to foreign aliens affected by military operations is irretrievably flawed.

*First*, Plaintiffs misconstrue the applicable legal standard by suggesting that a *Bivens* claim can only be defeated by congressional action "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." Opp'n at 36 (quoting *Carlson v. Green*, 446 U.S. 14, 18-19 (1980)). The Supreme Court's most recent jurisprudence is hardly so rigid: "So long as the plaintiff ha[s] an avenue for *some* redress, bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69 (emphasis added); *see also Bush v. Lucas*, 462 U.S. 367, 386 (1983) (congressional provision of "meaningful remedies" for the type of harm alleged displaces *Bivens* remedy); *cf. Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) ("courts *must* withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to

11

administer public rights, has 'not  inadvertently, omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies") (emphasis added).[6]

    *Second*, congressional inaction, particularly where, as here, Congress has considered the very issues now before the Court, is highly relevant to special factors analysis.  Congress refused to create this right of action when it passed the Torture Victims Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note § 2(a).  *See* Motion at 16-17.  Plaintiffs suggest that the TVPA "was addressing a different evil, namely torture under the authority of *foreign* government officials and the lack of redress in many foreign nations." Opp'n at 47.[7]  But the TVPA is the only private right of action created by the political branches for torture and abuse, and President Bush highlighted that the TVPA did not create the right of action Plaintiffs seek.  *See* Motion at 16.

    Similarly, Plaintiffs acknowledge that the Ronald Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811 (2005) (the "Reagan Act"), was Congress' "response to evidence of widespread torture and abuse of Iraqis in U.S. custody at Abu Ghraib," but that the Act "makes no mention of remedies for victims of . . . torture and abuse . . . ."  Opp'n at 45-46.  Likewise, the Detainee Treatment Act of 2005

---

[6]  Plaintiffs cite *Spagnola* as setting forth the "only" basis for judicial decisions not to extend the *Bivens* remedy. Opp'n at 43.  But the existence of a comprehensive  remedial scheme indicating an intent to displace other remedies is but one of many special factors that may counsel hesitation by the judiciary in extending the remedy into new contexts.  *See, e.g., Sanchez-Espinoza*, 770 F.2d at 209; *see also United States v. Stanley*, 483 U.S. 669, 683 (1987) ("The 'special facto[r]' that 'counsel[s] hesitation is . . . the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate.").

[7]  The TVPA was passed largely in response to the concurring opinion of Judge Bork in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), which questioned whether the ATS created a private right of action for acts of torture.  *See* H. Rep. No. 102-367(I), at 3 (November 21, 1991).  The TVPA explicitly created that private right of action for foreign aliens, and extended the right of action to U.S. citizens (who could not have sought relief pursuant to the ATS).  *Id.*  To the extent that Congress anticipated the ATS would confer U.S. courts with jurisdiction to hear international law claims by foreign aliens against U.S. military officials, it would have expected those claims to be subject to the limitations stated in the Federal Tort Claims Act.  *See* Motion at 33-34.

("DTA") neither confers any rights on foreign aliens, DTA, § 1404(f) ("Nothing in this section shall be construed to confer any constitutional right on an alien detained as an enemy combatant outside the United States."), nor divests any rights that may have already existed.  Opp'n at 46. The DTA thus, by definition, does not advance Plaintiffs' case.

3.    Plaintiffs acknowledge that Congress passed the Foreign Claims Act ("FCA") for the express purpose of satisfying claims for injury that arise in foreign countries from the acts or omissions of U.S. armed forces personnel abroad.  10 U.S.C. § 2734.  And indeed, the United States has approximately 78 claims processors on the ground in Iraq to accept, investigate and pay valid claims.[8]  The FCA is plainly a "meaningful remedy" relevant to Plaintiffs' request that this Court extend a constitutional damages remedy to them as well.

The confluence of three factors—(i) potential for dramatic judicial interference with military decisions, national security, and foreign affairs, (ii) express reluctance by the political branches to create the very right of action that Plaintiffs ask this Court to create, and (iii) the presence of a remedial scheme addressed specifically to Plaintiffs—compels the Court to defer to the political branches regarding the creation of a damages remedy for foreign aliens who allege that they were injured during U.S. military operations abroad.  Any one of these factors would be enough counsel hesitation.  Together they present an insurmountable obstacle to judicial action independent of the political branches.

**B.    Foreign Nationals May Not Assert Rights Under the U.S. Constitution As Grounds for Monetary Relief**

1.    The Supreme Court and D.C. Circuit have consistently recognized that the Constitution does not confer rights upon all persons, whereever they are located, and whatever

---

[8] *See* U.S. Dep't. of State, Second Periodic Report of the United States of America to the U.N. Committee on Torture, June 29, 2005, at 79 *available at* http://www.state.gov/documents/organization/62175.pdf (visited July 5, 2006).

wrongs that have befallen them. *See* Motion at 21-24. To avoid these cases, Plaintiffs—relying heavily on Judge's Green analysis in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005)—have crafted a new theory of constitutional scope that goes even further than Judge Green's holding. Opp'n at 16-17. Plaintiffs newly-minted theory asserts that constitutional rights, or at least those rights they deem fundamental, extend to foreign aliens located wherever the United States conducts military operations abroad. But Plaintiffs' theory is irreconcilable with the Supreme Court's repeated insistence that aliens may assert rights under the Constitution only within territory subject to the exclusive, sovereign authority of the U.S.

*First*, Plaintiffs are wrong to interpret the *Insular Cases* and their progeny as "consistently affirm[ing] the principle that fundamental constitutional protections apply to both citizens and non-citizens overseas." Opp'n at 18. The *Insular Cases* "held that not every constitutional provision applies to governmental activity even where the United States has sovereign power." *Verdugo-Urquidez*, 494 U.S. at 268. The cases cannot be read as extending even "fundamental" rights to foreign aliens located in territories that are not under the exclusive jurisdiction and control of the United States.[9] Likewise, *Reid v. Covert* stands only for the principle that *U.S. citizens* stationed abroad may assert the protections of the Fifth and Sixth Amendment. 354 U.S. 1, 5-6 (1957). Like Mr. Verdugo-Urquidez, Plaintiffs, as foreign aliens, can "derive no comfort from the *Reid* holding." *Verdugo-Urquidez*, 494 U.S. at 271. Not one of

---

[9]  The *Insular Cases* are of no assistance to Plaintiffs efforts' because each case involved *unincorporated territories of the United States* regulated by Congress in accordance with Article IV, section 3, clause 2 of the Constitution. In three of the *Insular Cases* referenced by Plaintiffs, the Supreme Court reviewed of decisions by territorial courts. *Balzac v. People of Porto Rico*, 258 U.S. 298, 312-313 (1922) (reviewing criminal convictions for libel of a Puerto Rican citizen by a U.S. territorial district court); *Dorr v. United States*, 195 U.S.138 (1904) (reviewing a criminal conviction for libel affirmed by the Supreme Court of the Philippines); *Territory of Hawaii v. Mankichi*, 190 U.S. 197, 221 (1903) (reviewing Hawaiian court decision denying writ of habeas corpus); *see also Gov't of the Canal Zone v. Scott*, 502 F.2d 566, 568 (5th Cir. 1974) (review of conviction by the U.S. District Court for the Canal Zone). The fourth case cited by Plaintiffs, *Downes v. Bidwell*, 182 U.S. 244, 283 (1901), addressed whether Puerto Rico had become part of the U.S., such that its citizens could seek protection under Art. I, section 8, which declares that "all duties, imposts, and excises shall be uniform throughout the United States."

the cases cited by Plaintiffs extends even "fundamental" constitutional rights to foreign aliens in territory not subject to the exclusive jurisdiction and control of the United States.

Plaintiffs mistakenly cite *Harbury v. Deutch*, 233 F.3d 596, 604 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002), as applying the logic of the *Insular Cases* to "occupation zones after war." In fact, the D.C. Circuit held in *Harbury* that a Guatemalan national allegedly tortured in Guatemala had no standing to assert substantive due process claims against U.S. officials allegedly involved in the torture. *Harbury*, 233 F.3d at 603-604. *Harbury* hardly advances Plaintiffs' cause.[10]

*Second*, the Supreme Court's majority opinion in *Verdugo-Urquidez* effectively controls this case. *See* Motion at 21 (quoting *Verdugo-Urquidez*, 494 U.S. at 269 ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.") (citing *Johnson v. Eisentrager*, 339 U.S. 763, 783 (1950))); *see also Harbury*, 233 F.3d at 603-04. Justice Kennedy joined the majority opinion, and its conclusions concerning the reach of the Fifth Amendment. *See Verdugo-Urquidez*, 494 U.S. at 275 (Kennedy, J., concurring) ("I do not believe [my views] depart in fundamental respects from the opinion of the Court, which I join."). And *Rasul* does not detract from the vitality of the *Verdugo-Urquidez* majority. *See* Motion at 16-17.[11]

Moreover, although the Supreme Court has never *adopted* Justice Harlan's "impracticable and anomalous test" for application of constitutional rights outside the United

---

[10]   The only decision extending constitutional rights to a military occupation zone is *United States v. Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979). Plaintiffs wisely disregard *Tiede*, which afforded criminal defendants constitutional rights (and distinguished the *Insular Cases*), including the right to trial by jury, on the grounds that the United States was the prosecuting body and the prosecution took place in a court established by federal law. *Tiede*, 86 F.R.D. at 249. The United States has not established courts in Iraq to prosecute defendants. To the contrary, Iraqi courts have remained operational since the Iraqi conflict began in March 2003.

[11]   Nor does the Supreme Court's most recent decision addressing the status of foreign detainees at Guantanamo Bay. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006). As in *Rasul*, the Supreme Court in *Hamdan* did not discuss the *constitutional* status of foreign detainees at Guantanamo. *Compare Hamdi*, 542 U.S. at 509 (discussing due process rights of U.S. *citizen*)

States, *cf.* Opp'n at 20 (asserting that the Supreme Court's decision in *Rasul* "most recently" "endorsed" that standard),[12] extension of Fifth Amendment rights to foreign aliens on the basis of U.S. military action in the territory where they reside would be "impracticable and anomalous" for all of the prudential reasons identified by the Supreme Court in *Verdugo-Urquidez* and *Johnson v. Eisentrager*. As the *Verdugo-Urquidez* majority explained, extending Fourth Amendment rights to foreign aliens affected by U.S. military actions abroad "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." 494 US at 274-75. Even if special factors might preclude the extension of *Bivens* to such contexts, "the Government would still be faced with case-by-case adjudications concerning the availability of such an action." *Id.* at 274. For many of the same reasons, extension of substantive due process rights to foreign aliens affected by U.S. military operations "could significantly disrupt" the ability of the political branches to respond to exigent circumstances abroad. *See, e.g.,* Motion at 13-16.

*Third*, Plaintiffs cannot analogize Iraqi citizens detained and held in Iraq by the U.S. military during counter-insurgency operations to the residents of unincorporated territories of the United States—or even to those detained by the United States at Guantanamo Bay, where the U.S. exercises "complete jurisdiction and control" and "may exercise such control permanently if it chooses." *Rasul*, 542 U.S. at 480.[13] Unlike the unincorporated territories and Guantanamo Bay, Iraq is a war zone and the U.S. military is present in Iraq to combat those hostile to Iraq's

---

[12]   The alleged endorsement of the "impracticable and anomalous test" resulted from a footnote citation to Justice Kennedy's separate opinion in *Verdugo-Urquidez* "*and cases cited therein.*" *Rasul v. Bush,* 542 U.S. 466, 483 n.15 (2004) (emphasis added). But *Rasul* did not decide anything about whether aliens outside of U.S. territory hold any rights. *See* Motion at 22. Indeed, by plaintiffs' reasoning, the *Rasul* opinion "recently endorsed" the holding of *Ross v. McIntyre,* 140 U.S. 453, 464 (1891), since Justice Kennedy not only cited that decision in his separate opinion, but confirmed that the Court has "not overruled" it. *Verdugo-Urquidez,* 494 U.S. at 275 (Kennedy, J., concurring); *cf.* Opp'n at 18 (asserting that *Ross v. McIntyre* has been "rejected").

[13]   Only Judge Green has extended the rights under the Constitution to foreign aliens at Guantanamo Bay, but even her holding cannot extend to the war zone in Iraq.

new government.  Notwithstanding the administrative role temporarily played by the Coalition Provisional Authority, Iraq is not, and never has been, subject to the complete and exclusive of the U.S. military.  Nor is a remedy under the U.S. Constitution needed to ensure that victims of U.S. misconduct are afforded meaningful civil remedies, or that crimes by U.S. service members are punished.  *See, supra,* 13 & n. 8 (discussing presence of FCA claims workers in Iraq).

Indeed, the question of Iraqi sovereignty is, in the final analysis, a political one reserved to the Executive Branch.  *See, e.g., Jones v. United States,* 137 U.S. 202, 212 (1890) ("Who is the sovereign, de jure or de facto, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government."); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948).  And the Executive Branch, rather than claiming U.S. sovereignty over Iraq, has consistently considered Iraq to be an independent and sovereign nation.

### C.    LTG Sanchez Is Entitled to Qualified Immunity

The foregoing shows that Plaintiffs' allegations, even if true, would fail to state a claim for any constitutional violation.   Even if it were possible to find a constitutional violation, however, such a decision would have to acknowledge that there was substantial ground for a difference of opinion.  As a result, the rights at issue were in no way clearly established enough to defeat LTG Sanchez's claim of Qualified Immunity.

1.    Plaintiffs mischaracterize LTG Sanchez's arguments on this score as focusing on the uncertainty of foreign prisoners' legal remedies.  *See* Opp'n at 54-55.  But this misstates LTG Sanchez's position completely.   The numerous technical hurdles standing in the way of Plaintiffs' suit, while sufficient to defeat liability in their own right, are not the basis of LTG Sanchez's qualified immunity defense.  Rather, his qualified immunity defense is like any other

government officer's:  He cannot be held liable for violating a particular right unless that right was "clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999).  LTG Sanchez had objectively reasonable grounds for believing not merely that Plaintiffs could not *recover* for the injuries alleged (as would be the case if, for instance, he was relying on a statute of limitations), but also that the acts complained of were *not unconstitutional.* As a result, qualified immunity applies.

    2.    Despite paying passing lip service to the bedrock principle of qualified immunity analysis that "[t]he constitutional right should be framed with an appropriate level of specificity," Opp'n at 54, Plaintiffs effectively ignore that principle.  For purposes of endeavoring to defeat LTG Sanchez's qualified immunity defense, Plaintiffs' Opposition repeatedly—and overly simplistically—casts the Plaintiffs' claims as being about the abstract right to be free from torture *vel non.*[14]  That is simply not specific enough.  As the Supreme Court has held: "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. at 201.  Yet "a broad general proposition" is all that Plaintiffs offer this Court.

    Once the Court begins to consider the qualified immunity issue at the appropriate level of specificity, the overwhelming difficulties with Plaintiffs' Complaint become readily apparent.  At issue here are the constitutional rights of *aliens*, *in another nation's territory,* in a *war zone,* during the detention and interrogation of *hostile combatants.*

    3.    Plaintiffs point to no judicial opinion at the time which should have made clear to LTG Sanchez the constitutional rights of such detainees.  At the same time, Plaintiffs' Opposition

_____

[14]    The generality of this analysis by plaintiffs is inconsistent with the far broader allegations repeated throughout their Complaint. *See, e.g., supra,* at 2-3, 8.  We understand full well why plaintiffs have chosen to ignore these other allegations in their qualified immunity analysis, of course.  It is because even they recognize that no court is going to create a *Bivens* remedy to redress such allegations.

ignores another highly pertinent source of authority (a source noted in Plaintiffs' own Complaint) which LTG Sanchez was entitled to rely on: the Office of Legal Counsel's "binding and controlling . . . legal analysis" indicating that much—if not all—of the complained of conduct was lawful. Am. Compl. ¶ 62. But that memorandum, which Plaintiffs themselves chose to highlight in their Complaint for other reasons, cannot be so easily ignored when it comes to evaluating the merits of LTG Sanchez's qualified immunity defense. The Supreme Court has previously recognized that the Department of Justice's views on such matters are relevant in deciding whether a reasonable official in the defendant's shoes would have known that the challenged conduct clearly violated the Constitution. *See Mitchell*, 472 U.S. at 534 (Justice Department's advice on warrantless domestic security wiretaps cited as factor in upholding qualified immunity defense). LTG Sanchez is not a lawyer. When lawyers from the Department of Justice advise that conduct is lawful, he is certainly entitled to rely on that advice. *See Wilson,* 526 U.S. at 617 (where the state of the law on a precise question is "undeveloped," it is not unreasonable for law enforcement officers to rely on their agency's policies).

4.    Finally, while admitting, as they must, that "Judges Green and Leon . . . disagree[d] about the applicability of constitutional rights" to foreign detainees abroad, Opp'n at 58, Plaintiffs nevertheless contend that "[t]he disagreement between the[] two rulings [by those judges] is not enough to show a lack of clarity" about the law governing LTG Sanchez's conduct. *Id*. Of course it is. "If judges thus disagree on a constitutional question, it is unfair to subject [a government official] to money damages for picking the losing side." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Plaintiffs are reduced to arguing that LTG Sanchez should have chosen one judge's analysis over another's—in spite of any clear authority settling the dispute.

But LTG Sanchez "cannot have been 'expected to predict the future course of constitutional law'" more accurately than a federal judge. *Id.* at 618.

## III. The International Law and Treaty Claims Against LTG Sanchez in Counts III, IV, and V Must Be Dismissed Under the Westfall Act and for Failure to State a Claim

Plaintiffs fundamentally misunderstand the nature of a *Westfall* Act inquiry. The Plaintiffs object that substituting the United States as the named defendant would ultimately result in dismissal of the lawsuit under the United States' valid claim of immunity. *See* Opp'n at 66 ("Because substitution of the United States for the individually named Defendants would result in sovereign immunity for conduct that a sovereign cannot engage in, this Court cannot sanction the substitution."). But the Supreme Court has ruled that the ultimate availability of relief against the United States may *not* be taken into account in deciding whether substitution applies under 28 U.S.C. § 2679—the statute requires substitution even where substitution will ultimately result in dismissal. *See United States v. Smith,* 499 U.S. 160, 1184-85 (1991). Similarly, Plaintiffs mistakenly cast the *Westfall* Act inquiry as a determination about whether an individual employee deserves to be *immunized*. But that approach is squarely wrong. The Court's job is simply to determine whether LTG Sanchez's conduct was sufficiently within the scope of his job that a private employer could be held *jointly* responsible under principles of *respondeat superior* in similar circumstances: "Defining an employee's scope of conduct is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct: an employee or his boss." *Schneider v. Kissinger,* 310 F. Supp. 2d 251, 265 (D.D.C. 2004), *aff'd on alternate grounds,* 412 F.3d 190 (2005). Here, there can be no doubt that, if LTG Sanchez were a private employee, the actions Plaintiffs complain of are actions for which his employer would be held responsible under

*respondeat superior* liability.  As a result, the *Westfall* Act requires that LTG Sanchez be dismissed from the suit, and that the United States be substituted in his place.

Hoping to avoid the well-established breadth of *respondeat superior* law applied in the District of Columbia, Plaintiffs ask the Court to apply the principles of the Restatement (Second) of Agency instead.  Opp'n at 67-68.  But this is a distinction without a difference:  The numerous D.C. cases finding *respondeat superior* liability even for outrageous and violent acts—such as a laundromat employee's decision to shoot a customer for leaving wet clothes in a laundry machine—were cases applying the Restatement.  *See Weinberg v. Johnson,* 518 A.2d 985, 988, 991, 992 n.12 (D.C. 1986).  Since D.C. law itself follows the Restatement, *Moseley v. Second New St. Paul Baptist Church,* 534 A.2d 346, 348 n.4 (D.C. 1987), the choice of law does nothing to help Plaintiffs' case.  Indeed, the Restatement provisions most pertinent to the question in this case—the provisions covering a servant's use of force—confirm what the Defendants had already proven as a matter of D.C. law: that LTG Sanchez's actions were within the scope of his employment.  Restatement § 245 proposes two general rules.  Some jurisdictions hold a master liable for a servant's use of force where "the servant is employed 'to perform acts which involve the use of force against persons or things or which are of such a nature that they are not uncommonly accompanied by the use of force.'"  Restatement § 245, cmt. b.  Others hold employers liable when "the employment brings the servant into contact with others out of which come angry words leading to blows."  *Id.*  Either view supports *respondeat superior* liability in this case.  Nobody can deny that (i) fighting a war, and (ii) forcibly detaining foreign fighters against their will are activities that by their nature involve the use of force.  Nor can it be denied that interrogations may by their nature lead to "angry words," perhaps eventually leading to blows.  At the end of the day, Plaintiffs' appeal to the Restatement gets them nowhere.

21

Plaintiffs' next argue that the general U.S. policy against torture precludes any finding that the alleged acts were within the scope of LTG Sanchez's employment. But this approach, too, is flawed in multiple ways. Such a policy is irrelevant to *respondeat superior*. Nobody would believe that verbal and physical sexual harassment is within a university's policies, or that shooting customers is within a laundromat's policies, or that rape is permitted under a trucking company's policies. To the contrary, it is reasonable to infer that each of these employers would have policies forbidding such actions. Yet these are all situations where the law considers an employee's action to have been within the scope of his employment for purposes of *respondeat superior*. *See Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984); *Weinberg,* 518 A.2d at 988; *Lyon v. Carey,* 533 F.2d 649 (D.C. Cir. 1976). The Restatement, too, recognizes that an employer's express instruction not to use force does not preclude *respondeat superior* liability. *See, e.g.,* § 245, cmt. c (noting that, since a job-description involving recovering or guarding property "is likely to lead to altercations," a master may become liable *in spite of express instructions not to use force*). Likewise, the Restatement provides for *respondeat superior* "if the servant, while intending to act for his master. . . in an excess of zeal uses *more than necessary force*, or commits *an error of law as to his privilege [to use force]*, or does an act combining all of these errors." Restatement § 245 cmt. e (emphasis added). LTG Sanchez's job, which involved fighting a war and detaining enemy fighters, necessarily involved the use of force. As a result, even an express policy forbidding the use of force alleged here would not take his actions outside the scope of employment. So long as the actions were motivated solely by the desire to aid his employer—a fact on which there is no dispute—the actions complained of must be considered "within the scope of his employment" even if they violated the employer's rules or policies.

Finally, Plaintiffs argue that their international law claims fall within an exception to the *Westfall* Act. Their argument on this point is brief (Opp'n at 72-73), and deserves only a brief response. In order to qualify for the exception, Plaintiffs must show that their claims under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, qualify as suits "for a violation of a statute of the United States under which such action against an individual is specifically authorized," 28 U.S.C. § 2679(b)(2)(B). Alternatively, they argue that the Geneva Convention is itself a "statute of the United States" for purposes of the exception. But the *Westfall* Act itself expressly refutes both arguments. The Geneva Conventions are treaties, not "statutes." And Plaintiffs are not suing for a "violation" of the ATS. Rather, they are suing *under* the ATS for an alleged violation of international law. Given that, it is not surprising that district courts have repeatedly rejected arguments like Plaintiffs'. *See Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 37-38 (D.D.C. 2006); *Elmaghraby v. Ashcroft*, No. 04cv1409, 2005 WL 2375202, at *34 (E.D.N.Y. Sept. 27, 2005); *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 9 (D.D.C. 2004); *Gonzalez-Vera v. Kissinger*, No. 02-02240 (D.D.C. Sep. 17, 2004), slip op. at 15-16. This Court should do the same here.[15]

## IV.    There Is No Claim for Declaratory Relief Against LTG Sanchez

Although the Amended Complaint itself seems not to be seeking declaratory relief against LTG Sanchez, *see* Am. Compl. ¶ 28 (LTG Sanchez is "sued in his individual capacity for damages") and ¶ 262 (seeking a judicial declaration about "Defendant Rumsfeld's conduct"), Plaintiffs now assert that it does, *see* Opp'n at 85 n. 75. But this new claim against LTG Sanchez suffers from a serious standing problem—over and above the problem affecting Plaintiffs' declaratory claims against Defendant Rumsfeld. *See* Rumsfeld Mot. to Dismiss. at 33-38 (noting unlikelihood of Plaintiffs' being imprisoned again). Plaintiffs admit that LTG Sanchez's

---

[15]    LTG Sanchez continues to maintain, in addition, that the international law claims go beyond the scope of the ATS; that the treaties Plaintiffs rely on are not self-executing; and that the treaties at issue create no private right of action for money damages. *See* Motion at 34-35.

command in Iraq ended two years ago, and that he no longer has any oversight of troops in Iraq. *See* Compl. ¶ 28.   Plaintiffs, therefore, cannot claim that it is "'likely,'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992), that a declaration against LTG Sanchez could avert any possible future injury.  *See also City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).   To the contrary, a declaration against LTG Sanchez will not affect military policies in Iraq or Afghanistan at all—and thus cannot benefit the Plaintiffs.   Thus, Plaintiffs lack standing to seek declaratory relief against him.  *See Adler v. Pataki*, 204 F. Supp. 2d 384, 390-391 (N.D.N.Y. 2002); *Kaukab v. Harris*, No. 02C0371, 2003 WL 21823752, at *9 (N.D.Ill. Aug. 6, 2003).[16]

### Conclusion

In most cases, nobody would deny that when a plaintiff alleges that someone has violated the law "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  "Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness."   *Vieth v. Jubelirer,* 541 U.S. 267, 277 (2004) (plurality opinion); *see also El Shifa Pharm. Indus. Co. v. United States,* 378 F. 3d 1346, 1361 (Fed. Cir. 2004) (same).  That is the case here.

LTG Sanchez is an experienced military officer.  Throughout his career, he has striven to conform his actions not only to the directives of the Commanders in Chief under whom he has served, but also to the requirements imposed by Congress under Art. I § 8 of the Constitution. LTG Sanchez, therefore, would never contend that the Executive Branch has "unilateral authority to order or permit the most horrific acts."  Opp'n. at 1.  Nor does he contend that, as a military officer, he is "entirely isolated from legal accountability."  *Id.*  Plaintiffs' assertions to this effect obscure the real issue.  In truth, with respect not only to the allegations in this lawsuit,

---

[16]     Well-established equitable principles would also counsel against granting declaratory relief in these circumstances.  *See Sanchez-Espinoza,* 770 F.2d at 208; Motion at 37 n.34.

but also to all of his other duties as a military officer over his 33-year career, General Sanchez acknowledges that he is *fully* accountable for *all* of his actions—*accountable via the specific mechanisms Congress and the Commander in Chief have established*.  Those mechanisms do not include civil suits for damages—particularly suits brought by foreign nationals captured in the theater of war during time of active conflict.  While the intelligence and authority of our courts is great, courts have no business intruding on military decisions such as the ones at issue here— unless and until Congress sees fit specifically to provide such a cause of action.

      For the reasons given above, the Court should dismiss the case.


Respectfully submitted,


  /s/ Ryan E. Bull
Stephen L. Braga
(D.C. Bar No. 366727)
Ryan E. Bull
(D.C. Bar No. 481743)
Joshua A. Klein
(D.C. Bar No. 489078)
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 639-7700

July 21, 2006                    *Counsel for LTG Ricardo S. Sanchez*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of July, 2006, I caused copies of the Reply

Brief in Further Support of Lieutenant General Ricardo Sanchez's Motion to Dismiss Amended

Complaint to be deposited for delivery by First Class, United States Mail addressed to each of

the following:

| | |
|---|---|
| Bill Lann Lee<br>Chimene K. Keitner<br>Nirej S. Sekhon<br>Leiff, Cabraser, Heimann & Bernstein LLP<br>275 Battery Street, Suite 3000<br>San Francisco, CA 94111-3339 | Lucas Guttentag<br>Cecillia Wang<br>American Civil Liberties Union Foundation<br>Immigrants' Rights Project<br>405 14th Street, Suite 300<br>Oakland, CA 94612 |
| Paul Hoffman<br>Schonbrun  DeSimone  Seplow  Harris  &<br>Hoffman LLP<br>723 Ocean Front Walk<br>Venice, CA  90291 | Steven R. Shapiro<br>Omar C. Jadwat<br>Amrit Singh<br>Steven Watt<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY   10044 |
| Erwin Chemerinsky<br>Duke University School of Law<br>Science Drive & Towerview Rd.<br>Durham, NC  27707 | David Rudovsky<br>Kairys, Roduovsky, Epstein & Messing LLP<br>924 Cherry St., Suite 500<br>Philadelphia, PA 19107 |
| Marcus Meeks<br>US Department of Justice<br>Torts Branch, Civil Division<br>P.O. Box 7146 Ben Franklin Station<br>Washington, D.C. 20044 | Michael L. Martinez<br>Paul D. Flynn<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004-2595 |
| Mark E. Nagle<br>Troutman Sanders LLP<br>401 Ninth Street, N.W., Suite 1000<br>Washington, D.C. 20004 | Sidney Samuel Rosdeitcher<br>Paul, Weiss, Rifkind, Wharton & Garrison<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 |
| James J. Silk<br>YALE LAW SCHOOL<br>P.O. Box 208215<br>New Haven, CT 06520-8215 | |

All counsel who have entered an appearance in Misc. Case. No. 06-145 were also served electronically in accordance with D.C. Local Civil Rule 5.4(d)(1).

_____/s/ Ryan E. Bull_____

Ryan E. Bull