# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | Misc. No. 06-145 (TFH) |
| This document relates to: | |
| ALI, et al. v. PAPPAS | Civ. No. 05-1377 (TFH) |
| ALI, et al. v. RUMSFELD | Civ. No. 05-1378 (TFH) |
| ALI, et al. v. KARPINKSI | Civ. No. 05-1379 (TFH) |
| ALI, et al. v. SANCHEZ | Civ. No. 05-1380 (TFH) |

## REPLY MEMORANDUM IN SUPPORT OF SECRETARY OF DEFENSE DONALD RUMSFELD'S AND THE UNITED STATES' MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch, Civil Division

J. MARCUS MEEKS
Trial Attorney, Torts Branch, Civil Division

UNITED STATES DEPARTMENT OF JUSTICE
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   SPECIAL FACTORS PRECLUDE PLAINTIFFS' *BIVENS* CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SECRETARY RUMSFELD IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS'
     CONSTITUTIONAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. SUBSTITUTION AND DISMISSAL IS REQUIRED UNDER THE *WESTFALL* ACT  . . . . . . . . . . . . . 12

     A.  The *Westfall* Act Applies to the Intentional Torts Alleged by Plaintiffs . . . . . . . . . . . 12

     B.  The Alleged Conduct Falls Within Defendants' Scope of Employment . . . . . . . . . . . . . 17

     C.  Plaintiffs' International Law Claims Do Not Fit Within the *Westfall* Act's Exception for
         Claims for Violation of a Federal Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.  PLAINTIFFS HAVE NO STANDING TO SEEK DECLARATORY RELIEF . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES:**

*Acheson v. Wohlmuth*,
        196 F.2d 866 (D.C. Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Al Odah v. United States*,
        321 F.3d 1134 (D.C. Cir. 2003), *rev' sub nom. Rasul v. Bush*, 542 U.S. 466 (2004) . . .  9

*Alvarez-Machain v. United States*,
        331 F.3d 604 (9th Cir. 2003), *rev' on other grounds sub nom.*
        *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Bancoult v. McNamara*,
        370 F. Supp. 2d 1 (D.D.C. 2004)*, aff' on other grounds,*
        445 F.3d 427 (D.C.Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 23

*Behrens v. Pelletier*,
        516 U.S. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Bell v. Wolfish*,
        441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
        403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

*Cabri v. Assasie-Gyimah*,
        921 F. Supp. 1189 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*City of Los Angeles v. Lyons*,
        461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Correctional Services Corp. v. Malesko*,
        534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Davis v. Scherer*,
        468 U.S. 183 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Dow v. Johnson*,
        100 U.S. 158 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Duffy v. United States,*
    966 F.2d 307 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Fleming v. Page,*
    50 U.S. 603 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Foley Bros, Inc. v. Filardo,*
    336 U.S. 281 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Haddon v. United States,*
    68 F.3d 1420 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 21

*Hamdan v. Rumsfeld,*
    126 S.Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 11

*Hoston v. Silbert,*
    681 F.2d 876 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Imbler v. Pachtman,*
    424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Estate of Marcos Human Rights Litig.,*
    25 F.3d 1467 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Guantanamo Detainee Cases,*
    355 F.Supp.2d 443 (D.D.C.), *appeal docketed sub nom. Al Odah v. United States,*
    No. 05-5064 (D.C. Cir. notice of appeal Mar. 7, 2005) . . . . . . . . . . . . . . . . . . . 7, 8, 9, 10

*In re Iraq and Afghanistan Detainees Litigation,*
    374 F. Supp. 2d 1356 (J.P.M.L. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Johnson v. Carter,*
    983 F.2d 1316 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 10, 11

*Khalid v. Bush,*
    335 F.Supp.2d 311 (D.D.C.), *appeal docketed,* No. 05-5063
    (D.C. Cir. notice of appeal Mar. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Kimbro v. Velten*,
    30 F.3d 1501 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Koch v. United States*,
    209 F.Supp.2d 89 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Letelier v. Republic of Chile*,
    488 F. Supp. 665 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Little v. Barreme*,
    6 U.S. 170 (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mathis v. Henderson*,
    243 F.3d 446 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Melo v. Hafer*,
    13 F.3d 736 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mundy v. Weinberger*,
    544 F. Supp. 811 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Munoz v. Aschroft*,
    338 F.3d 950 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Nadler v. Mann*,
    731 F. Supp. 493 (S.D. Fla. 1990), *rev' in part on other grounds*,
    951 F.2d 301 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nebraska Beef, Ltd. v. Greening*,
    398 F.3d 1080 (8th Cir. 2005), *cert. denied*, 126 S.Ct. 1908 (2006) . . . . . . . . . . . . . . . 2

*Neely v. Henkel*,
    180 U.S. 109 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Oliva v. United States Dept. of Justice*,
    433 F.3d 229 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pelletier v. Fed. Home Loan Bank of San Francisco*,
    968 F.2d 865 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Princz v. Federal Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ramey v. Bowsher,*
    915 F.2d 731 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rasul v. Bush,*
    542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Rasul v. Rumsfeld,*
    414 F. Supp. 2d 26 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Reid v. Covert,*
    354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11

*Schneider v. Kissinger,*
    310 F. Supp. 2d 251 (D.D.C. 2004), *aff' on other grounds,*
    412 F.3d 190 (D.C. Cir. 2005), *cert. denied,* 126 S.Ct. 1768 (2006) . . . . . . . . . . passim

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005), *cert. denied,* 126 S.Ct. 1768 (2006) . . . . . . . . 16, 17, 18

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Seminole Tribe v. Florida,*
    517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Siegert v. Gilley,*
    500 U.S. 226 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Smith v. United States,*
    508 U.S. 223 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Stokes v. Cross,*
    327 F.3d 1210 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 22

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tel-Oren v. Libya,*
    726 F.2d 774 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*The Nereide*,
    13 U.S. (9 Cranch) 388 (1815) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*The Paquete Habana*,
    175 U.S. 677 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Tripp v. Dep't of Defense*,
    173 F.Supp. 2d 58 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Aguilar*,
    883 F.2d 662 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Smith*,
    499 U.S. 160 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Verdugo-Urquidez*,
    856 F.2d 1214 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Waters v. United States*,
    812 F. Supp. 166 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wilson v. Layne*,
    526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Xuncax v. Gramajo*,
    886 F.Supp. 162 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8


**STATUTES:**

Alien Tort Statue, 28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 23, 24

Auth. for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) . . . . . 19, 20

Auth. for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116
  Stat. 1498 (Oct. 16, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Detainee Treatment Act, Pub. L. No. 109-163, 119 Stat. 3136 . . . . . . . . . . . . . . . . . . . . . . .  4

Federal Employees Liability Reform and Tort Compensation Act of 1988 (*"Westfall* Act")
  28 U.S.C. §2679(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 13
  28 U.S.C. § 2679(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 22, 23

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 . . . . . . . . . . . . . . . . . . . . . . 15, 17

Ronald W. Reagan National Defense Auth. Act for Fiscal Year 2005, Pub. L. No. 108-375,
  118 Stat. 1811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

28 U.S.C. § 1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

28 U.S.C. § 1652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

**FEDERAL RULES:**

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 25

**OTHER AUTHORITIES:**

BLACK'S LAW DICTIONARY (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The Federalist No. 75 (Clinton Rossiter ed., 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

H.R. Rep. No. 101-55, 101st Cong., 1st Sess., pt. 1 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 23

W. P. Keeton, D. Dobbs, R. Keeton & D. Owen, PROSSER & KEETON ON THE LAW OF TORTS
  § 70 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Merrian-Webster Online . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Restatement (Second) of Agency § 228(1) (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Norman J. Singer, Statutes and Statutory Construction (6th ed. 2000) . . . . . . . . . . . 15

As the Defendants demonstrated in their opening brief, for Plaintiffs' claims to survive this Court must extend the judicially created *Bivens* remedy into a wholly new context never recognized by any court, ignore Supreme Court precedent that proscribes Fifth Amendment protections to non-resident aliens injured abroad, and disregard the plain language of the *Westfall* Act, 28 U.S.C. §§ 2671, 2674 and 2679, and decisions by this Court interpreting that Act. Nothing in the Plaintiffs' opposition brief, or the *amici curiae* briefs, militates in favor of permitting this action to proceed. Plaintiffs' repeated citations to military regulations and *jus cogens* norms do not alter the application of well established rules of law that bar Plaintiffs' claims. Plaintiffs' unprecedented *Bivens* claims are precluded by the "special factors" doctrine, but even if not, Secretary Rumsfeld is entitled to qualified immunity because the law did not clearly establish at the time in question that non-resident aliens detained at military facilities in Afghanistan and Iraq were entitled to constitutional protections. Plaintiffs' international law claims brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, also fail because the *Westfall* Act bars these claims, as this Court has held in similar circumstances. Finally, Plaintiffs do not face an imminent threat of harm and therefore have no standing to seek declaratory relief.

## I.    SPECIAL FACTORS PRECLUDE PLAINTIFFS' *BIVENS* CLAIMS

Plaintiffs' first and second causes of action assert constitutional claims for damages under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). As explained in the opening brief, a *Bivens* claim is a judicially-created cause of action that courts may recognize only when there are no "special factors counseling hesitation" in doing so. *Bivens,* 403 U.S. at 396. Under the special factors doctrine, an effective presumption exists against the recognition of novel claims and courts must be especially wary whenever a plaintiff

seeks to extend the *Bivens* remedy to "any new context." *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 68 (2001); *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005), *cert. denied*, 126 S.Ct. 1908 (2006) (there is a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials or employees"). This is particularly true here, where Plaintiffs seek to extend *Bivens* into an area constitutionally committed to the Legislative and Executive branches – the conduct of our armed forces during wartime. *See* Defs.' Mem. at 5-11.

Plaintiffs argue that recognizing a *Bivens* remedy here would not entail judicial oversight of military decision-making because the challenged acts occurred when plaintiffs "were detained in prisons and detention facilities away from the exigencies of combat and under the complete control of military police." Pls.' Mem. at 37. While the facts alleged by Plaintiffs must be accepted as true at this stage of the litigation, there is no question that Plaintiffs were detained in military facilities in Afghanistan and Iraq during the course of active combat – combat that continues to this day. This fact underscores the wholly unprecedented nature of Plaintiffs' *Bivens* claims. Plaintiffs are asking this Court to afford aliens captured and detained on foreign battlefields during wartime a damages remedy in tort personally against the senior military and civilian leadership of our Nation's armed forces. That remedy would permit enemy aliens to force the leaders of our armed forces into court whenever detainees claim that they have been mistreated or improperly confined. Creating such a remedy would constitute a radical extension of *Bivens* that would result in the disruption of military operations. It is reasonable to anticipate that enemy aliens would utilize *Bivens* litigation to cause maximum disruption in the administration of military detention facilities overseas. Subjecting military leaders to such

personal tort liability could distract them from their duties, and the specter of captured aliens harassing military personnel with time-consuming individual capacity litigation could cause grave damage to military morale.

Plaintiffs cite no precedent for their proposed cause of action because no remotely similar tort claim has ever been afforded to alien military detainees in the history of this country's warfare. The cases Plaintiffs cite for support, *The Paquete Habana*, 175 U.S. 677 (1900), and *Little v. Barreme*, 6 U.S. 170 (1804), did not involve constitutional tort claims against federal officials – a judicially created cause of action – brought by alien military detainees captured in the field of battle against individual officers. *The Paquete Habana* involved claims by owners of fishing vessels against the United States for the confiscation of the vessels. In *Barreme*, the owners of a ship and its cargo confiscated by the United States brought claims against the captain who commandeered the ship. The claimants in these cases are fundamentally different from the Plaintiffs, making the cases inapplicable.[1]

Nor does *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), refute Defendant's argument that permitting this *Bivens* action would interfere with military operations, as Plaintiffs contend. Pls.' Mem. at 39. *Hamdi* was a habeas action brought by a U.S. citizen being detained in the United

---

[1] The other outdated common-law cases cited by Plaintiffs are likewise irrelevant. *See* Pls.' Mem. at 38 n.34  A tort action brought against a military officer is now subject to the *Westfall* Act, which, as explained in the opening brief, requires substitution of the United States whenever it is determined by the Attorney General that the defendant was acting within the scope of his or her employment. Moreover, the Supreme Court's decision in *Dow v. Johnson*, 100 U.S. 158 (1879), is contrary to Plaintiffs' sweeping assertion that courts have permitted "damages actions against military officials for intentional torts, even during times of war," Pls.' Mem. at 38. *Dow* involved a claim brought by a Mississippi plantation owner against a Union army general in a Louisiana state court, which was operating under authority of the occupying Union forces, for allegedly ordering a regiment to plunder his plantation without military necessity. The Court held that the Louisiana court had no jurisdiction over the general for this "military conduct." *Dow*, 100 U.S. at 165, 166-68. Importantly, the Court observed that the general was to be punished, if at all, by a military tribunal and "public opinion." *Id.* at 166.

States.  *Hamdi*, 542 U.S. at 510.  Contrary to Plaintiffs' assertion, the *Hamdi* Court provided for

a limited judicial review of the detention that respected the "uncommon potential [for such

review] to burden the Executive at a time of ongoing military conflict."  *Id.* at 533.  Moreover, a

*Bivens* claim is categorically different from a habeas claim because individual liability is at

stake.[2]  As noted, allowing *Bivens* claims would subject military personnel, including those in

the field, to personal liability and embroil them in litigation that would distract from their duties

and potentially impact military policy.

Plaintiffs also argue that Congress has not expressly precluded a *Bivens* claim, and

therefore their *Bivens* remedy is permissible.  Plaintiffs misapprehend special factors analysis on

this point.  As Secretary Rumsfeld explained in the opening brief, the question is not whether

Congress has expressly precluded a *Bivens* claim, but whether Congress has established a

remedial system to address an issue that does not create a private right of action.  *See* Defs.'

Mem. at 11-14.  Where Congress has done so, it is presumed that Congress's decision to not

create a private right of action "has not been inadvertent."  *Schweiker v. Chilicky*, 487 U.S. 412,

423 (1988).  Thus, Congress' decision to *not* create a private right of action in the Reagan Act,

Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (codified at 10 U.S.C. § 801, stat. note §§ 1091-

92), and the Detainee Treatment Act, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (to be

codified at 10 U.S.C. § 801, note and 42 U.S.C. § 2000dd), which both address detainee

---

[2]  In holding that criminal defendants may not sue prosecutors for constitutional violations committed against them in the course of a prosecution, the Supreme Court explained: "Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate."  *Imbler v. Pachtman*, 424 U.S. 409, 425 (1976).  Those concerns would be far greater here if alien military detainees were permitted to hound the leadership of our armed forces in our courts.

-4-

treatment overseas, is noteworthy. This Court should defer to the congressional judgment

contained in these statutes on the remedial measures necessary to prevent detainee abuse –

measures that do not include a heretofore unrecognized *Bivens* cause of action.

Federal courts have long been reluctant to interfere in Legislative and Executive Branch

decision-making in military operations because of separation of powers concerns. *See* Defs.'

Mem. at 5-11. Such concerns are quintessential examples of the types of special factors that

preclude the recognition of Plaintiffs' *Bivens* claims.

## II.    SECRETARY RUMSFELD IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' CONSTITUTIONAL CLAIMS

1.    Plaintiffs' theory of constitutional liability is that "the Constitution's *fundamental*

rights are enforceable in territories that the United States controls," regardless of who is claiming

constitutional protection. Pls.' Mem. at 16 (emphasis in original). Plaintiffs' assertion is fatally

flawed, however, because the Supreme Court has consistently held that non-resident aliens with

no connection to the United States are not entitled to constitutional rights. The Supreme Court

held in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), that alien military detainees held outside

the United States are not generally entitled to constitutional protections. Following *Eisentrager*,

the Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001), recognized that aliens seeking to immigrate

into this country are not normally afforded constitutional protections prior to their lawful

admission even when physically present in the country.

The case most damaging to Plaintiffs' theory of constitutional liability is *United States v.*

*Verdugo-Urquidez*, 494 U.S. 259 (1990), where the Court determined that aliens with no

substantial connection to this country generally are not afforded constitutional protections in the

federal criminal investigatory context, and specifically emphasized that Fifth Amendment

protections – which Plaintiffs seek to invoke here – do not extend to non-resident aliens.[3]

Indeed, the Court in *Verdugo-Urquidez* squarely addressed and rejected the very argument

advanced by Plaintiffs here – i.e., that the *Insular Cases* and the plurality holding in *Reid v.*

*Covert*, 354 U.S. 1 (1957), stand for the proposition that the Fifth Amendment applies wherever

in the world the United States exercises "control" over a particular locale.  *Verdugo-Urquidez*,

494 U.S. at 268-70.  The Ninth Circuit had held that the *Insular Cases* and *Reid* stood for a

"proposition of enormous vitality" that "[t]he Constitution imposes substantive constraints on the

federal government, even when it operates abroad."  *United States v. Verdugo-Urquidez*, 856

F.2d 1214, 1218 (9th Cir. 1988).  The Supreme Court, however, rejected outright this "global

view taken by the Court of Appeals."  *Verdugo-Urquidez*, 494 U.S. at 268.  The Court explained

that the *Insular Cases* simply addressed what constitutional protections applied "in an

unincorporated territory – one not clearly destined for statehood," and that *Reid* stands for the

unremarkable proposition that "United States citizens stationed abroad could invoke the

protection of the Fifth and Sixth Amendments."  *Id.* at 268, 270.  In an observation equally

applicable to the Plaintiffs, the Court stated that "[s]ince respondent is not a United States

citizen, he can derive no comfort from the *Reid* holding."  *Id.*  In reaching that conclusion in

*Verdugo-Urquidez*, the Supreme Court followed its prior reasoning in *Johnson v. Eisentrager*,

which "emphatically... rejected the claim that aliens are entitled to Fifth Amendment rights

outside the sovereign territory of the United States."  *Id.* at 269.  In fact, the  Court based its

---

[3]  Plaintiffs have also pled Eighth Amendment claims, but as explained in the Defendants' opening brief
(at p. 19), these claims are foreclosed because Plaintiffs were never convicted.  *See Bell v. Wolfish*, 441
U.S. 520, 579 (1979).

decision partly on the concern that *Bivens* actions would follow.  "[A]liens with no attachment to this country might well bring actions for damages to remedy claimed violations of the Fourth Amendment in foreign countries or in international waters."  *Verdugo-Urquidez*, 494 U.S. at 274 (citing *Bivens*).  That concern is no less applicable here.

Plaintiffs attempt to minimize *Verdugo-Urquidez* by asserting that the Court's comments regarding the Fifth Amendment were dicta and that those comments did not command a majority because Justice Kennedy "rejected any categorical approach to determining the applicability of constitutional provisions."  Pls.' Mem. at 21-22 and n.15.  Plaintiffs' assertions mischaracterize *Verdugo-Urquidez*.  First, the Court's comments regarding the Fifth Amendment were integral to its holding and therefore are binding.[4]  Second, Justice Kennedy's concurring opinion did not concur only in the judgment; Justice Kennedy made explicit that he joined the opinion of the Court, including its observations regarding the Fifth Amendment.  *See Verdugo-Urquidez*, 494 U.S. at 275.  (Justice Stevens, in contrast, concurred only in the judgment.  *See id.* at 279.)

Plaintiffs assert that the Supreme Court recently "endorsed" their reading of the *Insular Cases* and *Reid* in *Rasul v. Bush*, 542 U.S. 466 (2004) ("*Rasul I*"), and that the Fifth Amendment is now understood to have broad international application to all actions taken by federal officials in regard to aliens and citizens alike.  Pls.' Mem. at 20, 22.  *Rasul I*, however, merely constitutes a statutory interpretation of the reach of federal habeas corpus and provides no guidance on the extraterritorial application of the Constitution to aliens.  To be sure, U.S. District Judge Green

---

[4] *Cf.  Seminole Tribe v. Florida*, 517 U.S. 44, 66-67 (1996) ("We adhere in this case [] not to mere *obiter dicta,* but rather to the well-established rationale upon which the Court based the results of its earlier decisions. When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

took a step towards a more expansive interpretation of *Rasul I* by recognizing Fifth Amendment

procedural due process rights for aliens held at Guantanamo Bay seeking to challenge the legality

of their detention. *See In re Guantanamo Detainee Cases*, 355 F.Supp.2d 443 (D.D.C.), *appeal*

*docketed sub nom. Al Odah v. United States*, No. 05-5064 (D.C. Cir. notice of appeal Mar. 7,

2005). However, Judge Green based her decision on the conclusion that the military facility at

Guantanamo Bay is more like an insular territory of the United States than a foreign nation.[5] She

did not conclude that the federal habeas corpus statute, much less the Constitution, now affords

worldwide protection to aliens. Moreover, as the Defendants explained in detail in their opening

brief (at pp. 20-26), Judge Green's interpretation of *Rasul I* – and the even more expansive

interpretation of *Rasul I* proposed by Plaintiffs here – cannot be squared with the Supreme Court

opinions in *Eisentrager*, *Verdugo-Urquidez* and *Zadvydas*, none of which *Rasul I* overturned.

---

[5] There is no merit to Plaintiffs' argument that the presence of United States military forces in
Afghanistan and Iraq established U.S. "control" over these countries such that the Fifth Amendment
applies there. Pls.' Mem. at 24-29. Mere control over a location is insufficient for non-resident aliens in
that location to invoke Fifth Amendment protections; the location must, at a minimum, be within the
"territorial jurisdiction" or "sovereign territory" of the United States for the Fifth Amendment to apply.
*Zadvydas*, 533 U.S. at 693; *Verdugo-Urquidez*, 494 U.S. at 269; *Eisentrager*, 339 U.S. at 768, 778, 784-
85. Similarly, federal statutes are presumed to apply only within the "territorial jurisdiction" of the
United States. *Rasul I*, 542 U.S. at 480-81; *Foley Bros, Inc. v. Filardo*, 336 U.S. 281, 285 (1949). The
rule has long been that countries occupied by U.S. forces during and after wartime retain their
sovereignty and are not part of the territorial jurisdiction of the Untied States. *See, e.g., Fleming v. Page*,
50 U.S. 603, 614-16 (1850) (part of Mexico occupied exclusively by U.S. forces was not "part of the
United States" and remained a "foreign country" such that federal statute did not apply there); *Neely v.
Henkel*, 180 U.S. 109, 119 (1901) (despite military's exclusive control over Cuba after the Spanish-
American war, Cuba "cannot be regarded, in any constitutional, legal or international sense, a part of the
territory of the United States"); *Acheson v. Wohlmuth*, 196 F.2d 866, 868 (D.C. Cir. 1952) ("Occupation
by our troops does not make conquered territory a part of the United States."). Indeed, *Rasul I*
undermines this argument. The Supreme Court extended the federal habeas statute to Guantanamo Bay
not because the United States military merely "controlled" the base, but because of the terms of a lease
with Cuba that grant the United States complete and exclusive jurisdiction and control over Guantanamo,
the distinctive language of the habeas statute, and the "extraordinary territorial ambit" of the writ under
the common law. S*ee Rasul I*, 542 U.S. at 475, 480-81 & n.12; *see also* Defs.' Mem. at 23-24. Those
factors have no application with respect to Afghanistan and Iraq, nascent democracies with elected
governments, and those countries are plainly not within the territorial jurisdiction of the United States.

Indeed, U.S. District Judge Leon, relying on these authorities, held that enemy aliens detained at Guantanamo Bay are not entitled to constitutional protection and that *Rasul I* did not change this well established rule. *See Khalid v. Bush*, 335 F.Supp.2d 311, 320-22 (D.D.C.), *appeal docketed*, No. 05-5063 (D.C. Cir. notice of appeal Mar. 2, 2005).

    **2.**      In all events, both *In re Guantanamo Detainee Cases* and *Khalid* are before the D.C. Circuit and regardless of the outcome of those cases, there is no question that Defendants in this action, like the defendants in *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006) (Urbina, J.) ("*Rasul II*"), are entitled to qualified immunity. Under the qualified immunity doctrine, federal officials are immune from suit unless they violate a clearly established constitutional right. Such a right is generally defined as one so thoroughly developed and consistently recognized in the jurisdiction at the time of the action as to be indisputable or beyond question. *See* Defs.' Mem. at 17. Plaintiffs have not met their burden of showing that the constitutional right they claim – Fifth Amendment protection of aliens held in a military detention facility in the field of battle abroad – was clearly established at the time of their alleged detention and abuse.

    It is not disputed that the controlling decision in this circuit at the time of the alleged conduct was *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. Rasul v. Bush*, 542 U.S. 466 (2004), in which the court expressly held that detainees at Guantanamo Bay were *not* entitled to any constitutional protections. 321 F.3d at 1141. Even accepting Plaintiffs' incorrect assertion that *Rasul I* has since altered that principle, Secretary Rumsfeld would still be entitled to qualified immunity because it is axiomatic that federal officials are only liable for the violation of rights that were clearly established at the time of their alleged conduct and cannot be held liable based on later developments in the law. *See* Defs.' Mem. at 21-22. Furthermore,

given the disagreement between Judges Green and Leon regarding the application of Fifth Amendment rights even at Guantanamo Bay and the recent ruling by Judge Urbina in *Rasul II*, there is no logical basis for contending that the law is clearly established in Plaintiffs' favor even today. Plaintiffs inexplicably brush off the limited scope of Judge Green's decision in *In re Guantanamo Detainee Cases* and the conflict between that decision and *Khalid* on the application of constitutional rights to aliens at Guantanamo Bay as "not enough to show a lack of clarity" regarding the worldwide application of constitutional rights to aliens. Pls.' Mem. at 58. Yet the Supreme Court has specifically noted that this type of disagreement among judges is sufficient for qualified immunity purposes. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy.")

Plaintiffs do not even address *Rasul II*, other than to say the decision is "not binding on this Court" and that Judge Urbina "mistakenly relied on *Eisentrager* and *Verdugo-Urquidez*." Pls.' Mem. at 56. Judge Urbina's qualified immunity analysis in *Rasul II* is on all fours with this case. The plaintiffs in *Rasul II*, like Plaintiffs here, alleged that they were not engaged in hostilities toward the United States but were nonetheless detained and tortured at an overseas military base. *Compare Rasul II*, 414 F. Supp. 2d at 28-29 *with* Pls.' Mem. at 4. In rejecting the plaintiffs' argument that *Eisentrager* did not apply for this reason, Judge Urbina observed that

> [T]his distinction proved crucial in Supreme Court decisions after the plaintiffs' release from Guantanamo, [but] the facts in this case are sufficiently similar to the situation in *Eisentrager* for a reasonable person to conclude that detainees were not afforded the specific Fifth Amendment protections at issue. Like *Eisentrager*, the plaintiffs are non-resident aliens captured abroad during a time of war and detained within a territory over which the United States does not have sovereignty.

-10-

*Rasul II*, 414 F. Supp. 2d at 42-43.[6]  Judge Urbina concluded that, at the time in question, both

*Eisentrager* and *Verdugo-Urquidez* stood for the clear proposition that "the Constitution applies

only once aliens were within the territory of the United States and developed substantial contacts

in this country." *Id.* at 44.[7]

        Plaintiffs erroneously argue that Secretary Rumsfeld does not contend "that there is any

doubt about the illegality of [his] conduct," but rather [he is] simply asserting that Plaintiffs are

"not clearly entitled to seek relief in U.S. Courts."  Pls.' Mem. at 55.  This argument totally

misconstrues the nature of the qualified immunity defense.  It is certainly true that Secretary

Rumsfeld has never suggested it is permissible for federal officials to torture military detainees or

that abuse should go unpunished.  However, the issue here is whether alien military detainees can

pursue private tort claims personally against the civilian and military leadership of this Nation's

armed forces for the alleged violation of constitutional rights when it was (and is) far from clear

that such detainees possessed the constitutional rights they assert.  Contrary to Plaintiffs'

assertions, the fact that the alleged conduct may have been prohibited under military law does not

show that the claimed Fifth Amendment right was clearly established.  In determining whether an

_____

[6]  Like the plaintiffs in *Rasul II*, Plaintiffs here were all released by the time *Hamdi* and *Rasul I* were
decided.  *See* Defs.' Mem. at 21.

[7]  There is no merit to Plaintiffs' argument that Judge Urbina did not consider "the long line of Supreme
Court precedent establishing that *fundamental* rights are protected in areas controlled by the United
States under the *Insular Cases* and the authorities endorsed by the Supreme Court in *Rasul v. Bush.*"
Pls.' Mem. at 56 (emphasis in original).  The plaintiffs in *Rasul II*, like Plaintiffs in this case, cited to the
*Insular Cases* and *Reid* for the proposition that they were entitled to Fifth Amendment protections.  *See*
*Rasul v. Rumsfeld*, Civ. No. 04-1864, Dkt. No. 14, Pls.' Mem. in Opp'n at 40-42.  Obviously, Judge
Urbina found those authorities unpersuasive.  He observed that not until after *Hamdi* and *Rasul I* "were
military personnel provided their first indication that detainees may be afforded a degree of constitutional
protection. . . . The plaintiffs have provided no case law, and the court finds none, supporting a
conclusion that military officials would have been aware, in light of the state of the law at the time, that
detainees should be afforded [constitutional] rights."  *Rasul II*, 414 F. Supp. 2d at 44.

official "would have known that their actions violated a clearly established constitutional or statutory right, the Court may look no further than the statute or constitutional right that forms the basis for plaintiff's claim." *Tripp v. Dep't of Defense*, 173 F.Supp. 2d 58, 61 (D.D.C. 2001). *See also Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation – of federal or of state law – unless that statute or regulation provides *the basis* for the cause of action sued upon.") (emphasis added). Secretary Rumsfeld is entitled to qualified immunity because it was not clearly established that his alleged conduct violated the Fifth or Eighth Amendments. It is irrelevant whether the alleged conduct violated a statute, regulation, or other legal norm.

## III.    SUBSTITUTION AND DISMISSAL IS REQUIRED UNDER THE *WESTFALL* ACT

The *Westfall* Act provides that a plaintiff's sole damages remedy for a claim arising from any "negligent or wrongful act or omission" of a federal employee acting within the scope of federal employment (other than a claim for violation of the Constitution or a federal statute) is a suit against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80. Nonetheless, Plaintiffs argue that substitution of the United States on their international law claims is inappropriate. First, Plaintiffs contend that the *Westfall* Act does not cover "intentional, egregious torts." Pls.' Mem. at 62-66. Second, Plaintiffs argue that Defendants' alleged conduct "fall[s] outside the scope of their employment." *Id.* at 67-71. And third, assuming the *Westfall* Act applies, Plaintiffs claim that their international law claims fit within the exception for claims for violation of a federal statute. *Id.* at 72-77. None of these arguments has merit.

### A.    The *Westfall* Act Applies to the Intentional Torts Alleged by Plaintiffs

Plaintiffs' argument that the *Westfall* Act does not cover "intentional, egregious" torts

-12-

such as those alleged in their complaint is unfounded.  No case law supports this argument; to the contrary, this Court has rejected it.  *See, e.g., Rasul II* at 31-36.[8]

Plaintiffs' "textual" analysis does not call these cases into question.  Plaintiffs contend without citing any authority that the term "wrongful" as used in the *Westfall* Act at 28 U.S.C. § 2679(b)(1) is ambiguous, and resort to vague legislative history to propose a narrow definition of the word that is at odds with its plain meaning and would render it superfluous.  Pls.' Mem. at 62-63.  The argument that "wrongful" is somehow ambiguous is contrary to the canons of statutory construction that undefined language is "given [its] ordinary or common meaning," *Smith v. United States*, 508 U.S. 223, 228 (1993), and that a statute should be interpreted so that "no clause, sentence, or word shall be superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotes and citation omitted).  Applying these canons to the language at issue – "negligent or wrongful act or omission"– it cannot be logically argued that the term "wrongful" does not encompass intentional misconduct.  Merriam-Webster defines the word "wrongful" as any conduct "[h]aving no legal sanction, unlawful; illegitimate."  Merriam-Webster Online at http://www.m-w.com/cgi-bin/dictionary/wrongful.  This definition cannot simply mean negligent behavior, as Plaintiffs seemingly argue, otherwise the word "wrongful" would be redundant within the phrase "negligent or wrongful act or omission."  Section 2679(b)(1), by its express terms, applies to negligent conduct *and* any other wrongful conduct without limitation, plainly covering intentional torts.  Indeed, numerous courts have held that the phrase "wrongful act" covers intentional torts.  *See, e.g., Duffy v. United States*, 966 F.2d 307,

---

[8]  *See also Bancoult v. McNamara*, 370 F. Supp. 2d 1, 13 (D.D.C. 2004)*, aff'd on other grounds,* 445 F.3d 427 (D.C. Cir. 2006); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265-66 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct. 1768 (2006).

313 (7th Cir. 1992) ("We are unwilling to accept that intentional torts do not fall under the rubric

of wrongful acts."); *Waters v. United States*, 812 F. Supp. 166, 169 (N.D. Cal. 1993) ("[C]ourts

have interpreted ['negligent and wrongful acts'] to encompass both negligent and intentional

torts."); *Nadler v. Mann*, 731 F. Supp. 493, 495 n.6 (S.D. Fla. 1990) ("[I]f Congress intended to

confine the Act to negligence claims, it would have written the Act in those terms."), *rev'd in

part on other grounds,* 951 F.2d 301 (11th Cir. 1992).

Plaintiffs also contend that the *Westfall* Act must be construed "consistent with

international law" and be read to permit their claims.  Pls.' Mem. at 63-64.  This argument rests

on a false premise.  International law is, by definition, "[t]hose laws governing the legal relations

between *nations*."  BLACK'S LAW DICTIONARY 816 (6th ed. 1990) (emphasis added).  Plaintiffs'

claims, however, are damages claims against *individuals* that are asserted under the ATS.  There

is no principle of international law that *requires* domestic courts to recognize individual capacity

claims like those pled in this case.  Indeed, if this were so, every nation that did not have a legal

rule equivalent to Plaintiffs' proposed construction of the ATS would be "in violation" of

international law.

Even assuming the international law standard is different than the rule otherwise provided

by the *Westfall* Act, that could not save Plaintiffs' claims.  "'In enacting statutes, Congress is not

bound by international law; if it chooses to do so, it may legislate contrary to the limits posed by

international law,' so long as the legislation is constitutional."  *Munoz v. Aschroft*, 338 F.3d 950,

958 (9th Cir. 2003) (quoting *United States v. Aguilar*, 883 F.2d 662, 679 (9th Cir. 1989)).  As

Chief Justice Marshall observed almost 200 years ago, while courts are "bound by the law of

nations which is a part of the law of the land," Congress may require that courts apply a different

rule "by passing an act for the purpose." *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815). *See also Oliva v. United States Dept. of Justice*, 433 F.3d 229, 233 (2d Cir. 2005) ("If a statute makes plain Congress's intent . . ., then Article III courts . . . must enforce the intent of Congress irrespective of whether the statute conforms to customary international law.") (quoting *United States v. Yousef*, 327 F.3d 56, 93 (2d Cir. 2003) (ellipses in original)).[9] The appropriate rule of construction in this case is that international law does not supply a rule of decision where there is a "controlling executive or legislative act or judicial decision." *The Paquete Habana*, 175 U.S. at 700. The *Westfall* Act is such a "controlling legislative act," in which Congress has conferred absolute immunity for the negligent or wrongful acts or omissions of federal employees acting within the scope of their employment.[10]

---

[9] Moreover, the principle that "an act of Congress should be construed so as not to conflict with international law" applies only "where it is possible to do so without distorting the statute." *See Munoz*, 339 F.3d at 958. To construe the *Westfall* Act as not covering Plaintiffs' claims would indeed distort the statute – by ignoring the plain meaning of the term "wrongful," disregarding the "scope of employment" standard that governs substitution, and implying a third exception to substitution for international law claims even though the statute identifies exceptions only for claims for violation of the constitution or a federal statute.

[10] Plaintiffs' reliance on the "act of state doctrine" is equally misplaced. Pls.' Mem. at 65. Plaintiffs cite irrelevant cases that do not address the critical issue for purposes of *Westfall* Act substitution – whether the federal employee was acting with the scope of employment. Instead, several of these cases focus on the scope of a foreign official's "authority" as defined by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 ("FSIA"). *See, e.g., In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994); *Cabri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1197-98 (S.D.N.Y. 1996); *Xuncax v. Gramajo*, 886 F.Supp. 162, 175 (D. Mass. 1995). There is no evidence that "scope of authority" in the FSIA means the same thing as "scope of employment" under the *Westfall* Act. *See* 2A Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION, 110 (6th ed. 2000) (noting limited value of comparing language in two distinct statutes); *cf. Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 867 (9th Cir. 1992) (improper to apply "narrow 'scope of authority' test" instead of the "broader 'scope of employment'" test when considering scope challenges under the FTCA). Additionally, the FSIA and FTCA have different purposes. The FSIA was designed to reduce "the foreign policy implications of sovereign immunity determinations," *Letelier v. Republic of Chile*, 488 F. Supp. 665, 670 (D.D.C. 1980), while the *Westfall* Act amended the FTCA "to assure that the decisions of federal public servants in the course of their work will not be adversely affected by the fear of personal liability for money damages and of the burden of defending damage liability claims." *Melo v. Hafer*, 13 F.3d 736, 744 (3d Cir. 1994).

The gist of Plaintiffs' argument is that this Court should imply an exception to the *Westfall* Act's substitution requirement for alleged violations of a *jus cogens* norm. *See* Pls.' Mem. at 66 ("The fundamental point is that an intentional, egregious tort in violation of a *jus cogens* prohibition is one that a sovereign cannot approve . . . . Because substitution of the United States for the individually named Defendants would result in sovereign immunity for conduct that a sovereign cannot engage in, this Court cannot sanction the substitution."). But as noted, private damages actions against individuals are not required by international law. An alleged *jus cogens* violation does not, *ipso facto*, require the recognition of an individual capacity damages action. Indeed, this is the teaching of the *Schneider* and *Rasul II* decisions. The plaintiffs in *Schneider* alleged that former Secretary of State Henry Kissinger was responsible for the "attempted kidnaping and death" of a Chilean general, *Schneider*, 310 F. Supp. at 257, while the plaintiffs in *Rasul II* alleged that Secretary Rumsfeld and senior military leaders were responsible for "torture, and cruel, inhumane and degrading treatment" at Guantanamo Bay. *Rasul II*, 414 F. Supp. at 28-29. Despite these alleged violations of "peremptory norms of international law," *Schneider*, 310 F. Supp. at 268, the defendants in both cases were found to be within the scope of their employment and the claims were dismissed under the *Westfall* Act for failing to exhaust administrative remedies. *Schneider*, 310 F. Supp. 2d at 265-68; *Rasul II*, 414 F. Supp. 2d at 32-39.[11] Indeed, the plaintiffs in *Schneider* made an argument identical to that here, *see* 310 F. Supp. 2d at 268, which the court rejected on the

---

[11] The D.C. Circuit in *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct. 1768 (2006), affirmed the dismissal of the claims against Secretary Kissinger on political question grounds. This holding logically presumes that Kissinger was acting within the scope of his employment, otherwise there would have been no foundation for the premise that the case presented a "political question" that the court could not decide.

ground that the sovereign must explicitly waive its immunity, and if it has not done so waiver is

not to be implied no matter how "heinous" the alleged "crimes against international law." *Id.*

(citing *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994)).[12]

### B.    The Alleged Conduct Falls Within Defendants' Scope of Employment

Plaintiffs challenge the scope of employment certification in this case by arguing that the

alleged conduct was not "foreseeable" and therefore not within the scope of Defendants'

employment.  Pls.' Mem. at 68-71.  As a fall back position, Plaintiffs argue they are entitled to

discovery on the scope of employment certification.  *Id.* at 71-72.  Neither argument is availing.

**1.**  The scope of employment certification provided by the Attorney General's designee is

entitled to "*prima facie*" effect.  *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994).  To

rebut this certification, Plaintiffs bear the burden of establishing that Defendants acted outside

the scope of their employment, as determined by the *respondeat superior* law "of the state where

the tortious act occurred."  *Rasul II*, 414 F. Supp. 2d at 32.  Plaintiffs cannot meet their burden,

however, because on two occasions this Court has applied D.C. *respondeat superior* law, which

looks to the Restatement (Second) of Agency (1958) to define scope of employment, and rejected

nearly identical claims.  *See Rasul II*, 414 F. Supp. 2d at 31-36; *Schneider*, 310 F. Supp. 2d at

264-67.  *Cf. Schneider*, 412 F.3d at 190 (dismissing claims against Secretary Kissinger on

---

[12]  The decision of the D.C. Circuit in *Princz* is highly relevant here.  In *Princz,* a Holocaust survivor
sought remuneration from Germany for injuries suffered and slave labor performed while a prisoner in
concentration camps.  *Princz*, 26 F.3d at 1168.  The D.C. Circuit recognized that "it is doubtful that any
state has ever violated *jus cogens* norms on a scale rivaling that of the Third Reich," yet the court refused
to imply an exception to the FSIA in order to allow the plaintiff's claims to proceed.  *Id.* at 1173-74.  The
court specifically rejected the argument of several *amici*, and the position taken by Judge Wald in her
dissent, that the nature of the claims – violations of *jus cogens* norms – required implying an exception in
order to "reconcile the FSIA with accepted principles of international law."  *Id.* at 1174 & n.1.

-17-

political question grounds, which logically presumed that Kissinger was acting within the scope

of his employment as a United States official when he allegedly caused the kidnaping and death

of a Chilean general).[13]

> Under the Restatement, conduct of a servant is within the scope of employment where:
>
> [a] it is of the kind he is employed to perform; [b] it occurs substantially within
> the authorized time and space limits; [c] it is actuated, at least in part, by a
> purpose to serve the master; and [d] if force is intentionally used by the servant
> against another, the use of force is not unexpected by the master.

*Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) (citing Restatement (Second) of Agency §

228(1)).  The Restatement test "is broad enough to embrace any intentional tort arising out of a

dispute that was originally undertaken on the employer's behalf." *Stokes*, 327 F.3d at 1216.  It

excludes only those "actions committed solely for [the servant's] own purposes." *Id*.

Application of the Restatement confirms that Defendants acted within the scope of their

employment.  The first prong asks whether the alleged conduct is "of the kind" the employee was

employed to perform.  To fit within this category, the conduct must be either "of the same

general nature as that authorized" or "incidental to the conduct authorized." *Haddon v. United*

*States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995).  "Conduct is 'incidental' to an employee's

---

[13]  Plaintiffs' assertion that this "case does not have a nexus to D.C." and therefore D.C. *respondeat superior* law should not apply, Pls.' Mem. at 67 n.56, is foreclosed by the finding of the Judicial Panel on Multidistrict Litigation that the four underlying cases have a strong connection to the District of Columbia.  *See In re Iraq and Afghanistan Detainees Litigation*, 374 F. Supp. 2d 1356, 1357 (J.P.M.L. 2005) ("In selecting the District of District of Columbia as the transferee district, the nation's capital provides a particularly appropriate forum for lawsuits brought against the Secretary of Defense and the three senior military officers for conduct that allegedly transpired in connection with their work for the United States.").  The assertion is also contrary to this Court's decision in *Rasul II.*  414 F. Supp. 2d at 32 ("Since Guantanamo does not provide adequate guidelines for determining scope of employment and the acts are 'inextricably bound up with the District of Columbia in its role as the nation's capital,' the relevant law to apply is that of the District of Columbia." (quoting *Mundy v. Weinberger*, 544 F. Supp. 811, 818 (D.D.C. 1982)).  In any event, D.C. follows the Restatement standard, which Plaintiffs appropriately urge the court to apply.

legitimate duties if it is 'foreseeable.'" *Haddon*, 68 F.3d at 1424.  To satisfy this foreseeable

standard, the conduct must be "a direct outgrowth of the employee's instructions or job

assignment."  *Id.* (citations omitted).

Plaintiffs focus entirely on the foreseeability element of the first prong.  *See* Pls.' Mem. at

68-71.  They argue it was not foreseeable that "the Secretary of Defense" or "U.S. military

commanders would authorize and tolerate torture and other cruel, inhuman or degrading

treatment of detainees" when such conduct is "expressly forbidden under U.S. law and military

regulations."  *Id.* at 69.  This argument, however, "is based on an erroneous interpretation of the

term 'scope of employment.'"  *Schneider*, 310 F.Supp.2d at 265.

> The plaintiffs' theory that a violation of international law always falls outside the scope of
> a federal official's employment misconstrues 'the scope' of this term.  It is well settled
> that an employee is capable of committing a variety of illegal or tortious acts for which
> his employer may be held liable, even though the employer did not hire him for that
> purpose. ***  [Defining] scope of employment is not a judgment about whether alleged
> conduct is deleterious or actionable; rather, this procedure merely determines *who* may be
> held liable for that conduct, an employee or his boss.

*Id.* (emphasis in original).  As the D.C. Circuit has observed in a similar context, "if the scope of

an official's authority or line of duty were viewed as coextensive with the official's lawful

conduct, then immunity would be available only where it is not needed; in effect, the immunity

doctrine would be 'completely abrogate[d].'"  *Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir.

1990) (quotations omitted).  That is no less true when immunity is claimed under the *Westfall*

Act.  *See, e.g., Johnson v. Carter*, 983 F.2d 1316, 1323 (4th Cir. 1993).

Here, the Defendants are the Secretary of Defense and several senior members of the

military chain of command.  Acting pursuant to congressional authorization, *see* Auth. for Use of

Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001); Auth. for Use of Military

Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002), they

ordered and participated in the conduct of military operations in Afghanistan and Iraq. During

hostilities in those countries, the military captured many individuals, including Plaintiffs. That

the military chain of command developed plans for the detention and interrogation of these

individuals is to be expected. Assuming for purposes of the instant motion only that the conduct

alleged in the complaint transpired as a result of such plans, it was at least "incidental to"

authorized conduct for purposes of the Restatement and District of Columbia law on *respondeat*

*superior*. *See, e.g., Rasul* II, 414 F. Supp. 2d at 36 (finding alleged torture at Guantanamo Bay

was incidental to defendants' conduct as military officials where the allegations "arose

specifically from authorized activities" and was "tied exclusively to the plaintiffs' detention in a

military prison and to the interrogations conducted therein"); *Schneider*, 310 F.Supp.2d at 265

(finding Kissinger's allegedly tortious conduct to be "incidental" to his cabinet duties and his

orders from the President). On the facts alleged, there is no basis to conclude that the Defendants

acted "solely for [their] own purposes." *Stokes*, 322 F.3d at 1216.[14]

Thus, Plaintiffs' assertions that the alleged conduct was "expressly forbidden under U.S.

law and military regulations," Pls.' Mem. at 69, and contrary to the "consistent pronouncements

of the Executive Branch and Congress," *id.* at 10-12, are immaterial to the scope inquiry.

Whenever an employee's actions are "of the same general nature as" or "incidental to" his or her

employment, the *means* an employee uses to accomplish the assigned task cannot remove the

---

[14]  *Compare Haddon*, 68 F.3d at 1425-26 (holding threat of physical violence not within scope of
employment because the threat "did not stem from a dispute over the performance of [the defendant's]
work" and the defendant "was not performing his assigned duties at the time of the incident. . . . The
conduct was completely unrelated to his official responsibilities.")

employee from the scope of employment. *Haddon*, 68 F.3d at 1424; W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts, § 70 at 503 (1984) (Where "the forbidden conduct is merely the servant's own way of accomplishing an authorized purpose, the master cannot escape responsibility no matter how specific, detailed and emphatic his orders may have been to the contrary." (footnote omitted)).[15]

    2.    Plaintiffs' request for discovery on the scope of employment issue is equally unavailing. Defendants seek dismissal in this instance based on the facts alleged by Plaintiffs in their Amended Complaint. The determination of whether Plaintiffs have alleged conduct outside of the scope of federal employment is purely a legal question, not a factual issue that could warrant any discovery. *See Haddon*, 68 F.3d at 1423; *see also Hoston v. Silbert*, 681 F.2d 876, 879 (D.C. Cir. 1982) ("Whether given acts are within the scope of employment is ultimately a legal question."). That is especially true in the absolute immunity context under the *Westfall* Act. *See United States v. Smith*, 499 U.S. 160, 163 (1991); *Haddon*, 68 F.3d at 1423. "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out

---

[15] There can be no dispute regarding the remaining factors in the Restatement test, and Plaintiffs' brief makes no attempt to address them. The conduct alleged in the Amended Complaint all occurred within the time and space limits of Defendants' employment. *See, e.g.,* Am. Compl. ¶¶ 51, 56, 70, 77, 86 (In his capacity as Secretary of Defense, Donald Rumsfeld established "interrogation policies" and issued an "order to the commander of the U.S. Southern Command" regarding interrogation. In their capacities as military officers, Lt. Gen. Sanchez "develop[ed] interrogation policy in Iraq," Col. Karpinski "carried out the plans of Defendant Sanchez," and Col. Pappas "authorized interrogation techniques while in command at the Abu Ghraib prison."). Likewise, the congressional authorizations for the use of force in Afghanistan and Iraq confirm that the alleged conduct was actuated by Defendants' desire to serve their employer. As Plaintiffs note, the war in Afghanistan precipitated the "orders, policies and practices" that they challenge. Am. Compl. ¶ 49. Finally, the alleged use of intentional force by the military could not have been unexpected. One need only consider the challenges inherent in the detention of individuals captured during combat to appreciate that the intentional use of force might be necessary to operate a maximum security detention facility in the field of battle.

lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (citation omitted).   For these reasons a

government official is entitled to a pre-discovery resolution of any substantial claim to immunity

from suit presented by way of a Rule 12(b)(6) motion to dismiss, *see Behrens v. Pelletier*, 516

U.S. 299, 306-07 (1996), and immediate appeal of a denial of certification and substitution.  *See*

*Mathis v. Henderson*, 243 F.3d 446, 448 (8th Cir. 2001).[16]

    **C.**    **Plaintiffs' International Law Claims Do Not Fit Within the *Westfall* Act's**
              **Exception for Claims for Violation of a Federal Statute**

      Finally, Plaintiffs contend that their international law claims, namely a claim for

violations of the "law of nations" and a claim for violations of the Third and Fourth Geneva

Conventions asserted under the ATS, *see* Am. Compl. ¶¶ 247-59, fit within the *Westfall* Act's

exception for claims for violation of a federal statute.  *See* Pls.' Mem. at 72-77.  Under this

exception, the exclusive remedy provisions of the *Westfall* Act do not apply to "claims brought

for a violation of a statute of the United States under which such action against an individual is

otherwise authorized." 28 U.S.C. §2679(b)(2)(B).  Plaintiffs propose two novel theories in an

attempt to transform their international law claims into claims for violation of a federal statute.

Neither theory has merit.

      Plaintiffs first argue that this Court should ignore the Supreme Court's holding in *Sosa v.*

*Alvarez-Machain*, 542 U.S. 692 (2004), that the ATS is jurisdictional only, and instead follow

---

[16]  Even *Stokes,* upon which Plaintiffs rely for their assertion that they are entitled to discovery, confirms that "not every complaint will warrant further inquiry into the scope-of-employment issue." *Stokes*, 327 F.3d at 1215-16.  Discovery is appropriate only if a scope inquiry involves a disputed issue of material fact.  Where plaintiffs have not met their burden of raising a material dispute by pleading sufficient facts that, if true, would rebut the certification, they are not entitled to discovery.  *Id.* at 1215; *see also Koch v. United States*, 209 F.Supp.2d 89, 92 (D.D.C. 2002).

pre-*Sosa* decisions by the Second and Ninth Circuits (but not the D.C. Circuit)[17] which Plaintiffs

claim held that the ATS provided a substantive cause of action. Pls.' Mem. at 72-74.[18]  Plaintiffs

reason that through such a circuitous approach this Court may find that at the time Congress

passed the *Westfall* Act, Congress incorporated the views of the Second and Ninth Circuits

regarding the ATS into §2679(b)(2)(B).  This argument is not only without foundation – there is

no authority whatsoever for this Court to disregard the *Sosa* holding – it has been rejected by this

Court and even by the Ninth Circuit, one of the circuits relied on by Plaintiffs.  *See Alvarez-*

*Machain v. United States*, 331 F.3d 604, 631 (9th Cir. 2003), *rev'd on other grounds sub nom.*

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004); *Rasul II*, 414 F. Supp. 2d at 37-38; *Bancoult*, 370

F. Supp. 2d at 9-10; *Schneider*, 310 F. Supp. 2d at 266-67.

     Plaintiffs next argue that "Congress did not specify precisely which causes of action it

intended to preserve through the statutory exception," and thus "the exception should be

construed to include the Fourth Geneva Convention."  Pls.' Mem. at 75.  But the language of the

exception does "specify precisely" what "causes of action it intended to preserve" – an action

"brought for a violation of *a statute of the United States* under which such action against an

individual is otherwise authorized."  28 U.S.C. § 2679(b)(2) (emphasis added).  *See also Rasul*

*II*, 414 F. Supp. 2d at 38 (only a federal statute that "confer[s] rights . . or duties" fits within the

---

[17]  *See Tel-Oren v. Libya*, 726 F.2d 774, 801, 827 (D.C. Cir. 1984).

[18]  Plaintiffs also cite to the legislative history of the Torture Victims Protection Act, yet that Act is not at issue here and has no relevance to this case.  Moreover, the language Plaintiffs quote evinces nothing more than that Congress understood the ATS to provide a jurisdictional basis for courts to hear claims asserting violations of the law of nations.  "[S]ection 1350 of the Judiciary Act of 1789 . . . *permits federal courts to hear* claims by aliens for torts committed 'in violation of the law of nations.'" H.R. Rep. No. 101-55, 101st Cong., 1st Sess., pt. 1 at 3 (1989) (emphasis added).

*Westfall* Act's statutory exception).  A treaty is obviously not a "statute of the United States," and does not fit within the plain language of the provision.  Moreover, the Supreme Court has held that additional exceptions to the *Westfall* Act may not be implied.  *See Smith*, 499 U.S. at 166-67. Plaintiffs try to salvage their claim by arguing that the Fourth Geneva Convention is the "law of the land" under the Supremacy Clause and "on the same footing" as statutes, and therefore should be treated as if it were a statute.  Pls.' Mem. at 76-77.  But Plaintiffs are confusing the legal *effect* to be given treaties with the *nature* of treaties.  As explained by Alexander Hamilton:

> The power of making treaties . . . relates neither to the execution of the subsisting laws nor to the enactment of new ones . . . . Its objects are CONTRACTS with foreign nations which have the force of law, but derive it from the obligations of good faith.  *They are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign.*

The Federalist No. 75, at 450-51 (Clinton Rossiter ed., 1961) (capitalization in original, italicized emphasis added).  Indeed, throughout Title 28, Congress has drawn a distinction between treaties and statutes as different sources of law.  *See, e.g.,* 28 U.S.C. § 1257 (referencing "the validity of a treaty or statute"); § 1331 (referencing claims "arising under the Constitution, laws, or treaties"); § 1350 (referring to the "violation of the law of nations or a treaty of the United States"); § 1652 (referencing "the Constitution or treaties of the United States or Acts of Congress").  Congress is well aware of the difference between a statute and a treaty and it is incongruous to argue that the *Westfall* Act's statutory exception encompasses claims for violations of treaties.[19]

---

[19]  For this reason, even if Plaintiffs have judicially enforceable rights under the Third or Fourth Geneva Convention, their treaty based claim still fails.  But as shown in the opening brief (pp. 32-33 & n.22.), neither Convention provides Plaintiffs judicially enforceable rights because the enforcement mechanisms of those treaties are committed to the signatory states.  The decision by the Supreme Court in *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), is not to the contrary.  Indeed, the Court assumed in *Hamdan* that the

## IV.  PLAINTIFFS HAVE NO STANDING TO SEEK DECLARATORY RELIEF

Plaintiffs' assertion that they have standing to seek declaratory relief is belied by the fact that not a single plaintiff has been detained in the last two years.  Given this fact, Plaintiffs' statement that they "face an immediate threat of further injury," Pls.' Mem. at 85, rings hollow. As shown in the opening brief, Plaintiffs' allegations based on past injury and the circumstances that allegedly led to those injuries are insufficient to confer standing to seek prospective relief. *See* Defs.' Mem. at 35-37.  Likewise, the fact that no Plaintiff has been detained in the last two years confirms that their alleged fears of being detained again are merely "subjective apprehensions."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).[20]  Plaintiffs have failed to satisfy their burden of showing that they face a imminent threat of future injury, and therefore they lack standing to seek declaratory relief on any claim.

## CONCLUSION

For the foregoing reasons and those in the Defendants' opening brief, all of Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

---

"scheme" of the Third Geneva Convention "would, absent some other provision of law, preclude Hamdan's invocation of the Convention's provisions as an independent source of law . . . furnishing [him] with any enforceable right."  *Hamdan*, 126 S.Ct. at 2794.  Here, unlike *Hamdan*, there is no "other provision of law" that enables Plaintiffs to claim that the Third and Fourth Geneva Conventions furnish them with enforceable rights.

[20]   Plaintiffs erroneously claim that *Lyons* is distinguishable because the policy in question there had been suspended, while "the instant case involves ongoing policies."  Pls.' Mem. at 87-88.  This argument ignores the fact that the alleged policies Plaintiffs challenge have been outlawed by the Detainee Treatment Act – a point made by Defendants in their opening brief but to which Plaintiffs do not respond in their opposition.  Plaintiffs also did not respond to the legion of case law cited by Defendants that prohibits equitable relief to prisoners after their release.

Dated: July 21, 2006                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        JEFFREY S. BUCHOLTZ
                                        Principal Deputy Assistant Attorney General

                                        C. FREDERICK BECKNER III
                                        Deputy Assistant Attorney General

                                        TIMOTHY P. GARREN
                                        Director, Torts Branch


                                        _____*J. Marcus Meeks*_____
                                        J. MARCUS MEEKS (D.C. Bar No. 472072)
                                        Trial Attorney
                                        UNITED STATES DEPARTMENT OF JUSTICE
                                        Torts Branch, Civil Division
                                        P. O. Box 7146
                                        Ben Franklin Station
                                        Washington, D.C. 20044
                                        (202) 616-4176 (voice)
                                        (202) 616-4314 (fax)

                                        Attorneys for Defendant Secretary of Defense
                                        Donald H. Rumsfeld and the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2006, I caused a copy of the foregoing **Reply Memorandum In Support Of Secretary Of Defense Donald Rumsfeld's and the United States' Motion To Dismiss** to be served upon counsel of record via ECF and electronic mail as follows:

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036
artspitzer@aol.com
*Counsel for Plaintiffs*

Mark E. Nagle
Troutman Sanders LLP
401 Ninth St, N.W., Ste. 1000
Washington DC 20004
mark.nagle@troutmansanders.com
*Counsel for Defendant Thomas Pappas*

Stephen L. Braga
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
stephen.braga@bakerbotts.com
*Counsel for Defendant Ricardo Sanchez*

Michael L. Martinez
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
mmartinez@crowell.com
*Counsel for Defendant Janis Karpinski*


　　　*J. Marcus Meeks*
　　J. Marcus Meeks