# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *IN RE* IRAQ AND AFGHANISTAN DETAINEES LITIGATION | ) ) ) ) ) | Misc. No. 06-145 (TFH) |
| This document relates to: ALI, et al. v. KARPINSKI | ) ) ) ) ) ) ) | Case No. 05-1379-TFH |

# REPLY MEMORANDUM IN SUPPORT OF
# DEFENDANT JANIS KARPINSKI'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ii

INTRODUCTION ..........................................................................................................................1

ARGUMENT ................................................................................................................................2

I.      Karpinski Is Entitled To Absolute Immunity Because Plaintiffs Have Failed
        to Rebut the Attorney General's Certification. ...............................................................2

II.     Special Factors Require Dismissal of Plaintiffs' Claims Against Karpinski. ...............6

        A.      Plaintiffs Would Require the Courts to Interfere Directly in Wartime
                Military Decision-Making and Foreign Policy Decisions. ..............................7

        B.      This Court Should Defer to the Congressionally-Established Scheme
                For Responding to Allegations of Wartime Misconduct. .............................11

III.    Plaintiffs' Claims Present Non-Justiciable Political Questions. ..................................12

IV.     Karpinski Is Entitled To Qualified Immunity ..............................................................14

        A.      Plaintiffs Have Not Alleged Actionable Constitutional Violations. ............15

                1.      The *Insular Cases* Are Not Applicable to This Case. .......................15

                2.      The "Impracticable and Anomalous" Test Does Not Control. .........18

                3.      *Eisentrager* Requires Dismissal of the Constitutional Claims. ..........19

        B.      Plaintiffs Do Not Allege Violations of Clearly Established Law. ................20

V.      Plaintiffs Cannot State a Claim for Violation of the Geneva Conventions. ...............21

VI.     Plaintiffs Cannot State a Claim for Declaratory Relief Against Karpinski. ...............23

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. on other grounds, Rasul v. Bush*, 542 U.S. 466 (2004) ...................................................................19, 20

*Am. Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756 (N.D. Cal. 1989)......................................22

*Anh v. Levi*, 586 F.2d 625 (6th Cir. 1978)........................................................................21

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ....................................................22

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)........................................................................16

*Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004), *aff'd on other grounds*, 445 F.3d 427 (D.C. Cir. 2006) ........................................................................3

\*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006)........................................................13, 14

*Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C. Cir. 2004)....................................................12

*Comm. of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929 (D.C. Cir. 1988)........................................................................23

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ........................................................21

*Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006)....................................................2

*De Lima v. Bidwell*, 182 U.S. 1 (1901)........................................................................17

*Diggs v. Richardson*, 555 F.2d 848 (D.C. Cir. 1976)..........................................................22, 23

*Dorr v. United States*, 195 U.S. 138 (1904)........................................................................16

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)........................................................................5

*Fleming v. Page*, 50 U.S. 603 (1850)........................................................................17

*Golden v. Zwickler*, 394 U.S. 103 (1969)........................................................................23, 25

*Goldstar (Panama) S.A. v. United States*, 967 F.2d 965 (4th Cir. 1992)........................................................22

*Gonzalez-Vera v. Kissinger*, No. 02-02240, slip op. (D.D.C. Sep. 17, 2004), *aff'd on other grounds*, 449 F.3d 1260 (D.C. Cir. 2006) ........................................................................3

\*Gonzalez-Vera v. Kissinger*, 449 F.3d 1260 (D.C. Cir. 2006)..........................................................13, 14

*Haddon v. United States*, 68 F.3d 1420 (D.C. Cir. 1995) ........................................................................6

*Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006) ................................................................ 22

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................................ 9, 10

*Handel v. Artukovic*, 601 F. Supp. 1421 (C.D. Cal. 1985) ........................................ 22, 23

*Harbury v. Deutch*, 233 F.3d 596 (D.C. Cir. 2000) ...................................................... 16

*Harbury v. Deutch*, No. 99-5307, 2002 WL 1905342 (D.C. Cir. Aug. 19, 2002) ........ 16

*Hawaii v. Mankichi*, 190 U.S. 197 (1903) .................................................................... 16

*In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994) ................ 5

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) ............ 16, 19, 20

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999) .................................. 22

*Jogi v. Voges*, 425 F.3d 367 (7th Cir. 2005) ................................................................ 22

*\*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .........................................................passim

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) .................................................... 16

*King v. Atiyeh*, 814 F.2d 565 (9th Cir. 1986) .............................................................. 25

*Koch v. United States*, 209 F. Supp. 2d 89 (D.D.C. 2002) ............................................ 6

*Late Corp. of the Church of Jesus Christ of Latter Day Saints v. United States*,
    136 U.S. 1 (1890) ...................................................................................................... 17

*McCall v. McDowell*, 15 F. Cas. 1235 (C.C.D. Cal. 1867) ........................................ 7, 10

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................ 9, 20

*Nat'l City Mortgage Co. v. Navarro*, 220 F.R.D. 102 (D.D.C. 2004) .......................... 25

*Ramey v. Bowsher*, 915 F.2d 731 (D.C. Cir. 1990) ........................................................ 2

*Rasul v. Bush*, 542 U.S. 466 (2004) ................................................................ 16, 18, 19

*\*Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006) ..........................................passim

*Reid v. Covert*, 354 U.S. 1 (1957) .............................................................................. 18

*\*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985) ............................ 8, 14, 20

*Saucier v. Katz*, 533 U.S. 194 (2001) ...................................................................... 9, 21

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ...................................................................... 9

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005) ............................................................................................3, 4, 6

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)...........................................................13, 14

*Siegert v. Gilley*, 500 U.S. 226 (1991) ......................................................................................... 6

*Spagnola v. Mathis*, 859 F. 2d 223 (D.C. Cir. 1988) ................................................................. 12

*Stokes v. Cross*, 327 F.3d 1210 (D.C. Cir. 2003)........................................................................ 6

*Stutts v. De Dietrich Group*, No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. Jun. 30, 2006) .......................................................................................... 22

*U.S. v. Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979) ................................................................. 17

*United States v. Stanley*, 483 U.S. 669 (1987) .......................................................................8, 11

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ...............................................15, 16, 18

*United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988) .............................................................. 20

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)............................................................. 5

## Other Authorities

Multilateral Protection of War Victims (Civilian Persons) Convention, Aug. 12, 1949, 6 U.S.T. 3516 ..................................................................................................21, 22, 23

## INTRODUCTION

Plaintiffs' response to the military Defendants' respective motions to dismiss is based entirely on the factual premise that "torture" is wrong – a question not here in dispute. But this case is not a tactical or philosophical debate regarding the parameters for military interrogation techniques to be applied in the field of battle, or whether the circumstances at Abu Ghraib never should have happened as a matter of common principle. Indeed, that debate *could not* be resolved in this forum. This case presents the straightforward question of whether military officials, acting under orders of their superiors, may be haled into federal court to respond to a complaint for damages by *enemy prisoners* based on allegations related to the wartime interrogation tactics of subordinate officers. As Karpinski demonstrated in her Motion to Dismiss, no court ever has authorized such relief – and for good reason.

Plaintiffs cite no authority to the contrary. Instead, they base their argument on centuries-old cases which have been outdated by current binding authority, are wholly distinguishable from this case, or support Karpinski's arguments here. *None* of the cases Plaintiffs cite, however, support Plaintiffs' theory that this Court should allow these military prisoners to sue their captors for damages arising from military activity *during a war*. The law remains clear: Karpinski is entitled to immunity – either absolute or qualified – from suit on each of Plaintiffs' claims. In any event, this case involves "special factors counseling hesitation" and presents non-justiciable political questions, each of which independently requires dismissal. Finally, Plaintiffs have no right to relief under the Geneva Conventions and cannot state a claim for declaratory relief against Karpinski. For these reasons, and those set forth in Karpinski's Motion to Dismiss ("MTD"), this Court should dismiss

Plaintiff's Consolidated Amended Complaint ("Complaint" or "Compl.") with prejudice.[1]

## ARGUMENT

I.     **Karpinski Is Entitled To Absolute Immunity Because Plaintiffs Have Failed to Rebut the Attorney General's Certification.**

The Attorney General's designee has certified that Karpinski was acting within the scope of her employment "at the time of the conduct alleged in the complaint." Therefore, Karpinski is entitled to absolute immunity unless Plaintiffs can establish that her alleged actions exceeded the scope of her employment. Plaintiffs have not met this burden, nor can they.

Plaintiffs attempt to meet their burden by arguing that the Westfall Act "does not cover intentional, egregious torts in violation of *jus cogens* norms," and that such a violation, as a matter of law, "does not fall within the 'scope of employment.'" Opp. at 62, 67. Plaintiffs completely misconstrue the applicable test for Westfall Act substitution. As the D.C. Circuit noted in *Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990), if an official's scope of employment were limited to lawful conduct, "then immunity would be available only where it is not needed; in effect, the immunity doctrine would be 'completely abrogate[d].'" (citations omitted). Immunity depends, therefore, not on the "nature of the tort" at issue or the severity of Plaintiffs' allegations, but rather is "'broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" *Council on Am. Islamic Relations. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (citation omitted).

To be sure, these are not the first Plaintiffs who have tried to avoid dismissal by arguing that their allegations of violations of international norms somehow take their claims outside the reach of

---

[1]     Several *amici* have filed briefs in this case. The issues raised in these briefs are not new and Karpinski and the other military Defendants already have responded to them. Like Plaintiffs, the various *amici* rely on generalizations regarding standards for wartime conduct, which do not change the result in this case. None of the *amici* provide any authority for a federal lawsuit on the grounds raised by Plaintiffs here.

a Westfall substitution.  The plaintiffs in *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004) ("*Schneider I*"), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005) ("*Schneider II*"), made a nearly identical argument – that a "violation of peremptory norms of international law . . . can never be within the scope of employment." *Id.* at 265.  Those plaintiffs alleged a series of acts against National Security Adviser Henry Kissinger including, *inter alia*, summary execution, torture, and cruel, inhuman, or degrading treatment in violation of various treaties and the law of nations.  *Id.* at 257.  The court rejected their argument, finding that the "theory that a violation of international law always falls outside the scope of a federal official's employment misconstrues 'the scope' of this term.  It is well settled that an employee is capable of committing a variety of illegal or tortious acts for which his employer may be held liable . . ." *Id.* at 265.  Because Kissinger was acting in an area for which he had responsibility, and was not acting for personal benefit, the court found that he was acting within the scope of his employment.  *Id.* at 266.

Courts in this district recently – and repeatedly – have reached the same conclusions in cases where the plaintiff's claims involved alleged *jus cogens* violations such as torture, genocide, and cruel, inhuman, and degrading treatment.  *See Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 30-31 (D.D.C. 2006); *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 7 (D.D.C. 2004) ("*Bancoult I*"), *aff'd on other grounds*, 445 F.3d 427 (D.C. Cir. 2006) ("*Bancoult II*"); *Gonzalez-Vera v. Kissinger*, No. 02-02240, slip op. at 13 (D.D.C. Sep. 17, 2004) ("*Gonzalez-Vera I*"), *aff'd on other grounds*, 449 F.3d 1260 (D.C. Cir. 2006) ("*Gonzalez-Vera II*").[2]

---

[2]     In these cases, the courts determined that the acts were "incidental to the individual defendants' job[s]," or were a "direct outgrowth of the [employees'] instructions [and] job assignment[s]," and could not be characterized as "unexpected" under the circumstances.  *Bancoult I*, 370 F. Supp. 2d at 7-8; *Rasul*, 414 F. Supp. 2d at 34.  Moreover, the fact that Plaintiffs alleged these acts to be "wrongful, even very wrongful, [was] of no legal moment … the immunity provided by the Westfall Act explicitly extends to 'wrongful acts'…"  *Gonzalez-Vera I*, No. 02-02240 at 13.

The only question, therefore, is whether, under the "law of the state where the tortious act occurred," *Rasul*, 414 F. Supp. 2d at 32 – in this case, the District of Columbia[3] – Plaintiffs have alleged facts against Karpinski that fall within the scope of her employment. They have. As Karpinski has established, courts in this district repeatedly have found that conduct of the sort alleged here falls squarely within the scope of military or government officials' employment. The conclusion in this case is made easier because of the District of Columbia's liberal construction of *respondeat superior*, *Schneider I*, 310 F. Supp. 2d at 265. Even so, under *any* construction there can be no question that Karpinski was acting within the scope of her employment.

For immunity to exist, Karpinski's alleged conduct need only be "of the same general nature" or "incidental to" that authorized. *Schneider I*, 310 F. Supp. 2d at 265; *see also Rasul*, 414 F. Supp. 2d at 33 (conduct need only have "some nexus to the actions authorized"). Plaintiffs' allegations quickly confirm that the alleged conduct not only meets this standard, but more specifically is "a direct outgrowth of [Karpinski's] instructions [and] job assignment." *Rasul*, 414 F. Supp. 2d at 34 (citation omitted). Indeed, Plaintiffs go out of their way to allege that the conduct at Abu Ghraib was the product of deliberate U.S. policy deriving from senior officials at the highest levels of the U.S. military establishment. *See, e.g.*, Compl. at ¶ 10 ("[t]he abuses at issue here had their genesis in and were continually reinforced by policies, patterns or practices deliberately formulated and adopted in the United States over long periods of time"); *see also, e.g.*, Compl. at ¶¶ 7-8, 49-50. As for Karpinski, Plaintiffs allege that her responsibility derives from her supposed failure to prevent subordinate officers from implementing *existing* interrogation policies and practices that

---

[3]     Recognizing the favorable authority to Karpinski under District of Columbia law, Plaintiffs argue against its application here. Karpinski already has established why D.C. law applies to cases such as this where the alleged conduct arises from military conduct outside the United States. MTD at 12 n.11. Plaintiffs' protestations, in any event, are curious, because they request the application of the Restatement (Second) of Agency, which is the exact same standard used in the District of Columbia. Either way, the result is the same.

were *established and authorized* by those same senior officials, *i.e.*, Karpinski's superiors.  *See, e.g.*, Compl. ¶¶ 29, 43, 77, 97, 156; *see also* MTD at 13 nn.13, 14.

Thus, Plaintiffs allege *specifically* that Karpinski was acting incidental to her military duties. Indeed, their argument *depends* on this assumption.  Having staked out that position, it is incredible for Plaintiffs to assert that this same conduct was completely unforeseeable.  Opp. at 68-69.  As the court noted when faced with similar arguments in *Rasul*, under these circumstances the "torture [was] a foreseeable consequence of the military's detention of suspected enemy combatants."  414 F. Supp. 2d at 34.

Faced with their own allegations and substantial legal authority supporting absolute immunity, Plaintiffs rely on some purported "ambigu[ity]" in the text of the Westfall Act, and a handful of statements from military and other government personnel, to argue that Westfall Act immunity is precluded here as a matter of law.  This argument, too, is to no avail.[4]  As the court observed in *Rasul*, "Congress established a framework where *state law*, not [*e.g.*,] State Department representations to the United Nations, governs the scope of employment determination;" to the extent the U.S. government chooses to speak on the dispositive scope of employment issue, "[it] ha[s] done so through the Attorney General's certification."  414 F. Supp. 2d at 32 n.5 (emphasis

---

[4]      Plaintiffs' argument that "courts repeatedly have declined to extend immunity to individuals in the analogous context of [Alien Tort Statute] cases," Opp. at 65, is similarly irrelevant.  In the cited cases, such as, *inter alia*, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995), and *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994), *foreign* government officials were denied immunity in U.S. courts for violations of international law.  These cases are irrelevant because they do not deal with the Westfall Act, but focus, instead, on the scope of a foreign official's "authority" as defined by the Foreign Sovereign Immunities Act ("FSIA").  In discussing the defendants in these same cases cited by Plaintiffs, the *Rasul* court noted that they were "foreign officials ineligible under the FTCA to receive immunity but eligible for immunity under various legislative acts and principles of international law [such as the FSIA].  * * * For this reason, case law interpreting legislation governing foreign officials is inapplicable to the present circumstance."  414 F. Supp. 2d at 34 n.7 (internal citations omitted).

added).  There is nothing ambiguous about the legal authority in this area.  Karpinski's alleged

conduct was within the scope of her employment, and Westfall substitution in this case is proper.[5]

## II.    Special Factors Require Dismissal of Plaintiffs' Claims Against Karpinski.

Plaintiffs argue that this Court should ignore decades of case law requiring dismissal of their

claim because there has been "no explicit congressional declaration . . . that individuals who suffered

gross acts of torture and abuse at the hands of U.S. officials are barred from recovering damages."

Opp. at 36.  Plaintiffs seek to turn their burden on its head; there is no need for Karpinski to prove

the negative when there is no authority for Plaintiffs' suit in the first instance.  In any event, their

argument has no merit.  Congress and the courts repeatedly have confirmed that cases such as this –

which threaten to compromise the ability of United States military personnel to carry out their duties

efficiently and consistent with wartime exigencies – should *not* proceed in Article III courts.

---

[5]      Plaintiffs' attempt to stave off dismissal by asking for jurisdictional discovery is unfounded.  Opp. at 71-72.  Because Karpinski has not disputed the facts in the Complaint for purposes of her motion to dismiss, the only question at issue is a pure question of law.  *See Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995) (scope of employment presents a purely legal question).  Therefore, there is no basis for compelling Karpinski to respond to discovery.  *See Stokes v. Cross*, 327 F.3d 1210, 1215-16 (D.C. Cir. 2003) (discovery only necessary if scope of employment inquiry involves a disputed issue of fact); *Schneider I*, 310 F. Supp. at 264 n.14 ("[g]iven that the Court accepts as true the plaintiffs' factual assertions . . . there is no need for an evidentiary hearing to resolve this legal issue").  Indeed, compelling such discovery would run afoul of the very purpose of Westfall immunity.  *See Haddon*, 68 F.3d at 1422-23; *see also Koch v. United States*, 209 F. Supp. 2d 89, 92 (D.D.C. 2002) ("only if the district court concludes that there is a genuine question of fact material to the scope-of-employment issue should the federal employee be burdened with discovery and an evidentiary hearing") (citation omitted).  "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (citation omitted); *see also Rasul*, 414 F. Supp. 2d at 39 n.13 (holding under nearly identical circumstances that "[t]he court need not conduct discovery or evidentiary hearings because the facts alleged by the plaintiffs, taken as true, do not exceed the defendants' scope of employment") (citation omitted).  There is nothing for Plaintiffs to learn through discovery that will change the analysis on this issue.  Assuming the truth of everything Plaintiffs allege in their Complaint, Karpinski still is entitled to absolute immunity and the case against her should be dismissed.

**A.      Plaintiffs Would Require the Courts to Interfere Directly in Wartime Military Decision-Making and Foreign Policy Decisions.**

Plaintiffs try to distance themselves from the indisputable impact of their lawsuit. Should these plaintiffs be entitled to pursue the relief sought here, this Court would become embroiled in second-guessing wartime military decisions that must be adjudicated exclusively in the military tribunals Congress established to resolve properly-raised military complaints, or through political and diplomatic channels. That is precisely where the decisions at issue in this case have been addressed. Perhaps of even greater concern, Plaintiffs would have United States military officials make decisions based not on the considered orders of the highest level of the military infrastructure, but out of concern that they may be held individually liable for damages to alien enemies held in military prisons based not only on their own actions, but those of their subordinates. To ignore the chilling effect of such a decision would require turning a blind eye to the realities of wartime decision-making, which *only* can be effective – and only can save lives – if soldiers follow orders.

As Plaintiffs would have it, each individual soldier would be required to decide, before taking *any* military action, whether to comply with the orders of his or her superiors (including the Secretary of Defense and even the President). *Cf. McCall v. McDowell*, 15 F. Cas. 1235, 1240 (C.C.D. Cal. 1867) (cited in Opp. at 39 n.34) ("[t]he first duty of a soldier is obedience, and without this there can be neither discipline nor efficiency in an army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander, and obey them or not as they may consider them valid or invalid, the camp would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions"). In this case, Plaintiffs would require each soldier to make an independent determination (a) whether the orders fall under the legal definition of "torture" and (b) whether to follow or defy those orders. Of course, this would not be limited to situations involving on-the-spot assessments of possible "torture," but would pervade *every* battlefield decision made during the course of a war.

As Karpinski demonstrated in her Motion to Dismiss, the courts have left no room for questioning the "special factors" inherent in wartime military operations, or the "danger of foreign citizens using the courts in situations such as this to obstruct the foreign policy of our government." MTD at 18-23 (citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208-09 (D.C. Cir. 1985)).[6]  In the words of the Supreme Court, "It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950).  Again, "even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at *correct* conclusions would disrupt the military regime." *United States v. Stanley*, 483 U.S. 669, 683 (1987) (emphasis added).  It is precisely in cases like this that the "special factors" doctrine applies.  *See id.*

None of the cases cited by Plaintiffs is to the contrary.  They try to get around unequivocal authority rejecting the sort of claims brought here by arguing that the Supreme Court has "adjudicated damages claims in cases where U.S. national security interests were at issue, even those involving war or exigent circumstances."  Opp. at 37.  What Plaintiffs fail to mention, however, is that – to the extent these cases mention "special factors" at all – *none* of the cases they cite in any way authorizes a damages claim by a foreign enemy prisoner against his captors or their supervisors for wartime actions related to the prisoner's confinement in a foreign battlefield prison.  Instead,

---

[6]    Plaintiffs argue that military "special factors" do not exist because they were "civilians" and that they were detained far from the "exigencies of combat."  To those charged with supervising these prisoners, and obtaining from them information which could mean the difference between life and death to military personnel in Iraq as well as United States civilians at home, however, the exigency was all too apparent.  This exigency also was apparent to Political Branch leaders who conferred upon the United States military the authority (and, in certain instances, specific orders) to interrogate such prisoners for this very purpose.  *See, e.g.*, MTD at 2-6.

Plaintiffs rely on a series of decisions that involve conduct in U.S. territories, U.S. citizen plaintiffs, actions which the court determined ran *contrary* to the decisions of the political branches, defendants whom the court held were *not* soldiers acting pursuant to military authority, peacetime or domestic issues, and other circumstances which have no bearing in the context of Plaintiffs' claims here.

Furthermore, the more recent Supreme Court decisions relied upon by Plaintiffs, Opp. at 38, which they suggest "allow[ed]" or "permitt[ed]" damages actions like those at issue here, are similarly inapposite. In some (*e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Scheuer v. Rhodes*, 416 U.S. 232 (1974)) the Court rejected only certain absolute immunity arguments. In *Mitchell*, the Court held that the suit – which was brought by a U.S. citizen plaintiff – was, in fact, barred on qualified immunity grounds. In others (*e.g.*, *Saucier v. Katz*, 533 U.S. 194 (2001)) the Court remanded the case with instructions that the case be *dismissed*. Plaintiffs' heavy reliance on *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), is similarly misplaced. *Hamdi* involved a dispute by a U.S. citizen plaintiff seeking *habeas corpus* relief. Moreover, the case involved exclusively the actions of the combatant himself; there was no question regarding the actions of U.S. military personnel.[7] In *none* of these cases did the Court ever reject a "special factors" analysis in the context of wartime military actions, much less for claims brought by foreign alien prisoners.

For centuries, the courts have taken great pains to emphasize the critical importance to the security of the United States that wartime decision-making be afforded the highest degree of deference, lest the military become compromised by competing influences from non-military sources (such as potential private litigants). This issue could not have been stated more plainly than

---

[7]      Plaintiffs argue that, unlike *habeas* cases, "[d]amages claims present a far more manageable process, which . . . can be tailored to address the needs of the parties." Opp. at 39. The question is not one of "manageab[ility]," but rather whether U.S. courts are the proper forum for addressing complaints by alien enemy prisoners for wartime actions. The overwhelming weight of authority confirms that such complaints must be addressed through other channels.

it was in *McCall v. McDowell*, 15 F. Cas. at 1235 (C.C.D. Ca. 1867) (cited in Opp. at 39 n.34), where

the court considered the liability of an army Captain for mistreatment of a U.S. citizen prisoner at

Fort Alcatraz. The court held that the Captain could not be held liable in damages to the plaintiff

where he was acting under orders of his superior officer. While *McCall*, too, is distinguishable on

grounds that it involved domestic detention of an American citizen, the court's reasoning in this

nearly 140-year-old case is directly applicable here:

> A prompt and unhesitating obedience to orders is indispensable to a
> complete attainment of the object. The service is a military service,
> and the command of a military nature; and in such cases, every delay,
> and every obstacle to an efficient and immediate compliance,
> necessarily tend to jeopard[y] the public interests. While subordinate
> officers or soldiers are pausing to consider whether they ought to
> obey, or are scrupulously weighing the evidence of the facts upon
> which the commander in chief exercises the right to demand their
> services, the hostile enterprise may be accomplished without the
> means of resistance. If a superior officer has a right to contest the
> orders of the president upon his own doubts as to the exigency
> having arisen, it must be equally the right of every inferior officer and
> soldier; and any act done by any person in furtherance of such orders
> would subject him to responsibility in a civil suit, in which his
> defense must finally rest upon his ability to re-establish the facts by
> competent proofs. Such a course would be subversive of all
> discipline, and expose the best disposed officers to the chances of
> ruinous litigation.

*Id.* at 1240; *see also Hamdi*, 542 U.S. at 535 (Opp. at 39) (discussing the "greatest respect" that must

be afforded "the judgments of military authorities in matters relating to the actual prosecution of a

war"). Those words ring especially clear in the context of the United States' post-9/11 military

operations in Iraq. There are no more "special" factors than those incident to wartime military

operations on foreign soil at a time the U.S. faces direct threats at home and abroad. A *Bivens* claim

may not lie under these circumstances.

**B.    This Court Should Defer to the Congressionally-Established Scheme For Responding to Allegations of Wartime Misconduct.**

Aside from the obvious perils of judicial interference in wartime decision-making, Plaintiffs' claims fail under a "special factors" analysis for yet another reason.  As set forth more fully in Karpinski's Motion to Dismiss, Congress has established – *and utilized in this case* – a comprehensive scheme for addressing allegations of wartime misconduct by members of the U.S. military.  *See* MTD at 23-27.  Plaintiffs argue that the carefully designed mechanisms created by Congress cannot represent a "comprehensive" scheme because they do not afford a forum for alien enemy prisoners to pursue *damages* claims against their captors.  Opp. at 43-44.  Plaintiffs' assumption that they are entitled, as a matter of right, to pursue money damages against military officials requires little attention; Plaintiffs simply ignore the substantial authority that the adequacy of the remedy Plaintiffs seek is "irrelevant to a 'special factors' analysis."  MTD at 23 n.21 (citing *Stanley*, 483 U.S. at 683).

What matters instead is whether Congress has created an infrastructure and provided tools to address the *conduct* at issue.  It has.  The political branches – *i.e.*, the branches of government commissioned to address such sensitive matters of foreign policy and national security – have utilized the myriad of resources available to them (yet unavailable to the courts) pursuant to this scheme, including, *inter alia*, hearings, investigations, legislation, and military tribunals, both to punish identified acts of misconduct and to clarify U.S. policy for military operations going forward in the current war.  Like the plaintiffs in the other "special factors" cases decided by the Supreme Court, these Plaintiffs, too, appear dissatisfied with the ultimate decisions of the political branches in response to their allegations.  But their dissatisfaction does not confer upon them access to the courts to seek different remedies that might benefit them financially.  Plaintiffs may pursue relief through diplomatic channels, to be determined by the political branches, but they may not pursue any such relief here.

Finally, Plaintiffs point to language (and the absence of language) in recent statutes to suggest that Congress has endorsed their right to bring this suit. Specifically, they argue that statutory references to remedies "otherwise available" – and the absence of any "explicit congressional declaration" barring Plaintiffs' claims – confirms the viability of their Complaint. Opp. at 36, 44. Plaintiffs are wrong. It is not unusual for Congress to preserve certain *existing* remedies, such as those that have been affirmed by the Supreme Court for, *e.g.*, detainees on U.S. territory at Guantanamo Bay. It strains credulity, however, to extend this language as Plaintiffs suggest to presume that Congress "expressly recognizes the existence of damages actions and assumes they can and will be brought" without limitation. Opp. at 44. There simply is no foundation for that conclusion, which flies directly in the face of specific pronouncements of the political branches. MTD at 26-27.[8] It also is of no moment that Congress did not take the unnecessary step of "explicit[ly]" barring Plaintiffs' claims. Here, too, Plaintiffs turn their burden on its head. Where, as here, a Congressional scheme is in place, the courts must defer "*unless*, of course, Congress has clearly expressed a preference that the judiciary preserve *Bivens* remedies." *Spagnola v. Mathis*, 859 F. 2d 223, 228-229 (D.C. Cir. 1988).[9] That has not happened here.

### III.    Plaintiffs' Claims Present Non-Justiciable Political Questions.

Nor can Plaintiffs escape the conclusion that this case is barred by the political question doctrine. Plaintiffs cite many of the same cases that they do in their unsuccessful attempt to avoid

---

[8]    Indeed, the D.C. Circuit has expressly held, relying on Supreme Court precedent, that courts cannot "construe statutes to imply a cause of action where Congress has not expressly provided one." *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033 (D.C. Cir. 2004) (holding that although Congress waived sovereign immunity against state sponsors of terrorism in 1996 amendments to the Foreign Sovereign Immunities Act, it did not *expressly* create a federal cause of action).

[9]    The futility of Plaintiffs' argument is underscored further by the language they cite from the Reagan Act. Opp. at 45. There, Plaintiffs note, Congress "reaffirm[ed] the United States' policy" that the "*Armed Forces*" and "*Department of Defense and appropriate military authorities*" must "take responsibility for both preventing torture and, in turn for punishing perpetrators of abuse." *Id.*

the "special factors" analysis, but this Court need look no further than the D.C. Circuit's recent opinions in *Gonzalez-Vera II*, and *Bancoult II*, to dispose of Plaintiffs' claims here.  Just like these Plaintiffs, the *Gonzalez-Vera* plaintiffs sought to distinguish *Schneider II*, 412 F.3d at 190 (among other cases), on the grounds that the *Schneider* cases "presented a challenge to the Government's 'policy decision to support Pinochet's rise to power,' whereas the present cases challenges specific 'acts of torture . . . committed after the military government was already in place.'" *Gonzalez-Vera II*, 449 F.3d at 1263.  As well, the *Gonzalez-Vera* plaintiffs argued that their case should proceed because it was "based on a narrow class of international norms, such as . . . claims of torture and extrajudicial killing." *Id.*  The *Bancoult* plaintiffs similarly sought to distinguish between military policy decisions and the alleged "egregious and illegal conduct" – including, *e.g.*, "torture; racial discrimination; cruel, inhuman, or degrading treatment; [and] genocide" – utilized to implement those decisions.  445 F.3d at 431, 436.

The D.C. Circuit rejected these arguments.  The *Bancoult II* court first noted that "the fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy *or the use and disposition of military power*; these matters are plainly the exclusive province of Congress and the Executive."  445 F.3d at 433 (emphasis added) (citation omitted).  The court held that the decision must be left to the political branches to "determine whether drastic measures should be taken in matters of foreign policy and national security," and that "the President 'must determine what degree of force [a] crisis demands.'"  *Id.* at 436-37 (citations omitted).  The court rejected the same argument Plaintiffs make here, *i.e.*, that it must separate the complained-of policy and the nature of its implementation, holding that "[t]he courts may not bind the executive's hands on matters such as these, whether directly – by restricting what may be done – or indirectly – by restricting how the executive may do it."  *Id.*  The *Gonzalez-Vera II* court, citing *Schneider II* and *Bancoult II*, rejected plaintiffs' claims in that case for the same

13

reasons. *See* 449 F.3d at 1263-64 (holding that to "evaluate the legal validity" of alleged "drastic measures taken by the United States . . . in order to implement United States policy," would require the court "to delve into questions of policy 'textually committed to a coordinate branch of government,'" and that the challenged conduct "can hardly be called anything other than foreign policy").

Not surprisingly, Plaintiffs fail to cite a single case rejecting a political question defense on facts similar to those at issue here. This case deals specifically with the decisions of the highest levels of the United States military establishment (*i.e.*, Karpinski's superiors) to implement Congress's and the President's foreign policy by utilizing certain interrogation methods to help defend United States soldiers and civilians from imminent attack; the question is not, as Plaintiffs suggest, whether U.S. foreign policy objectively authorizes "torture" as Plaintiffs choose to define that term. In this manner, this case is precisely like the prior cases in this circuit, including *Sanchez-Espinoza*, *Schneider*, *Bancoult*, and now *Gonzalez-Vera* – all cases that involved decisions "classically within the province of the political branches, not the courts." *Schneider II*, 412 F.3d at 195.

To resolve this case in Plaintiffs' favor would require this Court to issue an indictment of the wartime policy decisions of the political branches, not to mention of the subordinate military officers who Plaintiffs allege simply followed those orders. Should damages claims by enemy prisoners be permitted in U.S. courts, there would be significant risk of "multifarious pronouncements" as every military prisoner would rush to federal courthouses around the United States to complain of mistreatment by his or her military captors. In this case, *all* of the political question factors compel dismissal of Plaintiffs' entire case.

## IV.    Karpinski Is Entitled To Qualified Immunity.

Plaintiffs' constitutional claims against Karpinski also must be dismissed on qualified immunity grounds because Plaintiffs cannot demonstrate that they had any clearly established rights

under the United States Constitution.  Nor do they (or can they) rebut the fact that they have alleged

conduct that, even if true, was objectively reasonable under the circumstances.  MTD at 33-34.

Plaintiffs' academic inquiry regarding a "categorical prohibition against torture" is nothing more

than a red herring.  Opp. at 31.  Binding case law leaves no question that Plaintiffs are not entitled to

pursue relief under the U.S. Constitution in this Court.

### A.    Plaintiffs Have Not Alleged Actionable Constitutional Violations.

There is no dispute that Plaintiffs were "subject[s] of a foreign state at war with the United

States" at all times relevant to this case.  *Eisentrager*, 339 U.S. at 769 n.2.  They were, therefore, "alien

enem[ies]," detained in military prison in Iraq during the course of wartime hostilities with the

United States.  MTD at 21-22 nn.18-19.  *Eisentrager* and its progeny make clear that alien enemies in

Plaintiffs' position are not entitled to the protections of the U.S. Constitution.  MTD at 27-31.

To avoid dismissal, Plaintiffs create a novel test – derived supposedly from the so-called

*Insular Cases* decided at the beginning of the 20th century – that any alien enemy is entitled to

"fundamental" constitutional rights if 1) the alleged acts occurred in "territories that the United

States controls," *or* if 2) application of such rights would not be "impracticable and anomalous."  *Id.*

at 16, 19-24.  Plaintiffs misunderstand the *Insular Cases* and the state of current Constitutional law.

### 1.    The *Insular Cases* Are Not Applicable to This Case.

First, the *Insular Cases* do not help Plaintiffs here.  Although Plaintiffs correctly identify these

cases as early pronouncements of the possible extraterritorial application of the Constitution to non-

U.S. citizens, they were limited to cases involving (a) violations of "fundamental rights" (b) in a

United States territory.  *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990) ("only

'fundamental' constitutional rights are guaranteed to inhabitants of [U.S.] territories") (citations

omitted).  To be clear, *all* of the *Insular Cases* concerned application of the Constitution to territories

unquestionably belonging to the United States, *e.g.*, Puerto Rico, Hawaii, and the Philippines.  *See,*

*e.g.*, *Balzac v. Porto Rico*, 258 U.S. 298 (1922); *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii v. Mankichi*, 190 U.S. 197 (1903). This fact was critical to each decision.

When the Supreme Court subsequently has considered application of the Constitution to non-resident aliens outside of the 50 states, it has distinguished expressly between conduct within and outside U.S. territories. *See, e.g.*, *Verdugo-Urquidez*, 494 U.S. at 268 (discussing "weak[ness]" of Constitutional claim by alien in foreign nation given limitations even for aliens in *U.S.* territories); *Eisentrager*, 339 U.S. at 771 (Supreme Court "has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."); *see also, e.g.*, *Khalid v. Bush*, 355 F. Supp. 2d 311, 321-22 (D.D.C. 2005) (analyzing *Verdugo-Urquidez* and *Eisentrager*, and finding that non-resident aliens were not entitled to constitutional rights on foreign soil).[10] Both *Verdugo-Urquidez* and *Eisentrager* considered the *Insular Cases* but did not apply the "fundamental rights" doctrine because the alleged violations did not occur in a U.S. territory. *See Verdugo-Urquidez*, 494 U.S. at 268; *Eisentrager*, 339 U.S. at 784-85.

Perhaps recognizing this fatal flaw in their argument, Plaintiffs try to shoehorn Iraq into the definition of a U.S. territory by alleging that Constitutional protections also extend to lands that the U.S. "controls," including "occupation zones after war." Opp. at 23-24.[11] According to Plaintiffs,

---

[10]     Karpinski already has explained why the Supreme Court's recent decision in *Rasul v. Bush*, 542 U.S. 466, 475 (2004) does not change this result. MTD at 31 n.24. Decisions since *Rasul* have further highlighted the dispositive distinction between U.S. and non-U.S. territories. *Compare In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005) (finding that fundamental rights are enforceable in Guantanamo Bay because it is "the equivalent of a U.S. territory in which fundamental constitutional rights apply"); *with Khalid*, 355 F. Supp. 2d at 321-22 (denying constitutional rights to alien plaintiffs because Guantanamo Bay was not a U.S. territory).

[11]     The only support Plaintiffs can muster for this novel theory is one opinion, *Harbury v. Deutch*, 233 F.3d 596 (D.C. Cir. 2000), that was subsequently vacated by the D.C. Circuit. *See Harbury v. Deutch*, No. 99-5307, 2002 WL 1905342 (D.C. Cir. Aug. 19, 2002). Even before it was vacated, however, *Harbury* did not support Plaintiffs' claims here, but rather held, like the other cases cited by Karpinski, that *Eisentrager* barred application of the Constitution to non-resident aliens. Opp. at 23-24. The language upon which Plaintiffs rely was passing *dicta* derived from the court's analysis of a highly unique case involving the application of the U.S. Constitution to conduct occurring in a *U.S. federal court*, established by treaty, that happened to be located
(continued…)

the Court should confer upon Iraq the status of a U.S. territory because of (a) the "pervasive extent" of U.S. military control, and (b) the U.S. involvement in Iraq through the Coalition Provisional Authority ("CPA").  Opp. at 25-28.  This argument merits little attention.

Iraq is not a U.S. territory.  For starters, it has long been held that only Congress has the authority to establish a U.S. territory, something it has not done with Iraq.  *See, e.g.*, *Late Corp. of the Church of Jesus Christ of Latter Day Saints v. United States*, 136 U.S. 1, 42 (1890) (discussing power of Congress to acquire and establish rules and regulations for U.S. territories).  Moreover, the Courts have recognized for more than 150 years the vast difference between a Congressionally designated U.S. territory and a country where the U.S. has established a presence *during a war.  See De Lima v. Bidwell*, 182 U.S. 1, 182 (1901) (discussing in one of the *Insular cases* that U.S. troops in an occupied country "were in an enemy's country, and not their own; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than the submission and obedience, sometimes called temporary allegiance, which is due from a conquered enemy when he surrenders to a force which he is unable to resist") (quoting *Fleming v. Page*, 50 U.S. 603, 614-616 (1850)); *see also Fleming*, 50 U.S. at 615-16 (the President's "conquests do not enlarge the boundaries of this Union, nor extend the operation of our institutions and laws beyond the limits before assigned to them by the legislative power . . . every place which was out of the limits of the United States, as previously established by the political authorities of the government, was still foreign; *nor did our laws extend over it*") (emphasis added).

In this case, Plaintiffs seek to characterize Iraq – a foreign sovereign country where the United States *still* is engaged in an active war – as a U.S. territory where all of the inhabitants,

---

(…continued)

in U.S.-occupied Berlin.  *See U.S. v. Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979).  There is no similar connection between Iraq and the U.S. here.

including enemy prisoners in battlefield military prisons, are protected by the U.S. Constitution. Plaintiffs have provided no authority for such a broad reading that would confer upon U.S. enemies across the globe the unprecedented right to sue their military captors in U.S. courts.

## 2.    The "Impracticable and Anomalous" Test Does Not Control.

Plaintiffs also seek to make new law by arguing that the Supreme Court has held that "fundamental" Constitutional protections extend to non-resident aliens, even outside U.S. territories, so long as such extension would not be "impracticable and anomalous."  Opp. Br. at 20-24.  There is no "impracticable and anomalous test" applicable in U.S. courts today.  This "test" is simply the reiteration of language in Justice Harlan's concurrence in *Reid v. Covert*, 354 U.S. 1, 65 (1957) which never has been adopted by a majority of the Supreme Court as the legal standard for determining the scope of Constitutional protections to non-resident aliens.

Indeed, Plaintiffs grossly overstate the effect of what they call Justice Harlan's "crucial concurrence" in *Reid.*  Opp. at 20.  First, Justice Harlan's opinion was not even directly related to the *Reid* holding, which concerned only the extraterritorial application of the Constitution to U.S. citizens.  Second, Justice Kennedy's concurrence in *Verdugo-Urquidez*, which Plaintiffs suggest approved Justice Harlan's analysis, was never adopted by the majority in that case; the majority instead highlighted the same distinctions between *Eisentrager* and the *Insular Cases* that Karpinski has discussed here.  Third, Plaintiffs are wrong to suggest that the Supreme Court's recent decision in *Rasul* "endorsed" an "impracticable and anomalous" test by relying on Justice Kennedy's *Verdugo-Urquidez* concurrence.  Opp. at 20.  The *Rasul* majority made nothing more than a passing reference in a footnote to Justice Kennedy's opinion; nor did it any way discuss this supposed standard.  *Rasul v. Bush*, 542 U.S. at 484 n.15.  Not even Justice Kennedy, in his concurrence in *Rasul*, mentioned the "impracticable and anomalous" test, but instead applied the "framework of *Eisentrager*" to conclude,

based on, *inter alia*, his determination that Guantanamo was a U.S. territory, that plaintiffs were entitled to petition for habeas relief. *Id.* at 485-87.

Finally, Plaintiffs rely heavily on Judge Green's opinion in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 443. Although Judge Green referred to the "impractical and anomalous" analysis, Plaintiffs' reliance on this opinion is similarly unavailing because Judge Green merely considered these factors *in addition to* the territorial requirement, finding that Guantanamo Bay was "the equivalent of a U.S. territory in which fundamental constitutional rights exist." *Id.* at 464. Accordingly, Plaintiffs' attempt to recast the applicable standard for determining the constitutional rights of non-resident alien enemy prisoners lacks any support in the law.[12]

### 3.     *Eisentrager* Requires Dismissal of the Constitutional Claims.

Plaintiffs last argue that *Eisentrager* simply does not apply to them because they are "innocent civilians, are not hostile to the United States" and "were never charged as such." Opp. at 32. The D.C. Circuit flatly rejected such an argument in *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. on other grounds, Rasul v. Bush*, 542 U.S. 466 (2004). In *Al Odah*, the court held that the *Eisentrager* plaintiffs' status as nationals of a country at war with the U.S. – and not the legal status of their confinement – was controlling to the Supreme Court's decision. *Id.* at 1139 (citing *Eisentrager*, 339 U.S. at 784-86). Likewise, these Plaintiffs are, by definition, alien enemies, captured and detained by the U.S. military during a time of war. Accordingly, Plaintiffs have failed to refute that *Eisentrager* and its progeny require dismissal of their claims. MTD at 28-30.

---

[12]     In any event, even if "impracticable and anomalous" were the standard, Karpinski already has explained why extending constitutional protections to enemy prisoners in the way Plaintiffs seek here, much less *during a war*, would be both impracticable and anomalous. *See supra* at II, III.

**B.    Plaintiffs Do Not Allege Violations of Clearly Established Law.**

Even if this Court accepted Plaintiffs' novel theories, Karpinski still is entitled to qualified immunity.  MTD at 27-34.  Plaintiffs' strained efforts to twist ancient case law and concurring opinions to their advantage, and to distinguish the current, clear and substantial authority which compels dismissal of their claims, underscores that they have, *at the very least*, failed to identify a violation of any "clearly established" constitutional rights.  *See Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985) (question is whether there is a "legitimate question" as to plaintiffs' entitlement to constitutional protections based on an analysis of the law at the time the alleged violations occurred). As late as 2003, the D.C. Circuit determined – albeit in *dicta* –that individuals such as Plaintiffs were *not* entitled to Constitutional protections.  *See Al Odah*, 321 F.3d at 1141.  Therefore, the *most* Plaintiffs can argue is that that the availability of constitutional rights to alien enemy prisoners was *unclear.  See* MTD at 31-33; *see also Rasul*, 414 F. Supp. 2d at 43 (finding that the law in this area was "clouded"); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 458 n.27 (noting that the D.C. Circuit has twice recognized the "continued murkiness" of whether non-citizens abroad are entitled to Constitutional protections) (citing *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)).

Yet, Plaintiffs insist that this analysis "turns the law of qualified immunity on its head," because it was "never meant to excuse knowing violations of the law based on a post hoc argument that the victim's legal remedies were not certain."  Opp. at 55.  Plaintiffs miss the point.  If anything were "not certain" at the time of the allegations in this case, it was whether these Plaintiffs were entitled to sue their captors under the U.S. Constitution.  The courts *still* appear to be grappling with the scope of constitutional protections for detainees *in U.S. territories*, much less in battlefield prisons on foreign soil.  Plaintiffs' torture allegations do not automatically open the courthouse doors for whatever claim they choose to bring.

To determine whether a right was "clearly established" for purposes of a qualified immunity analysis, the Court must analyze the question "in the specific context of the case, [and] not as a broad general proposition." *Saucier*, 533 U.S. at 201. In the context of this case, it is abundantly clear that Plaintiffs' constitutional rights were not *clearly established* at the time. It is unclear whether they existed at all, then or now. *See, e.g., Rasul*, 414 F. Supp. 2d at 44 (granting defendants' qualified immunity for plaintiffs' Fifth and Eighth Amendment torture claims "due to the unsettled nature of Guantanamo detainees' constitutional rights in American courts").[13]

## V.    Plaintiffs Cannot State a Claim for Violation of the Geneva Conventions.[14]

Karpinski explained in her Motion to Dismiss that, even assuming the myriad other grounds for dismissal were each rejected, Plaintiffs' Geneva Conventions claim also must be dismissed. This is because the Geneva Conventions, including the Fourth Geneva Convention, are not self-executing; neither do they provide for a private right of action exercisable in U.S. courts. Multilateral Protection of War Victims (Civilian Persons) Convention, Aug. 12, 1949, 6 U.S.T. 3516 ("Geneva IV"). Over the past several decades U.S. courts across the country repeatedly have so held. *See, e.g., Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005) (Geneva IV "is not 'self-executing,' that is, it does not expressly or impliedly create a private claim for relief"); *see also Anh v. Levi*, 586 F.2d 625, 629 (6th Cir. 1978) (same); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424,

---

[13]    Plaintiffs appear to think that absent some affirmative statement that the Constitution *does* not apply to their claims, they are entitled to Constitutional protection. Opp. at 16, 31. They also argue that the Defendants' precedent-based arguments regarding the lack of clearly established law "turns the law of qualified immunity on its head." Opp. at 55. It is, in fact, *Plaintiffs* who seek to turn the law on its head. There is no question that its is Plaintiffs' burden to establish a clearly established right, and lack of objectively reasonable conduct, not the other way around. *See, e.g., Rasul*, 414 F. Supp. 2d at 41 (citing *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001)). Plaintiffs have failed to show that their right to Constitutional protection was clearly established at the time. Nor do they even contest Karpinski's argument that her conduct was objectively reasonable.

[14]    Plaintiffs incorrectly assume Karpinski concedes Geneva IV is self-executing. Opp. at 78. To the contrary, Karpinski maintains that Plaintiffs' claims under Geneva IV fail both because the treaty is not self-executing and because it does not provide a private right of action.

439 n.16 (D.N.J. 1999) (same); *Am. Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 770

(N.D. Cal. 1989) (same).[15]  In his recent dissent in *Hamdan v. Rumsfeld*, Justice Thomas underscored

this point, noting that the Geneva Conventions are "not judicially enforceable because that

Convention contemplated that diplomatic measures by political and military authorities were the

exclusive mechanisms for such enforcement."  126 S.Ct. 2749, 2844-45 (2006) (Thomas J.,

dissenting).  The majority did not disagree.  *See id.* at 2794 ("We may assume that [the Geneva

Convention] would, absent some other provision of law, preclude Hamdan's invocation of the

Convention's provisions as an independent source of law binding the Government's actions and

furnishing petitioner with any enforceable right."); *see also id.* at 2802-03 (Kennedy, J., concurring)

(same).[16]  If, as here, a treaty is not self-executing, a plaintiff's claim under the treaty fails on this

basis alone.  *Jogi v. Voges*, 425 F.3d 367, 376 (7th Cir. 2005).

     Plaintiffs seek to avoid this authority by isolating the language of certain provisions of

Geneva IV, which they contend imply a contrary result.  Opp. at 79-83.  Such a presumption is

unwarranted.  As an initial matter, "[i]nternational treaties are not presumed to create rights that are

privately enforceable," *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992), and

in order for a treaty to confer judicially enforceable rights, the *whole* of the treaty must evince the

intent to create a private right of action.  *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976) (no

such intent in U.N. Security Counsel Resolution); *Goldstar*, 967 F.2d at 968 (no such intent in the

---

[15]    *See also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989) (Geneva Convention on the High Seas); *Stutts v. De Dietrich Group*, No. 03-CV-4058, 2006 WL 1867060, at *7 (E.D.N.Y. Jun. 30, 2006) (Third Geneva Convention; decided the day after *Hamdan*); *Handel v. Artukovic*, 601 F. Supp. 1421, 1425 (C.D. Cal. 1985) (1929 version of Third Geneva Convention).

[16]    Plaintiffs anticipated the Supreme Court's *Hamdan* decision might support their claims here.  Opp. at 83.  It does not.  The Supreme Court did not disrupt the D.C. Circuit's decision that military detainees are prohibited from seeking judicial relief pursuant to the Geneva Conventions.  *See* MTD at 45.  Rather, the Court ruled on other grounds, holding only that the Geneva Conventions are part of the "law of war," and that Congress, by statute, requires that all military commissions created by the Executive comply with the law of war.  *Hamdan*, 126 S. Ct. at 2794.

Hague Convention); *Handel*, 601 F. Supp. at 1425 (no such intent in the 1929 Geneva Convention).

Moreover, "[a] treaty which provides that signatory states will take measures through their own laws

to enforce its provisions evinces an intent that the treaty not be self-executing." *Handel*, 601 F.

Supp. at 1425; *see also Diggs*, 555 F.2d at 851 (treaty not self-executing where language "call[ed] upon

governments to take certain action"); *Comm. of United States Citizens Living in Nicaragua v. Reagan*, 859

F.2d 929, 938 (D.C. Cir. 1988) (no private right of action where provisions "did not by their terms

confer rights upon individual citizens [but] call[ed] upon governments to take certain action")

(internal quotes omitted) (citations omitted).

   In *Handel*, the court held that the Third Geneva Convention applying to Prisoners of War

did not provide a private right of action because the signatories agreed to undertake to enact

legislation necessary to provide effective sanctions for persons violating the Convention. *Handel*,

601 F. Supp. at 1425. Geneva IV (in Article 146) incorporates exactly the same language. Indeed,

Article 3, under which Plaintiffs specifically seek to allege a claim, provides that the signatories

"should further endeavor to bring into force, by means of special agreements, all or part of the other

provisions of the present Convention." Viewed as a whole, Geneva IV provides no basis for

deviation from decades of legal authority demonstrating that Plaintiffs may not access U.S. courts on

claims for violations of the Geneva Conventions.

## VI.    Plaintiffs Cannot State a Claim for Declaratory Relief Against Karpinski.

   Plaintiffs expressly limited Count Six of their Complaint to Defendant Rumsfeld. Now they

allege that they intended to seek declaratory relief against all Defendants. It does not matter. Any

claim against Karpinski for declaratory relief fails for several reasons.

   *First*, Plaintiffs fail to allege the "sufficient immediacy and reality" required to support

declaratory relief. *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (dismissing request for declaratory

relief where Congressperson allegedly responsible for plaintiff's injury would not be re-elected).

They do not allege (nor can they) that Karpinski remains in command of Abu Ghraib, or even remains a member of the U.S. military. *See, e.g.*, Compl. at ¶¶ 29, 145, 167. Indeed, they *rely* on this very point to explain (albeit disingenuously) why a damages remedy would not impact military operations in Iraq. Opp. at 40 ("it appears that three of the four Defendants do not currently have duties in Iraq"). There simply is nothing for this Court to "declare" against Karpinski vis-à-vis Plaintiffs.

*Second*, the plain language of the Amended Complaint fails to state a declaratory relief claim against Karpinski.[17] Plaintiffs expressly state that Karpinski is "sued in her individual capacity for *damages*." Compl. ¶ 29. On the other hand, Count VI alleges that "[t]here is a real and actual controversy between Plaintiffs and *Defendant Rumsfeld*," that Plaintiffs "reasonably fear that they are at risk of and will be subjected to *Defendant Rumsfeld's* unlawful and unconstitutional actions," and requests only "a judicial declaration that *Defendant Rumsfeld's* conduct deprived them of their rights…." Compl. ¶¶ 261-262 (emphasis added).

*Third*, as set forth above, Plaintiffs have failed to state any claim upon which relief can be granted under any cause of action, rendering their request for declaratory and all other relief moot.[18]

The question in any declaratory judgment case is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy an[d] reality to warrant the issuance of a declaratory judgment."

---

[17]    Based on the fact that Plaintiffs' Count Six appears to be directed only to Defendant Rumsfeld, Karpinski did not address these issues in her Motion to Dismiss. MTD at 2 n.1. However, Plaintiffs' Opposition claims that under their Amended Complaint, they "do seek declaratory relief against all four defendants." Opp. at 61 n.52, 84 n.75. Karpinski therefore responds to Count Six here for the first time.

[18]    Plaintiffs string-cite a series of cases supposedly supporting the imposition of declaratory relief under the law of nations and treaties and the Westfall Act, but conveniently neglect to provide contextual explanation for their inclusion. Opp. at 61-62. None of these cases actually grant declaratory relief under the law of nations or treaties. To the extent that the cases suggest that it might be an available remedy, Plaintiffs' request for declaratory relief is not warranted because, as set forth above, plaintiffs fail to state a claim upon which relief may be granted.

*Golden*, 394 U.S. at 108.  Recognizing that they failed to allege in their Amended Complaint – and, thereby have waived[19] – any declaratory relief claim against any defendant other than Rumsfeld, Plaintiffs now argue that their claim resides in their "Prayer for Relief".  Opp. at 84-85 n.75. Plaintiffs' contention falls short.  Having failed to allege the existence of any real and actual controversy between Plaintiffs and Karpinski or any basis to fear that Karpinski poses any ongoing threat, Plaintiffs lack standing to bring a claim for declaratory relief against Karpinski.

## CONCLUSION

For the reasons set forth above, Defendant Janis Karpinski respectfully requests that the Court dismiss all claims against her with prejudice.

Respectfully submitted,


　　　　/s/ *Michael L. Martinez*
Michael L. Martinez, DC Bar #347310
Aryeh S. Portnoy, DC Bar #464507
David E. Bell, DC Bar # 477903
Matthew F. Scarlato, DC Bar # 484124
Rhonda M. Galaz, DC Bar # 489999
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2500


Counsel for Defendant Janis Karpinski

July 21, 2006

2799629.09

---

[19]    Because Plaintiffs' "amended complaint supersedes the original complaint," any reliance they may place upon the language of the four original complaints (Opp. at 84-85 n.75) against Defendants fails to save their request for declaratory relief from dismissal.  *Nat'l City Mortgage Co. v. Navarro*, 220 F.R.D. 102, 106 (D.D.C. 2004); *see also King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1986) ("[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived").

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 21ˢᵗ day of July 2006, I caused a copy of the Reply in Support of Janis Karpinski's Motion to Dismiss to be served upon all counsel of record via ECF and electronic mail as set forth below:

**Arthur B. Spitzer**
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036
artspitzer@aol.com

*Counsel for All Plaintiffs*

**Mark E. Nagle**
Troutman Sanders LLP
401 Ninth St, N.W.
Suite 1000
Washington DC 20004
mark.nagle@troutmansanders.com

*Counsel for Thomas Pappas*

**Stephen L. Braga**
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
stephen.braga@bakerbotts.com

*Counsel for Ricardo Sanchez*

**J. Marcus Meeks**
United States Department of Justice
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
Marcus.meeks@usdoj.gov

*Counsel for Donald H. Rumsfeld and the United States*

Dated: July 21, 2006

                    /s/ *Michael L. Martinez*
                    Michael L. Martinez