# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re* **Iraq and Afghanistan Detainees Litigation**

**This document relates to:**

**ALI v. PAPPAS**
**ALI v. RUMSFELD**
**ALI v. KARPINSKI**
**ALI v. SANCHEZ**

**Misc. No. 06-145**

**Civ. No. 05-1377-TFH**
**Civ. No. 05-1378-TFH**
**Civ. No. 05-1379-TFH**
**Civ. No. 05-1380-TFH**

## REPLY MEMORANDUM IN SUPPORT OF THE
## MOTION TO DISMISS FILED ON BEHALF OF COLONEL PAPPAS

Dated: July 21, 2006

Mark E. Nagle, Bar #416364
Tracy Varghese, Bar #472805
TROUTMAN SANDERS LLP
401 9th Street, N.W.
Washington, D.C. 20004
(202) 274-2972 (telephone)
(202) 654-5666 (facsimile)

*Counsel for Colonel Pappas*

# TABLE OF CONTENTS

ARGUMENT .................................................................................................................. 1

I.    Plaintiffs Have No Actionable Claims Under The Constitution .............................. 1

     A.    The Constitution Does Not Confer A Right Of Action Upon Plaintiffs In The Circumstances Alleged In The Amended Complaint ................................................................................................. 1

     B.    Special Factors Strongly Counsel Hesitation In Recognizing A *Bivens* Remedy .............................................................................. 7

II.    Plaintiffs Fail to Apply the Law of Qualified Immunity to the Specific Context of This Case ................................................................................. 8

III.    Substitution Under The Westfall Act Is Appropriate ........................................ 13

     A.   Pappas Was Acting Within the Scope of His Employment ..................... 13

     B.   Plaintiffs' Request For Discovery Should Be Denied ........................... 17

     C.   The Westfall Act Applies To Claims For Intentional Torts .................... 18

     D.   Plaintiffs' International Law Claims Do Not Fit Within the Westfall Act's Statutory Claim Exception .............................................. 19

IV.    Plaintiffs' Geneva Convention Claims Are Not Actionable ............................... 20

V.    Plaintiffs' Claims for Declaratory Relief Against Pappas Must Fail ................... 21

VI.    Plaintiffs Have Failed to Establish a *Prima Facie* Case for The Exercise Of Personal Jurisdiction ................................................................................. 22

CONCLUSION ............................................................................................................ 24

## TABLE OF AUTHORITIES

### FEDERAL CASES

Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003) ............................................11

Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir. 2003) .................................19

Anderson v. Creighton, 483 U.S. 635 (1987) .............................................................9, 11

Balzac v. Puerto Rico, 258 U.S. 298 (1922) .....................................................................2

Bancoult v. McNamara, 370 F. Supp. 2d 1 (D.D.C. 2004)..............................18, 19, 20

Barham v. Ramsey, 434 F.3d 565 (D.C. Cir. 2006) ..........................................................9

Behrens v. Pelletier, 516 U.S. 299 (1996) ......................................................................18

Brosseau v. Haugen, 543 U.S. 194 (2004)........................................................................9

Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001) ......................................9

Dertz v. City of Chicago, 912 F. Supp. 319 (N.D. Ill. 1995)..........................................22

Dorr v. United States, 195 U.S. 138 (1904)......................................................................2

Downes v. Bidwell, 182 U.S. 244 (1901) ..........................................................................2

Duffy v. United States, 966 F.2d 307 (7th Cir. 1992) .....................................................18

Goldstarr (Panama) S.A. v. United States, 967 F.2d 965 (4th Cir. 1992) .....................20

Haddon v. United States, 68 F.3d 1420 (D.C. Cir. 1995)....................................15, 17, 18

Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005)..................................................20, 21

Hamdi v. Rumsfeld, 542 U.S. 507 (2005) ..........................................................................4

Handel v. Artukovic, 601 F. Supp. 1421 (C.D. Ca. 1985).............................................20

Harbury v. Deutch, 233 F.3d 596 (D.C. Cir. 2000) ......................................................2, 5

Hawaii v. Mankichi, 190 U.S. 197 (1903).........................................................................2

Hoston v. Silbert, 681 F.2d 876 (D.C. Cir. 1982).............................................................18

Huynh Thi Anh v. Levi, 586 F.2d 625 (6th Cir. 1978).........................................................20

In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005)..............................2

Jifry v. Federal Aviation Admin., 370 F.3d 1174 (D.C. Cir. 2004).....................................10

Johnson v. Carter, 983 F.2d 1316 (4th Cir. 1993) ..............................................................16

Johnson v. Eisentrager, 339 U.S. 763 (1950) ............................................................. passim

Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005)...........................................................12

Kimbro v. Velten, 30 F.3d 1501 (D.C. Cir. 1994)........................................................13, 17

Koch v. United States, 209 F. Supp. 2d 89 (D.D.C. 2002)...................................................18

Lyon v. Carey, 533 F.2d 649 (D.C. Cir. 1976) ....................................................................15

Mathis v. Henderson, 243 F.3d 446 (8th Cir. 2001) ............................................................18

National City Mortgage Co. v. Navarro, 220 F.R.D. 102 (D.D.C. 2004)...........................22

Ramey v. Bowsher, 915 F.2d 731 (D.C. Cir. 1990) .............................................................16

Rasul v. Bush, 542 U.S. 466 (2004) ........................................................................... passim

Rasul v. Rumsfeld, 414 F. Supp. 2d 26 (D.D.C. 2006) ............................................... passim

Reid v. Covert, 354 U.S. 1 (1957) .........................................................................................6

Robinson v. Overseas Military Sales Corp., 21 F.3d 502 (2d. Cir. 1994) ..........................24

Saucier v. Katz, 533 U.S. 194 (2001) ...............................................................................9, 11

Schneider v. Kissinger, 310 F. Supp. 2d 251 (D.D.C. 2004).......................14, 15, 18, 20

Schweiker v. Chilicky, 487 U.S. 412 (1988) ..........................................................................8

Seetransport Wiking Trader Schiffarhtsgesellschaft MGH & Co., Kommanditgesellschaft
    v. Navimpex Centrala Navala, 989 F.2d 572 (2d Cir. 1993)............................................24

Siegert v. Gilley, 500 U.S. 226 (1991) .................................................................................18

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) ..................................................................19

Stokes v. Cross, 327 F.3d 1210 (D.C. Cir. 2003) ..........................................................14, 18

Tarpeh-Doe v. United States, 28 F.3d 120 (D.C. Cir. 1994) ..............................................13

United States v. Smith, 499 U.S. 160 (1991)......................................................................18

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) ...............................5, 6, 10, 11

Vancouver Women's Health Collective Society v. A.H. Robins Co., 820 F.2d 1359 (4th
    Cir. 1987) ....................................................................................................................11

Vanover v. Hantman, 77 F. Supp. 2d 91 (D.D.C. 1999) ...................................................22

Washer v. Bullitt County, 110 U.S. 558 (1884) ................................................................22

Waters v. United States, 812 F. Supp. 166 (N.D. Cal. 1993) ...........................................19

Wilson v. Layne, 526 U.S. 603 (1999) ...........................................................................9, 10

Zadvydas v. Davis, 533 U.S. 678 (2001)......................................................................4, 11

Zicherman v. Korean Air Lines Co., 516 U.S. 217 (1996)................................................20

## STATE CASES

Hechinger Co. v. Johnson, 761 A.2d 15 (D.C. 2000)........................................................14

Weinberg v. Johnson, 518 A.2d 985 (D.C. 1986)..............................................................15

## FEDERAL STATUTES

28 U.S.C. § 2679(b)(1) .................................................................................................13, 19

28 U.S.C. § 2679(d)(1) .......................................................................................................13

Fed. R. Civ. P. 12(b)(1) ......................................................................................................24

Fed. R. Civ. P. 12(b)(6) ......................................................................................................24

Federal Employees Liability Reform and Tort Compensation Act of 1998 ("FELRTCA"),
    Pub. L. No. 100-694, 102 Stat. 4563 ...........................................................................13

Lease of Lands for Coaling & Naval Stations, Feb. 23, 1903, U.S.-Cuba Art. III, T.S. No.
    418...................................................................................................................................2

The National Defense Authorization Act (FY 2006), Pub. L. No. 109-163, 119 Stat. 3136 ..........7

Reagan Defense Act (FY 2005), Pub. L. No. 108-375, 118 Stat. 1811 ............................................7

Treaty Defining Relations with Cuba, May 29, 1934, 111, 48 Stat. 1683, T.S. No. 866 ...............2

**MISCELLANEOUS**

Restatement (Second) of Agency § 228(1) (1958) ........................................................................14

## ARGUMENT

I.   **Plaintiffs Have No Actionable Claims Under The Constitution**

   A.   **The Constitution Does Not Confer A Right Of Action Upon Plaintiffs In The Circumstances Alleged In The Amended Complaint**

The threshold question presented in this, as in every *Bivens* case, is whether the United States Constitution gives rise to a private right of action by the plaintiffs—here, non-resident aliens who have no connection with the United States. There is no binding precedent that even suggests, let alone compels, such a sweeping application of the Constitution. Plaintiffs nevertheless boldly ask this Court to do so, advancing an impermissibly expansive reading of the Supreme Court's narrow holding in *Rasul v. Bush,* 542 U.S. 466 (2004) ("*Rasul I*"), that runs counter to the case law addressing what constitutional protections, if any, should apply to non-resident aliens.

Plaintiffs maintain that foreign nationals are accorded the protections of the United States Constitution where: (1) the "right being asserted is fundamental;" and (2) the United States exercises "exclusive and complete control" over the place where the claim arises. *See* Plaintiffs Opposition at 16 ("Opp." or "Opposition"). But a proper application of the case law from which plaintiffs distill this formulation makes clear that the United States did not maintain anything akin to the "exclusive and complete control over Iraq" at the time of plaintiffs' detention that would confer a right of action under the Constitution. Moreover, even if this Court accepts the notion that the United States exercised exclusive and complete control over Iraq or the military prisons therein, plaintiffs' analysis fails because it does not address a critical additional test for Constitutional application – whether they had a sufficient nexus with the United States to justify

extending constitutional protections to them.[1]

Plaintiffs acknowledge that the Constitution can only be applied in situations where the territory in question is under the control of the United States. Opp. at 16-17, *citing In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 463 (D.D.C. 2005). The cases relied upon by plaintiffs involved territories held by the United States or areas wherein the United States exercised exclusive control.[2] For example, the United States operates a military facility in Guantanamo Bay pursuant to a land lease agreement with Cuba. *Rasul I,* 542 U.S. at 480, *citing* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418 and Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba art. 111, 48 Stat. 1683, T.S. No. 866. The occupation of a small parcel of land pursuant to a lease and treaty agreement is markedly different from the military occupation of an entire country as part of an ongoing wartime operation. *Rasul I*, 542 U.S. at 487 (Kennedy, J., concurring) ("Guantanamo Bay is in every practical respect a United States territory, and it is one far removed from any hostilities.").

Unlike Guantanamo Bay, Abu Ghraib prison was not "far removed from any hostilities." Rather, it was at or near the heart of an active zone of war. Plaintiffs' reliance on *Harbury v. Deutch*, 233 F.3d 596 (D.C. Cir. 2000), likewise is misplaced. In *Harbury*, the Court of Appeals

---

[1] Plaintiffs' Opposition fails to respond to, and thus concedes, the arguments set forth by Pappas that the allegations of the amended complaint on their face limit Pappas' alleged responsibility to Iraq, and more specifically to the Abu Ghraib prison. *See* Pappas Memorandum In Support of Motion to Dismiss ("Pappas Motion") at 32-33. While other Iraq locations are identified in the Amended Complaint, Pappas is not alleged to have taken any specific actions with respect to those locations. *See* Pappas Motion at 32, *citing* Am. Compl. at ¶ 189, 194, 199, 204 & 208. Moreover, plaintiffs Sherzad Kamal Khalid ("Khalid") and Ali H. failed to respond to Pappas' arguments that they had failed to identify him as someone that had "control and authority" over them. *See* Pappas Motion at 33, *citing* Am. Compl. at ¶¶ 19-20. Plaintiffs' failure to allege any connection to Pappas as to these alleged violations of their constitutional rights warrants a dismissal of these claims.

[2] Opp. at 4, *citing Dorr v. United States*, 195 U.S. 138, 149 (1904) (Sixth Amendment jury trial provision inapplicable in the Philippines); *Hawaii v. Mankichi*, 190 U.S. 197, 214-215 (1903) (grand jury and jury trial provisions inapplicable in Hawaii, then a territory); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901) (Revenue Clauses inapplicable in Puerto Rico); *Balzac v. Puerto Rico*, 258 U.S. 298, 311-313 (1922) (Sixth Amendment right to jury trial inapplicable in Puerto Rico).

identified "unincorporated territories or occupation zones *after war*" as examples of "nonstate

territories controlled by the U.S." *Id.* at 603 (emphasis added).

Iraq is not an unincorporated territory of the United States such as Puerto Rico, or a

leasehold like Guantanamo Bay. Equally incongruous would be classifying Iraq as an

occupation zone after war. Currently, as at the time of plaintiffs' detention, the United States

military is engaged in daily hostile confrontations with insurgents in Iraq.[3] Iraq was, and

remains, an active "zone of military operations." *Johnson v. Eisentrager*, 339 U.S. 763, 780

(1950). Plaintiffs' brief fails to address the simple fact that the situation in the present case is

more akin to that presented in *Eisentrager* than to the cases upon which they rely.

In *Eisentrager*, German nationals were arrested in China subsequent to Germany's May

8, 1945 surrender, but before the September 2, 1945 surrender of Japan. The German nationals

were arrested in an active theater of war and were engaging in hostile activities directed against

U.S. military operations on the Asian front. After a trial in China, the German prisoners were

held at a military prison in Germany. *Id.* at 766. Despite Germany's 1945 surrender, the

activities undertaken by the German prisoners in *Eisentrager* illustrate that German nationals

continued to act against U.S. interests after the German surrender was issued. Thus, both the

arrest and detention of the prisoners in *Eisentrager* - unlike those in *Rasul I* - occurred not in a

peaceful territory of the United States, but in an active wartime setting.

Given the situation in Iraq, it is wrong to assert that the United States exercised

"exclusive jurisdiction and control" over Iraq at the time of plaintiffs' detention. *Rasul I*, 542

U.S. at 480. Plaintiffs' Opposition neither addresses nor explains how an ongoing insurgency

---

[3] The Court may take judicial notice of this fact pursuant to F.R.E. 201(b).

impacts its analysis of whether the United States is exercising exclusive control.[4]  Rather, plaintiffs rely on the Coalition Provisional Authority's ("CPA") exercise of governmental authority during the time period in which plaintiffs were incarcerated.  Opp. at 27-28.  Its very name is indicative of the fact that the CPA was not under the exclusive control of the United States.  As acknowledged by plaintiffs, it was established jointly by the United States and Great Britain.  Opp. at 28.  The appointment of an American as CPA Administrator does not and cannot change the fact that the CPA was jointly established and operated by both the United States and Great Britain.

Plaintiffs' Opposition, moreover, contains no persuasive analysis of a crucial test repeatedly applied by the Supreme Court in non-resident alien cases.  As the majority stated in *Eisentrager*, "[t]he alien . . . has been accorded a generous and ascending scale of rights as he increases his identity with our society."  *Eisentrager*, 339 U.S. at 770.  Thereafter, in considering similar cases, other courts have repeatedly recognized that there must be some nexus between the alien and the United States.  *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507 (2005); *Zadvydas v. Davis*, 533 U.S. 678 (2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).

In *Verdugo-Urquidez*, the Supreme Court declined to extend Fourth Amendment protections to a Mexican national who was detained in the United States while his Mexican residences were subjected to warrantless searches.  Relying on the analysis set forth in *Eisentrager*, the majority found that Verdugo-Urquidez was not entitled to Fourth Amendment rights because he "is an alien who has had no *previous significant voluntary connection* with the

---

[4] Indeed, Abu Ghraib's location adjacent to the area dubbed the "Triangle of Death" belies the notion that the area surrounding the prison, let alone the entire country of Iraq, was under the exclusive control of the United States in the same manner that the United States maintains control over Guantanamo Bay.  The "Triangle of Death" was given its name by United States forces as a result of often fierce and frequent combat during 2004.  Richard Sisk and Corky Siemaszko, "Despicable," Daily News (New York), p. 5 (April 1, 2004).

United States." *Id.* at 271 (emphasis added).

The plaintiffs in the present case have even a more tenuous relationship with the United States than that of Verdugo-Urquidez. As set forth Pappas' Motion to Dismiss, plaintiffs allege no personal, business, social or other connection to this country. Am. Compl. at ¶¶ 17-21, 189, 194, 199, 204, and 208. They have undertaken none of the obligations of citizenship or even those that devolve upon resident aliens. Indeed, plaintiffs here do not identify a single occasion on which they have set foot in the United States, nor do they indicate having any relatives, business interests or other connection to this country. Rather, plaintiffs are foreign nationals of a country that was at war with the United States at the time of their detention. "It is war that exposes the relative vulnerability of the alien's status." *Eisentrager*, 339 U.S. at 771. As the Court in *Eisentrager* noted, even aliens within the United States are not given unfettered access to our judicial system if such access would aid the enemy. *Id.* at 776.

Unable to meet this nexus requirement, plaintiffs instead attempt to dismiss it as dicta from the *Eisentrager* decision. Plaintiffs' erroneous characterization is underscored by the fact that the nexus analysis was the deciding factor in *Verdugo*. Even if the nexus requirement could be considered as dicta in the *Eisentrager* decision, it can and should be heeded by this Court. *See Harbury*, 233 F.3d at 604, *citing U.S. v. Oaker*, 111 F.3d 146, 153 (D.C. Cir. 1997) ("carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative").

Plaintiffs seek to apply a test that has never been endorsed by a majority opinion of the Supreme Court – whether the application of a particular constitutional guarantee to a non-resident alien would be "impracticable and anomalous." Opp. at 17. Apart from plaintiffs' own self-serving opinion, there is little justification for the notion that Justice Harlan's concurrence in

*Reid v. Covert,* 354 U.S. 1, 74 (1957), "set[s] forth the analysis that should govern." Opp. at 20.[5]

Despite plaintiffs' insistence that "Justice Harlan's 'impracticable and anomalous' test . . . was endorsed most recently by the Supreme Court in *Rasul v. Bush,*" they provide no specific citation for such an endorsement.[6]  Opp. at 20.  That is because the Supreme Court in *Rasul I* made ***no*** mention of Justice Harlan's concurring opinion or his impracticable and anomalous test. Indeed, the Court's opinion in *Rasul I* contains not even a passing reference to *Reid.*  The only support for plaintiffs' claimed endorsement of the impracticable and anomalous test is an oblique footnote citing to Justice Kennedy's concurring opinion in *Verdugo.  See Rasul I,* 542 U.S. at 483, n.15.  Justice Kennedy's concurrence in *Verdugo,* in turn, cites to Justice Harlan's concurring opinion in *Reid.  Verdugo,* 494 U.S. at 277-78.  In other words, plaintiffs attempt to create binding Supreme Court precedent based solely on a footnote, citing to a concurring opinion that cites to yet another concurring opinion.  The links that plaintiffs attempt to forge among these cases simply cannot bear the strain that plaintiffs' argument places upon them.

Even if this Court elects to accept and apply the impracticable and anomalous test in the present case, dismissal of plaintiffs' claims is nevertheless warranted.  In their Opposition, plaintiffs state that "compliance with the prohibition on torture and abuse cannot be impracticable or anomalous." Opp. at 23.  Plaintiffs mischaracterize the very test they insist this Court should adopt.  The question is not whether a ***prohibition*** on a particular conduct is

---

[5] Plaintiffs' characterization of Justice Harlan's concurrence in *Reid* as "crucial" is overstated.  *Id.*  In *Reid,* the Supreme Court issued a plurality opinion accompanied by two separate opinions concurring in the judgment – one by Justice Harlan and another by Justice Frankfurter.  Although virtually ignored by plaintiffs, Justice Frankfurter's separate concurrence is thus no less "crucial" than that of Justice Harlan.

[6] In addition, plaintiffs' arguments are based almost entirely on an overly expansive reading of the Supreme Court's decision in *Rasul I.*  As explained in Defendant's Motion to Dismiss, *Rasul I* resolved the jurisdictional question presented on purely statutory grounds.  The Court in *Rasul I* did not address, nor purport to resolve, any question regarding the application of constitutional provisions beyond U.S. borders.  Contrary to plaintiffs' assertions (Opp. at 34-35), *Rasul I* neither explicitly nor implicitly superseded the Court's prior opinions in *Eisentrager* and *Verdugo.*

impracticable or anomalous, but whether *affording certain constitutional protections* to particular non-resident aliens is impracticable and anomalous.

The case law compels an answer in the affirmative in the present case, for reasons that the Judiciary has recognized as compelling for more than a half century. As the Supreme Court put it in *Eisentrager*, "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Eisentrager*, 339 U.S. at 779. To decide otherwise would transform our judicial system into a tool by which enemy aliens could "hamper our own war efforts and give aid to the enemy." *Id.* at 776.

### B.    Special Factors Strongly Counsel Hesitation In Recognizing A *Bivens* Remedy

The *Eisentrager* quote succinctly underscores another barrier that stands in the way of recognizing a *Bivens* remedy for plaintiffs. The military nature of the actions attributed to defendant Pappas and the fact that those actions all occurred in a combat zone strongly counsel hesitation in creating a damages remedy, the existence of which could pose grave consequences to the conduct of military operations hereafter—especially those executed in active combat areas. *See* Pappas' Motion to Dismiss at 13-22. The National Defense Authorization Act (FY 2006), Pub. L. No. 109-163, 119 Stat. 3136, 3474 and the Reagan Defense Act (FY 2005), Pub. L. No. 108-375, 118 Stat. 1811, 2068-71, provide further reasons for caution. Those statutes prohibit cruel, inhuman or degrading treatment of persons under the control of the U.S. government and direct the Defense Department to implement a system to prevent unlawful treatment of detainees abroad, but do not include a private right of action. 119 Stat. at 3474-75; Reagan Act at §1091(a)(4)-(5).

Plaintiffs respond by quarreling about defendants' citations to legislative history and insisting that their claims would not require undue intrusion into military decision-making. Opp. at 43-45. After all, they point out, the military's own rules prohibit infliction of torture and other forms of cruelty on prisoners. Opp. at 12. The problem with plaintiffs' argument—quite apart from their failure to overcome the force of the holding in *Schweiker v. Chilicky,* 487 U.S. 412 (1988), that a comprehensive statutory scheme must give the courts pause in grafting on *Bivens* remedies—is that they fail to recognize the pernicious effect that recognition of a cause of action today may have on the formulation of complaints to be filed tomorrow. Once the courthouse door is opened for non-resident aliens to sue personally the U.S. military forces who detain them in combat areas in the course of executing their military mission, the potential for disruption of critical military functions is truly vast. Plaintiffs offer no basis in law or policy to unleash such dangerous consequences.

## II.    Plaintiffs Fail to Apply the Law of Qualified Immunity to the Specific Context of This Case

The plaintiffs' qualified immunity argument reveals a fundamental misunderstanding of the basic precepts of immunity law. They broadly frame the constitutional right at issue by asserting that "[i]t has long been the settled law under the Constitution that the torture of any detainee is forbidden." Opp. at 54. Additionally, plaintiffs erroneously imply that "the proper qualified immunity question is whether the prohibition against torture was clearly established . . . ." *Id.* at 65. In so doing, plaintiffs have failed to frame the qualified immunity question in accordance with applicable law. *Id.*

As delineated in Pappas' initial brief, assuming, *arguendo*, that the plaintiffs adequately alleged a violation of a constitutional right, a court proceeds to "the next, sequential step" in the qualified immunity analysis, which is to ask whether the constitutional right at issue was "clearly

established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006). This inquiry must be made within "the *specific context of the case*, not as a broad general proposition." *Saucier*, 533 U.S. at 201 (emphasis added). The relevant test of "whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

As the Supreme Court has explained, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *accord Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004); *see also Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. . . . But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 639-40 (citations omitted); *see also Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001) ("courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning . . . ").

Plaintiffs' argument is based on the broad "legal mandate[ ]" that torture is prohibited by the Constitution. Opp. at 54. They contend that *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2006) ("*Rasul II*"), a case upon which Pappas relied in his initial brief, was erroneously decided because the court failed to address "the proper qualified immunity question," which they claim

"is whether the prohibition against torture was clearly established . . . ."  Opp. at 65.

By framing the issue in this manner, plaintiffs have done exactly what the Supreme Court has cautioned against.  *See Wilson*, 526 U.S. at 615 ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police.")  For the purpose of determining whether the law was clearly established in this case, the appropriate focus is an objective inquiry of whether a reasonable military official could have believed that his or her alleged decisions, taken in the heat of battle, regarding the detention of non-resident aliens in a war zone in which military operations were ongoing, would not violate the Fifth and Eighth Amendments of the Constitution.

The court looks to the case law of the Supreme Court and the relevant Circuit to determine whether a government official was on notice at the time that his or her actions were unlawful in light of the situation he or she confronted.  *See Wilson*, 526 U.S. at 617 (immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts unlawful); *Rasul II*, 414 F. Supp. 2d at 41-2 ("Accordingly, the court will look to case law that was available to the defendants at the time of the plaintiffs' detention.  Only with this foundation can the court determine whether a reasonable person would, at the time of the alleged torture, be aware that the plaintiffs were entitled to the Fifth Amendment rights they claim").

As outlined in Pappas' initial brief and discussed above in greater detail, at the time the events in this case took place, constitutional protections had not been extended to non-resident aliens abroad in circumstances akin to those of plaintiffs.  *See* Pappas Motion 3-13; *see Verdugo-Urquidez*, 494 U.S. at 271; *Zadvydas*, 533 U.S. at 693; *Eisentrager*, 339 U.S. at 784-90; *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1299

(2005); *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.,* 820 F.2d 1359, 1363

(4th Cir. 1987). This Court has specifically recognized that, at the time of plaintiffs' detention in

this case, *Eisentrager* and *Verdugo-Urquidez* "indicate[d] that the Constitution applies only once

aliens were within the territory of the United States and developed substantial contacts in this

country." *Rasul II*, 414 F. Supp. 2d at 44. Therefore, "in the light of pre-existing law," a

reasonable military official could have believed his alleged actions were lawful in the situation

he or she confronted at the time the events in this case took place. *Anderson*, 483 U.S. at 640.

   Moreover, as explained in Pappas' initial brief, although the case law that discusses the

rights of Guantanamo Bay detainees is not directly applicable here because it does not address

"the *specific context of the case*" before this court, the cases do serve to inform the qualified

immunity analysis. *Saucier*, 533 U.S. at 201 (emphasis added). At the time the events in this

action took place, *Al Odah v. United States* was the controlling decision in this Circuit

concerning the rights of Guantanamo Bay detainees; it confirmed long-standing precedent that

non-resident aliens, such as the Guantanamo detainees in that case, were not entitled to

protection under the Constitution.[7]  321 F.3d 1134, 1141 (D.C. Cir. 2003), *rev'd sub nom. Rasul*

*v. Bush*, 542 U.S. 466 (2004) ("We cannot see why, or how, the writ may be made available to

aliens abroad when basic constitutional protections are not. . . ."). Therefore, at the time the

events in this case took place, based on *Al Odah*, a reasonable military official could have

believed that his alleged actions were lawful in the situation he confronted.

   Additionally, recent cases concerning the rights of Guantanamo Bay detainees underscore

---

[7] The D.C. Circuit's decision in *Al Odah* was issued in March of 2003, prior to the alleged detainment of the
plaintiffs in this case. *See* Am. Compl. ¶¶ 17-21. The plaintiffs were either released prior to or at the same time as
the issuance of the Supreme Court's decision in *Rasul I*, which reversed *Al Odah*. *Id.* In any event, the Supreme
Court's decision in *Rasul I* did not purport to find a constitutional predicate for the Guantanamo Bay detainees' right
to challenge the legality of their detention. 542 U.S. at 475, 481-484.

that, even today, the law is not clearly established as to whether the Constitution confers any rights upon non-resident alien detainees at Guantanamo Bay. *Compare In re Guantanamo Detainee Cases*, 355 F.Supp. 2d at 464 ("Guantanamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply." ) *with Khalid v. Bush*, 355 F. Supp. 2d 311, 321 (D.D.C. 2005) ("Due to their status as aliens outside sovereign United States territory with no connection to the United States, it was well established prior to *Rasul* that the petitioners possess no cognizable constitutional rights."). As the *Rasul II* court recently noted:

> The plaintiffs have provided no case law, and the court finds none, supporting a conclusion that military officials would have been aware, in light of the state of the law at the time, that detainees should be afforded the rights they now claim. Accordingly, due to the unsettled nature of Guantanamo detainees' constitutional rights in American courts, the defendants cannot be said to have been "plainly incompetent" or to have "knowingly violated the law," and therefore are entitled to qualified immunity.

414 F. Supp. 2d at 44. Logic dictates that if it is not clearly established that the Constitution confers rights upon detainees held in Guantanamo Bay, where the Supreme Court has found that "the United States exercises 'complete jurisdiction and control,'" it certainly cannot be clear that the Constitution confers rights upon detainees in Iraq, where the United States does not. *Rasul I*, 542 U.S. at 480.

Finally, plaintiffs persist in misconstruing the law of qualified immunity by erroneously arguing that Pappas does not contend "that there is any doubt about the illegality of [his] conduct," but rather he is simply asserting that plaintiffs are "not clearly entitled to seek relief in U.S. Courts." Opp. at 55. Pappas has never suggested, nor does he argue here, that it is permissible for federal officials to torture or abuse military detainees with impunity. However, the plaintiffs have brought a *Bivens* suit against Pappas in his individual capacity. As a result, the crucial question is whether alien military detainees can pursue private tort claims personally

against military officers of this nation's armed forces for the alleged violation of constitutional rights when it was, and continues to be, far from clear that such detainees possessed the constitutional rights they invoke. The well-established precedent of the Supreme Court regarding qualified immunity clearly forecloses such a suit.

## III.  Substitution Under The Westfall Act Is Appropriate

### A. Pappas Was Acting Within the Scope of His Employment

Plaintiffs cannot meet their burden to demonstrate that Pappas acted outside the scope of his employment. Under the Federal Employees Liability Reform and Tort Compensation Act of 1998 ("FELRTCA"), Pub. L. No. 100-694, 102 Stat. 4563 (codified in part at 28 U.S.C. §§ 2671, 2674 and 2679) (hereinafter "Westfall Act"), the exclusive remedy for a claim arising from any "negligent or wrongful act or omission" of a federal employee acting within the scope of his or her employment is a suit against the United States under the FTCA. *See* 28 U.S.C. § 2679(b)(1). Upon certification by a designee of the Attorney General that the individual employee acted within the scope of his employment, the United States is substituted in place of the individual defendant. 28 U.S.C. § 2679(d)(1).

The certification of scope provided by the Attorney General's designee is entitled to "prima facie" effect. *See Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). To rebut this certification, plaintiffs bear the burden of establishing facts that if true would demonstrate that the official acted outside the scope of his employment. *Rasul II*, 414 F. Supp. 2d at 32. "To determine whether the federal employee was acting within the scope of his employment, a federal court must apply the law of the state where the tortious act occurred." *Id.*, *citing Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994). Here, the alleged tortious acts arose from Pappas' military conduct while stationed in Iraq. Since Iraq does not provide the necessary

respondeat superior law, the Court must look to the law of the District of Columbia.[8] *See Rasul II*, 414 F. Supp. 2d at 32 (appling D.C. respondeat superior law to allegations of tortious acts occurring at Guantanamo Bay, Cuba) ("Since Guantanamo does not provide adequate guidelines for determining scope of employment and the acts are 'inextricably bound up with the District of Columbia in its role as the nation's capital,' the relevant law to apply is that of the District of Columbia."); *see also Schneider v. Kissinger*, 310 F. Supp. 2d 251, 264-267 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005) (Where the direct orders authorizing the conduct that occurred in Chile came from the President of the United States, the court applied the D.C. law of respondeat superior). Applying the Restatement standard, it is clear that Pappas acted within the scope of his employment; therefore, the certification by the Attorney General's designee should be upheld.

Under the Restatement (Second) of Agency, an employee's act is within the scope of employment when:

> (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

Restatement (Second) of Agency § 228(1) (1958); *Rasul II*, 414 F. Supp. 2d at 32; *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 n.5 (D.C. 2000). The Restatement test "is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003). It excludes only

---

[8] Plaintiffs attempt to make a distinction between "general principles of tort law common to the majority of United States jurisdictions" and the law of respondeat superior in the District of Columbia, but this is a distinction without a difference. Plaintiffs even concede that the law of respondeat superior in the District of Columbia follows the Restatement (Second) of Agency. *See* Opp. at 71 ("In any event, D.C. law is itself based on fairness and the general Restatement test.").

those "actions committed solely for [the servant's] own purposes."[9]  *Id.*

Plaintiffs erroneously challenge the certification that Pappas was acting within the scope

of his employment on the grounds that the alleged conduct was not "foreseeable."  Opp. at 68-

71.  The first prong of the Restatement standard asks whether the alleged conduct is "of the kind"

the employee was employed to perform.  To fit within this category, the conduct must be either

"of the same general nature as that authorized" or "incidental to the conduct authorized."

*Haddon v. United States,* 68 F.3d 1420, 1424 (D.C. Cir. 1995).  To satisfy this foreseeability

standard, the alleged conduct must be "a direct outgrowth of the employee's instructions or job

assignment."  *Id.*  (citations omitted).

Plaintiffs contend that it was not foreseeable that Pappas "would authorize and tolerate

torture and other cruel, inhuman or degrading treatment of detainees" when such conduct is

"expressly forbidden under U.S. law and military regulations."  Opp. at 69.  This argument "is

based on an erroneous interpretation of the term 'scope of employment.'"  *Schneider*, 310 F.

Supp. 2d at 265.

> The plaintiffs' theory that a violation of international law always falls outside the
> scope of a federal official's employment misconstrues 'the scope' of this term.  It
> is well settled that an employee is capable of committing a variety of illegal or
> tortious acts for which his employer may be held liable, even though the employer
> did not hire him for that purpose. *** [S]cope of employment is not a judgment
> about whether alleged conduct is deleterious or actionable; rather, this procedure
> merely determines who may be held liable for that conduct, an employee or his
> boss.

*Id.*  As the D.C. Circuit has observed in a similar context, "if the scope of an official's authority

---

[9] Relying on the Restatement standard, "[t]he courts in the District of Columbia categorize practically any conduct as falling within the scope of, or incidental to, that authorized by their employer so long as the action has some nexus to the action authorized."  *See Rasul II*, 414 F. Supp. at 33; *see e.g. Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) (laundromat employee who shot a customer over a dispute was acting within the scope of his employment); *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (furniture deliveryman who sexually assaulted a customer was acting within the scope of his employment).

or line of duty were viewed as coextensive with the official's lawful conduct, then immunity would be available only where it is not needed; in effect, the immunity doctrine would be 'completely abrogate[d].'" *Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990) (quotations omitted). That is no less true when immunity is claimed under the Westfall Act. *See, e.g. Johnson v. Carter*, 983 F.2d 1316, 1323 (4th Cir. 1993).

In the present case, the plaintiffs allege that Pappas "was at relevant times the commander of the 205th Military Intelligence Brigade, the unit of the U.S. Army responsible for intelligence gathering in Iraq." Am. Compl. at ¶ 30. Plaintiffs further allege that Pappas' job was to supervise and command all military personnel at Abu Ghraib, including those responsible for the interrogation of detainees. *Id.* Plaintiffs' amended complaint essentially alleges that Pappas violated the plaintiffs' rights by inadequately supervising his subordinates and the implementation of the interrogation policies and practices that were established and authorized by senior military officials. *See, e.g.* Am. Compl. at ¶¶ 44, 49, 75-76, 86, 94, 98, 145, and 146-147 Even assuming plaintiffs' allegations to be true, they do not demonstrate that he acted outside the scope of his employment, nor do they show that he was acting out of a personal motive.

Plaintiffs' allegations rely entirely on the theory that Pappas was (a) following orders and implementing policies from his superiors (which plaintiffs allege authorized and caused their mistreatment), *see* Am. Compl. at ¶ 49; and (b) was acting, at all times, pursuant to his responsibilities over the Abu Ghraib facility in Iraq and more specifically over military personnel responsible for the interrogation of detainees. Am. Compl. at ¶ 30. Even assuming plaintiffs could demonstrate that Pappas was responsible for the most egregious claims set forth in the amended complaint, there can be no dispute that any alleged conduct by Pappas, even if true,

was motivated exclusively by an intention to serve the United States and its military leadership.

Plaintiffs cannot credibly argue that it was not foreseeable that soldiers in Iraq would use force to facilitate information-gathering from Iraqi prisoners considering: (a) the post 9/11 military and national security environment in which the United States had determined to use all available means to forestall future terrorist attacks abroad or on American soil; (b) the specific authorization for, and directive to implement, aggressive interrogation tactics by military superiors and senior Executive Branch officials; (c) confusion among lawyers, lawmakers, and courts regarding the legality of the conduct in question; and (d) the fact that the plaintiffs were prisoners in a military prison during the course of a war. *See, e.g. Rasul II*, 414 F. Supp. 2d at 36 ("[i]n the present case, the heightened climate of anxiety, due to the stresses of war and pressures after September 11 to uncover information leading to the capture of terrorists, would naturally lead to a greater desire to procure information and, therefore, more aggressive techniques for interrogations."). A finding that Pappas' actions were not foreseeable would require this Court to ignore completely the context in which this conduct allegedly occurred.

### B. Plaintiffs' Request For Discovery Should Be Denied

Plaintiffs' request for discovery on the scope of Pappas' employment should be denied. Pappas seeks dismissal in this case based on the facts alleged by the plaintiffs in their amended complaint.[10] Although, in *Haddon*, the court held that where the parties do not dispute the facts, the determination of whether the plaintiffs have alleged conduct outside of the scope of federal employment is purely a legal question, not a factual issue that could warrant any discovery. *Haddon*, 68 F.3d at 1423. The determination of whether the plaintiffs have alleged conduct

---

[10] *Kimbro v. Velten, 30 F.3d 1501 (D.C. Cir. 1994)*, provides that a plaintiff is only entitled to reasonable discovery as to the scope of employment after coming forward with the evidence that calls the certification into question. *Id.* at 1509. "If there is a material dispute as to the scope issue the district court must resolve it at an evidentiary hearing." *Id.*

outside of the scope of federal employment is purely a legal question, not a factual issue that could warrant any discovery. *Id.*; *see also Hoston v. Silbert*, 681 F.2d 876, 879 (D.C. Cir. 1982) ("Whether given acts are within the scope of employment is ultimately a legal question."). That is especially true in the absolute immunity context under the Westfall Act. *See United States v. Smith*, 499 U.S. 160, 162 (1991); *Haddon*, 68 F.3d at 1423. "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (citation omitted). For these reasons, Pappas is entitled to a pre-discovery resolution of any substantial claim to immunity from suit presented by way of a Rule 12(b)(6) motion to dismiss, *see Behrens v. Pelletier*, 516 U.S. 299, 306-307 (1996), and immediate appeal of a denial of certification and substitution. *See Mathis v. Henderson*, 243 F.3d 446, 448 (8th Cir. 2001).[11]

## C. The Westfall Act Applies To Claims For Intentional Torts

Plaintiffs' argument that the Westfall Act does not apply to intentional or egregious torts such as those they alleged in the amended complaint is groundless. Contrary to the plaintiffs' argument, this court has held that the Westfall Act applies to intentional torts. *See Rasul II*, 414 F. Supp. 2d at 31-36; *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 13 (D.D.C. 2004), *aff'd on other grounds*, 445 F.3d 427 (D.C. Cir. 2006); *Schneider*, 310 F. Supp. 2d at 265-266.[12]

---

[11] Even *Stokes v. Cross*, 327 F.3d 1210 (D.C. Cir. 2003), upon which the plaintiffs' rely for their assertion that they are entitled to discovery, confirms that "not every complaint will warrant further inquiry into the scope-of-employment issue." *Stokes*, 327 F.3d at 1215-1216. Discovery is appropriate only if a scope inquiry involves a disputed issue of fact. Where plaintiffs have not met their burden of raising a material dispute by pleading sufficient facts that, if true, would rebut the certification, they are not entitled to discovery. *Id.* at 1215; *see also Koch v. United States*, 209 F. Supp. 2d 89, 92 (D.D.C. 2002).

[12] Moreover, plaintiffs' claim that "wrongful acts" do not encompass intentional torts has been refuted by the numerous courts that have held that the phrase "wrongful act" includes intentional torts. *See, e.g. Duffy v. United*

### D. Plaintiffs' International Law Claims Do Not Fit Within the Westfall Act's Statutory Claim Exception

Plaintiffs contend that their claims for violations of the law of nations and the Geneva Conventions asserted under the Alien Tort Statute ("ATS") effectively constitute statutory claims that fit within the Westfall Act's exception for "claims brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). But as the Supreme Court made clear in *Sosa v. Alvarez-Machain,* "the ATS is a jurisdictional statute creating no new causes of action." 542 U.S. 692, 730 (2004). This court has specifically held that the ATS "does not confer rights nor does it impose obligations or duties" that can be "violated" for purposes of the Westfall Act. *See Rasul II*, 414 F. Supp. 2d at 38; *accord Bancoult*, 370 F. Supp. 2d at 9. The ATS merely affords the jurisdictional basis for the assertion of rights conferred elsewhere, namely by the law of nations or a U.S. treaty. *See Sosa*, 542 U.S. at 724; *Rasul II*, 414 F. Supp. 2d at 38 n.11; *Bancoult,* 370 F. Supp. 2d at 9-10. A claim brought under the ATS is not a claim brought "for a violation of" the ATS, 28 U.S.C. § 2679(b)(2), and thus is "not exempt from the exclusive remedy provision of the [Westfall] Act."[13] *Alvarez-Machain v. United States*, 331 F.3d 604, 631 (9th Cir. 2003), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004); *accord Rasul II*, 414 F. Supp.

---

*States*, 966 F.2d 307, 313 (7th Cir. 1992) ("We are unwilling to accept that intentional torts do not fall under the rubric of wrongful acts."); *Waters v. United States*, 812 F. Supp. 166, 169 (N.D. Cal. 1993) ("[C]ourts have interpreted ['negligent and wrongful acts'] to encompass both negligent and intentional torts.").

[13] Moreover, plaintiffs' strained analogy of their case to ATS cases in which foreign defendants assert the "act of state doctrine" does nothing to further their claims. *See* Opp. at 65. Plaintiffs rely on the "act of state doctrine" for the proposition that the federal courts have declined to extend immunity to foreign defendants under the ATS; plaintiffs' argument is irrelevant to the determination of immunity in this case. The Torture Victims Protection Act ("TVPA") and the Foreign Sovereign Immunities Act ("FSIA") statues that the plaintiffs seek to rely on, permit United States citizens jurisdiction to file suit against foreign officials for acts of torture. At no point do the TVPA or the FSIA provide jurisdiction to aliens for suit against United States officials. Nor do they preclude the application of the Westfall Act. In fact, the TVPA and the FSIA cannot preclude the application of the Westfall Act because neither permits jurisdiction to sue a United States federal employee for acts of torture. Therefore, the "act of state doctrine" is not applicable to this case.

2d at 38 (substituting the United States in place of individual defendants on ATS claims);

*Bancoult*, 370 F. Supp. 2d at 9-10 (same); *Schneider*, 310 F. Supp. 2d at 266-267.

Plaintiffs further argue that the statutory claim exception should include the Fourth

Geneva Convention.  Opp. at 72-73.  A treaty is not a statute of the United States.  It may be part

of the "law of the land," *see Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996), but a

tort claim based directly upon a treaty does not constitute a claim for the violation of the

Constitution or a federal statute within the pertinent exceptions to the Westfall Act.

Furthermore, the *Rasul II* court held that a claim alleging violations of the Geneva Conventions

was not within either Westfall Act exception and substituted the United States in place of the

individual defendants.  *Rasul II*, 414 F. Supp. 2d at 38.

## IV.    Plaintiffs' Geneva Convention Claims Are Not Actionable

Plaintiffs' allegations that the Geneva Conventions are self-executing are contrary to the

prevailing law.  *See Goldstarr (Panama) S.A. v. United States*, 967 F.2d 965, 968-969 (4th Cir.

1992) (Geneva Conventions are not self-executing because "Courts will only find a treaty to be

self-executing if the document, as a whole, evidences an intent to provide a private right of

action.").

Furthermore, plaintiffs' attempt to distinguish the D.C. Circuit's decision in *Hamdan v.

Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005), *rev'd* No. 05-184, 2006 U.S. LEXIS 5185 (June 29,

2006), is unfounded.  Specifically, the plaintiffs argued that the *Hamdan* decision is not

applicable to the determination of whether the Fourth Geneva Convention permits a private right

of action because it only addressed the Third Geneva Convention.[14]  As the Supreme Court

recently stated in its decision in *Hamdan*, "Article 3, [is] often referred to as Common Article 3

---

[14] Courts have held that the Geneva Conventions do not provide a private right of action.  *See Huynh Thi Anh v. Levi*, 586 F.2d 625, 629 (6th Cir. 1978); *Handel v. Artukovic*, 601 F. Supp. 1421, 1425 (C.D. Ca. 1985).

because, like Article 2, it appears in all four Geneva Conventions." *Id*. at *124-125. The Supreme Court held in *Hamdan*, that Common Article 3 required that Hamdan "be tried by a 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id*. at *129. While the Supreme Court held that the *Hamdan* was entitled to be tried by court-martial, it did not confer a private right of action to sue for civil damages. The Supreme Court simply held that where the United States has invoked the mechanism of the Geneva Convention, it must provide the individual with a trial by court-martial. But Hamdan, unlike the plaintiffs here, is a prisoner that is currently in custody in Guantanamo Bay, Cuba, facing criminal charges by a special tribunal established by the United States pursuant to the Geneva Convention. The United States invoked the provisions of the Geneva Convention when it initiated the criminal proceedings against Hamdan. Here, the United States has not invoked the Geneva Convention, therefore, the plaintiffs cannot invoke its terms without some other provision of law that provides them a private right of action.

## V.    Plaintiffs' Claims for Declaratory Relief Against Pappas Must Fail

Plaintiffs argue that they not only seek "damages, but also declaratory relief for the violations of their rights under the law of nations and the Fourth Geneva Convention" against Pappas. Opp. at 61. In support of their assertion, plaintiffs state that their claim of declaratory relief was included in the Prayer for Relief contained in the amended complaint and in their original complaint filed against Pappas. *Id*. at n.52. While plaintiffs' argument is factually correct, it does not support their assertion their claim for declaratory relief against Pappas remains viable.

Plaintiffs' Sixth Cause of Action contained in the amended complaint specifically seeks declaratory relief for violation of the law of nations, of the Geneva Conventions and of the

Constitution against Defendant Rumsfeld, but it omits any mention of Pappas. Am. Compl. at ¶¶

260-263. Only the Prayer for Relief seeks declaratory judgment against all of the defendants.

*Id.* at pp. 82-83. Plaintiffs' omission of Pappas is underscored by the fact that they made a

specific assertion for declaratory relief against Rumsfeld. Plaintiffs' reliance on their original

complaint, *see* Opp. at 61 n.52, is of no help to them. The amended complaint controls this

lawsuit. *Washer v. Bullitt County*, 110 U.S. 558, 562 (1884); *National City Mortgage Co. v.*

*Navarro*, 220 F.R.D. 102, 106 (D.D.C. 2004).

Even assuming that the Plaintiffs' amended complaint properly includes a claim for

declaratory relief against Pappas, that claim must fail. Plaintiffs sued Pappas solely in his

individual capacity. Am. Compl. at ¶ 30. An award for declaratory judgment cannot be imposed

on federal government officials in their individual capacities. *Vanover v. Hantman*, 77 F. Supp.

2d 91, 100 (D.D.C. 1999), *citing Dertz v. City of Chicago*, 912 F. Supp. 319, 328 (N.D. Ill. 1995)

(noting that declaratory relief must be sought against officials in their official capacity).

## VI.  Plaintiffs Have Failed to Establish a *Prima Facie* Case for The Exercise Of Personal Jurisdiction

Plaintiffs erroneously claim that they "have offered sufficient evidence to establish a

*prima facie* case for personal jurisdiction" over Pappas. Plaintiffs' Opposition To Defendant

Pappas's Motion To Dismiss for Lack of Personal Jurisdiction ("Juris. Opp.") at 7. In an attempt

to counter Pappas' sworn declaration that he is a legal resident of New Jersey, plaintiffs have

submitted with their brief a declaration of an investigator, which recounts her research regarding

Pappas' legal residence, and an exhibit, which plaintiffs assert is "sufficient evidence to establish

a *prima facie* case for personal jurisdiction" over Pappas in Connecticut. *Id.; see also* Juris.

Opp., Declaration of Melissa Matheny, Ex. 1.

Plaintiffs' statement that Pappas "does not identify any ties to New Jersey other than his

declared intent to return there once he has completed his military service" is patently false. Juris. Opp. at 3. In his declaration, Pappas states that he is "a legal resident of the State of New Jersey," that he has "been a New Jersey resident continuously since 1968," and that New Jersey is his "legal domicile." Pappas Motion, Declaration of Thomas Pappas.

Despite these sworn statements, plaintiffs maintain, incorrectly, that Pappas is a resident of Connecticut and that they "have offered sufficient evidence to establish a *prima facie* case for personal jurisdiction" over him. Juris. Opp. at 3, 7. The apparent basis for Plaintiffs' claim is a Lexis-Nexis search conducted by a law firm investigator. *See* Juris. Opp., Declaration of Melissa Matheny at 1. Attached to the investigator's declaration is Exhibit 1, which the declaration indicates is a copy "of the address history retrieved for Thomas M. Pappas by Accurint.com." Juris. Opp., Declaration of Melissa Matheny at 2, Ex. 1.

The declaration of Ms. Matheny states that: "Exhibit 1 indicates that since April 1998, Defendant Pappas has consistently used a single address in Norwich, CT." Juris. Opp., Declaration of Melissa Matheny at 2. The cited exhibit, however, shows nothing of the sort. It has a number of listings with the name, "Thomas Pappas," and a number of addresses. Juris. Opp., Ex. 1. A Thomas Pappas is listed at a Connecticut address, but a Thomas Pappas is also listed at a New Jersey address. *Id.* Therefore, it is unclear how Exhibit 1 could conclusively "indicate[ ] that since April 1998, Defendant Pappas has consistently used a single address in Norwich, CT." Juris. Opp., Declaration of Melissa Matheny at 2. While the investigator's declaration indicates that her research "did not reveal any contacts between Thomas M. Pappas and New Jersey in the form of voter registration records, driver's license information, vehicle registration, state income tax records, or real estate," she does not indicate that her research revealed that Pappas had such contacts with the state of Connecticut. *Id.* Consequently, the

plaintiffs have failed to make a *prima facie* case for personal jurisdiction over Pappas in the state of Connecticut.

As a result, plaintiffs' reliance on *Robinson v. Overseas Military Sales Corp.* and *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala* is misplaced because both cases require the plaintiffs to make "a prima facie showing of jurisdiction," which they have failed to do. *Robinson*, 21 F.3d 502, 507 (2d. Cir. 1994) ("Where, however, the district court relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction."); *Seetransport Wiking Trader*, 989 F.2d 572, 580 (2d Cir. 1993) ("'Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing.'"). Plaintiffs have failed to put forth "a prima facie showing" of jurisdiction. The allegation in the complaint that Pappas' primary residence is in Connecticut is defeated by his affidavit indicating that he is a legal resident of New Jersey. Plaintiffs, therefore, have failed to meet their burden of establishing personal jurisdiction over Pappas.

## CONCLUSION

For the foregoing reasons and those in the Motion to Dismiss filed on behalf of Pappas, all of plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

Dated: July 21, 2006

Respectfully submitted,


   /s/ Mark E. Nagle
Mark E. Nagle, Bar #416364
Tracy Varghese, Bar #472805

TROUTMAN SANDERS LLP
401 9th Street, N.W.
Washington, D.C. 20004
(202) 274-2972 (telephone)
(202) 654-5666 (facsimile)

## CERTIFICATE OF SERVICE

      I hereby certify that on this 21st day of July 2006, I caused a copy of the Reply Memorandum In Support of the Motion to Dismiss Filed on Behalf of Pappas to be served upon all counsel of record via ECF and electronic email as set forth below:

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, N.W.
Suite 119
Washington, D.C. 20036
Email: artspitzer@aol.com

*Counsel for Plaintiffs*

J. Marcus Meeks
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
Email: marcus.meeks@usdoj.gov

*Counsel for Donald H. Rumsfeld and
   the United States*

Stephen L. Braga
Baker Botts LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Email: stephen.braga@bakerbotts.com

*Counsel for Ricardo Sanchez*

Michael L. Martinez
Crowel & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Email: mmartinez@crowell.com

*Counsel for Janis Karpinski*

     \_\_\_\_\_/s/_____
Mark E. Nagle