## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALIM AHMED HAMDAN,                :
                                   :
          Plaintiff,               :
                                   :
     v.                            : Civil Action No. 04-1519 (JR)
                                   :
DONALD H. RUMSFELD,                :
                                   :
          Defendant.               :

### <u>MEMORANDUM</u>

The government seeks dismissal of the petition of Salim Ahmed Hamdan for a writ of habeas corpus for lack of subject matter jurisdiction, relying upon the jurisdiction-stripping provisions of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (MCA) [75].  Petitioner resists, arguing that the MCA did not remove our jurisdiction over pending Guantanamo habeas petitions, and alternatively that, if it did, it was an unconstitutional suspension of the writ of habeas corpus [78].

### Background

Salim Ahmed Hamdan, a Yemeni national, was taken into United States military custody in Afghanistan in November 2001. He was transported to the Defense Department's detention facility at Guantanamo Bay in June 2002.  In July 2003, the President declared him eligible for trial by military commission.  On April 6, 2004, Hamdan petitioned for mandamus or habeas corpus in

the United States District Court for the Western District of
Washington.  On July 13, 2004, after having been held for about
two years and eight months without formal charges, Hamdan was
finally charged at Guantanamo Bay with a single count of
conspiracy.  In August 2004, his habeas petition was transferred
to this court.

On November 8, 2004, I granted Hamdan's petition for a
writ of habeas corpus after finding that he could not be tried
lawfully before a military commission that had not been approved
by Congress, Hamdan v. Rumsfeld, 344 F. Supp. 2d 152 (D.D.C.
2004).  That decision was reversed by a panel of the D.C. Circuit
on July 15, 2005, 415 F.3d 33, in a decision that was itself
reversed a year later by the Supreme Court, Hamdan v. Rumsfeld,
126 S. Ct. 2749 (2006), four justices noting that "[n]othing
prevents the President from returning to Congress to seek the
authority he believes necessary" to lawfully try enemy
combatants, Id. at 2799, (Breyer, J., concurring).[1]  On
September 22, 2006, the Court of Appeals remanded the case to me
"for further proceedings."  The remand order contained no
instructions, nor was it clear what proceedings, if any, would be
possible – for, by that time, the President had indeed
"return[ed] to Congress," and he had asked Congress to strip the

---

[1]Four justices also concluded that conspiracy is not an
offense that may be tried by a military commission.  Id. at 2779.

federal courts of their jurisdiction to hear any habeas petitions of the Guantanamo detainees.

On September 29, 2006 Congress enacted, and on October 17, 2006, the President signed, the Military Commissions Act.  The day after the MCA became law, the government filed, in each of the 181 Guantanamo habeas cases pending in this Court, a Notice of Military Commissions Act of 2006 [75], highlighting the jurisdiction-stripping and retroactivity provisions of the Act. The government focused on section 7 of the Act, which amends the federal habeas statute by removing the jurisdiction of any "court, judge, or justice" over habeas petitions and all other actions filed by aliens who are either detained as enemy combatants or are "awaiting such determination."  MCA § 7(a).  I construed that notice as a motion to dismiss for lack of subject matter jurisdiction and called for a response from Hamdan [77].[2]

---

[2] I did not issue similar orders in the 14 other Guantanamo habeas cases on my own docket, in deference to the continuing pendency before the Court of Appeals of two cases in which that court has asked for supplemental briefing on the effect of the Military Commissions Act, Boumediene, et al. v. Bush, 450 F. Supp. 2d 25 (D.D.C. 2006) (appeal pending); Al Odah, et al. v. United States, 346 F. Supp. 2d 1 (D.D.C. 2004) (appeal pending). Hamdan's successful certiorari petition in the Supreme Court, however, sets his case apart from the others.  Unlike the petitioners in those other cases, moreover, Hamdan moved for a briefing schedule on the subject of jurisdiction [73] even before the government filed its notice.

**Analysis**

The Military Commissions Act and the briefs of the parties present three questions:  (1) As a matter of statutory interpretation and construction, did Congress actually succeed in removing our statutory habeas jurisdiction over the detainee habeas cases?  (2) If so, is the Military Commissions Act a constitutionally valid "suspension" of the writ of habeas corpus within the meaning of the Suspension Clause, U.S. Const. art. I § 9 cl. 2?  (3) If not, and if a "constitutional" writ of habeas corpus survives the Military Commissions Act, does Hamdan have a right to seek such a writ?  The answers to these questions are "yes" to number (1) and "no" to numbers (2) and (3).

**1. The MCA reflects clear congressional intent to limit the statutory habeas jurisdiction of the federal courts.**

It has been clear since Ex Parte Yerger, 75 U.S. 85 (1869) (habeas petition by a prisoner facing trial by military commission), that statutory language will be interpreted as stripping courts of their habeas jurisdiction only when the intent of Congress is abundantly clear.  "Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal."  INS v. St. Cyr, 533 U.S. 289, 299 (2001).  In the instant case, it appears to be conceded that Congress's intent to remove jurisdiction over future habeas petitions filed by a

- 4 -

specified class of individuals was clear enough.  Hamdan's
submission, however, is that the MCA lacks the requisite clarity
to support its retroactive operation – stripping the courts of
their jurisdiction over previously filed habeas cases.

Section 7 of the MCA provides:

(a) IN GENERAL. – Section 2241 of title 28, United
States Code [the habeas statute], is amended by
... inserting the following new subsection (e):

(e)(1) No court, justice, or judge shall have
jurisdiction to hear or consider an application
for a writ of habeas corpus filed by or on behalf
of an alien detained by the United States who has
been determined by the United States to have been
properly detained as an enemy combatant or
is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3)
of section 1005(e) of the Detainee Treatment Act
of 2005 (10 U.S.C. 801 note), no court, justice,
or judge shall have jurisdiction to hear or
consider any other action against the United
States or its agents relating to any aspect of the
detention, transfer, treatment, trial, or
conditions of confinement of an alien who is or
was detained by the United States and has been
determined by the United States to have been
properly detained as an enemy combatant or is
awaiting such determination.

(b) EFFECTIVE DATE. – The amendment made by
subsection (a) shall take effect on the date of
the enactment of this Act, and shall apply to all
cases, without exception, pending on or after the
date of the enactment of this Act which relate to
any aspect of the detention, transfer, treatment,
trial, or conditions of detention of an alien
detained by the United States since September 11,
2001.

Relying on what he calls "[o]rdinary principles of statutory
construction," [78 at 10] and quoting Hamdan, 126 S. Ct. at 2765-

- 5 -

69, Hamdan argues that the retroactivity provision of § 7(b) does not clearly apply to the habeas jurisdiction-stripping provision of § 7(a), because, while the language of § 7(b) tracks much of the language in § 7(a) describing cases <u>other</u> than habeas petitions, it does not explicitly refer to habeas petitions.  The argument is unsuccessful.

Section 7(b) instructs that "the <u>amendment</u> made by subsection (a)" is effective immediately, and that it applies both retroactively and prospectively.  New subsections (e)(1) and (e)(2) both amend the habeas statute and therefore together comprise "the amendment made by subsection (a)."  Section 7(b), then, means that all of § 7(a), and not just the part encompassed in new subsection (e)(2), applies retroactively.

Application of the retroactivity clause in § 7(b) to new subsection (e)(1) is also compelled by the framework of the statute.  The references in section 7 are to one large category of cases: those cases that relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of certain aliens.  In § 7(a), Congress divided this broad category into two subcategories – (1) habeas petitions and (2) "any <u>other</u> action[s] against the United States ... relating to any aspect of the detention..." – and removed jurisdiction over both types of cases.  "Other," as used in this subsection, logically describes cases other than the habeas petitions referenced in the previous

subsection and confirms the inclusion of habeas proceedings within the broader category encompassing "all cases . . . pending on or after the date of enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." Section 7(b) applies "without exception" to the broad category of cases encompassing both sub-categories addressed in new subsections (e)(1) and (e)(2); this language is "so clear that it could sustain only one interpretation." Lindh v. Murphy, 521 U.S. 320, 329 n.4 (1997). Habeas petitions are thus clearly within the ambit of § 7(b).

**2. The MCA is not a constitutionally valid suspension of the writ of habeas corpus.**

Congress unquestionably has the power to establish and to define the jurisdiction of the lower federal courts. U.S. Const. art. III, §§ 1, 2. But it does not necessarily follow, from the fact that Congress has repealed its statutory grant of habeas jurisdiction, that Congress has also "suspended" the writ. Some historical background will be helpful in explaining why this is so.

The history of habeas corpus – the "symbol and guardian of individual liberty," Peyton v. Rowe, 391 U.S. 54, 59 (1968) – is well established. What we now know as the "Great Writ"

originated as the "prerogative writ of the Crown";[3] its purpose
at first was to bring people into court rather than out of
imprisonment.  Alan Clarke, Habeas Corpus: The Historical Debate,
14 N.Y.L. Sch. J. Hum. Rts. 375, 378 (1998), citing S.A. DeSmith,
The Prerogative Writs, 11 Cambridge L.J. 40 (1951); William F.
Duker, A Constitutional History of Habeas Corpus 17 (1980).  By
the year 1230, the writ's utility for that purpose was a well-
known aspect of English common law.  Clarke, supra.

       The transformation of the writ to a guardian of liberty
dates to the 14th century, when the Norman Conquest overlaid a
centralized court system on top of the existing courts.  It was
during this period that prisoners began to initiate habeas
proceedings to challenge the legality of their detention.  Id.
The first such use was by detained members of the privileged
classes who raised habeas claims in superior central courts to
challenge their convictions in inferior courts; central courts
would grant such writs to assert the primacy of their
jurisdiction.  Id.  Thus, oddly enough, the original use of the
writ by prisoners challenging convictions or detentions had more
to do with jurisdictional disputes between courts than concerns
over liberty.  Id.; Gerald L. Neuman, Habeas Corpus, Executive

---

   [3]Standing alone, the phrase "habeas corpus" refers to the
common law writ of habeas corpus ad subjiciendum, or the "Great
Writ."  Preiser v. Rodriguez, 411 U.S. 475, 484-85 and n.2 (1973)
citing Ex parte Bollman, 8 U.S. (4 Cranch) 75, 95 (1807).

Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 970-71 (1998).

As the power of the common law courts expanded in the 15th century, so too did the availability and meaning of habeas corpus. The writ became a favorite tool of both Parliament and the judiciary in battling the monarch's assertion of unbridled power. Clarke, supra at 380. By 1670, habeas corpus was "the most usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." Bushell's Case, Vaughan 135, 136, 124 Eng. Rep. 1006, 1007. The growing significance of the writ is reflected in the Habeas Corpus Act of 1679, described by Blackstone as "a second magna charta, a stable bulwark of our liberties." 1 Blackstone 133.

Notwithstanding the cherished status of habeas corpus, its suspension in England was not uncommon. The writ was suspended in 1688 and 1696 because of conspiracies against the king, again during the American revolution, and at other points during the 18th century. Rex A. Collings, Jr., Habeas Corpus for Convicts — Constitutional Right or Legislative Grace?, 40 Cal. L. Rev. 335, 339 (1952).

Colonists in America were well aware of the growing significance of the Great Writ, and many asserted a common law right to habeas corpus in the period leading up to the adoption of the Constitution. Massachusetts, New Hampshire, and Georgia

- 9 -

adopted constitutional provisions guaranteeing the writ or prohibiting its suspension under most circumstances.  Max Rosenn, <u>The Great Writ -- A Reflection of Societal Change</u>, 44 Ohio St. L.J. 337, 338 n.14 (1983).  Several delegates to the Constitutional Convention sought to include a guarantee of habeas corpus in the federal Constitution, Erwin Chemerinsky, <u>Thinking about Habeas Corpus</u>, 37 Case W. Res. L. Rev. 748, 752, and the language that emerged from the Constitutional Convention, forbidding the suspension of habeas unless necessary in the face of "rebellion or invasion," U.S. Const. art. I, § 9, cl. 2, was a compromise.  Habeas corpus nevertheless enjoys powerful and unique constitutional stature as the only common law writ explicitly referenced in the Constitution.  The first session of Congress also evinced appreciation for the writ: in section 14 of the Judiciary Act of 1789, Congress affirmatively gave the power to issue writs of habeas corpus to the newly created federal courts.  Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat 73, 81.  It is that statute, amended several times over the last 217 years, that the MCA has amended once again: this time to take away jurisdiction.[4]

---

[4]The MCA may not have been Congress's last word on the statutory habeas rights of detainees such as Hamdan.  On December 5, 2006, Senators Specter and Leahy introduced the Habeas Corpus Restoration Act of 2006, S. 4081, 109th Cong. (2006), which would grant statutory habeas rights to those whose rights were repealed by the MCA.

Article I, section 9, clause 2 of the Constitution
provides, "The Privilege of the Writ of *Habeas Corpus* shall not
be suspended, unless when in Cases of Rebellion or Invasion the
public Safety may require it."   "Although [the Suspension Clause]
does not state that suspension must be effected by, or authorized
by, a legislative act, it has been so understood, consistent with
English practice and the Clause's placement in Article I."  Hamdi
v. Rumsfeld, 542 U.S. 507, 562 (2004) (Scalia, J., dissenting),
citing Ex parte Bollman, 8 U.S. at 101; Ex parte Merryman, 17 F.
Cas. 144, 151—152 (CD Md. 1861) (Taney, C. J., rejecting
Lincoln's unauthorized suspension); 3 Story § 1336, at 208—209.[5]

Congress has authorized executive suspension of the
writ only four times.  See Duker, supra at 149, 178 n.190.  All
such suspensions were accompanied by clear statements expressing
congressional intent to suspend the writ and limiting the
suspension to periods during which the predicate conditions
(rebellion or invasion) existed.  Id.  The first such instance
was during the Civil War, when the status and availability of
habeas corpus were at the center of an epic struggle.  In 1861,
without congressional authorization, President Lincoln gave the
Commanding General of the Army permission to suspend the writ in

---

[5]In his dissent in Hamdi, Justice Scalia also makes
reference to President Jefferson's unsuccessful attempt to
suspend the writ in response to the Aaron Burr conspiracy.
Hamdi, 542 U.S. at 563 (Scalia, J. dissenting), citing 16 Annals
of Congress 402-425 (1807).

response to rioting between Philadelphia and Washington as Union
troops moved down the coast.  A. Lincoln, Letter to Commanding
General Winfield Scott, (April 27, 1861), reprinted in <u>Abraham
Lincoln: Speeches and Writings, 1859-1865</u>, at 237 (D.
Fehrenbacher ed. 1989).  John Merryman was subsequently arrested
for interfering with troop movements and challenged the executive
suspension of the writ.  Chief Justice Taney, riding circuit,
heard the case and ruled in Merryman's favor, holding that only
Congress may suspend the writ.  <u>Ex parte Merryman</u>, 17 F. Cas. at
151—152.  Lincoln ignored Taney's order, but Congress eventually
authorized executive suspension, mooting the question of whether
or not Lincoln's initial suspension was unconstitutional and
avoiding a Supreme Court test.  Act of Mar. 3, 1863, 12 Stat.
755.  Thereafter, Lincoln's suspensions explicitly relied upon
the congressional grant of authority.  <u>See, e.g.</u>, Proclamation
No. 7, 13 Stat. 734 (1863).

        After the Civil War, Congress next authorized executive
suspension of the writ in its Ku Klux Klan Act, which allowed
President Grant to suspend the writ while rebellions were raging
in several South Carolina counties.  Duker, <u>supra</u> at 178 n.190.
Congress's last two authorizations for executive suspension of
the writ were in 1902, when it granted suspension power to the
President and the governor during a rebellion in the

Phillipines,[6] and in 1941, after the attack on Pearl Harbor, when
Congress authorized the governor of Hawaii to temporarily suspend
the writ in that territory.[7]  All four congressionally authorized
executive suspensions occurred during times of indisputable, and
congressionally declared, rebellion or invasion.

      The Supreme Court has never decided whether an Act of
Congress alone has effectively "suspended" the writ.  In two
relatively recent cases involving the Antiterrorism and Effective
Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration
Reform and Immigrant Responsibility Act of 1996 (IIRIRA), indeed,
the Court has carefully avoided saying exactly what the
Suspension Clause protects.  In Felker v. Turpin, 518 U.S. 651
(1996), the Court, per Rehnquist, C.J., "assume[d], for purposes
of decision here, that the Suspension Clause of the Constitution
refers to the writ as it exists today, rather than as it existed
in 1789," but held that the restrictions placed by the AEDPA upon
second and successive statutory habeas petitions by prisoners
were "well within the compass of [the writ's] evolutionary
process, and . . . do not amount to a 'suspension' of the writ
contrary to Article I, § 9."  518 U.S. at 663-64.  In INS v. St.
Cyr, 533 U.S. 299 (2001), the Court rejected the government's
argument that the AEDPA and the IIRIRA had effectively stripped

---

[6]Act of July 1, 1902, ch. 1369, 32 Stat. 691.

[7]See Duncan v. Kahanamoku, 327 U.S. 304, 307-308 (1946).

- 13 -

the federal courts of jurisdiction to decide questions of law.
Acknowledging that the scope of the writ has expanded
significantly since the Founding, the Court noted that, "at the
absolute minimum, the Suspension Clause protects the writ 'as it
existed in 1789,'" id. at 1788 (quoting Felker).  And the Court
went on to observe:

> The fact that this Court would be required to answer
> the difficult question of what the Suspension Clause
> protects is in and of itself a reason to avoid
> answering the constitutional questions that would be
> raised by concluding that review was barred entirely.
> Cf. Neuman, Habeas Corpus, Executive Detention, and the
> Removal of Aliens, 98 Colum. L.Rev. 961, 980 (1998)
> (noting that "reconstructing habeas corpus law . . .
> [for purposes of a Suspension Clause analysis] would be
> a difficult enterprise, given fragmentary
> documentation, state-by-state disuniformity, and
> uncertainty about how state practices should be
> transferred to new national institutions").[8]

Id. at n.13.  Whether the Suspension Clause protects only the
"writ antecedent to statute," Williams v. Kaiser, 323 U.S. 471,
484 (1945), or "the writ as it exists today," Felker, 518 U.S. at
663, its protection is absolute in the absence of "invasion" or
"rebellion."  Neither rebellion nor invasion was occurring at the
time the MCA was enacted.  Indeed, Congress itself must not have

---

[8]In both Felker and St. Cyr, the Court was quick to point
out that neither the AEDPA nor the IIRIRA purported to repeal its
own original jurisdiction of habeas cases, which was expressly
granted by the Judiciary Act of 1789, Felker, 518 U.S. at 660-61,
quoted in St. Cyr, 533 U.S. at 298-99.  The jurisdiction-
stripping language of the MCA, of course, does purport to repeal
the habeas jurisdiction of Supreme Court justices("No court,
justice or judge . . . ." MCA § 7(a)).

- 14 -

thought that it was "suspending" the writ with the enactment of the MCA, since it made no findings of the predicate conditions, as it did when it approved Lincoln's suspension in the Civil War and each of the subsequent suspensions in Mississippi, the Phillippines, and Hawaii.  Thus, the Great Writ has survived the Military Commissions Act.  If and to the extent that the MCA operates to make the writ unavailable to a person who is constitutionally entitled to it, it must be unconstitutional.

**3.  Hamdan is not entitled to the constitutional writ that survives the MCA.**

The jurisdiction of federal courts over the habeas petitions of detainees at Guantanamo Bay rested upon the grant of jurisdiction in the habeas statute and upon the United States' exercise of "complete jurisdiction and control" over the Navy base in Cuba.  <u>Rasul</u>, 542 U.S. 466, 471, 481 (2004).  Because the habeas statute drew no distinction between citizens and aliens, moreover, the Court found "little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship.  Aliens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under § 2241."  <u>Id.</u> at 481.  My original assumption of jurisdiction of Hamdan's habeas petition depended entirely upon <u>Rasul</u> and upon § 2241, 344 F. Supp. 2d at 156.  Now that the MCA has amended § 2241 so that it no longer serves as the basis for my jurisdiction, I must inquire whether

- 15 -

Hamdan or any other alien is constitutionally entitled to the writ.

It has long been the practice of judges to ascertain the "meaning of the term habeas corpus [by reference to] the common law." Ex parte Bollman, 8 U.S. at 93-94 (1807). Petitioner cites at least two English common law cases in which "aliens detained by the Executive at wartime" brought habeas petitions challenging their designation as enemies. [78 at 20], citing Case of the Three Spanish Sailors, 96 Eng. Rep. 775, 776 (C.P. 1779); Rex v. Schiever, 97 Eng. Rep. 551 (K. B. 1759). In dicta, the majority in Rasul cited several other examples of pre-1789 habeas petitions brought by aliens detained within the sovereign territory or elsewhere within the sovereign's control. Rasul, 542 U.S. at 481 n.11.[9] Unfortunately, those cases do not so easily resolve the issue when the statutory grant of habeas has been withdrawn. In each of them, habeas relief was either (1) denied, in an opinion that failed to distinguish between

---

[9]The court supplied the following list of English and American habeas proceedings prior to 1789 and shortly thereafter: King v Schiever, 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759); Sommersett v Stewart, 20 How. St. Tr. 1, 79-82 (K. B. 1772); Case of the Hottentot Venus, 13 East 195, 104 Eng. Rep. 344 (K. B. 1810)); United States v. Villato, 2 Dall. 370, 2 U.S. 370, 1 L. Ed. 419 (CC Pa. 1797); Ex parte D'Olivera, 7 F. Cas. 853, F. Cas. No. 3967 (CC Mass 1813) (Story, J., on circuit); Wilson v. Izard, 30 F. Cas. 131, F. Cas. No. 17810 (CC NY 1815) (Livingston, J., on circuit).

- 16 -

jurisdictional and substantive grounds for the dismissal;[10]  (2)
denied to a prisoner of war without connections to the country in
which the writ was sought;[11] or (3) granted to an alien with a
significant relationship to the country in which the writ was
sought.[12]  Not one of the cases mentioned in <u>Rasul</u> held that an
alien captured abroad and detained outside the United States – or
in "territory over which the United States exercises exclusive
jurisdiction and control," <u>Rasul</u>, 542 U.S. at 475 – had a common
law or constitutionally protected right to the writ of habeas
corpus.[13]

---

[10]<u>See, e.g.</u>, <u>Case of the Three Spanish Sailors</u>, 96 Eng. Rep.
775, 776 (C.P. 1779); <u>Rex v. Shiever</u>, 97 Eng. Rep. 551 (K. B.
1759).  Note, too, that petitioners in both of these cases were
held within English sovereign territory, unlike petitioner
Hamdan.

[11]<u>Rex v. Schiever</u> falls under this category as well:
"[petitioner] is the King's prisoner of war, and we have nothing
to do in that case, nor can we grant an habeas corpus to remove
prisoners of war."  96 Eng. Rep. 1249 (K. B. 1759).

[12]<u>See, e.g.</u>, <u>U.S. v. Villato</u>, 2 U.S. 370, 28 F. Cas. 377, 1
L. Ed. 419 (No. 16,622) (Pa. 1797) (petitioner, though Spanish-
born, had traveled from New Orleans to Philadelphia and attempted
to become a citizen before the offense that precipitated his
detention).

[13]Note that even <u>INS v. St Cyr</u>, heavily relied upon by
petitioner Hamdan and filled with language extolling the
importance of habeas corpus in challenging executive detention,
contains this limited description of the rights herein asserted:
"[i]n England prior to 1789, in the Colonies, and in this Nation
during the formative years of our Government, the writ of habeas
corpus was available to <u>nonenemy aliens</u> as well as to citizens,"
533 U.S. at 301.

The petitioner in <u>Sommersett v. Stewart</u> was not an enemy alien but a slave challenging his enslavement.  Unlike Hamdan, James Sommersett was temporarily residing in England, and the asserted unlawfulness of his confinement stemmed from the arguable illegality of slavery in England.  98 Eng. Rep. 499 (K. B. 1772).  In the <u>Case of the Hottentot Venus</u>, Saartje Baartman – a South African exhibited in a cage in Piccadilly, England – was a non-enemy foreigner from the British Protectorate of South Africa who could invoke the protection of the Crown by right. 104 Eng. Rep. 344 (K. B. 1810).

In American habeas actions, alien petitioners have had access to the writ largely because they resided, lawfully or unlawfully, on American soil.  <u>See, e.g.</u>, <u>The Japanese Immigrant Case</u>, 189 U.S. 86, 101 (1903) (alien, while alleged to have entered the country unlawfully, nevertheless had made himself "a part of its population"); <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886) (petitioner had been a legal resident of the United States for over twenty years).  Hamdan has been a prisoner of the United States for five years.  He has lived nearly all of that time within the plenary and exclusive jurisdiction of the United States, but he has not become a part of the population enough to separate himself from the common law tradition generally barring non-resident enemy aliens from accessing courts in wartime.  <u>See</u> <u>Ex parte Kawato</u>, 317 U.S. 69, 72-75 (1942) (describing common law

- 18 -

rule).  His detention in Guantanamo, in other words, has not
meaningfully "increase[d] his identity with our society."
Eisentrager v. Johnson, 339 U.S. 763, 770 (1950).

     It is the Eisentrager case that appears to provide the
controlling authority on the availability of constitutional
habeas to enemy aliens.[14]  In that case, petitioners were Germans
living in China in the aftermath of World War II.  Id. at 765.
After trial before a United States Military Commission in China,
they were convicted of war crimes and sent to occupied Germany to
serve their sentences.  Id. at 766.  The Supreme Court held that
they had no constitutional entitlement to habeas relief in U.S.
Courts because "at no relevant time were [they] within any
territory over which the United States is sovereign, and the
scenes of their offense, their capture, their trial, and their
punishment were all beyond the territorial jurisdiction of any
court of the United States."  Id. at 778.

     Hamdan contends that several of the differences between
the Guantanamo petitioners and the Eisentrager petitioners are
constitutionally significant.  First, he notes that the
Eisentrager petitioners admitted that they were enemy aliens,
whereas petitioner Hamdan has always objected to his

─────────────

     [14] Eisentrager was unimportant to the statutory habeas
question presented the last time Hamdan was here, as the Supreme
Court had made plain in Rasul, 542 U.S. at 475-76, and was not
dispositive on the questions presented in the earlier Hamdan
case, 126 S.Ct. at 2794.

classification as an unlawful enemy combatant [78 at 25].  Here, however, as in Eisentrager (where petitioners amended their petitions to assert that they had really been civilian employees) Hamdan's "exact affiliation is . . . for our purposes, immaterial." Eisentrager, 339 U.S. at 765.  Second, Hamdan claims that, unlike the Eisentrager petitioners, he has never been afforded access to a proper tribunal.  That observation is obviously true, thus far, but Hamdan is to face a military commission newly designed, because of his efforts, by a Congress that finally stepped up to its responsibility, acting according to guidelines laid down by the Supreme Court.  It is difficult to see how continued habeas jurisdiction could make further improvements in his tribunal.  Third, Hamdan argues that, after several years in a territory within "the complete jurisdiction and control" of the United States, his relationship with the United States is more extensive than those of petitioners in Eisentrager.  See Rasul, 542 U.S. at 480.  This third distinction merits further consideration.

Hamdan's lengthy detention beyond American borders but within the jurisdictional authority of the United States is historically unique.  Nevertheless, as the government argues in its reply brief, his connection to the United States lacks the geographical and volitional predicates necessary to claim a constitutional right to habeas corpus [85-1 at 15].  Petitioner

has never entered the United States and accordingly does not
enjoy the "implied protection" that accompanies presence on
American soil.  Eisentrager, 339 U.S. at 777-79.  Guantanamo Bay,
although under the control of the United States military, remains
under "the ultimate sovereignty of the Republic of Cuba."  Rasul,
U.S. 542 at 471.  Presence within the exclusive jurisdiction and
control of the United States was enough for the Court to conclude
in Rasul that the broad scope of the habeas statute covered
Guantanamo Bay detainees, but the detention facility lies outside
the sovereign realm, and only U.S. citizens in such locations may
claim entitlement to a constitutionally guaranteed writ.  United
States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936).
There is no dispute, moreover, that Hamdan's presence within the
exclusive jurisdiction of the United States has been involuntary.
Presence within the United States that is "lawful but involuntary
[ ] is not of the sort to indicate any substantial connection
with our country" that would justify the invocation of a
constitutional right to habeas corpus, United States v.
Verdugo-Urquidez, 494 U.S. 259, 271 (1990).[15]

---

[15]My ruling does not address whether and to what extent
enemy aliens may invoke other constitutional rights; I find only
that the Suspension Clause does not guarantee the right to
petition for habeas corpus to non-resident enemy aliens captured
and detained outside the United States.

- 21 -

**Conclusion**

Congress's removal of jurisdiction from the federal courts was not a suspension of habeas corpus within the meaning of the Suspension Clause (or, to the extent that it was, it was plainly unconstitutional, in the absence of rebellion or invasion), but Hamdan's statutory access to the writ is blocked by the jurisdiction-stripping language of the Military Commissions Act, and he has no constitutional entitlement to habeas corpus.[16]  Hamdan's habeas petition must accordingly be dismissed for want of subject matter jurisdiction.


JAMES ROBERTSON
United States District Judge

---

[16] Having been divested of jurisdiction over Hamdan's habeas petition, I do not reach his other arguments that the MCA is unconstitutional – because it does not provide an adequate substitute for habeas review, because it violates the principle of separation of powers by instructing the courts to ignore the Supreme Court's ruling that the Geneva Conventions afford judicially enforceable protections to petitioner Hamdan, because it is an unlawful Bill of Attainder, and because it violates Equal Protection.