## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | Misc. No. 06-145 (TFH) |
| This document relates to: | |
| ALI, et al. v. PAPPAS | Civ. No. 05-1377 (TFH) |
| ALI, et al. v. RUMSFELD | Civ. No. 05-1378 (TFH) |
| ALI, et al. v. KARPINSKI | Civ. No. 05-1379 (TFH) |
| ALI, et al. v. SANCHEZ | Civ. No. 05-1380 (TFH) |

### NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants Donald Rumsfeld and the United States respectfully notify the Court of the recent decision by the D.C. Circuit in *Boumediene, et al. v Bush, et al.*, No. 05-5062 (Feb. 20, 2007), which was issued after oral argument in this case. In *Boumediene*, the D.C. Circuit held that federal courts do not have jurisdiction over habeas corpus petitions filed by aliens detained at Guantanamo Bay, Cuba. Slip Op. at 24. In reaching its conclusion the court articulated several holding that confirm Plaintiffs' *Bivens* claims must be dismissed.

First, in addressing the constitutional rights of aliens detained at Guantanamo Bay, the court held that aliens who have no ties to the United States, such as the Plaintiffs in this case, are not entitled to constitutional protections. "Precedent in this court and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States." Slip Op. at 18. The court cited several cases in support of this holding, including *Johnson v. Eisentrager*, 339 U.S. 763 (1950), *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999), which were all cited for the same point in Defendants' briefs to

this Court.

The D.C. Circuit also rejected an argument, made by Plaintiffs in this case, that the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004) undermined prevailing precedents holding that aliens who have no ties to the United States are not entitled to constitutional protections. *See* Slip Op. at 20 n.10. ("The *Rasul* decision, resting as it did on statutory interpretation, could not possibly have affected the constitutional holding of *Eisentrager*.") (citation ommitted). Moreover, the court observed that "[e]ven if *Rasul* somehow calls *Eisntrager*'s constitutional holding into question" the court would still be bound to follow *Eisentrager*, an observation that applies no less to this Court. *Id.*

Finally, the D.C. Circuit affirmed that only the political branches of government, not the judiciary, may declare whether the United States exercises sovereignty over a geographic area. Slip Op. at 20-21. "The 'determination of sovereignty over an area' the Supreme Court has held, "is for the legislative and executive departments." *Id.* at 20 (quoting *Vermilya-Brown Co. v. Connell*, 335 U.S. 377 (1948)). The *Insular Cases*, relied on by appellants in *Boumediene* and Plaintiffs in this case, have no application to the determination of whether constitutional protections are afforded to aliens in areas that are not territories "belonging to the United States" under Article IV, Section 3 of the Constitution. Slip Op. at 21. There can be no question that Afghanistan and Iraq are not territories that belong to the United States, and no political branch of government has ever declared that facilities operated by the United States military within those countries fall under United States sovereignty.

*Boumediene* thus confirms that Plaintiffs cannot maintain a lawsuit for violation of the Fifth and Eighth Amendments because Plaintiffs have no rights under these provisions. A copy of the *Boumediene* decision is attached.

Dated: February 28, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch

_J. Marcus Meeks_
J. MARCUS MEEKS (D.C. Bar No. 472072)
Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
(202) 616-4176 (voice)
(202) 616-4314 (fax)

Attorneys for Defendant Secretary of Defense
Donald H. Rumsfeld and the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2007, I caused a copy of the foregoing **Notice of Supplemental Authority** to be served upon counsel of record via ECF as follows:

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036
artspitzer@aol.com
*Counsel for Plaintiffs*

Mark E. Nagle
Troutman Sanders LLP
401 Ninth St, N.W., Ste. 1000
Washington DC 20004
mark.nagle@troutmansanders.com
*Counsel for Defendant Thomas Pappas*

Stephen L. Braga
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
stephen.braga@bakerbotts.com
*Counsel for Defendant Ricardo Sanchez*

Michael L. Martinez
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
mmartinez@crowell.com
*Counsel for Defendant Janis Karpinski*

     *J. Marcus Meeks*     
     J. Marcus Meeks

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 8, 2005　　　　Decided February 20, 2007

No. 05-5062

LAKHDAR BOUMEDIENE, DETAINEE, CAMP DELTA, ET AL.,
APPELLANTS

v.

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

———

Consolidated with
05-5063

———

Appeals from the United States District Court
for the District of Columbia
(No. 04cv01142)
(No. 04cv01166)

No. 05-5064

KHALED A. F. AL ODAH, NEXT FRIEND OF FAWZI KHALID
ABDULLAH FAHAD AL ODAH ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

2

UNITED STATES OF AMERICA, ET AL.,
APPELLANTS/CROSS-APPELLEES

———

Consolidated with
05-5095, 05-5096, 05-5097, 05-5098, 05-5099, 05-5100,
05-5101, 05-5102, 05-5103, 05-5104, 05-5105, 05-5106,
05-5107, 05-5108, 05-5109, 05-5110, 05-5111, 05-5112,
05-5113, 05-5114, 05-5115, 05-5116

———

Appeals from the United States District Court
for the District of Columbia
(No. 02cv00828)
(No. 02cv00299)
(No. 02cv01130)
(No. 02cv01135)
(No. 02cv01136)
(No. 02cv01137)
(No. 02cv01144)
(No. 02cv01164)
(No. 02cv01194)
(No. 02cv01227)
(No. 02cv01254)

———

*Stephen H. Oleskey* argued the causes for appellants in
Nos. 05-5062, et al.  With him on the briefs were *Louis R.
Cohen*, *Robert C. Kirsch*, *Douglas F. Curtis*, *Mark C. Fleming*,
*Wesley R. Powell*, *Julia Symon*, and *Christopher Land*.

*James F. Fitzpatrick*, *Leslie M. Hill*, and *Graham J.*

3

*Jenkins* were on the brief for *amicus curiae* Global Rights in support of appellants in Nos. 05-5062, et al.

*Thomas B. Wilner* argued the causes for the appellees/cross-appellants in Nos. 05-5064, et al. With him on the briefs were *Barbara J. Olshansky*, *Joe Margulies*, *Neil H. Koslowe*, *Jared A. Goldstein*, *L. Barrett Boss*, *Adrian Lee Steel, Jr.*, *Baher Azmy*, *Shayana Devendra Kadidal*, *Barry J. Pollak*, *Eric M. Freedman*, *Richard J. Wilson*, *George Brent Mickum, IV*, *Douglas James Behr*, *Erwin Chemerinsky*, *Jonathan L. Hafetz*, *Muneer I. Ahmad*, *Pamela Rogers Chepiga*, *Ralph A. Taylor*, *Seth B. Waxman*, *Kevin B. Bedell*, *David H. Remes*, *Marc Falkoff*, *Marc A. Goldman*, *David J. Cynamon*, and *Osman Handoo*.

*Wesley R. Powell* and *Christopher C. Land* were on the brief of *amicus curiae* Omar Deghayes in support of the detainees.

*Morton Sklar* was on the brief of *amicus curiae* The World Organization for Human Rights USA in support of the detainees.

*David Overlock Stewart* was on the brief of *amici curiae* Legal and Historical Scholars in support of the detainees.

*Jonathan L. Hafetz* was on the brief of *amici curiae* British and American Habeas Scholars in support of the detainees.

*Steven T. Wax*, Federal Public Defender, *Stephen R. Sady*, *Ruben L. Iniguez*, and *Amy Baggio*, Chief Deputies Federal Public Defender, Federal Public Defender for the District of Oregon, and *A.J. Kramer*, Federal Public Defender, Federal Public Defender for the District of Columbia, were on

4

the brief for *amicus curiae* Federal Public Defender Habeas Corpus Counsel in support of the detainees.

*Eugene R. Fidell* and *Ronald W. Meister* were on the brief for *amicus curiae* the National Institute of Military Justice in support of the detainees.

*Gregory G. Katsas*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for the United States of America, et al. in Nos. 05-5062, et al. and 05-5064, et al. With him on the briefs were *Paul D. Clement*, Solicitor General, *Peter D. Keisler*, Assistant Attorney General, and *Douglas N. Letter*, *Robert M. Loeb*, *Eric D. Miller*, and *Catherine Y. Hancock*, Attorneys. *Kenneth L. Wainstein*, U.S. Attorney at the time the briefs were filed, entered an appearance.

*Daniel J. Popeo* and *Richard A. Samp* were on the brief of *amici curiae* Washington Legal Foundation and Allied Educational Foundation in support of the United States of America.

Before: SENTELLE, RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

RANDOLPH, *Circuit Judge*:  Do federal courts have jurisdiction over petitions for writs of habeas corpus filed by aliens captured abroad and detained as enemy combatants at the Guantanamo Bay Naval Base in Cuba?  The question has been the recurring subject of legislation and litigation.  In these consolidated appeals, foreign nationals held at Guantanamo filed petitions for writs of habeas corpus alleging violations of the

5

Constitution, treaties, statutes, regulations, the common law, and the law of nations. Some detainees also raised non-habeas claims under the federal question statute, 28 U.S.C. § 1331, and the Alien Tort Act, *id.* § 1350. In the "Al Odah" cases (Nos. 05-5064, 05-5095 through 05-5116), which consist of eleven cases involving fifty-six detainees, Judge Green denied the government's motion to dismiss with respect to the claims arising from alleged violations of the Fifth Amendment's Due Process Clause and the Third Geneva Convention, but dismissed all other claims. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). After Judge Green certified the order for interlocutory appeal under 28 U.S.C. § 1292(b), the government appealed and the detainees cross-appealed. In the "Boumediene" cases (Nos. 05-5062 and 05-5063) – two cases involving seven detainees – Judge Leon granted the government's motion and dismissed the cases in their entirety. *See Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005).

In the two years since the district court's decisions the law has undergone several changes. As a result, we have had two oral arguments and four rounds of briefing in these cases during that period. The developments that have brought us to this point are as follows.

In *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. Rasul v. Bush*, 542 U.S. 466 (2004), we affirmed the district court's dismissal of various claims – habeas and non-habeas – raised by Guantanamo detainees. With respect to the habeas claims, we held that "no court in this country has jurisdiction to grant habeas relief, under 28 U.S.C. § 2241, to the Guantanamo detainees." 321 F.3d at 1141. The habeas statute then stated that "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a) (2004). Because

6

Guantanamo Bay was not part of the sovereign territory of the United States, but rather land the United States leases from Cuba, *see Al Odah*, 321 F.3d at 1142-43, we determined it was not within the "respective jurisdictions" of the district court or any other court in the United States. We therefore held that § 2241 did not provide statutory jurisdiction to consider habeas relief for any alien – enemy or not – held at Guantanamo. *Id.* at 1141. Regarding the non-habeas claims, we noted that "'the privilege of litigation' does not extend to aliens in military custody who have no presence in 'any territory over which the United States is sovereign,'" *id.* at 1144 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 777-78 (1950)), and held that the district court properly dismissed those claims.

The Supreme Court reversed in *Rasul v. Bush*, 542 U.S. 466 (2004), holding that the habeas statute extended to aliens at Guantanamo. Although the detainees themselves were beyond the district court's jurisdiction, the Court determined that the district court's jurisdiction over the detainees' custodians was sufficient to provide subject-matter jurisdiction under § 2241. *See Rasul*, 542 U.S. at 483-84. The Court further held that the district court had jurisdiction over the detainees' non-habeas claims because nothing in the federal question statute or the Alien Tort Act categorically excluded aliens outside the United States from bringing such claims. *See Rasul*, 542 U.S. at 484-85. The Court remanded the cases to us, and we remanded them to the district court.

In the meantime Congress responded with the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 (2005) (DTA), which the President signed into law on December 30, 2005. The DTA added a subsection (e) to the habeas statute. This new provision stated that, "[e]xcept as provided in section 1005 of the [DTA], no court, justice, or judge" may exercise jurisdiction over

7

> (1) an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba; or
>
> (2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who
>
> > (A) is currently in military custody; or
> >
> > (B) has been determined by the United States Court of Appeals for the District of Columbia Circuit . . . to have been properly detained as an enemy combatant.

DTA § 1005(e)(1) (internal quotation marks omitted). The "except as provided" referred to subsections (e)(2) and (e)(3) of section 1005 of the DTA, which provided for exclusive judicial review of Combatant Status Review Tribunal determinations and military commission decisions in the D.C. Circuit. *See* DTA § 1005(e)(2), (e)(3).

The following June, the Supreme Court decided *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006). Among other things, the Court held that the DTA did not strip federal courts of jurisdiction over habeas cases pending at the time of the DTA's enactment. The Court pointed to a provision of the DTA stating that subsections (e)(2) and (e)(3) of section 1005 "shall apply with respect to any claim . . . that is pending on or after the date of the enactment of this Act." DTA § 1005(h). In contrast, no provision of the DTA stated whether subsection (e)(1) applied to pending cases. Finding that Congress "chose not to so provide . . . after having been presented with the option," the

8

Court concluded "[t]he omission [wa]s an integral part of the statutory scheme." *Hamdan*, 126 S. Ct. at 2769.

In response to *Hamdan*, Congress passed the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) (MCA), which the President signed into law on October 17, 2006. Section 7 of the MCA is entitled "Habeas Corpus Matters." In subsection (a), Congress again amended § 2241(e). The new amendment reads:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

> (2) Except as provided in [section 1005(e)(2) and (e)(3) of the DTA], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA § 7(a) (internal quotation marks omitted). Subsection (b) states:

> The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to *all cases, without exception, pending on or after the date of the enactment* of this Act which relate to any aspect of the detention, transfer, treatment, trial, or

9

conditions of detention of an alien detained by the United States since September 11, 2001.

MCA § 7(b) (emphasis added).

The first question is whether the MCA applies to the detainees' habeas petitions. If the MCA does apply, the second question is whether the statute is an unconstitutional suspension of the writ of habeas corpus.[1]

## I.

As to the application of the MCA to these lawsuits, section 7(b) states that the amendment to the habeas corpus statute, 28 U.S.C. § 2241(e), "shall apply to all cases, without exception, pending on or after the date of the enactment" that relate to certain subjects. The detainees' lawsuits fall within the subject matter covered by the amended § 2241(e); each case relates to an "aspect" of detention and each deals with the detention of an "alien" after September 11, 2001. The MCA brings all such "cases, without exception" within the new law.

Everyone who has followed the interaction between Congress and the Supreme Court knows full well that one of the primary purposes of the MCA was to overrule *Hamdan*.[2]

_____

[1] Section 7(a) of the MCA eliminates jurisdiction over non-habeas claims by aliens detained as enemy combatants. That alone is sufficient to require dismissal even of pending non-habeas claims. *See Bruner v. United States*, 343 U.S. 112, 116-17 (1952). Section 7(b) reinforces this result.

[2] Without exception, both the proponents and opponents of section 7 understood the provision to eliminate habeas jurisdiction over pending cases. *See, e.g.*, 152 Cong. Rec. S10357 (daily ed. Sept. 28, 2006) (statement of Sen. Leahy) ("The habeas stripping provisions

10

Everyone, that is, except the detainees. Their cases, they argue, are not covered. The arguments are creative but not cogent. To accept them would be to defy the will of Congress. Section 7(b) could not be clearer. It states that "the amendment made by subsection (a)" – which repeals habeas jurisdiction – applies to "all cases, without exception" relating to any aspect of detention. It is almost as if the proponents of these words were

---

in the bill go far beyond what Congress did in the Detainee Treatment Act . . . . This new bill strips habeas jurisdiction retroactively, even for pending cases."); *id.* at S10367 (statement of Sen. Graham) ("The only reason we are here is because of the *Hamdan* decision. The *Hamdan* decision did not apply . . . the [DTA] retroactively, so we have about 200 and some habeas cases left unattended and we are going to attend to them now."); *id.* at S10403 (statement of Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally accomplish what it sought to do through the [DTA] last year. It will finally get the lawyers out of Guantanamo Bay. It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with a narrow DC Circuit-only review of the [CSRT] hearings."); *id.* at S10404 (statement of Sen. Sessions) ("It certainly was not my intent, when I voted for the DTA, to exempt all of the pending Guantanamo lawsuits from the provisions of that act. * * * Section 7 of the [MCA] fixes this feature of the DTA and ensures that there is no possibility of confusion in the future. . . . I don't see how there could be any confusion as to the effect of this act on the pending Guantanamo litigation. The MCA's jurisdictional bar applies to that litigation 'without exception.'"); 152 Cong. Rec. H7938 (daily ed. Sept. 29, 2006) (statement of Rep. Hunter) ("The practical effect of [section 7] will be to eliminate the hundreds of detainee lawsuits that are pending in courts throughout the country and to consolidate all detainee treatment cases in the D.C. Circuit."); *id.* at H7942 (Rep. Jackson-Lee) ("The habeas provisions in the legislation are contrary to congressional intent in the [DTA]. In that act, Congress did not intend to strip the courts of jurisdiction over the pending habeas [cases].").

11

slamming their fists on the table shouting "When we say 'all,' we mean all – **without exception**!"[3]

The detainees of course do not see it that way. They say Congress should have expressly stated in section 7(b) that habeas cases were included among "all cases, without exception, pending on or after" the MCA became law. Otherwise, the MCA does not represent an "unambiguous statutory directive[]" to repeal habeas corpus jurisdiction. *INS v. St. Cyr*, 533 U.S. 289, 299 (2001). This is nonsense. Section 7(b) specifies the effective date of section 7(a). The detainees' argument means that Congress, in amending the habeas statute (28 U.S.C. § 2241), specified an effective date only for non-habeas cases. Of course Congress did nothing of the sort. Habeas cases are simply a subset of cases dealing with detention. *See, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).[4] Congress did not have to say that "the amendment made by subsection (a)" – which already *expressly* includes habeas cases – shall take effect on the date of enactment and shall apply to "all cases, without exception, *including habeas cases*." The *St. Cyr* rule of

_____

[3] Congress has rarely found it necessary to emphasize the *absence* of exceptions to a clear rule. Indeed, the use of "without exception" to emphasize the word "all" occurs in only one other provision of the U.S. Code. *See* 48 U.S.C. § 526(a).

[4] If section 7(b) did not include habeas cases among cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention," it would be inconsistent with section 7(a). Section 7(a) of the MCA first repeals jurisdiction "to hear or consider an application for a writ of habeas corpus" by detainees. 28 U.S.C. § 2241(e)(1). It then repeals jurisdiction over "any *other* action . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of a detainee, *id.* § 2241(e)(2) (emphasis added), thus signifying that Congress considered habeas cases as cases relating to detention, as indeed they are.

12

interpretation the detainees invoke demands clarity, not redundancy.

The detainees also ask us to compare the language of section 7(b) to that of section 3 of the MCA. Section 3, entitled "Military Commissions," creates jurisdiction in the D.C. Circuit for review of military commission decisions, *see* 10 U.S.C. § 950g. It then adds 10 U.S.C. § 950j, which deals with the finality of military commission decisions. Section 950j strips federal courts of jurisdiction over any pending or future cases that would involve review of such decisions:

> Except as otherwise provided in this chapter and notwithstanding any other provision of law (*including section 2241 of title 28 or any other habeas corpus provision*), no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.

10 U.S.C. § 950j(b) (emphasis added). The detainees maintain that § 950j calls into question Congress's intention to apply section 7(b) to pending habeas cases.

The argument goes nowhere. Section 7(b), read in conjunction with section 7(a), is no less explicit than § 950j. Section 7(a) strips jurisdiction over detainee cases, including habeas cases, and section 7(b) makes section 7(a) applicable to pending cases. Section 950j accomplishes the same thing, but in one sentence. A drafting decision to separate section 7 into two subsections – one addressing the scope of the jurisdictional

13

bar, the other addressing how the bar applies to pending cases – makes no legal difference.[5]

## II.

This brings us to the constitutional issue: whether the MCA, in depriving the courts of jurisdiction over the detainees' habeas petitions, violates the Suspension Clause of the Constitution, U.S. CONST. art. I, § 9, cl. 2, which states that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

────────────

[5]  The detainees suggest that federal courts retain some form of residual common law jurisdiction over habeas petitions.  *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807), holds the opposite.  *See Ex parte McCardle*, 74 U.S. 506 (1868).  "Jurisdiction of the lower federal courts is . . . limited to those subjects encompassed within a statutory grant of jurisdiction."  *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).  The observations about common law habeas in *Rasul*, 542 U.S. at 481-82, referred to the practice in England.  Even if there were such a thing as common law jurisdiction in the federal courts, § 2241(e)(1) quite clearly eliminates all "jurisdiction to hear or consider an application for a writ of habeas corpus" by a detainee, whatever the source of that jurisdiction.

In order to avoid "serious 'due process,' Suspension Clause, and Article III problems," the detainees also urge us not to read section 7 of the MCA to eliminate habeas jurisdiction over Geneva Convention claims.  But that reading is unavoidable. Section 7 is unambiguous, as is section 5(a), which states that "No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding . . . as a source of rights in any court of the United States."

14

The Supreme Court has stated the Suspension Clause protects the writ "as it existed in 1789," when the first Judiciary Act created the federal courts and granted jurisdiction to issue writs of habeas corpus. *St. Cyr*, 533 U.S. at 301; *cf.* Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 170 (1970). The detainees rely mainly on three cases to claim that in 1789 the privilege of the writ extended to aliens outside the sovereign's territory. In *Lockington's Case*, Bright. (N.P.) 269 (Pa. 1813), a British resident of Philadelphia had been imprisoned after failing to comply with a federal marshal's order to relocate. The War of 1812 made Lockington an "enemy alien" under the Alien Enemies Act of 1798. Although he lost on the merits of his petition for habeas corpus before the Pennsylvania Supreme Court, two of three Pennsylvania justices held that he was entitled to review of his detention.[6] In *The Case of Three Spanish Sailors*, 96 Eng. Rep. 775 (C.P. 1779), three Spanish seamen had boarded a merchant vessel bound for England with a promise of wages on arrival. After arriving in England, the English captain refused to pay their wages and turned them over to a warship as prisoners of war. The King's Bench denied the sailors' petitions because they were "alien enemies and prisoners of war, and therefore not entitled to any of the privileges of Englishmen; much less to be set at liberty on a habeas corpus." *Id.* at 776. The detainees claim that, as in *Lockington's Case*, the King's Bench exercised jurisdiction and reached the merits. The third case – *Rex v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759) – involved a citizen of Sweden intent on entering the English merchant trade. While at sea on an English merchant's

---

[6] During this period, state courts often employed the writ of habeas corpus to inquire into the legality of federal detention. The Supreme Court later held in *Ableman v. Booth*, 62 U.S. (21 How.) 506 (1859), and *Tarble's Case*, 80 U.S. (13 Wall.) 397 (1871), that state courts had no such power.

15

ship, a French privateer took Schiever along with the rest of the crew as prisoners, transferred the crew to another French ship, and let the English prisoners go free. An English ship thereafter captured the French ship and its crew, and carried them to Liverpool where Schiever was imprisoned. From Liverpool Schiever petitioned for habeas corpus, claiming he was a citizen of Sweden and only by force entered the service of the French. The court denied him relief because it found ample evidence that he was a prisoner of war. *Id*. at 552.

None of these cases involved an alien outside the territory of the sovereign. Lockington was a resident of Philadelphia. And the three Spanish sailors and Schiever were all held within English sovereign territory.[7] The detainees cite no case and no historical treatise showing that the English common law writ of habeas corpus extended to aliens beyond the Crown's dominions. Our review shows the contrary. *See* WILLIAM F. DUKER, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS 53 (1980); 9 WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 116-17, 124 (1982 ed.); 3 BLACKSTONE, COMMENTARIES 131 (1768); *see also* 1 Op. Att'y Gen. 47 (1794); *In re Ning Yi-Ching*, 56 T. L. R. 3, 5 (Vacation Ct. 1939) (noting prior judge "had listened in vain for a case in which the writ of *habeas corpus* had issued in respect of a foreigner detained in a part of the world which was not a part of the King's dominions or realm"). Robert Chambers, the successor to Blackstone at Oxford, wrote in his lectures that the writ of

---

[7] The dissent claims that the difference between Schiever and the detainees is "exceedingly narrow," Dissent at 14, because Schiever was brought *involuntarily* to Liverpool. For this proposition, the dissent cites *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). *Verdugo-Urquidez* was a Fourth Amendment case. Obviously, it had nothing to say about habeas corpus in Eighteenth Century England.

16

habeas corpus extended only to the King's dominions.  2 ROBERT CHAMBERS, A COURSE OF LECTURES ON THE ENGLISH LAW DELIVERED AT OXFORD 1767-1773 (composed in association with Samuel Johnson), at 7-8 (Thomas M. Curley ed., 1986).  Chambers cited *Rex v. Cowle*, 97 Eng. Rep. (2 Burr.) 587 (K.B. 1759), in which Lord Mansfield stated that "[t]o foreign dominions . . . this Court has no power to send any writ of any kind.  We cannot send a habeas corpus to Scotland, or to the electorate; but to Ireland, the Isle of Man, the plantations [American colonies] . . . we may."  Every territory that Mansfield, Blackstone, and Chambers cited as a jurisdiction to which the writ extended (e.g., Ireland, the Isle of Man, the colonies, the Cinque Ports, and Wales) was a sovereign territory of the Crown.

    When agents of the Crown detained prisoners outside the Crown's dominions, it was understood that they were outside the jurisdiction of the writ.  *See* HOLDSWORTH, *supra*, at 116-17.  Even British citizens imprisoned in "remote islands, garrisons, and other places" were "prevent[ed] from the benefit of the law," 2 HENRY HALLAM, THE CONSTITUTIONAL HISTORY OF ENGLAND 127-28 (William S. Hein Co. 1989) (1827), which included access to habeas corpus, *see* DUKER, *supra*, at 51-53; HOLDSWORTH, *supra*, at 116; *see also* Johan Steyn, *Guantanamo Bay: The Legal Black Hole*, 53 INT'L & COMP. L.Q. 1, 8 (2004) ("the writ of habeas corpus would not be available" in "remote islands, garrisons, and other places" (internal quotation marks omitted)).  Compliance with a writ from overseas was also completely impractical given the habeas law at the time.  In *Cowle*, Lord Mansfield explained that even in the far off territories "annexed to the Crown," the Court would not send the writ, "notwithstanding the power."  97 Eng. Rep. at 600.  This is doubtless because of the Habeas Corpus Act of 1679.  The great innovation of this statute was in setting time limits for producing the prisoner and imposing fines on the

17

custodian if those limits were not met.  *See* CHAMBERS, *supra*, at 11.  For a prisoner detained over 100 miles from the court, the detaining officer had twenty days after receiving the writ to produce the body before the court.  *See id.*  If he did not produce the body, he incurred a fine.  One can easily imagine the practical problems this would have entailed if the writ had run outside the sovereign territory of the Crown and reached British soldiers holding foreign prisoners in overseas conflicts, such as the War of 1812.  The short of the matter is that given the history of the writ in England prior to the founding, habeas corpus would not have been available in 1789 to aliens without presence or property within the United States.

*Johnson v. Eisentrager*, 339 U.S. 763 (1950), ends any doubt about the scope of common law habeas.  "We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes."  *Id*. at 768; *see also* Note, *Habeas Corpus Protection Against Illegal Extraterritorial Detention*, 51 COLUM. L. REV. 368, 368 (1951).  The detainees claim they are in a different position than the prisoners in *Eisentrager*, and that this difference is material for purposes of common law habeas.[8]  They point to dicta in *Rasul*, 542 U.S. 481-82, in which the Court discussed English habeas cases and the "historical reach of the writ."  *Rasul* refers to several English and American cases involving varying combinations of territories of the Crown and relationships

---

[8]  The detainees are correct that they are not "enemy aliens." That term refers to citizens of a country with which the United States is at war.  *See Al Odah*, 321 F.3d at 1139-40.  But under the common law, the dispositive fact was not a petitioner's enemy alien status, but his lack of presence within any sovereign territory.

18

between the petitioner and the country in which the writ was sought. *See id*. But as Judge Robertson found in *Hamdan*, "[n]ot one of the cases mentioned in *Rasul* held that an alien captured abroad and detained outside the United States – or in 'territory over which the United States exercises exclusive jurisdiction and control,' *Rasul*, 542 U.S. at 475 – had a common law or constitutionally protected right to the writ of habeas corpus." *Hamdan v. Rumsfeld*, No. 04-1519, 2006 WL 3625015, at *7 (D.D.C. Dec. 13, 2006). Justice Scalia made the same point in his *Rasul* dissent, *see Rasul*, 542 U.S. at 502-05 & n.5 (Scalia, J., dissenting) (noting the absence of "a single case holding that aliens held outside the territory of the sovereign were within reach of the writ"), and the dissent acknowledges it here, *see* Dissent at 12. We are aware of no case prior to 1789 going the detainees' way,[9] and we are convinced that the writ in 1789 would not have been available to aliens held at an overseas military base leased from a foreign government.

The detainees encounter another difficulty with their Suspension Clause claim. Precedent in this court and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States. As we explained in *Al Odah*, 321 F.3d at 1140-41, the controlling case is *Johnson v. Eisentrager*. There twenty-one German nationals confined in custody of the U.S. Army in

---

[9] The dissent claims the lack of any case on point is a result of the unique combination of circumstances in this case. But extraterritorial detention was not unknown in Eighteenth Century England. *See* HOLDSWORTH, *supra*, at 116-17; DUKER, *supra*, at 51-53. As noted, *supra*, these prisoners were beyond the protection of the law, which included access to habeas corpus. And *Eisentrager* (and the two hundred other alien petitioners the court noted, *see* 339 U.S. at 768 n.1) involved both extraterritorial detention and alien petitioners.

19

Germany filed habeas corpus petitions. Although the German prisoners alleged they were civilian agents of the German government, a military commission convicted them of war crimes arising from military activity against the United States in China after Germany's surrender. They claimed their convictions and imprisonment violated various constitutional provisions and the Geneva Conventions. The Supreme Court rejected the proposition "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses," 339 U.S. at 783. The Court continued: "If the Fifth Amendment confers its rights on all the world . . . [it] would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments." *Id.* at 784. (Shortly before Germany's surrender, the Nazis began training covert forces called "werewolves" to conduct terrorist activities during the Allied occupation. *See* http://www.archives.gov/iwg/ declassified_records/oss_ records_263_wilhelm_hoettl.html.)

Later Supreme Court decisions have followed *Eisentrager*. In 1990, for instance, the Court stated that *Eisentrager* "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). After describing the facts of *Eisentrager* and quoting from the opinion, the Court concluded that with respect to aliens, "our rejection of extraterritorial application of the Fifth Amendment was emphatic." *Id.* By analogy, the Court held that the Fourth Amendment did not protect nonresident aliens against unreasonable searches or seizures conducted outside the

20

sovereign territory of the United States. *Id*. at 274-75. Citing *Eisentrager* again, the Court explained that to extend the Fourth Amendment to aliens abroad "would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries," particularly since the government "frequently employs Armed Forces outside this country," *id*. at 273. A decade after *Verdugo-Urquidez,* the Court – again citing *Eisentrager* – found it "well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).[10]

Any distinction between the naval base at Guantanamo Bay and the prison in Landsberg, Germany, where the petitioners in *Eisentrager* were held, is immaterial to the application of the Suspension Clause. The United States occupies the Guantanamo Bay Naval Base under an indefinite lease it entered into in 1903. *See Al Odah*, 321 F.3d at 1142. The text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba – not the United States – has sovereignty over Guantanamo Bay. *See Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381 (1948); *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995). The "determination of sovereignty over an area," the Supreme Court has held, "is for the legislative and executive departments." *Vermilya-Brown*, 335 U.S. at 380. Here the political departments have firmly and clearly spoken: "'United States,'

---

[10]    The *Rasul* decision, resting as it did on statutory interpretation, *see* 542 U.S. at 475, 483-84, could not possibly have affected the constitutional holding of *Eisentrager*. Even if *Rasul* somehow calls *Eisentrager*'s constitutional holding into question, as the detainees suppose, we would be bound to follow *Eisentrager*. *See Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484-85 (1989).

21

when used in a geographic sense . . . does not include the United States Naval Station, Guantanamo Bay, Cuba." DTA § 1005(g).

The detainees cite the *Insular Cases* in which "fundamental personal rights" extended to U.S. territories. *See Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922); *Dorr v. United States*, 195 U.S. 138, 148 (1904); *see also Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977). But in each of those cases, Congress had exercised its power under Article IV, Section 3 of the Constitution to regulate "Territory or other Property belonging to the United States," U.S. CONST., art. IV, § 3, cl. 2. These cases do not establish anything regarding the sort of *de facto* sovereignty the detainees say exists at Guantanamo. Here Congress and the President have specifically disclaimed the sort of territorial jurisdiction they asserted in Puerto Rico, the Philippines, and Guam.

Precedent in this circuit also forecloses the detainees' claims to constitutional rights. In *Harbury v. Deutch*, 233 F.3d 596, 604 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury,* 536 U.S. 403 (2002), we quoted extensively from *Verdugo-Urquidez* and held that the Court's description of *Eisentrager* was "firm and considered dicta that binds this court." Other decisions of this court are firmer still. Citing *Eisentrager*, we held in *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) (per curiam), that "non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States." The law of this circuit is that a "foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *see also 32*

22

*County Sovereignty Comm. v. U.S. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).[11]

As against this line of authority, the dissent offers the distinction that the Suspension Clause is a limitation on congressional power rather than a constitutional right. But this is no distinction at all. Constitutional rights are rights against the government and, as such, *are* restrictions on governmental power. *See H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534 (1949) ("Even the Bill of Rights amendments were framed only as a limitation upon the powers of Congress.").[12] Consider the First Amendment. (In contrasting the Suspension Clause with provisions in the Bill of Rights, *see* Dissent at 3, the dissent is careful to ignore the First Amendment.) Like the Suspension Clause, the First Amendment is framed as a limitation on Congress: "Congress shall make no law . . .." Yet no one would deny that the First Amendment protects the rights to free speech and religion and assembly.

---

[11]  The text of the Suspension Clause also does not lend itself freely to extraterritorial application. The Clause permits suspension of the writ only in cases of "Rebellion or Invasion," neither of which is applicable to foreign military conflicts. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 593-94 (2004) (Thomas, J., dissenting); *see also* J. Andrew Kent, *A Textual and Historical Case Against a Global Constitution*, 95 GEO. L.J. (forthcoming 2007) (manuscript at 59-60, *available at* http://ssrn.com/abstract=888602).

[12]  James Madison's plan was to insert almost the entire Bill of Rights into the Constitution rather than wait for amendment. His proposed location of the Bill of Rights? Article I, Section 9 – next to the Suspension Clause. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH. L. REV. 547, 700-01 & n.437 (1999).

23

The dissent's other arguments are also filled with holes. It is enough to point out three of the larger ones.

There is the notion that the Suspension Clause is different from the Fourth, Fifth, and Sixth Amendments because it does not mention individuals and those amendments do (respectively, "people," "person," and "the accused"). *See* Dissent at 3. Why the dissent thinks this is significant eludes us. Is the point that if a provision does not mention individuals there is no constitutional right? That cannot be right. The First Amendment's guarantees of freedom of speech and free exercise of religion do not mention individuals; nor does the Eighth Amendment's prohibition on cruel and unusual punishment or the Seventh Amendment's guarantee of a civil jury. Of course it is fair to assume that these provisions apply to individuals, just as it is fair to assume that petitions for writs of habeas corpus are filed by individuals.

The dissent also looks to the Bill of Attainder and Ex Post Facto Clauses, both located next to the Suspension Clause in Article I, Section 9. We do not understand what the dissent is trying to make of this juxtaposition. The citation to *United States v. Lovett*, 328 U.S. 303 (1946), is particularly baffling. *Lovett* held only that the Bill of Attainder Clause was justiciable. The dissent's point cannot be that the Bill of Attainder Clause and the Ex Post Facto Clause do not protect individual rights. Numerous courts have held the opposite.[13]  "The fact that the

---

[13]  *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) ("[C]ourts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups . . ..") (citing *United States v. Brown*, 381 U.S. 437 (1965); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866)); *see also Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005); *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981); *Nixon v.*

24

Suspension Clause abuts the prohibitions on bills of attainder and ex post facto laws, provisions well-accepted to protect individual liberty, further supports viewing the habeas privilege as *a core individual right*." Amanda L. Tyler, *Is Suspension a Political Question?*, 59 STAN. L. REV. 333, 374 & n.227 (2006) (emphasis added).[14]

Why is the dissent so fixated on how to characterize the Suspension Clause? The unstated assumption must be that the reasoning of our decisions and the Supreme Court's in denying constitutional rights to aliens outside the United States would not apply if a constitutional provision could be characterized as protecting something other than a "right." On this theory, for example, aliens outside the United States are entitled to the protection of the Separation of Powers because they have no individual rights under the Separation of Powers. Where the dissent gets this strange idea is a mystery, as is the reasoning behind it.

III.

Federal courts have no jurisdiction in these cases. In supplemental briefing after enactment of the DTA, the government asked us not only to decide the habeas jurisdiction question, but also to review the merits of the detainees' designation as enemy combatants by their Combatant Status

---

*Adm'r of Gen. Servs.*, 433 U.S. 425, 468-69 (1977); *Shabazz v. Gabry*, 123 F.3d 909, 912 (6th Cir. 1997).

[14] *Accord* Jay S. Bybee, *Common Ground: Robert Jackson, Antonin Scalia, and a Power Theory of the First Amendment*, 75 TUL. L. REV. 251, 318, 321 (2000) ("[W]e could easily describe [Article I,] Section 9 as a bill of rights for the people of the United States.").

25

Review Tribunals.  *See* DTA § 1005(e)(2).[15]  The detainees objected to converting their habeas appeals to appeals from their Tribunals.  In briefs filed after the DTA became law and after the Supreme Court decided *Hamdan*, they argued that we were without authority to do so.[16]  Even if we have authority to convert the habeas appeals over the petitioners' objections, the record does not have sufficient information to perform the review the DTA allows.  Our only recourse is to vacate the district courts' decisions and dismiss the cases for lack of jurisdiction.

*So ordered.*

---

[15] *See* Supplemental Br. of the Federal Parties Addressing the Detainee Treatment Act of 2005 53-54 ("This Court can and should convert the pending appeals into petitions for review under [DTA section] 1005(e)(2).").

[16] *See* The Guantanamo Detainees' Supplemental Br. Addressing the Effect of the Supreme Ct.'s Op. in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), on the Pending Appeals 8-9 ("The detainees in the pending petitions challenge the lawfulness of their detentions – not the subsequent CSRT decisions . . .."); Corrected Supplemental Br. of Pet'rs Boumediene, et al., & Khalid Regarding Section 1005 of the Detainee Treatment Act of 2005 56-59 ("Nothing in the [DTA] authorizes the Court to 'convert' Petitioners' notices of appeal of the district court's judgment into original petitions for review of CSRT decisions under section 1005(e)(2) of the Act."); The Guantanamo Detainees' Corrected Second Supplemental Br. Addressing the Effect of the Detainee Treatment Act of 2005 on this Ct.'s Jurisdiction over the Pending Appeals 43-44 ("[T]his court should not convert these petitions into petitions for review under the DTA as the government suggests.").

ROGERS, *Circuit Judge*, dissenting:  I can join neither the reasoning of the court nor its conclusion that the federal courts lack power to consider the detainees' petitions.  While I agree that Congress intended to withdraw federal jurisdiction through the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA"), the court's holding that the MCA is consistent with the Suspension Clause of Article I, section 9, of the Constitution does not withstand analysis.  By concluding that this court must reject "the detainees' claims to constitutional rights," Op. at 21, the court fundamentally misconstrues the nature of suspension:  Far from conferring an individual right that might pertain only to persons substantially connected to the United States, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), the Suspension Clause is a limitation on the powers of Congress.  Consequently, it is only by misreading the historical record and ignoring the Supreme Court's well-considered and binding dictum in *Rasul v. Bush*, 542 U.S. 466, 481-82 (2004), that the writ at common law would have extended to the detainees, that the court can conclude that neither this court nor the district courts have jurisdiction to consider the detainees' habeas claims.

A review of the text and operation of the Suspension Clause shows that, by nature, it operates to constrain the powers of Congress.  Prior to the enactment of the MCA, the Supreme Court acknowledged that the detainees held at Guantanamo had a statutory right to habeas corpus.  *Rasul*, 542 U.S. at 483-84.  The MCA purports to withdraw that right but does so in a manner that offends the constitutional constraint on suspension.  The Suspension Clause limits the removal of habeas corpus, at least as the writ was understood at common law, to times of rebellion or invasion unless Congress provides an adequate alternative remedy.  The writ would have reached the detainees at common law, and Congress has neither provided an adequate alternative remedy, through the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Div. A, tit. X, 119 Stat. 2680, 2739

2

("DTA"), nor invoked the exception to the Clause by making the required findings to suspend the writ. The MCA is therefore void and does not deprive this court or the district courts of jurisdiction.

On the merits of the detainees' appeal in *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) and the cross-appeals in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), I would affirm in part in *Guantanamo Detainee Cases* and reverse in *Khalid* and remand the cases to the district courts.

## I.

Where a court has no jurisdiction it is powerless to act. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173-74 (1803). But a statute enacted by Congress purporting to deprive a court of jurisdiction binds that court only when Congress acts pursuant to the powers it derives from the Constitution. The court today concludes that the Suspension Clause is an individual right that cannot be invoked by the detainees. *See* Op. at 22. The text of the Suspension Clause and the structure of the Constitution belie this conclusion. The court further concludes that the detainees would have had no access to the writ of habeas corpus at common law. *See* Op. at 14-17. The historical record and the guidance of the Supreme Court disprove this conclusion.

In this Part, I address the nature of the Suspension Clause, the retroactive effect of Congress's recent enactment on habeas corpus — the MCA — and conclude with an assessment of the effect of the MCA in light of the dictates of the Constitution.

## A.

The court holds that Congress may suspend habeas corpus as to the detainees because they have no individual rights under

3

the Constitution. It is unclear where the court finds that the limit on suspension of the writ of habeas corpus is an individual entitlement. The Suspension Clause itself makes no reference to citizens or even persons. Instead, it directs that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. This mandate appears in the ninth section of Article I, which enumerates those actions expressly excluded from Congress's powers. Although the Clause does not specifically say so, it is settled that only Congress may do the suspending. *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807); *see Hamdi v. Rumsfeld*, 542 U.S. 507, 562 (2004) (Scalia, J., dissenting); *Ex parte Merryman*, 17 F. Cas. 144, 151-152 (No. 9487) (Taney, Circuit Justice, C.C.D. Md. 1861); 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342 (5th ed. 1891). In this manner, by both its plain text and inclusion in section 9, the Suspension Clause differs from the Fourth Amendment, which establishes a "right of the people," the Fifth Amendment, which limits how a "person shall be held," and the Sixth Amendment, which provides rights to "the accused." These provisions confer rights to the persons listed .[1]

---

[1]   The Suspension Clause is also distinct from the First Amendment, which has been interpreted as a guarantor of individual rights. *See, e.g.*, *United States v. Robel*, 389 U.S. 258, 263 (1967); *Gitlow v. New York*, 268 U.S. 652, 666 (1925). The court cannot seriously maintain that the two provisions are alike while acknowledging that the First Amendment confers an individual right enforceable by the courts and simultaneously claiming that the Suspension Clause does not, *see* Op. at 13 n.5 (citing *Bollman*, 8 U.S. (4 Cranch) at 95); *see also In re Barry*, 42 F. 113, 122 (C.C.S.D.N.Y. 1844), *error dismissed sub nom. Barry v. Mercein*, 46 U.S. 103 (1847) ("The ninth section of the first article of the constitution, par. 2, declaring that 'the privilege of the writ of habeas corpus shall not be suspended unless, when in cases of rebellion or invasion, the public

4

The other provisions of Article I, section 9, indicate how to read the Suspension Clause. The clause immediately following provides that "[n]o Bill of Attainder or ex post facto Law shall be passed."[2] The Supreme Court has construed the Attainder Clause as establishing a "category of Congressional actions which the Constitution barred." *United States v. Lovett*, 328 U.S. 303, 315 (1946). In *Lovett*, the Court dismissed the possibility that an Act of Congress in violation of the Attainder Clause was non-justiciable, remarking:

> Our Constitution did not contemplate such a result. To quote Alexander Hamilton,
>
>> * * * a limited constitution * * * [is] one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex post facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; *whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void.* Without this, all the reservations of particular rights or privileges

---

safety may require it,' does not purport to convey power or jurisdiction to the judiciary. It is in restraint of executive and legislative powers, and no further affects the judiciary than to impose on them the necessity, if the privilege of habeas corpus is suspended by any authority, to decide whether the exigency demanded by the constitution exists to sanction the act.").

[2] Suspensions and bills of attainder have a shared history. In England, suspensions occasionally named specific individuals and therefore amounted to bills of attainder. *See* Rex A. Collings, Jr., *Habeas Corpus for Convicts — Constitutional Right or Legislative Grace?*, 40 Cal. L. Rev. 335, 339 (1952).

5

would amount to nothing.

*Id.* at 314 (quoting THE FEDERALIST NO. 78) (emphasis added) (alteration and omissions in original). So too, in *Weaver v. Graham*, 450 U.S. 24, 28-29 & n.10 (1981), where the Court noted that the ban on *ex post facto* legislation "restricts governmental power by restraining arbitrary and potentially vindictive legislation" and acknowledged that the clause "confin[es] the legislature to penal decisions with prospective effect." *See also Marbury*, 5 U.S. (1 Cranch) at 179-80; *Foretich v. United States*, 351 F.3d 1198, 1216-26 (D.C. Cir. 2003). For like reasons, any act in violation of the Suspension Clause is void, *cf. Lovett*, 328 U.S. at 316, and cannot operate to divest a court of jurisdiction.[3]

------

[3]    The court cites a number of cases for the proposition that the Attainder Clause confers an individual right instead of operating as a structural limitation on Congress. *See* Op. at 23 n.13. None of these cases makes the court's point. In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Supreme Court held that it is not a bill of attainder for Congress to punish a state. This speaks to the definition of a bill of attainder and says nothing about the operation of the Attainder Clause. *Weaver v. Graham*, 450 U.S. 24, 30 (1981), says the opposite of what the court asserts. In *Weaver*, the Supreme Court emphasized that the *Ex Post Facto* Clause is not intended to protect individual rights but governs the operation of government institutions:

The presence or absence of an affirmative, enforceable right is not relevant, however, to the *ex post facto* prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the

6

The court dismisses the distinction between individual rights and limitations on Congress's powers. It chooses to make no affirmative argument of its own, instead hoping to rebut the sizable body of conflicting authorities.

The court appears to believe that the Suspension Clause is just like the constitutional amendments that form the Bill of Rights.[4] It is a truism, of course, that individual rights like those found in the first ten amendments work to limit Congress. However, individual rights are merely a subset of those matters that constrain the legislature. These two sets cannot be understood as coextensive unless the court is prepared to recognize such awkward individual rights as Commerce Clause rights, *see* U.S. CONST. art. I, § 8, cl. 3, or the personal right not

_____

crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

The Court also emphasized the structural nature of the limitations of Article I, section 9, in *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 469 (1977) (noting that "the Bill of Attainder Clause [is] . . . one of the organizing principles of our system of government"). Unsurprisingly, the court cites no authority that would support its novel construction of section 9 by providing that certain individuals lack Attainder Clause or *Ex Post Facto* Clause rights.

[4]    For this point, the court quotes, without context, from *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949), *see* Op. at 22. In that case, the Supreme Court emphasized that the Bill of Rights limited the powers of Congress and did not affect the powers of the individual states, *H.P. Hood & Sons*, 336 U.S. at 534, at least until certain amendments were incorporated after ratification of the Fourteenth Amendment. This says nothing about the distinction, relevant here, between individual rights and limitations on Congress.

7

to have a bill raising revenue that originates in the Senate, *see* U.S. CONST. art. I, § 7, cl. 1; *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224 (1974) (finding no individual right under the Ineligibility Clause).

That the Suspension Clause appears in Article I, section 9, is not happenstance. In Charles Pinckney's original proposal, suspension would have been part of the judiciary provision. It was moved in September 1789 by the Committee on Style and Arrangement, which gathered the restrictions on Congress's power in one location. *See* WILLIAM F. DUKER, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS 128-32 (1980); 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 596 (Max Farrand ed., rev. ed. 1966). By the court's reasoning, the Framers placed the Suspension Clause in Article I merely because there were no similar individual rights to accompany it. It is implausible that the Framers would have viewed the Suspension Clause, as the court implies, as a budding Bill of Rights but would not have assigned the provision its own section of the Constitution, much as they did with the only crime specified in the document, treason, which appears alone in Article III, section 3. Instead, the court must treat the Suspension Clause's placement in Article I, section 9, as a conscious determination of a limit on Congress's powers. The Supreme Court has found similar meaning in the placement of constitutional clauses ever since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 419-21 (1819) (Necessary and Proper Clause); *see also, e.g.*, *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 220-21 (1989) (Taxing Clause).

The court also alludes to the idea that the Suspension Clause cannot apply to foreign military conflicts because the exception extends only to cases of "Rebellion or Invasion." Op. at 21 n.11. The Framers understood that the privilege of the writ was of such great significance that its suspension should be

8

strictly limited to circumstances where the peace and security of the Nation were jeopardized. Only after considering alternative proposals authorizing suspension "on the most urgent occasions" or forbidding suspension outright did the Framers agree to a narrow exception upon a finding of rebellion or invasion. *See* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, *supra*, at 438. Indeed, it would be curious if the Framers were implicitly sanctioning Executive-ordered detention abroad without judicial review by limiting suspension — and by the court's reasoning therefore limiting habeas corpus — to domestic events. To the contrary, as Alexander Hamilton foresaw in *The Federalist No. 84*, invoking William Blackstone,

> To bereave a man of life (says he), or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore *a more dangerous engine* of arbitrary government.

THE FEDERALIST NO. 84, at 468 (E.H. Scott ed. 1898) (quoting WILLIAM BLACKSTONE, 1 COMMENTARIES *131-32); *see also Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 125 (1866).

## B.

This court would have jurisdiction to address the detainees' claims but for Congress's enactment of the MCA. In *Rasul*, 542 U.S. at 483-84, the Supreme Court held that the federal district courts had jurisdiction to hear petitions for writs of habeas corpus filed pursuant to 28 U.S.C. § 2241 by persons detained as "enemy combatants" by the United States at the Guantanamo Bay Naval Base. At the time, the habeas statute provided, in

9

relevant part, that upon the filing of such a petition, the district court would promptly determine whether the petitioner was being held under the laws, Constitution, and treaties of the United States, utilizing the common-law procedure of a return filed by the government and a traverse filed by the petitioner. *See* 28 U.S.C. §§ 2242-2253. After *Rasul*, Congress enacted the DTA, which purported to deprive the federal courts of habeas jurisdiction. DTA § 1005(e), 118 Stat. at 2741-43. The Supreme Court held in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2764-69 (2006), however, that the DTA does not apply retroactively, and so it does not disturb this court's jurisdiction over the instant appeals, which were already pending when the DTA became law.

As for the MCA, I concur in the court's conclusion that, notwithstanding the requirements that Congress speak clearly when it intends its action to apply retroactively, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-73 (1994), and when withdrawing habeas jurisdiction from the courts, *see INS v. St. Cyr*, 533 U.S. 289, 299 (2001); *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 102 (1869), Congress sought in the MCA to revoke all federal jurisdiction retroactively as to the habeas petitions of detainees held at Guantanamo Bay. *See* Op. at 9-12. I do not join the court's reasoning. The court stresses Congress's emphasis that the provision setting the effective date for the jurisdictional change "shall apply to all cases, without exception." However, the absence of exceptions does not establish the scope of the provision itself. The entire provision reads:

> (b)—EFFECTIVE DATE. The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act *which relate to* any aspect of the

10

>detention, transfer, treatment, trial, or conditions of
>detention of an alien detained by the United States
>since September 11, 2001.

MCA § 7(b), 120 Stat. at 2636 (emphasis added).  Subsection
(a), in turn, amends 28 U.S.C. § 2241(e), which confers habeas
jurisdiction on the federal courts.  New section 2241(e)(1)
repeals "jurisdiction to hear or consider an application for a writ
of habeas corpus."  New section 2241(e)(2) repeals "jurisdiction
to hear or consider any other action . . . relating to any aspect of
the detention, transfer, treatment, trial, or conditions of
confinement."

      The detainees suggest that by singling out habeas corpus in
§ 2241(e)(1) and by failing to do so in section 7(b) — and
instead repeating the same list ("detention, transfer, treatment,
trial, or conditions of confinement") that appears in § 2241(e)(2)
— Congress was expressing its intent to make the MCA
retroactive only as to § 2241(e)(2).  This argument hinges on
their view that a petition for a writ of habeas corpus is not
"relating to any aspect of . . . detention."  But, by the plain text
of section 7, it is clear that the detainees suggest ambiguity
where there is none.  As the court notes, *see* Op. at 11 n. 4,
whereas § 2241(e)(1) refers to habeas corpus, § 2241(e)(2) deals
with "any *other* action . . . relating to any aspect of the
detention, transfer, treatment, trial, or conditions of
confinement." (Emphasis added).  By omitting the word "other"
in section 7(b), and by cross-referencing section 7(a) in its
entirety, Congress signaled its intent for the retroactivity
provision to apply to habeas corpus cases.  This conclusion has
nothing to do with Congress's emphasis that there are no
exceptions and everything to do with the intent it expressed
through the substantive provisions of the statute.

11

### C.

The question, then, is whether by attempting to eliminate all federal court jurisdiction to consider petitions for writs of habeas corpus, Congress has overstepped the boundary established by the Suspension Clause. The Supreme Court has stated on several occasions that "*at the absolute minimum*, the Suspension Clause protects the writ 'as it existed in 1789.'" *St. Cyr*, 533 U.S. at 301 (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996)) (emphasis added). Therefore, at least insofar as habeas corpus exists and existed in 1789, Congress cannot suspend the writ without providing an adequate alternative except in the narrow exception specified in the Constitution.[5] This proscription applies equally to removing the writ itself and to removing all jurisdiction to issue the writ. *See United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872). *See generally* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 3.2 (4th ed. 2003).

---

[5]   It is unnecessary to resolve the question of whether the Constitution provides for an affirmative right to habeas corpus — either through the Suspension Clause, the Fifth Amendment guarantee of due process, or the Sixth Amendment — or presumed the continued vitality of this "writ antecedent to statute," *Williams v. Kaiser*, 323 U.S. 471, 484 n.2 (1945) (internal quotation marks omitted). Because the Supreme Court in *Rasul* held that the writ existed in 2004 and that there was, therefore, something to suspend, it is sufficient to assess whether the writ sought here existed in 1789. Given my conclusion, *see infra* Part C.1, it is also unnecessary to resolve the question of whether the Suspension Clause protects the writ of habeas corpus as it has developed since 1789. *Compare St. Cyr*, 533 U.S. at 304-05, *and LaGuerre v. Reno*, 164 F.3d 1035, 1038 (7th Cir. 1998), *with Felker*, 518 U.S. at 663-64, *and* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 COLUM. L. REV. 961, 970 (1998). The court oddly chooses to ignore the issue by truncating its reference to *St. Cyr*, without comment, and omitting the qualifier "at the absolute minimum." *See* Op. at 14.

12

**1.**

Assessing the state of the law in 1789 is no trivial feat, and the court's analysis today demonstrates how quickly a few missteps can obscure history.  In conducting its historical review, the court emphasizes that no English cases predating 1789 award the relief that the detainees seek in their petitions. Op. at 15-17.  "The short of the matter," the court concludes, is that "habeas corpus would not have been available in 1789 to aliens without presence or property within the United States." Op. at 17.  But this misses the mark.  There may well be no case at common law in which a court exercises jurisdiction over the habeas corpus claim of an alien from a friendly nation, who may himself be an enemy, who is captured abroad and held outside the sovereign territory of England but within the Crown's exclusive control without being charged with a crime or violation of the Laws of War.  On the other hand, the court can point to no case where an English court has refused to exercise habeas jurisdiction because the enemy being held, while under the control of the Crown, was not within the Crown's dominions.[6]  The paucity of direct precedent is a consequence of

---

[6]   The court's assertion that "extraterritorial detention was not unknown in Eighteenth Century England," Op. at 18 n.9, is of no moment.  The court references the 1667 impeachment of the Earl of Clarendon, Lord High Chancellor of England.  *See id.* at 16, 18 n.9. Clarendon was accused of sending enemies to faraway lands to deprive them of effective legal process.  The court makes the unsupported inference that habeas corpus was therefore unavailable abroad.  Nothing in the Clarendon affair suggests that habeas corpus was sought and refused.  Instead, as remains the case today, legal process can be evaded when prisoners are detained without access to the courts.  That the detainees at Guantanamo were able to procure next friends and attorneys to pursue their petitions whereas seventeenth-century Englishmen would have found this difficult, if not impossible, says nothing about the availability of the writ at common law.  The court's obfuscation as to the distinction between

13

the unique confluence of events that defines the situation of these detainees and not a commentary on the reach of the writ at common law.

The question is whether by the process of inference from similar, if not identical, situations the reach of the writ at common law would have extended to the detainees' petitions. At common law, we know that "the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown.'" *Rasul*, 542 U.S. at 482 (quoting *Ex parte Mwenya*, [1960] 1 Q.B. 241, 303 (C.A.) (Lord Evershed, M.R.)). We also know that the writ extended not only to citizens of the realm, but to aliens, *see id.* at 481 & n.11, even in wartime, *see id.* at 474-75; *Case of Three Spanish Sailors*, 2 Black. W. 1324, 96 Eng. Rep. 775 (C.P. 1779); *Rex v. Schiever*, 2 Burr. 765, 97 Eng. Rep. 551 (K.B. 1759). A War of 1812-era case in which Chief Justice John Marshall granted a habeas writ to a British subject establishes that even conceded enemies of the United States could test in its courts detention that they claimed was unauthorized. *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien: A Case Missing from the Canon*, 9 Green Bag 2d 39 (2005) (reporting *United States v. Williams* (C.C.D. Va. Dec. 4, 1813)).

To draw the ultimate conclusion as to whether the writ at common law would have extended to aliens under the control (if not within the sovereign territory) of the Crown requires piecing together the considerable circumstantial evidence, a step that the court is unwilling to take. Analysis of one of these cases, the 1759 English case of *Rex v. Schiever*, shows just how small this final inference is. Barnard Schiever was the subject of a neutral

impracticality and unavailability is further addressed *infra*.

14

nation (Sweden), who was detained by the Crown when England was at war with France. *Schiever*, 2 Burr. at 765, 97 Eng. Rep. at 551. He claimed that his classification as a "prisoner of war" was factually inaccurate, because he "was desirous of entering into the service of the merchants of England" until he was seized on the high seas by a French privateer, which in turn was captured by the British Navy. *Id.* In an affidavit, he swore that his French captor "detained him[] against his will and inclination . . . and treated him with so much severity[] that [his captor] would not suffer him to go on shore when in port . . . but closely confined him to duty [on board the ship]." *Id.* at 765-66, 97 Eng. Rep. at 551. The habeas court ultimately determined, on the basis of Schiever's own testimony, that he was properly categorized and thus lawfully detained. *Id.* at 766, 97 Eng. Rep. at 551-52.

The court discounts *Schiever* because, after England captured the French privateer while en route to Norway, it was carried into Liverpool, England, where Schiever was held in the town jail. *Id.*, 97 Eng. Rep. at 551. As such, the case did not involve "an alien outside the territory of the sovereign." Op. at 14-15. However, Schiever surely was not *voluntarily* brought into England, so his mere presence conferred no additional rights. As the Supreme Court observed in *Verdugo-Urquidez*, "involuntary [presence] is not the sort to indicate any substantial connection with our country." 494 U.S. at 271. Any gap between *Schiever* and the detainees' detention at Guantanamo Bay is thus exceedingly narrow.

This court need not make the final inference. It has already been made for us. In *Rasul*, the Supreme Court stated that "[a]pplication of the habeas statute to persons detained at the [Guantanamo] base is consistent with the historical reach of the writ of habeas corpus." 542 U.S. at 481. By reaching a contrary conclusion, the court ignores the settled principle that "carefully

15

considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (quoting *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997)) (internal quotation marks omitted). Even setting aside this principle, the court offers no convincing analysis to compel the contrary conclusion. The court makes three assertions: First, Lord Mansfield's opinion in *Rex v. Cowle*, 2 Burr. 834, 97 Eng. Rep. 587 (K.B. 1759), disavows the right claimed by the detainees. Second, it would have been impractical for English courts to extend the writ extraterritorially. Third, *Johnson v. Eisentrager*, 339 U.S. 763 (1949), is controlling. None of these assertions withstands scrutiny.

In *Cowle*, Lord Mansfield wrote that "[t]here is no doubt as to the power of this Court; where the place is under the subjection of the Crown of England; the only question is, as to the propriety." 2 Burr. at 856, 97 Eng. Rep. at 599. He noted thereafter, by way of qualification, that the writ would not extend "[t]o foreign dominions, which belong to a prince who succeeds to the throne of England." *Id.*, 97 Eng. Rep. at 599-600. Through the use of ellipsis marks, the court excises the qualification and concludes that the writ does not extend "[t]o foreign dominions." Op. at 16. This masks two problems in its analysis. A "foreign dominion" is not a foreign country, as the court's reasoning implies, but rather "a country which at some time formed part of the dominions of a foreign state or potentate, but which by conquest or cession has become a part of the dominions of the Crown of England." *Ex parte Brown*, 5 B. & S. 280, 122 Eng. Rep. 835 (K.B. 1864). And the exception noted in Lord Mansfield's qualification has nothing to do with extraterritoriality: Instead, habeas from mainland courts was unnecessary for territories like Scotland that were controlled by princes in the line of succession because they had independent court systems. *See* WILLIAM BLACKSTONE, 1 COMMENTARIES

16

*95-98; James E. Pfander, *The Limits of Habeas Jurisdiction and the Global War on Terror*, 91 CORNELL L. REV. 497, 512-13 (2006). In the modern-day parallel, where a suitable alternative for habeas exists, the writ need not extend. *See* 2 ROBERT CHAMBERS, A COURSE OF LECTURES ON THE ENGLISH LAW DELIVERED AT OXFORD 1767-1773, at 8 (Thomas M. Curley, ed., 1986) (quoting *Cowle* as indicating that, notwithstanding the power to issue the writ "in *Guernsey*, *Jersey*, *Minorca*, or the *plantations*," courts would not think it "proper to interpose" because "the most usual way is to complain to the *king in Council*, the supreme court of appeal from those provincial governments"); *see also infra* Part C.2. The relationship between England and principalities was the only instance where it was "found necessary to restrict the scope of the writ." 9 WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 124 (1938). *Cowle*, by its plain language, then, must be read as recognizing that the writ of habeas corpus ran even to places that were "no part of the realm," where the Crown's other writs did not run, nor did its laws apply. 2 Burr. at 835-36, 853-55, 97 Eng. Rep. at 587-88, 598-99. The Supreme Court has adopted this logical reading. *See Rasul*, 542 U.S. at 481-82; *see also* Mitchell B. Malachowski, *From Gitmo with Love: Redefining Habeas Corpus Jurisdiction in the Wake of the Enemy Combatant Cases of 2004*, 52 NAVAL L. REV. 118, 122-23 (2005).[7]

---

[7] The significance of a 1794 opinion by the U.S. Attorney General, *see* Op. at 15, which expresses the view that the writ should issue to the foreign commander of a foreign ship-of-war in U.S. ports, reasoning that the foreign ship has "no exemption from the jurisdiction of the country into which he comes," 1 Op. Att'y Gen. 47 (1794), is unclear. Nor is it clear what point the court is making by referencing *In re Ning Yi-Ching*, 56 T.L.R. 3 (K.B. Vacation Ct. 1939). In *Rasul*, the Supreme Court noted that *Ning Yi-Ching* "made quite clear that 'the remedy of *habeas corpus* was not confined to British subjects,'

17

The court next disposes of *Cowle* and the historical record by suggesting that the "power" to issue the writ acknowledged by Lord Mansfield can be explained by the Habeas Corpus Act of 1679, 31 Car. 2, c. 2.  *See* Op. at 16.  The Supreme Court has stated that the Habeas Corpus Act "enforces the common law," *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202 (1730), thus hardly suggesting that the "power" recognized by Lord Mansfield was statutory and not included within the 1789 scope of the common-law writ.  To the extent that the court makes the curious argument that the Habeas Corpus Act would have made it too impractical to produce prisoners if applied extraterritorially because it imposed fines on jailers who did not quickly produce the body, Op. at 16-17, the court cites no precedent that suggests that "practical problems" eviscerate "the precious safeguard of personal liberty [for which] there is no higher duty than to maintain it unimpaired," *Bowen v. Johnston*, 306 U.S. 19, 26 (1939).  This line of reasoning employed by the court fails for two main reasons:

First, the Habeas Corpus Act of 1679 was expressly limited to those who "have beene committed for criminall or supposed criminall Matters."  31 Car. 2, c. 2, § 1.  Hence, the burden of expediency imposed by the Act could scarcely have prevented common-law courts from exercising habeas jurisdiction in non-criminal matters such as the petitions in these appeals.  Statutory habeas in English courts did not extend to non-criminal detention until the Habeas Corpus Act of 1816, 56 Geo. 3, c.

---

but would extend to 'any person . . . detained' within the reach of the writ," 542 U.S. at 483 n.13 (quoting *Ning Yi-Ching*, 56 T.L.R. at 5), and that the case does not support a "narrow view of the territorial reach of the writ," *id.*  Here, the court provides a parenthetical quotation for *Ning Yi-Ching* that recalls a dissenting position from a prior case that was later repudiated.  *See Rasul*, 542 U.S. at 483 n.14; *Mwenya*, [1960] 1 Q.B. at 295 (Lord Evershed, M.R.).

18

100, although courts continued to exercise their common-law powers in the interim. *See* 2 CHAMBERS, *supra*, at 11; 9 HOLDSWORTH, *supra*, at 121.

Second, there is ample evidence that the writ did issue to faraway lands. In *Ex parte Anderson*, 3 El. & El. 487, 121 Eng. Rep. 525 (Q.B. 1861), *superseded by statute*, 25 & 26 Vict., c. 20, § 1, the Court of Queen's Bench exercised its common-law powers to issue a writ of habeas corpus to Quebec in Upper Canada after expressly acknowledging that it was "sensible of the inconvenience which may result from such a step." *Id.* at 494-95, 121 Eng. Rep. at 527-28; *see also Brown*, 5 B. & S. 280, 122 Eng. Rep. 835 (issuing a writ to the Isle of Man in the sea between England and Ireland). English common-law courts also recognized the power to issue habeas corpus in India, even to non-subjects, and did so notwithstanding competition from local courts, well before England recognized its sovereignty in India. *See* B.N. PANDEY, THE INTRODUCTION OF ENGLISH LAW INTO INDIA 112, 149, 151 (1967); *see also Rex v. Mitter*, Morton 210 (Sup. Ct., Calcutta 1781), *reprinted in* 1 THE INDIAN DECISIONS (OLD SERIES) 1008 (T.A. Venkasawmy Row ed., 1911); *Rex v. Hastings*, Morton 206, 208-09 (Sup. Ct., Calcutta 1775) (opinion of Chambers, J.), *reprinted in* 1 THE INDIAN DECISIONS, *supra*, at 1005, 1007; *id.* at 209 (opinion of Impey, C.J.); Kal Raustiala, *The Geography of Justice*, 73 FORDHAM L. REV. 2501, 2530 n.156 (2005).

Finally, the court reasons that *Eisentrager* requires the conclusion that there is no constitutional right to habeas for those in the detainees' posture. *See* Op. at 17-18. In *Eisentrager*, the detainees claimed that they were "entitled, as a constitutional right, to sue in some court of the United States for a writ of *habeas corpus*." 339 U.S. at 777. Thus *Eisentrager*

19

presented a far different question than confronts this court.[8]  The detainees do not here contend that the Constitution accords them a positive right to the writ but rather that the Suspension Clause restricts Congress's power to eliminate a preexisting statutory right.  To answer that question does not entail looking to the extent of the detainees' ties to the United States but rather requires understanding the scope of the writ of habeas corpus at common law in 1789.  The court's reliance on *Eisentrager* is misplaced.

## 2.

This brings me to the question of whether, absent the writ, Congress has provided an adequate alternative procedure for challenging detention.  If it so chooses, Congress may replace the privilege of habeas corpus with a commensurate procedure without overreaching its constitutional ambit.  However, as the Supreme Court has cautioned, if a subject of Executive detention "were subject to any substantial procedural hurdles which ma[k]e his remedy . . . less swift and imperative than federal habeas corpus, the gravest constitutional doubts would be engendered [under the Suspension Clause]."  *Sanders v. United States*, 373 U.S. 1, 14 (1963).

The Supreme Court has, on three occasions, found a replacement to habeas corpus to be adequate.  In *United States v. Hayman*, 342 U.S. 205 (1952), the Court reviewed 42 U.S.C. § 2255, which extinguished the writ as to those convicted of federal crimes before Article III judges in exchange for recourse before the sentencing court.  Prior to the enactment of section 2255, the writ was available in the jurisdiction of detention, not the jurisdiction of conviction.  The Court concluded that this

---

[8]    To the extent that the court relies on *Eisentrager* as proof of its historical theory, the Supreme Court rejected that approach in *Rasul, see* 542 U.S. at 475-79.

20

substitute was acceptable in part because the traditional habeas remedy remained available by statute where section 2255 proved "inadequate or ineffective." *Id.* at 223. The Court came to a similar conclusion in *Swain v. Pressley*, 430 U.S. 372 (1977), reviewing a statute with a similar "inadequate or ineffective" escape hatch, *id.* at 381 (reviewing D.C. CODE § 23-110). In that case, the Court concluded that a procedure for hearing habeas in the District of Columbia's courts, as distinct from the federal courts, was an adequate alternative. Finally, in *Felker*, 518 U.S. at 663-64, the Court found no Suspension Clause violation in the restrictions on successive petitions for the writ under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1217, concluding that these were "well within the compass of [the] evolutionary process" of the habeas corpus protocol for abuse of the writ and did not impose upon the writ itself.

These cases provide little cover for the government. As the Supreme Court has stated, "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *St. Cyr*, 533 U.S. at 301. With this in mind, the government is mistaken in contending that the combatant status review tribunals ("CSRTs") established by the DTA suitably test the legitimacy of Executive detention. Far from merely adjusting the mechanism for vindicating the habeas right, the DTA imposes a series of hurdles while saddling each Guantanamo detainee with an assortment of handicaps that make the obstacles insurmountable.

At the core of the Great Writ is the ability to "inquire into illegal detention with a view to an order releasing the petitioner." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (internal quotation marks and alteration omitted). An examination of the CSRT procedure and this court's CSRT

21

review powers reveals that these alternatives are neither adequate to test whether detention is unlawful nor directed toward releasing those who are unlawfully held.

"Petitioners in habeas corpus proceedings . . . are entitled to careful consideration and plenary processing of their claims including full opportunity for the presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969). The offerings of CSRTs fall far short of this mark. Under the common law, when a detainee files a habeas petition, the burden shifts to the government to justify the detention in its return of the writ. When not facing an imminent trial,[9] the detainee then must be afforded an opportunity to traverse the writ, explaining why the grounds for detention are inadequate in fact or in law. *See, e.g.*, 28 U.S.C. §§ 2243, 2248; *Bollman*, 8 U.S. (4 Cranch) at 125; *Ex parte Beeching*, 4 B. & C. 137, 107 Eng. Rep. 1010 (K.B. 1825); *Schiever*, 2 Burr. 765, 97 Eng. Rep. 551; *cf. Hamdi*, 542 U.S. at 537-38 (plurality opinion). A CSRT works quite differently. *See* Order Establishing Combatant Status Review Tribunal (July 7, 2004), *available at* h t t p : / / w w w . d e f e n s e l i n k . m i l / n e w s / J u l 2 0 0 4 / d20040707review.pdf. The detainee bears the burden of coming forward with evidence explaining why he should *not* be detained. The detainee need not be informed of the basis for his detention (which may be classified), need not be allowed to

---

[9] At common law, where criminal charges were pending, a prisoner filing a habeas writ would be remanded, although habeas incorporated a speedy-trial guarantee. *See, e.g.*, *Ex parte Beeching*, 4 B. & C. 137, 107 Eng. Rep. 1010 (K.B. 1825); *Bushell's Case*, Vaugh. 135, 124 Eng. Rep. 1006, 1009-10 (C.P. 1670). *But see* MCA § 3(a)(1), 120 Stat. at 2602 (codified at 10 U.S.C. § 948b(d)(A)). Once there was "a judgment of conviction rendered by a court of general criminal jurisdiction," release under the writ was unavailable. *Hayman*, 342 U.S. at 210-11.

22

introduce rebuttal evidence (which is sometimes deemed by the CSRT too impractical to acquire), and must proceed without the benefit of his own counsel.[10] Moreover, these proceedings occur before a board of military judges subject to command influence, *see Hamdan*, 126 S. Ct. at 2804, 2806 (Kennedy, J., concurring in part); *Weiss v. United States*, 510 U.S. 163, 179-80 (1994); *cf.* 10 U.S.C. § 837(a). Insofar as each of these practices impedes the process of determining the true facts underlying the lawfulness of the challenged detention, they are inimical to the nature of habeas review.

This court's review of CSRT determinations, *see* DTA § 1005(e)(2), 119 Stat. at 2742, is not designed to cure these inadequacies. This court may review only the record developed by the CSRT to assess whether the CSRT has complied with its own standards. Because a detainee still has no means to present evidence rebutting the government's case — even assuming the detainee could learn of its contents — assessing whether the government has more evidence in its favor than the detainee is hardly the proper antidote. The fact that this court also may consider whether the CSRT process "is consistent with the Constitution and laws of the United States," DTA § 1005(e)(2)(C)(ii), 119 Stat. at 2742, does not obviate the need for habeas. Whereas a cognizable constitutional, statutory, or treaty violation could defeat the lawfulness of the government's cause for detention, the writ issues whenever the Executive lacks a lawful justification for continued detention. The provisions of DTA § 1005(e)(2) cannot be reconciled with the purpose of

---

[10] With a few possible exceptions, the Guantanamo detainees before the federal courts are unlikely to be fluent in English or to be familiar with legal procedures and, as their detentions far from home and cut off from their families have been lengthy, they are likely ill prepared to be able to obtain evidence to support their claims that they are not enemies of the United States.

23

habeas corpus, as they handcuff attempts to combat "the great engines of judicial despotism," THE FEDERALIST NO. 83, at 456 (Alexander Hamilton) (E.H. Scott ed. 1898).

Additionally, and more significant still, continued detention may be justified by a CSRT on the basis of evidence resulting from torture. Testimony procured by coercion is notoriously unreliable and unspeakably inhumane. *See generally* INTELLIGENCE SCIENCE BOARD, EDUCING INFORMATION: INTERROGATION: SCIENCE AND ART (2006), *available at* http://www.fas.org/irp/dni/educing.pdf. This basic point has long been recognized by the common law, which "has regarded torture and its fruits with abhorrence for over 500 years." *A. v. Sec'y of State*, [2006] 2 A.C. 221 ¶ 51 (H.L.) (appeal taken from Eng.) (Bingham, L.); *see also Hamdan*, 126 S. Ct. at 2786; *Jackson v. Denno*, 378 U.S. 368, 386 (1964); *Proceedings Against Felton*, 3 Howell's St. Tr. 367, 371 (1628) (Eng.); JOHN H. LANGBEIN, TORTURE AND THE LAW OF PROOF 73 (1977) ("Already in the fifteenth and sixteenth centuries, . . . the celebrated Renaissance 'panegyrists' of English law were . . . extolling the absence of torture in England.") (footnote omitted). The DTA implicitly endorses holding detainees on the basis of such evidence by including an anti-torture provision that applies only to future CSRTs. DTA § 1005(b)(2), 119 Stat. at 2741. Even for these future proceedings, however, the Secretary of Defense is required only to develop procedures to assess whether evidence obtained by torture is probative, not to require its exclusion. *Id.* § 1005(b)(1), 119 Stat. at 2741.

Even if the CSRT protocol were capable of assessing whether a detainee was unlawfully held and entitled to be released, it is not an adequate substitute for the habeas writ because this remedy is not guaranteed. Upon concluding that detention is unjustified, a habeas court "can only direct [the prisoner] to be discharged." *Bollman*, 8 U.S. (4 Cranch) at 136;

24

*see also* 2 STORY, *supra*, § 1339.  But neither the DTA nor the MCA require this, and a recent report studying CSRT records shows that when at least three detainees were found by CSRTs not to be enemy combatants, they were subjected to a second, and in one case a third, CSRT proceeding until they were finally found to be properly classified as enemy combatants.  Mark Denbeaux et al., No-Hearing Hearings: CSRT: The Modern Habeas Corpus?, at 37-39 (2006), http://law.shu.edu/news/final_no_hearing_hearings_report.pdf.

**3.**

Therefore, because Congress in enacting the MCA has revoked the privilege of the writ of habeas corpus where it would have issued under the common law in 1789, without providing an adequate alternative, the MCA is void unless Congress's action fits within the exception in the Suspension Clause:  Congress may suspend the writ "when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. CONST. art. I, § 9, cl. 2.  However, Congress has not invoked this power.

Suspension has been an exceedingly rare event in the history of the United States.  On only four occasions has Congress seen fit to suspend the writ.  These examples follow a clear pattern:  Each suspension has made specific reference to a state of "Rebellion" or "Invasion" and each suspension was limited to the duration of that necessity.  In 1863, recognizing "the present rebellion," Congress authorized President Lincoln during the Civil War "whenever, in his judgment, the public safety may require it, . . . to suspend the writ of habeas corpus."  Act of Mar. 3, 1863, ch. 81, § 1, 12 Stat. 755, 755.  As a result, no writ was to issue "so long as said suspension by the President shall remain in force, and said rebellion continue."  *Id.*  In the Ku Klux Klan Act of 1871, Congress agreed to authorize suspension whenever "the unlawful combinations named [in the

25

statute] shall be organized and armed, and so numerous and powerful as to be able, by violence, to either overthrow or set at defiance the constituted authorities of such State, and of the United States within such State," finding that these circumstances "shall be deemed a rebellion against the government of the United States." Act of Apr. 20, 1871, ch. 22, § 4, 17 Stat. 13, 14-15. Suspension was also authorized "when in cases of rebellion, insurrection, or invasion the public safety may require it" in two territories of the United States: the Philippines, Act of July 1, 1902, ch. 1369, § 5, 32 Stat. 691, 692, and Hawaii, Hawaiian Organic Act, ch. 339, § 67, 31 Stat. 141, 153 (1900); *see Duncan v. Kahanamoku*, 327 U.S. 304, 307-08 (1946). *See also* DUKER, *supra*, at 149, 178 n.190.

Because the MCA contains neither of these hallmarks of suspension, and because there is no indication that Congress sought to avail itself of the exception in the Suspension Clause, its attempt to revoke federal jurisdiction that the Supreme Court held to exist exceeds the powers of Congress. The MCA therefore has no effect on the jurisdiction of the federal courts to consider these petitions and their related appeals.

## II.

In *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), Judge Joyce Hens Green addressed eleven coordinated habeas cases involving 56 aliens being detained by the United States as "enemy combatants" at Guantanamo Bay, *id.* at 445. These detainees are citizens of friendly nations — Australia, Bahrain, Canada, Kuwait, Libya, Turkey, the United Kingdom, and Yemen — who were seized in Afghanistan, Bosnia and Herzegovina, The Gambia, Pakistan, Thailand, and Zambia. Each detainee maintains that he was wrongly classified as an "enemy combatant." Denying in part the government's motion to dismiss the petitions, the district court ruled:

26

> [T]he petitioners have stated valid claims under the
> Fifth Amendment to the United States Constitution
> and . . . the procedures implemented by the government
> to confirm that the petitioners are "enemy combatants"
> subject to indefinite detention violate the petitioners'
> rights to due process of law.

*Id.* at 445.  The district court further ruled that the Taliban but
not the al Qaeda detainees were entitled to the protections of the
Third and Fourth Geneva Conventions.  *Id.* at 478-80.

In *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005),
Judge Richard J. Leon considered the habeas petitions of five
Algerian-Bosnian citizens and one Algerian citizen with
permanent Bosnian residency.  They were arrested by Bosnian
police in 2001 on suspicion of plotting to attack the United
States and British embassies in Sarajevo.  After the Supreme
Court of the Federation of Bosnia and Herzegovina ordered the
six men to be  released in January 2002,[11] they were seized by
United States forces and transported to Guantanamo Bay.  The
*Khalid* decision also covers the separate case of a French citizen
seized in Pakistan and transported to Guantanamo Bay.
Rejecting the petitioners' claim that their detention is
unjustified, the district court ruled that "no viable legal theory
exists by which [the district court] could issue a writ of habeas
corpus under" the circumstances presented, *id.* at 314, noting the
President's powers under Article II, Congress's Authorization
for the Use of Military Force ("AUMF"), and the Order on
Detention (Nov. 13, 2001), *see id.* at 317-20.  The district court
granted the government's motion and dismissed the petitions.
*Id.* at 316.

---

[11]    *See* Supreme Court of the Federation of Bosnia and
Herzegovina, Sarajevo, Jan. 17, 2003, Ki-1001/01.

27

The fundamental question presented by a petition for a writ of habeas corpus is whether Executive detention is lawful. A far more difficult question is what serves to justify Executive detention under the law. At the margin, the precise constitutional bounds of Executive authority are unclear, *see Hamdan*, 126 S. Ct. at 2773-74; *id.* at 2786 (citing *Ex parte Quirin*, 317 U.S. 1, 28 (1942)), and the Executive detention at issue is the product of a unique situation in our history. Unlike the uniformed combat that is contemplated by the laws of war, *see generally* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS (2d ed. 1920), the Geneva Conventions, *e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, and the Constitution, *see* U.S. CONST. art. I, § 8, cl. 11, the United States confronts a stateless enemy in the war on terror that is difficult to identify and widely dispersed. *See Hamdi*, 519 U.S. at 519-20.

The parties recite in their several briefs the substantial competing interests of individual liberty and national security that are at stake, much as did the Supreme Court in *Hamdi*, 542 U.S. at 529-32 (plurality opinion); *see id.* at 544-45 (Souter, J., joined by Ginsburg, J., concurring in part, dissenting in part, and concurring in the judgment). In *Hamdi*, the plurality acknowledged that "core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Id.* at 531. At the same time, it acknowledged that for Hamdi "detention could last for the rest of his life." *Id.* at 520. Although Hamdi was a United States citizen, the premise underlying the conclusion that there is a role for the judiciary, *id.* at 532-33, was that "history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat," *id.* at 530. In short, the nature of the conflict makes true enemies of the United

28

States more troublesome. At the same time, the risk of wrongful detention of mere bystanders is acute, particularly where, as here, the Executive detains individuals without trial.

Parsing the role of the judiciary in this context is arduous. The power of the President is at its zenith, after all, when the President acts in the conduct of foreign affairs with the support of Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring). Even assuming the AUMF and the Order on Detention provide such support for the detentions at issue, still the President's powers are not unlimited in wartime. *See, e.g., Milligan*, 71 U.S. (4 Wall.) at 125. The Founders could have granted plenary power to the President to confront emergency situations, but they did not; they could have authorized the suspension of habeas corpus during any state of war, but they limited suspension to cases of "Rebellion or Invasion." U.S. CONST. art. I, § 9, cl. 2; *see* 2 STORY, *supra*, § 1342; *see also* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, *supra*, at 341 (proposal of Charles Pinckney). Even in 1627, at a time when "[a]ll justice still flowed from the king [and] the courts merely dispensed that justice," DUKER, *supra*, at 44, the idea that a court would remand a prisoner merely because the Crown so ordered ("*per speciale mandatum Domini Regis*") was deemed to be inconsistent with the notion of a government under law. *See Darnel's Case*, 3 Howell's St. Tr. 1, 59 (K.B. 1627); MEADOR, *supra*, at 13-19. While judgments of military necessity are entitled to deference by the courts and while temporary custody during wartime may be justified in order properly to process those who have been captured, the Executive has had ample opportunity during the past five years during which the detainees have been held at Guantanamo Bay to determine who is being held and for what reason. *See, e.g., Hamdan*, 126 S. Ct. at 2773; *cf. Hamdi*, 542 U.S. at 521.

29

Throughout history, courts reviewing the Executive detention of prisoners have engaged in searching factual review of the Executive's claims. In *Bollman*, the Supreme Court reviewed a petition of two alleged traitors accused of levying war against the United States. The petitioners were held in custody by the marshal but had not yet been charged. 8 U.S. (4 Cranch) at 75-76, 125. After the "testimony on which they were committed [was] fully examined and attentively considered," the Court ordered the prisoners released. *Id.* at 136-37. The 1759 English case of *Rex v. Schiever*, discussed *supra* Part I.C.1, also shows that habeas courts scrutinized the factual basis for the detention of even wartime prisoners. In *Schiever*, the court reviewed the prisoner's affidavit and took further testimony from a witness, who "sw[ore] that Schiever was forced against his inclination . . . to serve on board [the French privateer]." 2 Burr. at 766, 97 Eng. Rep. at 551. Nonetheless, to the court it was clear that Schiever had, in fact, fought against England. As such, "the Court thought this man, upon his own shewing, clearly a prisoner of war and lawfully detained as such. Therefore they Denied the motion." *Id.*, 97 Eng. Rep. at 552 (footnote omitted). Similar themes and factual inquiry appear in *Three Spanish Sailors*, 2 Black. W. 1324, 96 Eng. Rep. 775, in which three alien petitioners submitted affidavits during wartime but failed to convince the court that they were not enemies of the Crown, and *Goldswain's Case*, 5 Black. W. 1207, 96 Eng. Rep. 711 (C.P. 1778), in which a wrongly impressed Englishman was released from service during wartime. *See also Beeching*, 4 B. & C. 137, 107 Eng. Rep. 1010.

In the early history of the United States, two cases further suggest that factual review accompanied even writs during wartime. In *United States v. Williams* (C.C.D. Va. Dec. 4, 1813), a previously unreported case researched for a recent essay in *The Green Bag*, Chief Justice John Marshall, riding

30

circuit, released an enemy alien from detention by civil authorities. The Chief Justice concluded that "the regulations made by the President of the United States respecting alien enemies [did] not authorize the confinement of the petitioner in this case." Neuman & Hobson, *supra*, at 42 (quoting the circuit court's order book). A majority of the Supreme Court of Pennsylvania, in *Lockington's Case*, 1 Brightly's (N.P.) 269 (Pa. 1813), agreed that alien enemies were entitled to a judgment on the merits as to whether their detention was justified,[12] and thereafter remanded the prisoners. *Id.* at 283-84 (Tilghman, C.J.); *id.* at 285, 293 (Yeates, J.).

The government maintains that a series of World War II-era cases undercuts the proposition that habeas review of uncharged detainees requires a factual assessment. It cites several cases in which courts have refused to engage in factual review of the findings of military tribunals imposing sentences under the laws of war. *See, e.g.*, *Eisentrager*, 339 U.S. 763; *In re Yamashita*, 327 U.S. 1 (1945); *Quirin*, 317 U.S. at 25. There is good reason to treat differently a petition by an uncharged detainee — who could be held indefinitely without even the prospect of a trial or meaningful process — from that of a convicted war criminal. *See Rasul*, 542 U.S. at 476; *Omar v. Harvey*, No. 06-5126, slip op. at 13 (D.C. Cir. Feb. 9, 2007); *see also supra* note 9. For example, in *Yamashita*, the prisoner petitioned for a writ of habeas corpus only after a trial before a military tribunal where his six attorneys defended against 286 government witnesses. 327 U.S. at 5. *Quirin* involved a military commission, *see* 317 U.S. at 18-19, where the government presented "overwhelming" proof that included confessions from the German saboteurs. PIERCE O'DONNELL, IN TIME OF WAR 152-53, 165-66, 189

---

[12]    Prior to *Ableman v. Booth*, 62 U.S. (21 How.) 506 (1859), and *Tarble's Case*, 80 U.S. (13 Wall.) 397, 411-12 (1872), state courts regularly issued writs of habeas corpus as to federal prisoners.

31

(2005).  In *Eisentrager*, 339 U.S. at 766, the military tribunal conducted a trial lasting months.  By contrast, the detainees have been charged with no crimes, nor are charges pending.  The robustness of the review they have received to date differs by orders of magnitude from that of the military tribunal cases.[13]

---

[13]    There is also good reason to distinguish between these detainees' cases and parallel cases where detainees have been accorded prisoner-of-war status and the benefits of Army Regulation 190-8, which implements the Third Geneva Convention.  These provisions contemplate the end of hostilities and prisoner exchanges, *id.* §§ 3-11, 3-13, and provide for more extensive process for determining the status of prisoners, *id.* § 1-6.  The regulations further specify that:

> Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.  The record of every Tribunal proceeding resulting in a determination denying [Enemy Prisoner of War] status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

*Id.* § 1-6g.  In *Hamdi*, the Supreme Court recognized that it was conceivable that procedures similar to Army Regulation 190-8 may suffice to provide due process to a citizen-detainee.  542 U.S. at 538 (plurality opinion); *id.* at 550-51 (Souter, J., with whom Ginsburg, J., joins, concurring in part, dissenting in part, and concurring in the judgment).  Even assuming that according Guantanamo detainees rights under Army Regulation 190-8 would provide adequate and independent factual review of their claims sufficient to satisfy the dictates of habeas corpus, as well as any treaty obligations that the detainees are able to enforce, the Executive has declined to accord such detainees prisoner-of-war status, *see, e.g.*, The President's News Conference With Chairman Hamid Karzai of the Afghan Interim

32

The Supreme Court in *Rasul* did not address "whether and what further proceedings may become necessary after respondents make their responses to the merits of petitioners' claims," 542 U.S. at 485. The detainees cannot rest on due process under the Fifth Amendment. Although the district court in *Guantanamo Detainee Cases*, 355 F. Supp. 2d at 454, made a contrary ruling, the Supreme Court in *Eisentrager* held that the Constitution does not afford rights to aliens in this context. 339 U.S. at 770; *accord Verdugo-Urquidez*, 494 U.S. at 269. Although in *Rasul* the Court cast doubt on the continuing vitality of *Eisentrager*, 542 U.S. at 475-79, absent an explicit statement by the Court that it intended to overrule *Eisentrager*'s constitutional holding, that holding is binding on this court. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); Op. at 21. Rather, the process that is due inheres in the nature of the writ and the inquiry it entails. The Court in *Rasul* held that federal court jurisdiction under 28 U.S.C. § 2241 is permitted for habeas petitions filed by detainees at Guantanamo, 542 U.S. at 485; *id.* at 488 (Kennedy, J., concurring in the judgment), and this result is undisturbed because the MCA is void. So long as the Executive can convince an independent Article III habeas judge that it has not acted unlawfully, it may continue to detain those alien enemy combatants who pose a continuing threat during the active engagement of the United States in the war on terror. *See id.* at 488 (Kennedy, J., concurring in the judgment); *cf. Hamdi*, 542 U.S. at 518-19. But it must make that showing and the detainees must be allowed a meaningful opportunity to respond. *See* MEADOR, *supra*, at 18; *see also Hamdi*, 542 U.S. at 525-26.

Therefore, I would hold that on remand the district courts shall follow the return and traverse procedures of 28 U.S.C. § 2241 *et seq.* In particular, upon application for a writ of habeas

---

Authority, 1 PUB. PAPERS 121, 123 (Jan. 28, 2002).

33

corpus, 28 U.S.C. § 2242, the district court shall issue an order to show cause, whereupon "[t]he person to whom the writ is or order is directed shall make a return certifying the true cause of the detention," *id.* § 2243. So long as the government "puts forth credible evidence that the [detainee] meets the enemy-combatant criteria," *Hamdi*, 542 U.S. at 533, the district court must accept the return as true "if not traversed" by the person detained. *Id.* § 2248. The district court may take evidence "orally or by deposition, or, in the discretion of the judge, by affidavit." *Id.* § 2246. The district court may conduct discovery. *See Harris*, 394 U.S. at 298-99; *cf.* Rules Governing Section 2254 Cases, R. 6-8; Rules Governing Section 2255 Cases, R. 6-8. Thereafter, "[t]he [district] court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."[14] District courts are well able to adjust these proceedings in light of the government's significant interests in guarding national security, as suggested in *Guantanamo Detainee Cases*, 355 F. Supp. 2d at 467, by use of protective orders and ex parte and in camera review, *id.* at 471. The procedural mechanisms employed in that case, *see, e.g., id.* at 452 & n.12, should be employed again, as district courts must assure the basic fairness of the habeas proceedings, *see generally id.* at 468-78.

---

[14] Because the Suspension Clause question must be decided by the Supreme Court in the detainees' favor in order for the district court proceedings to occur, I leave for another day questions relating to the evolving and unlimited definition of "enemy combatant," *see Guantanamo Detainee Cases*, 355 F. Supp. 2d at 474-75, a detainee's inability to rebut evidence withheld on national security grounds, *see id.* at 468-72, as well as the detainees' claims under other statutes, international conventions, and treaties, and whether challenges to the conditions of confinement are cognizable in habeas. *Compare Khalid*, 355 F. Supp. 2d at 324-25, *with Miller v. Overholser*, 206 F.2d 415, 419-21 (D.C. Cir. 1953). Congressional action may also clarify matters. *See, e.g.*, S. 185, S. 576, 110th Cong. (2007).

34

   Accordingly, I respectfully dissent from the judgment vacating the district courts' decisions and dismissing these appeals for lack of jurisdiction.